## Docket No. 24-3518

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————◆———————

STUART REGES,

*Plaintiff-Appellant,*

v.

ANA MARI CAUCE, in her official capacity as President of the University of
Washington, MAGDALENA BALAZINSKA, in her official and individual capacities as
Director of the Paul G. Allen School of Computer Science & Engineering, DAN
GROSSMAN, in his official and individual capacities as Vice Director of the Paul G. Allen
School of Computer Science & Engineering and NANCY ALLBRITTON, in her official
and individual capacities as Dean of the College of Engineering,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for Western the District of Washington,*
*No. 2:22-cv-00964-JHC · Honorable John H. Chun*

## APPELLANT'S OPENING BRIEF

JOSHUA BLEISCH
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
700 Pennsylvania Avenue, SE, Suite 340
Washington, District of Columbia 20003
(215) 717-3473 Telephone
josh.bleisch@thefire.org

JAMES M. DIAZ
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, Pennsylvania 19106
(215) 717-3473 Telephone
jay.diaz@thefire.org

*Attorneys for Appellant Stuart Reges*



# TABLE OF CONTENTS

**Page:**

TABLE OF CONTENTS ...........................................................................ii

TABLE OF AUTHORITIES ......................................................................v

STATEMENT REGARDING ORAL ARGUMENT ...................................1

JURISDICTIONAL STATEMENT .............................................................2

ISSUES PRESENTED ...............................................................................3

SUPPLEMENTAL AUTHORITIES............................................................3

INTRODUCTION ....................................................................................4

STATEMENT OF THE CASE ...................................................................9

    A.    Professor Reges objected to the Allen School urging professors to place the University's land acknowledgment statement in course syllabi as a teaching "best practice."...........................................................9

    B.    The Allen School punished and censored Professor Reges because of his land acknowledgment critique...............................................................................11

    C.    Professor Reges said he would include his one-sentence dissent in his spring quarter syllabi, and the Allen School commenced a disciplinary process. ..................................................................15

    D.    The district court granted the University's motion for summary judgment on Professor Reges's retaliation and viewpoint discrimination claims and dismissed his overbreadth and vagueness claims.....................................................................19

SUMMARY OF THE ARGUMENT .......................................................21

STANDARD OF REVIEW....................................................................24

ARGUMENT ........................................................................................26

    I.    The University Punished Professor Reges for Academic Expression Protected by the First Amendment. .........................................................26

    II.   The District Court's *Pickering* Analysis Ignored the University's Educational Mission Causing It to Misunderstand and Misbalance Both Parties' Interests. ..............................................................29

        A.    The district court's *Pickering* analysis ignored the University's core mission to foster pursuit of truth and the exchange of ideas, including those that may offend........................31

        B.    Professor Reges's interest in speaking on matters of public concern is strong.............................38

        C.    Complaints from students and staff offended by an opinion do not outweigh Professor Reges's interest in speaking on a matter of public concern...............................................40

    III.  The District Court Erred by Holding the University's EO-31 Policy Not Unconstitutionally Overbroad and Vague. ........................................49

        A.    EO-31 is unconstitutionally overbroad because it covers a significant amount of protected speech related to scholarship or teaching. ................................................50

        B.    EO-31 is void for vagueness because its operative terms are subjective, undefined, and open-ended. ..........................................56

C.     The district court's impermissible and atextual "limiting construction" fails to correct EO-31's overbreadth and vagueness. ..............59

CONCLUSION ................................................................62

STATEMENT OF RELATED CASES ...................................64

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT....65

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Adamian v. Jacobsen,*
523 F.2d 929 (9th Cir. 1975) ........................................................ 22, 34

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ................................................................. 52

*Bachellar v. Maryland,*
397 U.S. 564 (1970) ................................................................. 23

*Bauer v. Sampson,*
261 F.3d 775 (9th Cir. 2001) ................................................ 35, 36, 37

*Blum v. Schlegel,*
18 F.3d 1005 (2d Cir. 1994) ................................................... 32, 36

*Cheatham v. City of Phoenix,*
699 F. App'x 647 (9th Cir. 2017) ................................................. 52

*Cohen v. California,*
403 U.S. 15 (1971) .................................................................. 58

*Comite de Jornaleros v. City of Redondo Beach,*
657 F.3d 936 (9th Cir. 2011) ..................................................... 50

*Corlett v. Oakland Univ. Bd. of Trustees,*
958 F. Supp. 2d 795 (E.D. Mich. 2013) ...................................... 60, 61

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) ................................................ 6, 24, 50, 51, 52, 62

*DeJohn v. Temple Univ.,*
537 F.3d 301 (3d Cir. 2008) .............................................. 54, 55, 58, 62

*Demers v. Austin,*
746 F.3d 402 (9th Cir. 2014) ..... 23, 26, 27, 28, 29, 30, 32, 33, 38, 39, 51

*Dodge v. Evergreen Sch. Dist. #114,*
56 F.4th 767 (9th Cir. 2022) ...................................... 35, 39, 40, 42, 43

*Duke v. Boyd,*
942 P.2d 351 (Wash. 1997) (en banc) .......................................... 60, 61

*Edge v. City of Everett,*
929 F.3d 657 (9th Cir. 2019) ..................................................... 56

*Flores v. Bennett,*
   No. 22-16762, 2023 WL 4946605
   (9th Cir. Aug. 3, 2023) .................................................. 53, 54, 57, 58, 62

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ............................................................................ 27

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................................. 56, 57, 58

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) ....................................................................... 22, 30

*Hernandez v. City of Phoenix,*
   43 F.4th 966 (9th Cir. 2022) ........................................ 22, 29, 31, 34, 38

*Hill v. Colorado,*
   530 U.S. 703 (2000) ............................................................................ 56

*Hodge v. Antelope Valley Comm. Coll. Dist.,*
   2014 WL 12776507 (C.D. Cal. Feb. 14, 2014) ..................................... 45

*Hufford v. McEnaney,*
   249 F.3d 1142 (9th Cir. 2011) ............................................................ 35

*Hulen v. Yates,*
   322 F.3d 1229 (10th Cir. 2003) ................................................ 21, 30, 32

*Hustler Magazine, Inc. v. Falwell,*
   485 U.S. 46 (1988) ............................................................................. 26

*Kev, Inc. v. Kitsap County,*
   793 F.2d 1053 (9th Cir. 1986) ............................................................ 56

*Keyishian v. Bd. of Regents of the Univ. of State of N.Y.,*
   385 U.S. 589 (1967) ........................................................... 6, 21, 26, 31

*L.F. v. Lake Wash. Sch. Dist. #414,*
   947 F.3d 621 (9th Cir. 2020) ......................................................... 24, 25

*Lane v. Franks,*
   573 U.S. 228 (2014) ............................................................................ 39

*Matal v. Tam,*
   582 U.S. 218 (2017) ..................................................................... 47, 54

*McCauley v. Univ. of the V.I.,*
   618 F.3d 232 (3d Cir. 2010) ............................................... 54, 55, 58, 62

*McIntyre v. Ohio Elections Comm'n,*
  514 U.S. 334 (1995) ................................................................54

*Meinecke v. City of Seattle,*
  99 F.4th 514 (9th Cir. 2024) ........................................... 23, 48

*Meriwether v. Hartop,*
  922 F.3d 492 (6th Cir. 2021) ........................... 28, 30, 36, 38, 39, 40, 46

*Moody v. NetChoice, LLC,*
  144 S.Ct. 2383 (2024) ........................................... 50, 52, 61

*Pickering v. Board of Education,*
  391 U.S. 563 (1968) ................................................... 22, 29

*Rankin v. McPherson,*
  483 U.S. 378 (1987) ............................................... 22, 34, 35

*Reno v. ACLU,*
  521 U.S. 844 (1997) ......................................................... 7

*Riley's Am. Heritage Farms v. Elsasser,*
  32 F.4th 707 (9th Cir. 2022) .............................................. 25

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,*
  605 F.3d 703 (9th Cir. 2010) ...................................... 31, 32, 35, 52, 62

*Rosenbaum v. City and Cnty. of San Francisco,*
  484 F.3d 1142 (9th Cir. 2007) ........................................... 47

*Skilstaf, Inc. v. CVS Caremark Corp.,*
  669 F.3d 1005 (9th Cir. 2012) ........................................... 25

*Smith v. Goguen,*
  415 U.S. 566 (1974) ................................................... 56, 58

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ..................................................... 38

*Sweezy v. New Hampshire,*
  354 U.S. 234 (1957) .............................................. 6, 22, 31

*Terminiello v. City of Chicago,*
  337 U.S. 1 (1949) ....................................................... 30

*Thunder Studios, Inc. v. Kazal,*
  13 F.4th 736 (9th Cir. 2021) ............................................. 25

*Tinker v. Des Moines Indep. Sch. Dist.*,
   393 U.S. 503 (1969) ................................................................. 22

*Tucson v. City of Seattle*,
   91 F.4th 1318 (9th Cir. 2024) ...................................... 51, 61

*United States v. Hansen*,
   599 U.S. 762 (2023) ...................................... 50, 51, 52, 61

*United States v. Rundo*,
   990 F.3d 709 (9th Cir. 2021) ............................................ 47

*United States v. Stevens*,
   559 U.S. 460 (2010) ...................................... 7, 50, 51, 59, 60

*Vasquez v. Cnty. of Los Angeles*,
   349 F.3d 634 (9th Cir. 2003) ............................................ 51

*Watson v. City of Memphis*,
   373 U.S. 526 (1963) ......................................................... 47

## Other Authorities

Title VI, IX, 42 U.S.C. § 2000d et seq. ................................... 51

Title IX, 20 U.S.C. § 1681 ....................................................... 51

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Plaintiff-Appellant Professor Stuart Reges respectfully requests that the Court schedule oral argument on his appeal. This appeal raises important questions about the extent of First Amendment protection public university faculty receive when speaking on matters of public concern. It also raises important First and Fourteenth Amendment questions about the extent to which a public university employer may constitutionally maintain a policy prohibiting expression that it deems "unacceptable or inappropriate," regardless of whether it constitutes unlawful harassment. Professor Reges believes oral argument would help the Court decide these important questions.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because Professor Reges's claims arise under the First and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over this case under 28 U.S.C. § 1291 because the district court's May 3, 2024, order was a final judgment denying Defendants-Appellees' motion to dismiss Professor Reges's retaliation and viewpoint discrimination claims; granting Defendant-Appellee's motion to dismiss Reges's facial overbreadth and vagueness claims; denying Reges's motion for summary judgement on all claims; and granting Defendant-Appellee's motion for summary judgment as to Reges's retaliation and viewpoint discrimination claims. Professor Reges timely filed a notice of appeal on May 30, 2024.

2

## ISSUES PRESENTED

1.  Whether the district court erred in failing to consider a public university's unique mission, and public professors' unique academic pursuit, in holding that the university's interest in mitigating subjective offense of students and staff outweighed a professor's interest in expressing dissent on a matter of public concern?

2.  Whether the district court erred in holding the university's "antiharassment" policy prohibiting "unacceptable or inappropriate" expression, "regardless of whether" it constitutes unlawful harassment, avoids unconstitutional overbreadth and vagueness through a limiting construction that both conflicts with the policy's express terms and fails to remedy the constitutional infirmities?

## SUPPLEMENTAL AUTHORITIES

Pursuant to Circuit Rule 28-2.7, an addendum containing the First Amendment to the United States Constitution, University of Washington Executive Order 31, and Faculty Code Section 25-71 are set forth in an addendum filed with this brief.

3

## INTRODUCTION

After the University of Washington ("the University") encouraged its professors to take a stance on a controversial matter of public concern, Professor Reges made a grave mistake: in the eyes of the University, he took the wrong stance. The First Amendment protects Professor Reges' expression, ensuring public universities remain guardians of free speech and reasoned dissent, not mouthpieces for the government. But the University censored and punished Professor Reges for exercising his right. Why? Because a few students and administrators felt offended by his viewpoint and complained. But the First Amendment does not wither at the first sign of disagreement. Nowhere is that principle truer or more critical than on a public university campus.

Several years ago, the University adopted a land acknowledgement statement expressing its view that the University sits on "occupied" tribal land. The University then went further by encouraging its professors to include the statement at the top of their course syllabi. Professor Reges, taking issue with the University's underlying premise and seeking to spark what he believes to be an important debate,

4

included a parody statement at the top of his syllabus.[1] A handful of Professor Reges's nearly 500 students complained about his viewpoint to administrators. There were no in-class disruptions or walk-outs or protests. University administrators responded by dubbing Professor Reges's statement "offensive" and "dehumanizing," deleting his syllabus from school servers and uploading a censored version, encouraging students to file complaints against him, opening a competing version of his course to siphon away students, and launching a year-long disciplinary process against him.

The First Amendment protects Professor Reges's statement, which the district court correctly held was speech related to teaching on a matter of public concern. Yet the district court ignored decades of First Amendment precedent to approve the University's conduct by treating Professor Reges's free speech rights no differently than those of any other government employee. This error cannot be reconciled with this Court's directive that, in public-employee speech retaliation cases, courts should

---

[1] Professor Reges's full statement read: "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington." 2-ER-321; 2-ER-266.

consider an employer's mission—which, for public universities, is "to provide that atmosphere which is most conducive to speculation, experiment and creation," *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J. concurring), and to serve as the "marketplace of ideas." *Keyishian v. Bd. of Regents of the Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

The district court nevertheless ratified the University's betrayal of academic freedom, holding its interest in avoiding offended students and staff outweighed Professor Reges's interest in challenging the University's position on a public issue related to teaching. It does not. Allowing upset listeners to silence a speaker has a name: the heckler's veto. It is poison to a free society and antithetical to academic freedom.

The district court also erred in dismissing Professor Reges's facial challenges to the "antiharassment" policy the University used to sanction him. That policy is unconstitutional under *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), because it reaches well beyond prohibiting actual harassment, and instead bans all "unacceptable or inappropriate" expressive conduct, "regardless of whether" it amounts to unlawful harassment. That broad scope means the policy by its plain terms reaches

6

a substantial amount of protected speech relative to its lawful application to unlawful harassment as defined by the Supreme Court. Prohibiting "unacceptable" and "inappropriate" conduct is also unlawfully vague by failing to provide meaningful guidance for students and professors to conform their conduct, or guardrails to prevent arbitrary enforcement.

The district court erred in not recognizing these infirmities, and in attempting to graft a "limiting construction" onto the policy to save it. But its attempt to confine the policy to conduct that "resembles" unlawful harassment impermissibly contravenes the plain text of the policy—which expressly disclaims such limits—and thus violates the rule that courts may adopt limiting constructions only if the regulation "is 'readily susceptible' to such a construction." *United States v. Stevens*, 559 U.S. 460, 481 (2010) (quoting *Reno v. ACLU*, 521 U.S. 844, 884 (1997)). Worse still, reading "resembles" into the policy simply swaps the University's vague and overbroad standard for another.

Academic freedom is a bulwark against the enforced conformity that destroys a democratic society. If the First Amendment does not bar censorship and punishment of Professor Reges's speech related to teaching on public issues, university classrooms in this Circuit will cease

7

to be the marketplace of ideas required to sustain a free nation. This Court should reverse.

## STATEMENT OF THE CASE

Plaintiff-Appellant Stuart Reges is a teaching professor at the University of Washington's Paul G. Allen School of Computer Science and Engineering, where he has taught introductory computer science for twenty years. 2-ER-263. He is the University's only active computer-science professor to have won a university-wide teaching award and is widely recognized as a leader in introductory computer-science pedagogy. 2-ER-263, 265. His disagreement with his University's views on the social issue of land acknowledgement statements lies at the heart of this case.

### A. Professor Reges objected to the Allen School urging professors to place the University's land acknowledgment statement in course syllabi as a teaching "best practice."

The University of Washington has its main campus in Seattle, Washington, a state with twenty-nine federally recognized tribes, with which the University works through its tribal liaison. 2-ER-287. The University's Office of Minority Affairs & Diversity takes the position that the campus "sits on occupied [tribal] land." 2-ER-309. So, in 2015, the University adopted a land acknowledgment statement: "The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands of the Suquamish, Tulalip, and Muckleshoot nations." 2-ER-308.

9

Four years later, the University's Allen School urged computer-science faculty to include the land acknowledgment statement in their syllabi as a "best practice[] for inclusive teaching." 2-ER-312. Professor Reges and many others believe land acknowledgments are political statements and empty, performative political gestures. 2-ER-267. He also believes the University's best practice recommendation is inherently political because it expresses the viewpoint that land acknowledgments are appropriate to include in syllabi. 2-ER-266.

While Professor Reges believes political statements do not belong in course syllabi, he felt the University's encouragement to include a land acknowledgment opened the door to an important debate. 2-ER-266. In late 2021, he and other Allen School faculty and administrators discussed land acknowledgment statements and the related public discourse. 2-ER-103; 3-ER-353. The University admits there is disagreement even among indigenous scholars and advocates about the value and meaning of land acknowledgment statements. 2-ER-289–90; 3-ER-476. Further, Professor Reges believes the University's land acknowledgment is factually incorrect; his understanding is that most of the land currently occupied

by the University was densely forested before it was cleared to make way for the campus. 2-ER-266.

To critique the University's land acknowledgment and "best practices" recommendation, Professor Reges included a dissenting statement in his syllabus—using parody to ridicule the University's land acknowledgment and recommendation. 2-ER-266. He wrote: "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington." 2-ER-266; 2-ER-321.

Professor Reges distributed his syllabus on the first day of his introductory computer-science course in the winter quarter of 2022. 2-ER-266. His one-sentence critique did not trigger any in-class reaction, much less substantial disruption. It did, however, as Professor Reges intended, spur discussion outside the classroom about land acknowledgment statements.

## B. The Allen School punished and censored Professor Reges because of his land acknowledgment critique.

An anonymous Reddit user posted Professor Reges's dissenting statement to an unofficial social media discussion forum for the

University, and Defendant-Appellee Magdalena Balazinska, Director of the Allen School, became aware of it when a colleague forwarded it to her. 3-ER-354. That same day, January 4, 2022, she and Defendant-Appellee Vice Director Grossman approved—and the Allen School posted from its official Twitter account—a public tweet condemning Professor Reges's statement: "We became aware of this offensive statement a few hours ago, were horrified by it, and are working on getting it removed from the syllabus." 3-ER-440; 3-ER-430–31.

Director Balazinska immediately undertook efforts to censor and punish Professor Reges. She directed him to remove the dissenting sentence from the online course portal version of his syllabus. 3-ER-327–28. When he declined, Balazinska ordered University staff to remove his syllabus from the online portal and replace it with a version censoring his parody statement. 3-ER-427; 2-ER-104. Balazinska took these actions with the express approval of the Dean of Engineering, Defendant-Appellee Nancy Allbritton. 3-ER-370.

Director Balazinska then conferred with Vice Director Grossman and took what she admits was the "unprecedented" step of emailing Professor Reges's students to apologize and to encourage them to file

complaints against him. 3-ER-436; 3-ER-450. She also privately wrote to colleagues, including Grossman, that receiving additional complaints from students would help the University take further action against Professor Reges. 3-ER-435. In a campus community of more than 50,000 students,[2] plus faculty and staff, and despite the University's efforts to *encourage* complaints, 3-ER-450, administrators received only thirteen written complaints about Professor Reges between January 3, 2022 and March 28, 2022. 2-ER-122–135 (collecting nine complaints); 3-ER-562 (referencing February complaints).

Director Balazinska contacted the Allen School's human resources director about escalating the University's response to Professor Reges's parody into a formal disciplinary process. 3-ER-411–12. The HR director advised the next step would come via Faculty Code Section 25-71, which provides the process for disciplining faculty for violating University

---

[2] Jackson Holtz, *UW's 2023 historic incoming class: one of the most diverse and at UW Bothell and UW Tacoma, the largest*, UW News (October 19, 2023), https://www.washington.edu/news/2023/10/19/uws-2023-historic-incoming-class-one-of-the-most-diverse-and-at-uw-bothell-and-uw-tacoma-the-largest/.

policy. 3-ER-412.[3] Section 25-71 charges can result in suspension, salary reduction, and termination. 3-ER-416–425.

Within a week of learning of Professor Reges's syllabus statement, Director Balazinska and Vice Director Grossman created a competing version of Professor Reges's introductory computer-science course. 3-ER-391–92; 3-ER-486, 499. This was the first time during Reges's 20-year employment at the University that the Allen School had offered more than one introductory computer-science course in a quarter. 2-ER-209; 2-ER-269.70% of Professor Reges's nearly 500 students chose to remain his class. 2-ER-269; 3-ER-488. And the University never attempted to determine the reason some students switched. 3-ER-489. [Schnapper 30b6 dep. Tr.] But students who departed did so for a myriad of reasons, such as a belief the new instructor might allow homework resubmissions (i.e., submitting corrected work for a higher grade) and would have a more lenient grading policy than Professor Reges. 3-ER-466; 3-ER-495–98; 3-ER-504–05.

---

[3] Despite this advice from HR, Director Balazinska did not pursue that disciplinary process until after Professor Reges expressed that he would include his statement in his syllabus the next quarter as well, which precipitated three of the written complaints. *See infra* Section C.

**C.** **Professor Reges said he would include his one-sentence dissent in his spring quarter syllabi, and the Allen School commenced a disciplinary process.**

Professor Reges was not deterred by the University's censorship. One month before the spring quarter, he sent an email confirming he would again include his land acknowledgment critique in his syllabus. 3-ER-507. In response, the administrators received two emailed staff complaints over the following week. 3-ER-567–68; 3-ER-510. They received another from a Native American faculty group. 3-ER-564.

Each complaint related directly to offense taken at Professor Reges's viewpoint. For instance, an Allen School diversity recruiter speculated they would not succeed in recruiting a diverse student body because, in their view, the Allen School effectively endorsed Professor Reges's statement by continuing to employ him. 3-ER-568. Members of the student employee union complained that teaching assistants would not feel comfortable discussing topics relating to diversity, equity, and inclusion with Professor Reges. 3-ER-510.

After receiving the recruiter and student employee union emails, Director Balazinska notified Professor Reges on March 2, 2022, she was initiating the Section 25-71 disciplinary process against him. 3-ER-514–

15

16. As the first step, she met with him and, citing the complaints, issued a written demand that he stop including his dissenting statement in his syllabi. 3-ER-526–27. When Professor Reges declined, Director Balazinska elevated the matter to Dean Allbritton. 2-ER-270–71. On April 21, 2022, Dean Allbritton notified Professor Reges she was convening a "special investigating committee" as allowed by Section 25-71 for matters of sufficient seriousness as to warrant potential suspension for more than one quarter, salary reduction, or termination, to investigate him under the University's antiharassment policy, Executive Order 31. 3-ER-558. The committee submitted an oral report to Dean Allbritton in October 2022, but Allbritton did not close the investigation for an additional eight months, by letter of June 13, 2023. 3-ER-572; 3-ER-574–79.

Facing suspension or termination under Section 25-71, Professor Reges commenced this litigation two days after Allbritton convened the special investigating committee, on July 13, 2022. Compl. ECF No. 1. He alleged University administrators discriminated against him based on his viewpoint and retaliated against him for his protected speech when they censored his syllabus, created a shadow course, and launched the

disciplinary investigation. He sought, among other things, an injunction preventing the University from punishing him any further for his statement.

From April 2022 to June 2023, Professor Reges labored under threat of termination, suspension, or reduced pay. Though Dean Allbritton did not fire, suspend, or cut Professor Reges's pay, her letter informed him that, in light of the investigation's findings, the University would discipline him for violating Executive Order 31 ("EO-31" or "the policy") if administrators received new complaints about his statement in future syllabi. 3-ER-578–79.[4]

EO-31 prohibits "discrimination," "harassment," or "retaliation" by any University member. 3-ER-518. It also prohibits conduct deemed "unacceptable or inappropriate, *regardless* of whether" the conduct meets the legal definitions of discrimination, harassment, or retaliation. *Id.* (emphasis added). The policy does not define or explain what it means to be "unacceptable or inappropriate." *Id.* And the University has not

---

[4] Professor Reges amended his complaint on August 2, 2023, after Allbritton's letter revealed Defendants-Appellees also withheld a merit pay increase from Reges during their disciplinary investigation. Doc. No. 46.

provided faculty or administrators guidance on what those terms mean. Am. Compl. Dkt. #46 ¶ 114.

Dean Albritton justified the University's admonition and threat to enforce EO-31 by claiming complaints from two students, the Allen School diversity recruiter, and the student employee union representative constituted "disruption." Her letter cited two indigenous students who allegedly complained of "emotional distress" because of Professor Reges's dissenting statement in his syllabus. 3-ER-575. But one of those students never took a class from Professor Reges, and their complaint to Director Balazinska related not only to Professor Reges's statement, but also the Allen School's testing procedures, lack of tutoring at a convenient time, 2-ER-61, and feeling "used" by Director Balazinska after speaking with her as part of the Reges investigation. 2-ER-59–60.

Dean Allbritton's letter also alleged a second indigenous student "drop[ped] out" from the University because of Professor Reges's statement. 3-ER-575. But the record shows (and discovery revealed) no evidence this student existed.[5]

---

[5] The indigenous faculty group orally relayed a story about this student to the special investigating committee, who relayed it orally to

**D.    The district court granted the University's motion for summary judgment on Professor Reges's retaliation and viewpoint discrimination claims and dismissed his overbreadth and vagueness claims.**

The district court decided the Defendant-Appellee's motion to dismiss and the parties' cross-motions for summary judgment together because the parties had completed discovery before the court ruled on the dismissal motion. 1-ER-11 The district court correctly held Professor Reges's dissenting land acknowledgment statement is speech related to scholarship or teaching on a matter of public concern. 1-ER-20. The court, pointing to the few complaints submitted by offended students and staff members, nevertheless held the University's interest in preventing the asserted "disruption" to its operations outweighed Professor Reges's First Amendment rights. 1-ER-48. The court thus denied Professor Reges's motion for summary judgment on his First Amendment retaliation and viewpoint discrimination claims and granted the university's motion for summary judgment on those claims. *Id.*

---

the Dean. 2-ER-57–58; 3-ER-572; 3-ER-574–75. But this game-of-telephone story was not true. The district court repeated the error by discussing a student who "dropp[ed] out," 1-ER-47, but that never happened, and Defendants-Appellees did not dispute that fact.

19

The district court also granted the University's motion to dismiss Professor Reges's claims that EO-31 is unconstitutionally overbroad and vague on its face. To do so, it limited EO-31 to proscribing speech "resembling" discrimination, harassment, or retaliation, despite the policy's prohibition on "unacceptable or inappropriate conduct, *regardless* of whether" the conduct could be unlawful discrimination, harassment, or retaliation. 1-ER-31, 34 (emphasis added). This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's award of summary judgment to the University on his retaliation and viewpoint discrimination claims, and the denial of his motion for summary judgment on all claims, as well as the dismissal of Professor Reges's vagueness and overbreadth claims.

Academic freedom is a "special concern" of the First Amendment. *Keyishian*, 385 U.S. at 603. That is because public universities and college classrooms are "peculiarly the marketplace of ideas." *Id*. Yet the University of Washington and the district court elevated the offense, discomfort, and concern asserted by a small number of complaining students and staff above Professor Reges's First Amendment interest in teaching his students and participating in public discussion.

Conflict is "not unknown" on a university campus, *Hulen v. Yates*, 322 F.3d 1229, 1239 (10th Cir. 2003), and because of their knowledge-creating purpose, public universities are different from other public workplaces. That difference is why, generally, this Court has held "the desire to maintain a sedate academic environment, 'to avoid the discomfort and unpleasantness that always accompany an unpopular

viewpoint' is not an interest sufficiently compelling . . . to justify limitations on a teacher's freedom to express." *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975) (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 509 (1969)). So when balancing a professor's interest in exercising their First Amendment rights in the classroom against a university's interests under *Pickering v. Board of Education*, 391 U.S. 563 (1968), courts must do so in light of the university's unique context. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (requiring *Pickering* balancing account for the "context in which the dispute arose"); *Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022) (citing *Pickering*, 391 U.S. at 572–73).

The highest purpose of any university is encouraging inquiry, study, and evaluation among faculty and students. *See Sweezy*, 354 U.S. at 263 (Frankfurter, J. concurring). Indeed, the Supreme Court has "long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Courts must consider universities' need to further that mission and their First

22

Amendment-related purpose alongside the university's interest in avoiding actual disruption. The district court did neither here, and that was error.

Even though the district court acknowledged Professor Reges's dissenting statement related to teaching under *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), it allowed the offense that some took at his expression to outweigh the value of his speech. Yet silencing speech the moment someone feels uncomfortable or offended is not how the First Amendment works, particularly at public universities.

Properly balanced, Professor Reges's First Amendment interest in speaking on a matter of public concern outweighs the University's interest in preventing offense or speculative future disruption to recruitment or classroom activities. The University's reliance on thirteen emails from offended listeners to silence a speaker has a name: a heckler's veto. And it has no place in our constitutional system.  It is "'firmly settled' that the 'public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Meinecke v. City of Seattle*, 99 F.4th 514, 522 (9th Cir. 2024) (quoting *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970)).

The district court also erred in dismissing Professor Reges's facial overbreadth and vagueness claims against the University's EO-31, which allows punishment for expressive conduct "deemed unacceptable or inappropriate, *regardless* of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation." 3-ER-518 (emphasis added). The law is clear: expression *must* rise to that level to lose First Amendment protection. *See Davis*, 526 U.S. at 652. By interpreting the policy to punish expressive conduct "resembling" unlawful discrimination, harassment, or retaliation, the district court impermissibly rewrote the plain text of the policy and then replaced one overbroad and vague standard with another.

## STANDARD OF REVIEW

This Court reviews de novo the district court's decision on the parties' cross-motions for summary judgment regarding Professor Reges's viewpoint discrimination and retaliation claims. *L.F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020). That means this Court views "the evidence for each of the motions 'in the light most favorable to the nonmoving party' for that motion and determine[s] 'whether there are any genuine issues of material fact and whether the

24

district court correctly applied the relevant substantive law.'" *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 719 (9th Cir. 2022) (quoting *L.F.*, 947 F.3d at 625). And in First Amendment cases, this Court "make[s] an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression" and thus "review[s] constitutional facts de novo." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021).

The Court also reviews de novo the district court's dismissal of Professor Reges's facial overbreadth and vagueness claims, "accepting all factual allegations in the complaint as true and construing them in the light most favorable to" Professor Reges. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).

## ARGUMENT

### I.    The University Punished Professor Reges for Academic Expression Protected by the First Amendment.

The district court erred in granting summary judgment to Defendants despite correctly holding the First Amendment protected Professor Reges's land acknowledgment critique as "speech 'related to scholarship and teaching,'" 1-ER-14, under this Court's holding in *Demers*, 746 F.3d at 406. Indeed, it was uncontested that Reges's critique of land acknowledgments is speech on a matter of public concern, 1-ER-36, and the First Amendment squarely protects using parody to criticize a public issue or public figure. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988).

Academic dissent and critique are "special concern[s]" of the First Amendment because "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues." *Keyishian*, 385 U.S. at 603. Professors must be able to speak, write, teach, and research free from the "pall of orthodoxy" that leads to the withering of democracy, progress, and the search for truth. *Id.*

As the district court correctly acknowledged 1-ER-13, this Court recognized an academic exception to the general rule in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), that public employees' on-the-job speech does not enjoy First Amendment protection. *Demers*, 746 F.3d at 406 (citing *Garcetti*, 547 U.S. at 425). This is because, as *Demers* notes, "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court." 746 F.3d at 411. So, *Demers* recognized the First Amendment safeguards public-faculty speech on public issues when that speech is pursuant to their scholarship or teaching. *Id* at 406.

Under *Demers*, courts evaluating academics' retaliation claims for speech "related to scholarship or teaching" bypass *Garcetti*'s analysis of whether a public employee's speech is pursuant to their job or as a private citizen, and proceed directly to *Pickering*'s balancing of the professor's interest in speaking on a matter of public concern with the government's interest in efficiently operating as an employer. *Id.* at 412. For example, in *Demers*, this Court held the First Amendment protected a professor's alternative proposal for a planned university restructuring that would

27

"substantially alter[] the nature of what was taught at the school" because his speech "related to . . . teaching." *Id.* at 414–15.

The district court thus correctly held the First Amendment applies to Professor Reges's statement for the same reason. It appeared in his course syllabus, a document "students depend on . . . to understand what is expected of them in the course," 2-ER-252. Professor Reges added his land acknowledgment parody statement to his syllabus "to encourage faculty and students to reconsider the placement of these political statements in syllabi." 2-ER-266–68. Parodying the University's land acknowledgment within the same platform the institution recommended using to transmit its viewpoint sharpened his critique.

As the district court recognized, Professor Reges's dissenting land acknowledgment is like the in-class speech featured in *Meriwether v. Hartop*, 992 F.3d 492, 504–07 (6th Cir. 2021), where the courts bypassed *Garcetti* and proceeded with *Pickering* balancing. 1-ER-15. Like Professor Meriwether's "views on gender identity . . . in his syllabus," Reges's statement "could have catalyzed a robust and insightful in-class discussion." 1-ER-16 (quoting *Meriwether*, 992 F.3d at 506). Professor

28

Reges's speech, the district court rightly decided, is therefore "governed by *Pickering*." 1-ER-20 (quoting *Demers*, 746 F.3d at 406).

## II. The District Court's *Pickering* Analysis Ignored the University's Educational Mission Causing It to Misunderstand and Misbalance Both Parties' Interests.

The district court erred by misapplying the *Pickering* balancing test. It ignored the public employer's unique nature and mission as a public university and gave essentially dispositive weight to its fear of offended students, faculty, and staff. Under *Pickering*, "the task of a court is 'to arrive at a balance between the interests of the teacher, as a citizen, . . . and the interest of the State, as an employer.'" *Demers*, 746 F.3d at 412 (quoting *Pickering*, 391 U.S. at 568). Courts generally view a public employer's interest as including "close working relationships among co-workers, . . . performance of the speaker's job duties, . . . [and] *the employer's mission*." *Hernandez*, 43 F.4th at 976 (emphasis added).

Though the district court noted speech in the academic context "implicates additional constitutional interests," 1-ER-13, its evaluation of the interests at stake under *Pickering* did not consider the mission of universities that is unique among public employers. That was error. The district court should have considered public universities' "special niche

29

in our constitutional tradition" where it is crucial to preserve "the expansive freedoms of speech and thought associated with the university environment." *Demers*, 746 F.3d at 411–12 (quoting *Grutter*, 539 U.S. at 329). Ignoring that mission led it to overvalue in the *Pickering* balance the University's interest in tamping down dissent and undervalue Professor Reges's interest in critiquing the University's land acknowledgment. *Cf.*, *Meriwether*, 992 F.3d 492 (holding professor's interest outweighed university employer's).

The district court compounded its error by giving undue weight to a handful of "offended" listeners who caused no actual disruption to University operations. Disagreement is expected in a university setting, so courts must preserve breathing room for professors to teach without fear of punishment for their views on matters of public concern. *See Hulen*, 322 F.3d at 1239. The First Amendment "may indeed best serve its high purpose when it . . . stirs people to anger" because "[s]peech is often provocative and challenging" and "may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The district court failed to discount from the University's interest

the disharmony that is entirely appropriate in a university setting, allowing no breathing room for free speech and rubber-stamping censorship at the first sign of an "offended" listener.

> **A.    The district court's *Pickering* analysis ignored the University's core mission to foster pursuit of truth and the exchange of ideas, including those that may offend.**

The district court failed to follow this Court's direction that the *Pickering* analysis considers the public employer's mission. *Hernandez*, 43 F.4th at 976. A public university's core function is to enable inquiry, study, evaluation, and intellectual growth among faculty and students. "It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation." *Sweezy*, 354 U.S. at 263. Accordingly, courts must consider a university's unique mission to foster the exchange of a "diversity of views" and "[i]ntellectual advancement" through "discord and dissent." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) (citing *Keyishian*, 385 U.S. at 603).

Here, the University recognizes its "primary mission" is "the preservation, advancement, and dissemination of knowledge." Vision & Values, Univ. of Wash., (last visited Sept. 20, 2024) *available at*

*https://www.washington.edu/about/visionvalues.* To achieve this mission, the University must foster the exchange of ideas which "ensures that ideas survive because they are correct, not because they are popular." *Rodriguez*, 605 F.3d at 708. "Colleges and universities— sheltered from the currents of popular opinion by tradition, geography, tenure and monetary endowments—have historically fostered that exchange." *Id.* And fulfilling this mission "depends, to a degree, on the dissemination . . . of controversial speech implicating matters of public concern." *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994). "[C]onflict is not unknown" on university campuses; it is expected. *Hulen v. Yates*, 322 F.3d 1229, 1239 (10th Cir. 2003).

University professors play a key role in executing this mission. They engage in the free exchange of ideas with colleagues, students, and staff while intentionally "sheltered from the currents of popular opinion." *Rodriguez*, 605 F.3d at 708. But the district court ignored the University's mission and *Demers*' admonition to undertake a "particularly subtle and difficult" *Pickering* analysis where university faculty members' speech is concerned. 746 F.3d at 413. This is necessary to account for "the public interest" of academic speech's "importance to our culture." *Id.* A "subtle

32

and difficult" *Pickering* analysis for academic speech is critical because public universities have priorities and foundational value different from every other public employer. Free and open inquiry and debate of ideas is the *sine qua non* of a quality university.

Yet the district court looked only at the University's interest in "promoting workplace efficiency and avoiding workplace disruption" based on supposedly "actual and reasonably anticipated disruption." (1-ER-47–48). Its *Pickering* analysis examined "staff functions," "teaching assistant cohesiveness," and "students' learning environment," but not how Reges's statement furthered the University's mission to preserve, advance, and disseminate knowledge. (1-ER-38–48). Instead, the district court should have accounted for the essential and primary mission of a public university—fostering the exchange of views—when considering the otherwise rote interest of a public employer in avoiding workplace disharmony.

The error of the district court's approach is evident from its reliance on cases outside the higher education context. For example, the district court interpreted *Rankin v. McPherson* to mean that all public employers—including public universities in any circumstance—may

33

restrict speech when it "interferes with the regular operation of the enterprise." 1-ER-47; 483 U.S. 378, 388 (1987). *Rankin,* however, involved the speech of a clerical worker in a law enforcement agency who said she hoped the President of the United States would be killed. 483 U.S. at 380. A law enforcement agency, where discipline and public trust are paramount, is a far cry from a public university campus.[6] *See Hernandez*, 43 F.4th at 981 ("[P]olice departments may permissibly consider the special status officers occupy in the community when deciding what limitations to place on officers' off-duty speech.").

A university's interest in preventing disruption among university employees (or between professors and their students) is not so heavily weighted. "[T]he desire to maintain a sedate academic environment" cannot "justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian*, 523 F.2d at 934. And "given the nature of academic life, especially at the college level," faculty and staff

---

[6] And even then, the *Rankin* Court *upheld* the employee's First Amendment rights because there was no evidence her comment hoping for the murder of the President interfered with her work. *Rankin*, 483 U.S. at 389.

need not "enjoy a close working relationship requiring trust and respect." *Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001).

The district court also mistakenly relied on the non-university cases *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767 (9th Cir. 2022), and *Hufford v. McEnaney*, 249 F.3d 1142 (9th Cir. 2011), involving a middle school and a fire department, respectively. "Promoting workplace efficiency and avoiding workplace disruption" might be dispositive government interests in those contexts, 1-ER-37, but public universities exist to *encourage* argument and challenge deeply held convictions necessary for inquiry, advocacy, and building knowledge. *Rodriguez*, 605 F.3d at 708. Being a place of dissent, debate, and discord *is* "the regular operation of the enterprise." *Rankin*, 483 U.S. at 388.

For the correct rule, the district court should have looked to college and university-specific cases like *Bauer*, 261 F.3d 775. There, a community college professor published a sharp criticism of the college's president in a campus newspaper, saying he had "a two-ton slate of polished granite which I hope to someday drop [on the President's] head." *Id.* at 780. This Court affirmed summary judgment for the professor, explaining: "[A]nyone who has spent time on college campuses knows

35

that the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams." *Id.* at 785. Because universities depend on "the vigorous exchange of ideas and resulting tension," the university's interest in preventing disruption is sapped of the weight it has for, say, a fire department. *Id.*

Other circuits agree that for a public university, providing "efficient . . . services," "actually depends, to a degree, on the dissemination . . . of controversial speech implicating matters of public concern." *Blum*, 18 F.3d at 1012. In *Blum*, the Second Circuit held a professor's writings about marijuana policy in a campus newspaper did not "impair the interests of the [public law school] in efficient provision of services," because university faculty have different "criteria for efficient performance" compared to other public employees. *Id.* at 1011–12. And in *Meriwether*, where a professor refused to use students' chosen pronouns, the Sixth Circuit held the university's interest in punishing the professor's speech was "comparatively weak," in part, because college classrooms are intended to promote "students' interests in hearing even contrarian views." 992 F.3d at 510.

Had the district court considered the University's core mission in its *Pickering* analysis, it would have concluded, as this Court did in *Bauer*, that the University's interest in preventing "disruption" must account for the university's unique purpose: facilitating the free exchange of views and the pursuit of knowledge, even when doing so causes disagreement. And when it comes to preventing "disruption" based solely on complaints of subjective offense to academic speech on public issues, the University's mission outweighs its interest in preventing those complaints. They represent nothing more than the "resulting tension" of the "the vigorous exchange of ideas"—a necessary fact of university life. *Bauer*, 261 F.3d at 785.

Fundamentally, public universities are speech-generating enterprises, gathering expert faculty in one place to research, publish, teach, and debate. Controversial opinions generating strong emotions are a feature of academic institutions, not a bug. By treating them as the latter, the district court misapplied *Pickering* and allowed a violation of the First Amendment to stand. This Court should reverse.

37

### B.   Professor Reges's interest in speaking on matters of public concern is strong.

The district court's failure to examine the University's mission also caused it to undervalue Professor Reges's interest in exploring a matter of public concern in his syllabus. The "Supreme Court has repeatedly stressed the importance of protecting academic freedom under the First Amendment." *Demers*, 746 F.3d at 411. So Reges has a bedrock First Amendment interest in speaking about land acknowledgments in syllabi, participating in this public debate, and encouraging critical thinking among his students and colleagues.

The value of Professor Reges's speech "in advancing First Amendment interests" is high. *Hernandez*, 43 F.4th at 977. The "robust tradition of academic freedom in our nation's post-secondary schools . . . alone offers a strong reason to protect [professor] speech." *Meriwether*, 992 F.3d at 509 (cleaned up). Professor Reges was participating in the ongoing nationwide and University-campus debate about land acknowledgments, encouraging his colleagues and students to do the same. 2-ER-267–68. "Speech on public issues occupies the highest rung on the hierarchy of First Amendment values and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). And "a

38

stronger showing of government interests may be necessary" to overcome a public employee's interest in speaking if their speech "more substantially involves matters of public concern." *Lane v. Franks*, 573 U.S. 228, 242 (2014) (cleaned up). So just as the professor in *Meriwether* had "powerful" interests in expressing his beliefs regarding gender pronouns—including on his syllabus—Professor Reges likewise has a powerful interest in expressing his beliefs on land acknowledgments. 992 F.3d at 510.

It may be that the "nature and strength of the public interest in academic speech will often be difficult to assess," but Professor Reges's parodic land acknowledgement statement does not involve a debate over esoteric academic subjects like the literary cannon to which *Demers* alluded. 746 F.3d at 413. Rather, it is part of a political debate the American public was and is having about the history of our nation and its land. 2-ER-289–90; 3-ER-476. That Professor Reges engaged in political speech means, as this Court put it, the University "has a particularly heavy burden under the *Pickering* test" to satisfy before it can censor one side of the discussion. *Dodge*, 56 F.4th at 782.

39

Professor Reges's First Amendment interest in speaking has more weight than the district court gave it—especially when the University's interest is properly reduced in light of its mission to foster the exchange of ideas. Professor Reges's dissenting statement advanced, not disrupted, the University's mission. Professor Reges was doing his job: encouraging inquiry, study, and evaluation among University faculty, staff, and students. His interests in communicating ideas related to teaching on a public issue in his syllabi are "powerful" and outweighed the University's interest in preventing offended students and staff. *See Meriwether*, 992 F.3d at 511.

### C.     Complaints from students and staff offended by an opinion do not outweigh Professor Reges's interest in speaking on a matter of public concern.

The district court failed to properly weigh Reges's significant First Amendment interest in academic freedom against the University's interest because it ignored decades of precedent holding that disagreement and offense cannot overcome First Amendment freedoms. The *Pickering* scales can only tip in the government's favor when it shows actual disruption or a "*reasonable* prediction of disruption in the workplace." *See* 1-ER-37 (quoting *Dodge*, 56 F.4th at 782) (cleaned up)

(emphasis added). Based on a smattering of complaints and unrealized concerns, the district court ratified the University's unreasonable conclusion that expressions of offense and disagreement demonstrate a disruption to the University's services. The court then decided the University's desire to prevent offense and emotional disagreement outweighed Reges's academic freedom. It does not.

First, no actual disruption to University teaching, learning, or staff functions occurred—not in the winter and spring of 2022, and not since. 3-ER-374–76. There was no class discussion, let alone a disruption, walkout, protest, tent encampment, or building occupation. The district court nevertheless found "actual and reasonably anticipated disruption of staff functions, teaching assistant cohesiveness, and students' learning environment." 1-ER-47–48. But its basis was administrators receiving thirteen written complaints from a campus community of more than 50,000 over the span of nearly three months and unreasonable assumptions about *potential* disruption to student learning and recruitment. With proper weight given to the University's primary mission and Professor Reges's academic freedom interests, however,

isolated individual expressions of offense alone cannot tip the *Pickering* scales in the University's favor.

That's because simple subjective offense cannot equal actionable disruption. In *Dodge*, for example, a middle school principal threatened disciplinary action against a teacher for his "Make America Great Again" hat. 56 F.4th at 772. It had made teachers and staff feel "intimidated, shocked, upset, angry, scared, frustrated," and "outraged [and] offended." *Id.* at 782–83. In response to the principal's claim of an interest in avoiding potential disruption, this Court held there was no evidence the hat interfered with the teacher's job performance or the school's regular operation "beyond the disruption that necessarily accompanies controversial speech." *Id.* at 782 (cleaned up). Distaste for a political message, the Court held, "cannot itself be a basis for finding disruption." *Id.*

The same rule applies here, and with more force. *See supra* Part II.A. None of the district court's bases demonstrate actual or reasonably anticipated disruption to (1) student learning, (2) staff functions, and (3) teaching assistant cohesiveness—just a few people out of tens of thousands feeling offended, uncomfortable, and concerned. That means

42

the University's censorship interest cannot overcome Professor Reges's interest in speaking.

Student learning. Administrators assert Professor Reges's statement did or would disrupt student learning. But even after administrators *encouraged* students to file complaints 3-ER-450, Director Balazinska could point to just 13 total complaints from University students and staff. 2-ER-122–135; 3-ER-562. Those complaints, far from evidencing material disruption, communicated only that Professor Reges's one-sentence dissent gave rise to negative emotional response.[7] The University has no evidence suggesting students missed classes or suffered a decrease in academic performance. And as in *Dodge*, emotional reactions to a speaker's opinion "cannot [themselves] be [the] basis for finding disruption" in a *Pickering* balance, but are just the "disruption that necessarily accompanies [controversial] speech." 56 F.4th at 783.

The record reflects administrators did not and do not believe Reges targeted anyone. Director Balazinska acknowledged during her

---

[7] 2-ER-122–35 (complainants said they felt "intimidated," not "welcome," not "supported," "despised," "unsafe," and "targeted").

43

deposition that she never believed Reges would treat anyone unfairly.[8] Dean Albritton agreed Reges would not retaliate against anyone who complained about his land acknowledgment.[9] And no one alleged he engaged in discriminatory or harassing conduct. The record instead shows that Professor Reges welcomes and seeks to be effective for all students.[10]

The district court credited the University's claim that "one [Native American] student felt compelled to drop out," 1-ER-44. But the record contains no evidence this student even exists, and even if they did, one student out of more than 50,000 does not a disruption make. The court also noted another student took a leave of absence, but the record and the information available to administrators at the time show the student's reason for departing Professor Reges's class had little to do with his land acknowledgment critique. There were, instead, many reasons for

---

[8] 2-ER-73–74 ("I'm not aware of any retaliations."); 3-ER-450 ("I would like to assure everyone that they can expect to be treated fairly and respectfully in this class.").

[9] 2-ER-85 ("Q. Did you have any reason to believe that [Reges] might retaliate against anyone who complained? A. Not specifically, no.").

[10] 2-ER-173; 2-ER-265.

her decision, including leaving a meeting with Director Balazinska feeling "used," a lack of tutoring at convenient times, and a sense that the Allen School valued test results more than actual learning. 2-ER-59–60.

Lastly, the district court cited the 30% of Professor Reges's students who transferred to the University-created shadow course as evidence of interference with students' ability to learn. 2-ER-47. Indeed, the record shows students hoped the "shadow" course would allow homework resubmissions (i.e., corrected work for a higher grade) or follow other more lenient grading policies than those for which Professor Reges is known. 3-ER-466; 3-ER-495–98; 3-ER-504–05. In any case, even if a few students transferred because of Professor Reges's land acknowledgment, their mere offense at statements made to a class of adult collegians does not give a university leave to trample the First Amendment. *See Hodge v. Antelope Valley Comm. Coll. Dist.*, No. CV 12-780 PSG (Ex), 2014 WL 12776507, at *10 (C.D. Cal. Feb. 14, 2014) (holding an EMT instructor's offensive in-class language did not impact his "teaching or other responsibilities").

45

Staff functions. The district court also relied upon potential disruption to the University's goal of creating a welcoming environment for Native American students, holding their emotional reactions to Professor Reges's one-sentence syllabus critique of land acknowledgments permitted a reasonable belief that recruitment would suffer. 1-ER-40. But concerns that some students or prospective students might be offended do not outweigh the professor's right to free speech. That's the point of academic freedom, and of freedom of expression generally. Universities exist in significant part to fulfill "students' interest in hearing even contrarian views." *Meriwether*, 992 F.3d at 510.

Cohesion among teaching assistants. The district court next held Professor Reges's statement "caused disruption with respect to teaching assistants" based on a single email from student-employee union members claiming teaching assistants feared retaliation if they shared their thoughts on land acknowledgments or diversity, equity, and inclusion. 1-ER-41. But it is undisputed that administrators did not actually think Professor Reges would (or did) retaliate against anyone. 1-ER-450; 2-ER-73–74; 2-ER-85. Given University administrators do not believe Professor Reges would or did retaliate against students, and an

46

undisputed multi-year history demonstrating a lack of retaliation, the district court erred in crediting an unfounded worry as sufficient to override his academic freedom.[11]

In considering and accepting each of these three areas of complaints, the district court gave a green light to an unconstitutional heckler's veto: "an impermissible content-based speech restriction where the speaker is silenced due to an anticipated disorderly or violent reaction of the audience." *United States v. Rundo*, 990 F.3d 709, 719 (9th Cir. 2021) (quoting *Rosenbaum v. City and Cnty. of San Francisco*, 484 F.3d 1142, 1158 (9th Cir. 2007)). When the government elevates the concerns of the listener over the rights of the speaker, "[t]he speech is targeted, after all, based on the government's disapproval of the speaker's choice of message." *Matal v. Tam*, 582 U.S. 218, 250 (2017); *see also Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise.").

---

[11] At minimum, if this Court believes the facts in the record present a close call regarding whether a disruption occurred, it should reverse the district court's grant of summary judgment to Defendants because a genuine issue of material fact exists. Fed. R. Civ. P. 56(a).

Earlier this year, this Court reaffirmed the unconstitutionality of heckler's vetoes in *Meinecke v. City of Seattle*, 99 F.4th 514 (9th Cir. 2024). There, police arrested a vocal street preacher because he refused relocate after a mob harassed and assaulted him. *Id.* at 518–19. This Court held the First Amendment prohibited punishing the preacher's protected speech "only in response to the actual and potential reaction of the audience." *Id.* at 524. Doing so enforced an unconstitutional "heckler's veto"—even where the police discerned a realistic potential for violence. *Id.* at 523–24.

All told, the district court's ruling sets a dangerous standard. Any complaint about academic speech related to teaching on a matter of public concern could be the basis for disciplining a faculty member in the name of preventing *potential* disruption. An Israeli or a Palestinian student might complain that a history or international relations professor's commentary about the conflict in Gaza is offensive and weakened their "feelings of belonging" on campus. A religious student could complain about a comparative religion professor's off-hand comment reflecting atheistic views and disagreement with believers. Or a student member of the federally unrecognized Duwamish tribe could

48

complain the University's official land acknowledgment excludes them—making them feel "unwelcome" and "targeted" and impeding their ability to learn. Teaching assistants and diversity recruiters could echo the same concerns and lament the negative effect on their job performance. Under the district court's approach, each could provide the basis for punishing and censoring public university faculty. That is unacceptable and untenable—and unconstitutional—at a public university.

## III.   The District Court Erred by Holding the University's EO-31 Policy Not Unconstitutionally Overbroad and Vague.

Defendants also violated Professor Reges's First Amendment rights by sanctioning him under an unconstitutionally overbroad and vague University policy. EO-31 provides:

> This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. To facilitate that goal, the University retains the authority to discipline or take appropriate corrective action **for any conduct that is deemed unacceptable or inappropriate**, **regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation**.

3-ER-518 (emphasis added). The policy's operative "unacceptable or inappropriate" terms are undefined and inherently subjective, and by allowing punishment for speech "regardless of whether" it rises to the level of unlawful harassment, retaliation, or discrimination, the policy

49

reaches a significant amount of protected expression relative to its permissible sweep under *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). The district court accordingly erred in dismissing Professor Reges's vagueness and overbreadth claims and denying him summary judgment on those claims.[12]

### A.  EO-31 is unconstitutionally overbroad because it covers a significant amount of protected speech related to scholarship or teaching.

EO-31's prohibition on "unacceptable or inappropriate" speech is unconstitutionally overbroad because it has a "substantial number" of applications to protected speech relative to its legitimate sweep. *Comite de Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Where overbreadth claims are "based on the First Amendment," the Court has deliberately "provide[d] breathing room for free expression." *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2397 (2024) (quoting *United States v.*

---

[12] The district court dismissed these claims under Rule 12(b)(6). Not only did Plaintiffs properly plead the claims, Am. Compl. ECF No. 46, but they are entitled to judgment as a matter of law on the claims because the constitutional invalidity is apparent from the face of the policy. This section thus cites both the Amended Complaint and the summary judgment record, as appropriate to the various points of discussion.

*Hansen*, 599 U.S. 762, 769 (2023)); *see also Tucson v. City of Seattle*, 91 F.4th 1318, 1327 (9th Cir. 2024) (applying First Amendment facial overbreadth rule).

Part of this "breathing room" in the public university context is the First Amendment's requirement that universities safeguard their professors' academic speech. *See, e.g.*, *Demers*, 746 F.3d at 411; *see also supra*, Part I.A. The First Amendment protects controversial and even offensive speech on campus, as off campus, unless it falls into one of the narrow categories of unprotected speech,[13] or is "so severe, pervasive, and objectively offensive that it denies its victims . . . equal access to education." *Davis*, 526 U.S. at 652 (defining unlawful harassment in the academic setting); *see also* Title VI, 42 U.S.C. § 2000d et seq; Title IX, 20 U.S.C. § 1681.[14]

---

[13] These include obscenity, defamation, fraud, incitement, speech integral to criminal conduct, and limited others, all of which have no relevance here. *See Stevens*, 559 U.S. at 468–69.

[14] Professor Reges's analysis here necessarily focuses on harassment law, because although the policy references "discrimination, harassment, and retaliation," only harassment can apply to pure speech because "discrimination" and "retaliation" each require some amount of conduct. *See, e.g.*, *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (emphasizing "conduct" requirement of discrimination claim, where alleged "discriminatory remarks" were

By design, the rule articulated in *Davis* defines the full scope of a harassment prohibition's "legitimate sweep." *See Moody*, 144 S. Ct. at 2397; *Hansen*, 599 U.S. at 766; *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). As this Court has explained:

> We [] doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs seek. Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment.

*Rodriguez*, 605 F.3d at 710 (citations omitted).

But EO-31 expressly rejects the *Davis* standard, or any balance between unlawful harassment and academic speech. Under EO-31: "the University retains the authority to discipline . . . **regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation**." EO-31 (emphasis

---

insufficient without "nexus" to "subsequent employment decisions"); *Cheatham v. City of Phoenix*, 699 F. App'x 647, 648 (9th Cir. 2017) (emphasizing "conduct" requirement for retaliation claim, which includes an "adverse employment action"). Nor does the University suggest that it ever interpreted Professor Reges's statement as retaliatory or discriminatory. In fact, Director Balazinska and Dean Allbritton readily concede they do not believe Professor Reges would treat students unfairly or that he would retaliate against them. 2-ER-73–74; 2-ER-85.

added). That gives EO-31 an *illegitimate* sweep, prohibiting protected speech that falls short of unlawful harassment.

And that illegitimate sweep is substantial compared to its legitimate sweep of prohibiting speech rising to the level of unlawful harassment under *Davis*. Under the guise of prohibiting "unacceptable" or "inappropriate" speech, university administrators could ban speech or expression on any issue, from drag shows to provocative lectures. But university campuses should be home base for free expression, allowing faculty and students to explore and challenge a broad universe of ideas.

That is why this Court and many others have enjoined enforcement of similar speech prohibitions in higher education. For instance, this Court recently affirmed a district court's preliminary injunction against a college's prohibition on "inappropriate or offensive" student speech. *Flores v. Bennett*, No. 22-16762, 2023 WL 4946605, at *1, *2 (9th Cir. Aug. 3, 2023). As the Court explained, the Supreme Court "has consistently held that speech may not be banned on the ground that it expresses ideas that offend, including in the university context." *Id*. At *1 (cleaned up) (citing *Matal*, 582 U.S. at 223).

Prohibitions on "inappropriate" and "offensive" speech are particularly concerning. Under those broad terms, there is "likely a substantial amount of protected speech that would be potentially chilled," because much protected speech, including "[p]olitical speech, for example, has a high propensity to be viewed as 'offensive,' and the First Amendment 'affords the broadest protection' to political expression." *Id.* at *2 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995)).

Other circuits agree. In *McCauley v. Univ. of the V.I.,* the Third Circuit held a university's "ban on 'offensive' signs" to be "hopelessly ambiguous and subjective." 618 F.3d 232, 250, 252 (3d Cir. 2010). As the court explained, the "interest in inculcating fundamental values is not a priority in public universities." *Id.* at 248. "The desire to protect the listener cannot be convincingly trumpeted as a basis for censoring speech for university students." *Id.* For these reasons, the court held that the University's "prohibitions on 'offensive' and 'unauthorized' speech have no plainly legitimate sweep" and are thus "facially overbroad in violation of the First Amendment." *Id.* at 250. In *DeJohn v. Temple Univ.*, the same court rejected a "policy's use of 'hostile,' 'offensive,' and 'gender-

54

motivated'" as facially "[over]broad and subjective." 537 F.3d 301, 317–18 (3d Cir. 2008). The court emphasized that "since the inception of overbreadth jurisprudence, the Supreme Court has recognized its prominent role in preventing a 'chilling effect' on protected expression." *Id.* at 313. "This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the lifeblood of academic freedom." *Id.* So too here.

The district court attempted to distinguish *Flores*, *McCauley*, and *DeJohn* because "EO 31 is tied to discriminatory, harassing, and retaliatory conduct." 1-ER-31; *see also id* at 28–29. But given the policy's textual affirmation that prohibited conduct need *not* rise to the level of "discrimination, harassment, or retaliation"—along with the policy's application in this case—any "tie" is illusory. *See supra*, Part III.A.

EO-31 violates the First Amendment for the same reasons this Court and other circuit courts have found in cases analyzing speech prohibitions with substantively indistinguishable language.

## B.     EO-31 is void for vagueness because its operative terms are subjective, undefined, and open-ended.

EO-31 also violates the First Amendment because it is void for vagueness by failing to define or explain what constitutes "unacceptable or inappropriate" expressive conduct. A regulation can be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Policies regulating speech like EO-31 must provide an even "greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). As this Court explained in analyzing a similar challenge, "where First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (cleaned up) (quoting *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986)).

Rather than hold EO-31 to this heightened standard, the district court lowered the bar. In seeking to excuse EO-31's vagueness, the court repeatedly emphasized that the policy "provides definitions for

56

'discrimination,' 'harassment,' 'retaliation'" that reflect their definitions under applicable law. 1-ER-23; *see also id.* at 24, 34. But EO-31 explicitly *rejects* these limitations: "[T]he University retains the authority to discipline . . . any conduct that is deemed unacceptable or inappropriate, **regardless** of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation." 3-ER-518 (emphasis added). Under its plain terms, EO-31 eschews any tether to the legal definitions of "discrimination, harassment, or retaliation."

The terms "unacceptable" and "inappropriate" instead rely on subjective interpretations that naturally vary according to the enforcer's judgment. As this Court recently explained, "What is 'inappropriate' or 'offensive' is a subjective determination, which would vary based on a college administrator's personal beliefs." *Flores*, 2023 WL 4946605, at *2. Prohibitions based on these terms do not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "invite[] 'arbitrary and discriminatory enforcement.'" *Id.* (quoting *Grayned*, 408 U.S. at 108) (quotations removed).

The Supreme Court has said the same with respect to so-called "offensive" speech. "No fair reading of the phrase 'offensive conduct' can

57

be said sufficiently to inform the ordinary person that . . . permissible speech or conduct would nevertheless . . . not be tolerated in certain places." *Cohen v. California*, 403 U.S. 15, 19 (1971); *see also*, *e.g.*, *McCauley*, 618 F.3d at 250 (finding university's "ban on 'offensive' signs" to be "hopelessly ambiguous and subjective"); *DeJohn*, 537 F.3d at 317 (rejecting a "policy's use of 'hostile,' 'offensive,' and 'gender-motivated'" as facially "[over]broad and subjective").

For the same reasons, EO-31 leaves would-be speakers guessing whether administrators might deem their speech "unacceptable" or "inappropriate"—and it affords broad discretion to punish those whose speech offends administrators' particular sensibilities. EO-31 provides no guidance to the governed and no guardrails for the enforcers. That is the definition of unconstitutional vagueness in *any* context, let alone in the First Amendment context. *See Smith*, 415 U.S. at 573; *Grayned*, 408 U.S. at 109; *McCauley*, 618 F.3d at 250; *DeJohn*, 537 F.3d at 317; *Flores*, 2023 WL 4946605 at *2. The district court erred in failing to enjoin EO-31 as void for vagueness.

### C.  The district court's impermissible and atextual "limiting construction" fails to correct EO-31's overbreadth and vagueness.

There is no lawful limiting construction to EO-31 that avoids the unconstitutional vagueness and overbreadth defects discussed above. The district court erred in imposing one that not only contravenes the plain text of EO-31 but creates its own vagueness and overbreadth issues. Specifically, despite EO-31's express terms, the district court read into the policy an additional qualification that "unacceptable or inappropriate" conduct is prohibited only where it "resembles" unlawful discrimination, harassment, or retaliation, "even if not unlawful under employment laws." 1-ER-27. Doing so violated the well-settled rule that courts may impose a limiting construction on a policy "only if it is readily susceptible to such a construction." *Stevens*, 559 U.S. at 481 (citations omitted).

The district court limited EO-31's reach to conduct "resembling" harassment, retaliation, and discrimination despite EO-31's plain text stating it applies "regardless" of whether conduct meets those standards. It claimed that construction is grounded in the policy's "goal" and "context" of preventing discrimination and harassment. 1-ER-27. But

59

context cannot overcome EO-31's plain language. It is a settled canon of construction that the drafter's intent "should be derived primarily from the [rule's] language. When the words . . . are clear and unequivocal, this court is required to assume the [drafter] meant exactly what it said and apply the [rule] as written." *Duke v. Boyd*, 942 P.2d 351, 354 (Wash. 1997) (en banc) (citations omitted); *see also Stevens*, 599 U.S. at 481 (rejecting, in First Amendment challenge to federal animal cruelty statute, the government's proposed limiting construction because it would "require[] rewriting, not just reinterpret[ing]" the statute). The district court did the opposite here.

To support doing so, the court relied on a single inapposite, out-of-circuit district court case, *Corlett v. Oakland Univ. Bd. of Trustees*, 958 F. Supp. 2d 795, 801, 811 (E.D. Mich. 2013), 1-ER-27–28, where the challenged policy prohibited "intimidation, harassment, threats, and assault." *Corlett*, 958 F. Supp. 2d at 810. Unlike EO-31, it did not contain language expressly rejecting a limitation to the legal definition of those terms. So, the *Corlett* court held the policy provided sufficient guidance because "the legal definitions" of "intimidation," "harassment," and "threats" were settled and ascertainable. *Id.* The *Corlett* court thus had

60

no need to read additional terms into the policy or invent new meanings for existing ones; it merely applied the legal definitions of the prohibited conduct as reflected in the policy's plain language. *Id.* That is not the path the district court followed here.

Worse still, even if its limiting construction were permissible, that does not cure EO-31's overbreadth and vagueness issues. In fact, it creates new ones. Interpreting EO-31 to prohibit speech that merely "resembles" unlawful harassment means EO-31 still prohibits speech not rising to the level of unlawful harassment. The limiting construction is thus unconstitutionally overbroad for the same reasons as the original*, see, supra* Part III.A, because it continues to allow for a "substantial number of applications" to protected speech. *Hansen*, 599 U.S. at 770; *accord. Moody*, 144 S. Ct. at 2397; *Duke*, 942 P.2d at 354. The added term "resembles" is also "wholly subjective" and lacks any "statutory definition[]" or "settled legal meaning[]," leaving EO-31 unconstitutionally vague. *Tucson*, 91 F.4th at 1329. Adding one subjective term to define another does not give anyone "reasonable opportunity to know what is prohibited, so that [they] may act

accordingly." *Flores*, 2023 WL 4946605, at *2; *see also McCauley*, 618 F.3d at 250; *DeJohn*, 537 F.3d at 317.

Professor Reges's case provides just one example of that what may "resemble" unlawful harassment to one observer may, to another, fall far short of it. His speech was not accompanied by harassing conduct, did not target specific individuals, nor did it deny students "equal access to education"—as unlawful harassment generally requires (among other things) as a constitutional matter. *See, e.g., Davis*, 526 U.S. at 652; *Rodriguez*, 605 F.3d at 710. Yet the University enforced EO-31 against Professor Reges anyway. Even under the district court's limiting construction, Professor Reges and others could not have known whether his or similar academic speech would "resemble" unlawful harassment in violation of EO-31. With or without the improper, atextual limiting instruction, EO-31 remains vague and overbroad, and the district court erred in failing to enjoin it.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of Defendants-Appellees' motion to dismiss, and direct entry of summary judgment for Professor Reges on all of his claims.

62

Dated: September 23, 2024

s/Joshua T. Bleisch

JOSHUA T. BLEISCH
DC Bar No. 90001269
James M. Diaz
VT Bar No. 5014
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 717-3473
josh.bleisch@thefire.org
jay.diaz@thefire.org

*Attorneys for Plaintiff*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**  24-3518

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  s/Joshua T. Bleisch            **Date** 09/23/2024

64

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  24-3518

I am the attorney or self-represented party.

**This brief contains** 11,003 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Joshua T. Bleisch          **Date** 09/23/2024