No. 24-3518

United States Court of Appeals
for the Ninth Circuit

STUART REGES,

*Plaintiff-Appellant,*

v.

ANA MARI CAUCE; MAGDALENA BALAZINSKA; DAN
GROSSMAN; NANCY ALLBRITTON,

*Defendants-Appellees,*

On appeal from the United States District Court
for the Western District of Washington at Seattle,
No. 2:22-cv-00964-JHC - Honorable John H. Chun Presiding

**BRIEF OF *AMICI CURIAE* PACIFIC LEGAL
FOUNDATION, STUDENTS FOR LIBERTY, AND
JAMES G. MARTIN CENTER FOR ACADEMIC
RENEWAL IN SUPPORT OF PLAINTIFF-
APPELLANT STUART REGES**

Ethan W. Blevins
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
EBlevins@pacificlegal.org

*Attorney for Amici Curiae Pacific Legal Foundation, Students for
Liberty, and James G. Martin Center for Academic Renewal*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* Pacific Legal Foundation, Students for Liberty, and James G. Martin Center for Academic Renewal states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES .......................................................... iii

INTERESTS AND INDENTITIES OF AMICI CURIAE ...................... 1

INTRODUCTION .................................................................... 3

BACKGROUND ..................................................................... 4

ARGUMENT ......................................................................... 6

  I.  The District Court's Decision Arms Hypersensitive Activists
     with a Heckler's Veto ..................................................... 7

    A. Controversial speech furthers the University's mission ............... 8

    B. *Pickering* offers no protection if listener disruption weighs
      against the speaker ................................................... 11

    C. The district court's *Pickering* analysis greenlights
      viewpoint discrimination ............................................ 13

  II. The School's Vague Anti-Harassment Policy Arms Censors
     Bent on Smothering Dissent ........................................... 14

    A. There is a long history of regulators abusing vague laws
      to hound dissenters .................................................. 15

    B. Vague campus anti-harassment policies have become
      political weapons ..................................................... 18

    C. The anti-harassment policy here poses an even greater risk
      of abuse than Title IX ............................................... 23

      i.  Executive Order 31 is overbroad .............................. 23

      ii. Executive Order 31 is unduly vague ......................... 27

      iii.Executive Order 31 is viewpoint-based ..................... 29

CONCLUSION ..................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bugg v. Benson,*
No. 4:22-cv-00062-DN
(D. Utah Oct. 3, 2022) ........................................................................ 20

*Davis v. Monroe County,*
526 U.S. 629 (1999) ............................................................................ 23

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
51 F.3d 591 (1995) .............................................................................. 23

*DeJohn v. Temple University,*
537 F.3d 301 (3d Cir. 2008) ..................................................... 22–23, 27

*Dodge v. Evergreen Sch. Dist. 114,*
56 F.4th 767 (9th Cir. 2022) .............................................................. 11

*Faragher v. City of Boca Raton,*
524 U.S. 775 (1998) ............................................................................ 24

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ...................................................................... 28–29

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
385 U.S. 589 (1967) ......................................................................... 4, 6

*Matal v. Tam,*
582 U.S. 218 (2017) ............................................................... 13–14, 28

*McCauley v. Univ. of the Virgin Islands,*
618 F.3d 232 (3d Cir. 2010) .............................................................. 27

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) ............................................................ 20

*Meriwether v. Trustees of Shawnee State Univ.*,
No. 1:18-cv-753, 2019 WL 4222598 (S.D. Ohio Sept. 5, 2019), *affirmed in part, vacated in part, reversed in part by Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............20

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
391 U.S. 563 (1968)................................................................ 6–7, 10–13

*Reges v. Cauce*,
No. 2:22-cv-00964-JHC
(W.D. Wash. 2024) ............................................................................25

*Sessions v. Dimaya*,
584 U.S. 148 (2018)..........................................................................26

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (2022) ........................................................................10

*Stannard v. State Ctr. Cmty. Coll. Dist.*,
1:22-cv-01250-JLT-EPG
(E.D. Cal. May 10, 2024)..................................................................20

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949)...............................................................................11

*Tinker v. Des Moines Ind. Sch. Dist.*,
393 U.S. 503 (1969) ..........................................................................12

*United States v. Kennerley*,
209 F. 119 (S.D.N.Y. 1913) ..............................................................17

*United States v. Stevens*,
559 U.S. 460 (2010)................................................................... 23, 25

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)..........................................................................26

## U.S. Constitution

U.S. Const. amend. I ............................................4, 5–6, 11, 13, 21, 23, 29

iv

## Other Authorities

2 Tocqueville, Alexis de, *Democracy in America*
(Henry Reeve trans., Random House 1994)
(1840) .................................................................................... 9

85 Fed. Reg. 30,026 (May 19, 2020) ....................................... 23

85 Fed. Reg. 30,033 (May 19, 2020) ....................................... 23

88 Fed. Reg. 33,833 (Apr. 29, 2024) ....................................... 18

Bernstein, David, *You Can't Say That! The Growing Threat
to Civil Liberties from Anti-Discrimination Laws* (2004) ................. 23

Blanchard, Margaret A. & Semonche, John E., *Anthony
Comstock and His Adversaries: The Mixed Legacy
of This Battle for Free Speech*,
11 Commc'n. L. & Pol'y 317 (2006) ................................. 16–17

Carson, Clayborne et al. *Martin Luther King, Jr.
Encyclopedia* (2008) ......................................................... 11

Foundation for Individual Rights in Expression &
College Pulse, *2025 College Free Speech Rankings,
University of Washington*,
https://rankings.thefire.org/rank/school/university-
of-washington-seattle-campus ............................................. 3

Haidt, Jonathan & Lukianoff, Greg, *The Coddling of the
American Mind* (2018) ......................................................... 19

Kipnis, Laura, *Sexual Paranoia Strikes Academe*,
Chron. Higher Educ. (Feb. 27, 2015),
https://www.chronicle.com/article/sexual-paranoia-strikes-
academe/ ......................................................................... 19

Kors, Alan Charles & Silvergate, Havey A., *The Shadow University: The Betrayal of Liberty on America's Campuses* (1999) ........................................................................... 29

Lukianoff, Greg & Schlott, Rikki, *Canceling of the American Mind* (2023) ................................................................. 9, 12, 18

Mchangama, Jacob, *Free Speech: A History from Socrates to Social Media* (2022) ............................................... 11, 15, 17

Milton, John, *Areopagitica: A Speech for the Liberty of Unlicenc'd Printing to the Parliament of England* (1644) ...................................................................... 8

Suk Gersen, Jeannie, *Laura Kipnis's Endless Trial by Title IX*, The New Yorker (Sep. 20, 2017) ........................ 19, 21–22

University of Chicago Institute of Politics, *CLIP: Van Jones on safe spaces on college campuses,* YouTube (Feb. 24, 2017), available at https://www.youtube.com/watch?v=Zms3EqGbFOk ........................... 8

U.S. Department of Education, Office of Civil Rights, Dear Colleague Letter (Oct. 26, 2020), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201010.pdf ..................................................... 21

U.S. Department of Education, Office of Civil Rights, Sexual Harrassment: It's Not Academic (2008), https://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf; .................................................................... 21

Woodward, C. Vann, *Report of the Committee on Freedom of Expression at Yale*, Yale University (December 23, 1974), https://www.thefire.org/sites/default/files/2017/10/08104141/Report-of-the-Committee-on-Freedom-of-Expression-at-Yale-_-Yale-College5.pdf ....................................................... 9

## Interests and Identities of Amici Curiae

Pacific Legal Foundation (PLF) is a non-profit public interest law firm that litigates nationwide to defend individual rights. In addition to other issues, PLF litigates to protect free speech against growing illiberalism and intolerance toward differing views on divisive topics. PLF writes to encourage the Ninth Circuit to protect the academic freedom of dissenting voices on campus.

Students for Liberty ("SFL") is a national, secular, non-partisan, 501(c)(3) non-profit educational organization dedicated to providing organizational support for students and student organizations devoted to liberty. Founded and operated by college students, SFL defines liberty as encompassing the economic freedom to choose how to provide for one's life, the social freedom to choose how to live one's life, and intellectual and academic freedom. To promote this understanding of liberty, SFL supports student organizations across the ideological spectrum by providing resources and training to campus leaders and student groups.

The James G. Martin Center for Academic Renewal is a nonprofit, nonpartisan organization that works to improve higher education. The purpose of the Martin Center is to discover and communicate ways to

renew and fulfill the promise of higher education in North Carolina and across the country. Since 2003, the Martin Center has been a voice for excellence in higher education. The Center advocates responsible governance, viewpoint diversity, academic quality, cost-effective education solutions, and innovative market-based reform. It does this by studying and reporting on critical issues in higher education and recommending policies that can create change—especially at the state and local level.

Amici file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief.

Counsel for the Appellant did not author the brief in whole or in part. Appellant did not contribute financial support intended to fund the preparation or submission of this brief. No other individual or organization contributed financial support intended to fund preparation or submission of this brief.

## Introduction

Universities should be beacons of free inquiry and open debate. Yet campuses are boiling with free speech controversies, and university

leaders have proven time and again that they are not up to the challenge. Administrators across the ideological spectrum have failed to treat controversial speech—whether it comes from students, faculty, or guest speakers—in an evenhanded and open-minded manner that nurtures the freedom to dissent.

The University of Washington, which ranks 226 out of 251 in the Foundation for Individual Rights in Expression's 2025 College Free Speech Rankings,[1] is no different. Professor Stuart Reges is just one of many examples of how far the University has strayed from a bastion of free thought. Half the students at the University of Washington report that they self-censor on campus at least once or twice a month. Said one student, "The Palestinian genocide has been a huge topic, but it always seems a bit risky to speak out especially when there has [sic] been reports of retaliation."[2] Another reported, "I am Israeli and I don't feel safe expressing my views regarding that conflict right now."[3] It is of

---

[1] Foundation for Individual Rights in Expression & College Pulse, *2025 College Free Speech Rankings, University of Washington*, https://rankings.thefire.org/rank/school/university-of-washington-seattle-campus.
[2] *Id.*
[3] *Id.*

course the "huge topics" that the campus community should be most free to speak on, but speakers must tiptoe around the most pressing issues of the day at this elite institution of higher learning.

Campus educators need a free speech education. There is no better teacher on that topic than the federal courts of appeal. This Court should reverse the district court and remind the University of Washington that the First Amendment does not allow universities to wrap their communities in a "pall of orthodoxy."[4]

## Background

Professor Stuart Reges, faculty at the University of Washington's Allen School, accepted the Allen School's invitation for faculty to include a land acknowledgment on their syllabuses.[5] His said this: "I acknowledge that by the labor theory of property that the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."[6] This was not what the Allen School had in mind.

---

[4] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).
[5] 2-ER-312.
[6] 2-ER-266; 2-ER-321.

4

A handful of students, teaching assistants, and staff complained. A few students claimed that Professor Reges's statement made them feel unsafe and unwelcome. University leadership accused Reges of creating a toxic environment with a single sentence and demanded the statement's removal.[7] When Professor Reges refused, the administration removed it for him.[8] University leaders also encouraged students to complain about the statement in a strategy to build support for moving against Reges.[9] They then opened an investigation[10] and threatened Reges that future use of his land acknowledgment would violate Executive Order 31, which says that the university can discipline faculty for "unacceptable or inappropriate" conduct, even if the conduct does not rise to the level of unlawful discrimination or harassment.[11]

Professor Reges brought this lawsuit to defend his First Amendment rights. The district court, however, rejected Reges's claims

---

[7] 3-ER-327–28.
[8] 3-ER-427; 2-ER-104.
[9] 3-ER-436; 3-ER-450.
[10] 3-ER-558.
[11] 3-ER-518; 3-ER-578–79

of First Amendment retaliation and viewpoint discrimination as well as his challenge to the validity of Executive Order 31. This appeal ensued.

## Argument

Academic freedom is a "transcendent value to all of us and not merely to the teachers concerned."[12] Yet that value has eroded across this nation's universities. This Court can help restore it. This brief offers some suggestions on how to do so. It will address two points:

- The district court erred by weighing any alleged disruption caused by offended listeners against the First Amendment interests of professors to engage in provocative speech;

- The district court erred by upholding the vague anti-harassment policy forbidding any speech that university administrators deem "unacceptable or inappropriate."

## I. The District Court's Decision Arms Hypersensitive Activists with a Heckler's Veto.

Under *Pickering v. Board of Education*, courts must balance the free speech interests of the government employee speaking on matters

---

[12] *Keyishian*, 385 U.S. at 603.

of public concern against the interests of the government employer in providing an efficient public service.[13] The district court held that mild disruption caused by those offended by Professor Reges's land acknowledgment sufficed to override his free speech interests.

That is incorrect for at least three reasons. First, controversial speech *aligns* with a university's service to the public rather than disrupting it. Second, if hypersensitive listeners can strip speakers of free speech protections by throwing a fit, then *Pickering* balancing will become a dead letter. Third, the district court's reasoning amounts to an implicit holding that universities have a legitimate interest in engaging in viewpoint discrimination.

### A. Controversial speech furthers the University's mission

A university is an intellectual gymnasium. Imagine that a few vocal gym members complain that weightlifting is too hard, so the gym removes the weights. The gym would lose its purpose, serving neither the interests of the vocal few nor the majority who wanted to push themselves.

---

[13] *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968).

7

Likewise, the purpose of the intellectual gymnasium is not served when administrators remove controversial speech. As Van Jones, Barack Obama's green jobs advisor, said to college students:

> I don't want you to be safe *ideologically*. I don't want you to be safe *emotionally*. I want you to be *strong*. That's different. I'm not going to pave the jungle for you. Put on some boots, and learn how to deal with adversity. I'm not going to take all the weights out of the gym; that's the whole point of the gym. This is the gym.[14]

John Milton made a similar point four hundred years earlier in his famous defense of free speech. He warned against "cloistered virtue, unexercised and unbreathed, that never sallies out and sees her adversary but slinks out of the race."[15]

When administrators censor controversial speech and discipline dissenters, they remove the weights from the gym. This leaves the intellectual development of students "unexercised and unbreathed." After all, the "history of intellectual growth and discovery clearly

---

[14] University of Chicago Institute of Politics, *CLIP: Van Jones on safe spaces on college campuses*, YouTube (Feb. 24, 2017), available at https://www.youtube.com/watch?v=Zms3EqGbFOk.
[15] John Milton, *Areopagitica: A Speech for the Liberty of Unlicenc'd Printing to the Parliament of England* (1644).

demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable."[16]

The district court, however, deferred to campus administrators' self-interested vision of their school's purpose, which is to make students feel welcome and safe, including ideologically and emotionally. These doting administrators peddle the "soft despotism" that Alexis De Tocqueville warned of two centuries ago, which seeks to "keep [students] in perpetual childhood" and "to spare them all the care of thinking and all the trouble of living."[17] As more recent observers have put it, the fawning deference to students' sensitivities "err[s] away from treating citizens like capable adults," which "will inevitably lead to the dismantling of speech protections" unless we "buck this infantilization of American adults."[18]

---

[16] C. Vann Woodward, *Report of the Committee on Freedom of Expression at Yale*, Yale University (December 23, 1974), https://www.thefire.org/sites/default/files/2017/10/08104141/Report-of-the-Committee-on-Freedom-of-Expression-at-Yale-_-Yale-College5.pdf.
[17] 2 Alexis De Tocqueville, *Democracy in America* 318 (Henry Reeve trans., Random House 1994) (1840).
[18] Greg Lukianoff & Rikki Schlott, *Canceling of the American Mind* 304–05 (2023).

A gym without weights is not a gym. And a university without debate and dissent is not a university. In the words of Judge Marcus of the Eleventh Circuit: "A university that turns itself into an asylum from controversy has ceased to be a university; it has just become an asylum."[19] This Court owes it to the students who expect an education to hold these universities to their stated missions: to educate young minds. That means holding that disruption among offended students is not the same as disruption of the university's mission. This Court should not let a few vocal students hijack the foundational purpose of higher education.

B. Pickering *offers no protection if listener disruption weighs against the speaker*

Speech that does not disrupt is speech that needs no defenders. Some of the greatest advances in free expression have caused extraordinary disruption. The printing press brought unprecedented freedom of thought, but it also gave wings to speech that fomented

---

[19] *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1130 (2022) (Marcus, J., concurring).

10

peasant uprisings across Europe.[20] The Birmingham Campaign's marches, protests, and sit-ins led by Martin Luther King Jr. stoked a violent response vicious enough to shake a nation from its stupor.[21] In fact, the First Amendment "may indeed best serve its high purpose when it . . . stirs people to anger" by "strik[ing] at prejudices and preconceptions."[22] Every hammer blow that has broken shackles on the human mind has ignited sparks.

If disruption is an inevitable element of speech targeted for censorship, then *Pickering* is a dead letter if disruption caused by listeners can outweigh the speaker's First Amendment interests. This Court has recognized that government employers cannot claim an overriding interest in "the disruption that necessarily accompanies controversial speech."[23] Even when it comes to the lighter protections

---

[20] *See* Jacob Mchangama, *Free Speech: A History from Socrates to Social Media* 70 (2022).
[21] *See* Clayborne Carson et al. *Martin Luther King, Jr. Encyclopedia* 28 (2008).
[22] *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).
[23] *Dodge v. Evergreen Sch. Dist. 114*, 56 F.4th 767, 782 (9th Cir. 2022) (cleaned up).

offered to K-12 students' speech, the Supreme Court affirmed the need to allow for some disturbance:

> Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength. . . .[24]

Some allowance for disruption among offended listeners is even more vital in the outrage culture permeating college campuses. A mild suggestion that Yale students are mature enough to choose their own Halloween costumes is enough to spark career-ending protests.[25] A polite email declining to grade based on race can whip up a social media storm.[26] Using the word "trap house" to advertise a law student party can raise shrieks of racism and threats from university administrators.[27]

If courts are quick to defer to university worries about disruption in these hypersensitized climates, *Pickering* will cease to offer any

---

[24] *Tinker v. Des Moines Ind. Sch. Dist.*, 393 U.S. 503, 508–09 (1969) (citation omitted).
[25] *See* Lukianoff, *supra* note 18 at 276–79.
[26] *See id.* at 50.
[27] *See id.* at 272–74.

shelter to faculty. Students with eggshell ears and the administrators who dote on them will enjoy a heckler's veto that shuts down speech whenever they cause a ruckus.

### C. The district court's Pickering analysis greenlights viewpoint discrimination.

If offended listeners can control the scope of First Amendment protections by dialing up their outrage, then viewpoint discrimination will leak into the *Pickering* balancing regime. That happened here. The university had invited professors to post land acknowledgment statements on their syllabuses. It then penalized the only controversial statement, and the district court let it slide because the statement drew complaints. Punishing speech because it upsets listeners results in favoring a "positive or benign" statement "but not a derogatory one."[28] In other words, viewpoint discrimination.

The district court, by weighing student outrage in its balancing analysis, created a bolthole for viewpoint discrimination within the *Pickering* test. This clashes with the fundamental First Amendment

---

[28] *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring).

13

tenet that the "proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate."[29]

## II. The School's Vague Anti-Harassment Policy Arms Censors Bent on Smothering Dissent.

The district court upheld a university policy granting administrators authority to penalize whatever they deem "unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation."[30] That holding is unacceptable. This overbroad and unduly vague language does not comport with basic due process or the freedom of speech. No linguistic gymnastics can save it through a limiting construction that avoids its constitutional infirmities.

### A. There is a long history of regulators abusing vague laws to hound dissenters.

Laws regulating speech with subjective and broad language like the policy upheld by the district court here have often served as

---

[29] *Matal*, 582 U.S. at 246 (cleaned up).
[30] 3-ER-518.

partisan weapons. Perhaps the most prominent American example is the notorious Sedition Act, which made it a crime to

> write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States . . . with intent to defame . . . or to bring them . . . into contempt or disrepute; or to excite against them . . . the hatred of the good people of the United States.

Vague, subjective terms like "scandalous" and "disrepute" helped the Adams Administration engage in vicious partisan enforcement, sweeping up legitimate political dissent and even the occasional drunken joke about the President.[31]

Early anti-obscenity laws offer another striking example of the abuses that result from subjective and vague speech restrictions. Such laws served as a partisan weapon in the latter half of the nineteenth century, most notably under the paternalistic prudery of postmaster general Anthony Comstock. In Comstock's hands, federal legislation barring "obscene, lewd, lascivious, or filthy" publications from the mail became a weapon for waging political battles against unpopular

---

[31] Mchangama, *supra* note 20, at 200.

viewpoints.[32] Thanks to his abuses of this statute, it remains known today as the Comstock Act.

Comstock and his puritanical allies wielded the Comstock Act's subjective language to hound political opponents. Comstock used the Act's subjective bar against obscene speech to silence critics of monogamous marriage, supporters of women's suffrage, and birth-control advocates.[33] For example, under the banner of his war against obscenity, Comstock persecuted feminist Victoria Woodhull—the first woman candidate for president—because her newspaper criticized religious notions of chastity and marriage.[34] Later, Comstock used the Act to censor birth-control advocate Margaret Sanger and jailed Sanger's husband for distributing pamphlets about pregnancy prevention.[35]

Comstock's partisan campaign disguised as obscenity prosecution even censored major works of literature and art. Notable victims of

---

[32] Margaret A. Blanchard & John E. Semonche, *Anthony Comstock and His Adversaries: The Mixed Legacy of This Battle for Free Speech*, 11 Commc'n. L. & Pol'y 317, 327 (2006).

[33] *Id.* 325, 332, 361.

[34] *Id.* at 325–26.

[35] *Id.* at 353–54.

Comstock's zealotry included Walt Whitman's *Leaves of Grass*, which contained poems alluding to intercourse,[36] Leo Tolstoy's *Kreutzer Sonata*, about a man who murders his wife in a jealous rage,[37] and the ancient Greek comedy *Lysistrata*, in which women put an end to the Peloponnesian War by refusing to have sex with their husbands.[38]

The Comstock Act's inherent subjectivity empowered these censorious impulses. As Judge Learned Hand put it, the "vague subject-matter" in the Act was at the mercy of "general notions about what is decent" such that it "put thought in leash to the average conscience of the time."[39]

To modern eyes, Comstock may look like a self-righteous prig. But there remain plenty in powerful positions, including at the University of Washington, who are just as eager to "put thought in leash" to their own sentiments. Indeed, universities are not above censoring works of

---

[36] *Id.* at 354.
[37] *Id.*
[38] Mchangama, *supra* note 20, at 16.
[39] *United States v. Kennerley*, 209 F. 119, 121 (S.D.N.Y. 1913).

art, just as Comstock did.[40] The orthodoxy du jour has changed, but the impulse to call dissenters to heel remains.

### B. Vague campus anti-harassment policies have become political weapons

Anti-harassment policies are the new Comstock Acts, and campus administrators are our modern Comstocks. Universities have weaponized anti-harassment and anti-discrimination policies like the one at issue here to quell dissent, much like Comstock wielded obscenity law to the same end.

Consider, for example, how universities have abused Title IX's anti-harassment and anti-discrimination provisions. Federal regulation defines sexual harassment in part as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity."[41]

---

[40] Lukianoff, *supra* note 18, at 13–18.
[41] 88 Fed. Reg. 33,833.

18

Like Comstock and his namesake law, universities have retrofitted Title IX as a political weapon. Take, for example, the plight of Laura Kipnis, a film and gender studies professor at Northwestern University. Kipnis had criticized Title IX in an essay claiming that "[i]n the post-Title IX landscape, sexual panic rules" and that if "you wanted to produce a pacified, cowering citizenry, this [approach to Title IX enforcement] would be the method."[42] With no apparent awareness of irony, Northwestern initiated an investigation and labeled her criticism of Title IX as Title IX harassment, engaging in the very overzealous abuse that Kipnis was criticizing.[43] It later dropped the matter, but then began *another* investigation in response to Kipnis's book about the original investigation.[44]

Kipnis's experience is not an anomaly. Not long ago, a philosophy professor at a California community college faced an investigation

---

[42] Laura Kipnis, *Sexual Paranoia Strikes Academe*, Chron. Higher Educ., (Feb. 27, 2015), https://www.chronicle.com/article/sexual-paranoia-strikes-academe/.

[43] Jeannie Suk Gersen, *Laura Kipnis's Endless Trial by Title IX*, The New Yorker (Sept. 20, 2017), https://www.newyorker.com/news/news-desk/laura-kipniss-endless-trial-by-title-ix.

[44] Jonathan Haidt & Greg Lukianoff, *The Coddling of the American Mind* 207–08 (2018).

19

thanks to an alleged comment that "children do better if they are raised with both biological parents."[45] Another recent example of similar abuse comes from Southern Utah University, where the school's Title IX office decided that a professor violated anti-harassment policy by refusing to use non-binary pronouns.[46] Similarly, Shawnee State University disciplined a professor under its anti-harassment policy over his refusal to use a student's preferred pronoun. That policy defined sexual harassment as "harassing conduct that limits, interferes with or denies educational benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint."[47] The Sixth Circuit held that the professor had alleged a valid free speech claim that the university had unlawfully applied this policy against him.[48]

---

[45] *See* Order Granting Defendants' Motion to Dismiss with Leave to Amend, *Stannard v. State Ctr. Cmty. Coll. Dist.*, 1:22-cv-01250-JLT-EPG (E.D. Cal. May 10, 2024), ECF No. 4, 11.

[46] *See* Second Amended Complaint, *Bugg v. Benson*, No. 4:22-cv-00062-DN (D. Utah Oct. 3, 2022), ECF No. 27.

[47] *See* Report & Recommendation, *Meriwether v. Trustees of Shawnee State Univ.*, No. 1:18-cv-753, 2019 WL 4222598, at *2 (S.D. Ohio Sept. 5, 2019), *affirmed in part, vacated in part, reversed in part by Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

[48] *Meriwether v. Hartop*, 992 F.3d 492, 511–12 (6th Cir. 2021).

These are not cherry-picked tales of rogue administrators. The federal Office of Civil Rights leaned into these First Amendment concerns in 2010 by adopting guidance that interpreted Title IX to cover "telling sexual or dirty jokes," "circulating or sharing emails or websites of a sexual nature," or "displaying or distributing sexually explicit drawings, pictures, materials or written materials."[49] Anthony Comstock would doubtless have used this guidance to cancel works like *Lysistrata* and *Leaves of Grass*.

Abuses of these anti-harassment policies have chilled speech. Harvard Law professor Jeannie Suk Gersen noted, in reflecting on Kipnis's story, that many faculty self-censor thanks to such policies:

> Title IX can also be used to discourage disagreement, deter dissent, deflect scrutiny, or register disapproval of people whom colleagues find loathsome. . . . That risk is now built into the professional life of those of us in universities who engage on subjects related to gender and sexuality. Like Kipnis, I routinely hear from teachers who say they are refraining from teaching and writing on such topics for fear of

---

[49] U.S. Department of Education, Office of Civil Rights, Sexual Harassment: It's not Academic (2008), https://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf; Dear Colleague Letter (Oct. 26, 2020), available at https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201010.pdf (guidance marked "not for reliance" because it departs from current Department practices in some ways).

attracting Title IX complaints, which bring possibilities of termination, demotion, pay cuts, and tens of thousands of dollars in legal fees.[50]

Title IX shows that anti-harassment policies, if not carefully limited, offer politically motivated enforcers a tempting weapon for viewpoint discrimination and provoke self-censorship on important issues. But the problem extends beyond Title IX, as this case demonstrates.

### C. The anti-harassment policy here poses an even greater risk of abuse than Title IX

The university's Executive Order 31, the anti-harassment policy with which the Allen School threatened Professor Reges, poses a greater threat to free speech than Title IX's anti-harassment provision for three reasons: (1) it is broader in reach; (2) it is more vague; and (3) to the extent it can be understood, it is viewpoint-based.

### i. Executive Order 31 is overbroad.

"[O]verbroad harassment policies can suppress or even chill core protected speech."[51] A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in

---

[50] Suk Gersen, *supra* note 43.

[51] *DeJohn v. Temple University*, 537 F.3d 301, 314 (3d Cir. 2008).

relation to the statute's plainly legitimate sweep."[52] Executive Order 31 sweeps up too much speech, even more than the Title IX anti-harassment provisions discussed above.

The tension between anti-harassment laws and the First Amendment is a longstanding problem.[53] Courts, regulators, and scholars have sought to address free speech concerns by imposing limits on the scope of these laws. For example, courts have defined harassment under Title IX as an act "that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[54] Circuit courts and federal regulators see this limiting language as a critical safeguard to ensure that anti-harassment law is "consistent with the First Amendment."[55]

---

[52] *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation and citation omitted).

[53] *See* David Bernstein, *You Can't Say That! The Growing Threat to Civil Liberties from Anti-Discrimination Laws* (2004), finding that a previous Department of Education policy on sexual harassment raised serious First Amendment concerns.

[54] *Davis v. Monroe County*, 526 U.S. 629, 633 (1999).

[55] 85 Fed. Reg. 30,026, 30,033 (May 19, 2020). *See also DeJohn*, 537 F.3d at 320 ("Yet, unless harassment is qualified with a standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech."); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (1995) ("[W]hen Title VII is applied to sexual

23

Even with such limiting language, the above discussion demonstrates that these anti-harassment laws are prone to abuse.

Executive Order 31 lacks these safeguards. In fact, it *clarifies* that it is unfettered by limits that other courts have seen as necessary to protect speech. The university asserts the authority "to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, *regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation*."[56]

Without safeguards, the policy could apply to a "mere utterance of an . . . epithet which engenders offensive feelings," simple "discourtesy or rudeness," or even just "a lack of racial sensitivity."[57] It is not difficult to imagine what an Anthony Comstock could do with a law that empowered him to discipline any speech that he deemed "unacceptable or inappropriate."

---

harassment claims founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech.").

[56] 3-ER-518 (emphasis added).

[57] *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (cleaned up).

24

Nonetheless, the district court forgave this extraordinary breadth by resorting to an implausible limiting construction. Courts can construe laws to avoid serious constitutional doubt, but only if the law is "readily susceptible to such a construction."[58] No linguistic tinkering can save Executive Order 31.

The district court construed the Order so that it only reaches conduct that "resembles" discrimination, harassment, or retaliation.[59] That reading is not only implausible—it contradicts the Order's language. Executive Order 31 mentions harassment and discrimination to *distinguish* the Order from those concepts and expressly reach beyond them. The Order doesn't seek to prohibit conduct that resembles harassment—it expressly says it reaches conduct that *does not* resemble harassment. By its plain language, it frees enforcers from the limits of harassment law, rather than fetter them. Instead of a leash that holds back enforcers, it's a launching pad from which the enforcers can pounce at whatever they flag as inappropriate or unacceptable. It is not

---

[58] *Stevens*, 559 U.S. at 481 (internal quotation omitted).
[59] Amended Order Re: Defendants' Motion to Dismiss and Cross-Motions for Summary Judgment at 26, *Reges v. Cauce*, No. 2:22-cv-00964-JHC (W.D. Wash. 2024), ECF No. 90.

reasonable to read a rule emancipating its enforcers from harassment law as emulating harassment law.

ii.    <u>Executive Order 31 is unduly vague.</u>

Executive Order 31 chills speech because of vague and subjective language. Vague laws raise three primary concerns, one of which is unique to the speech context: they fail to offer adequate notice, they invite arbitrary and discriminatory enforcement, and they chill speech.[60] Because of this special concern for self-censorship, "a more stringent vagueness test should apply" where speech is at issue.[61]

This Court should consider the following questions: Can a person of reasonable intelligence understand what a policy forbidding "unacceptable or inappropriate" conduct demands of them? Is a policy prohibiting "unacceptable or inappropriate" conduct clear and objective enough to allow enforcers to seal away their own subjective judgments and apply the law neutrally? And is a professor in a hypersensitive campus environment less likely to say something controversial,

---

[60] *See Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).
[61] *Vill. of Hoffman Estates*, 455 U.S. at 499.

knowing that administrators can penalize whatever they deem "unacceptable or inappropriate?"

The questions answer themselves. Terms like "unacceptable" and "inappropriate" invite arbitrary and discriminatory enforcement. Similar to the Sedition Act's language like "scandalous" and Comstock Act terms like "obscene, lewd, lascivious, or filthy," the executive order's language is "hopelessly ambiguous and subjective."[62] The order's murky language can "encompass any speech that might simply be offensive to a listener, or a group of listeners, believing that they are being subjected to or surrounded by hostility."[63] Indeed, that is just what happened here.

In upholding Executive Order 31 against the vagueness challenge, the district court simply repeated the same erroneous limiting construction that it had used to prop the rule up against the overbreadth challenge. As already discussed, that construction clashes with the language of the rule and cannot save it.

---

[62] *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 250 (3d Cir. 2010).
[63] *DeJohn*, 537 F.3d at 320.

iii.   Executive Order 31 is viewpoint-based.

To the extent that Executive Order 31 is comprehensible, it is viewpoint-based and therefore unlawful unless it can survive strict scrutiny, which is unlikely.[64] At the very least, the language creates a heightened risk that enforcers will engage in viewpoint-based enforcement and thus exacerbates concerns of overbreadth and vagueness.

The order's focus on "unacceptable or inappropriate" conduct boils down to a ban on causing offense. And, according to the Supreme Court, "Giving offense is a viewpoint."[65] For instance, in *Iancu v. Brunetti*, the Supreme Court struck down a Lanham Act provision that denied trademark registration to "immoral or scandalous" trademarks. The Court held that the provision discriminated based on viewpoint because

---

[64] *Matal*, 582 U.S. at 253 (Kennedy, J., concurring) ("It is telling that the Court's precedents have recognized just one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf.").
[65] *Id.* at 243.

it "permits registration of marks that champion society's sense of rectitude and morality, but not marks that denigrate those concepts."[66]

Here, faculty who take an "acceptable" or "appropriate" position on a divisive issue like land acknowledgments are in the clear, while those whose views are "unacceptable" or "inappropriate" are not. This viewpoint bias cannot stand under the First Amendment.

## Conclusion

"A nation that does not educate in freedom will not survive in freedom, and it will not even know when it has lost it."[67] Universities need a lesson about how to educate in freedom. This Court should take this opportunity to teach them.

DATED: September 30, 2024.

Respectfully submitted,

/s/ *Ethan W. Blevins*
Ethan W. Blevins
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7477

---

[66] *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019).
[67] Alan Charles Kors & Harvey A. Silvergate, The Shadow University: The Betrayal of Liberty on America's Campuses 372 (1999).

Email: EBlevins@pacificlegal.org

*Attorney for Attorney for Amici Curiae Pacific Legal Foundation, Students for Liberty, and James G. Martin Center for Academic Renewal*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Case Management System (ACMS) system.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ *Ethan W. Blevins*
Ethan W. Blevins

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Cir. Case Number: 24-3518

I am the attorney or self-represented party.

**This brief contains 5,112 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATED:  September 30, 2024        /s/ *Ethan W. Blevins*
                                  Ethan W. Blevins

                                  *Attorney for Attorney for Amici
                                  Curiae Pacific Legal Foundation,
                                  Students for Liberty, and
                                  James G. Martin Center for
                                  Academic Renewal*

32