**CASE NO. 24-3518**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STUART REGES,

                              Plaintiff-Appellant,

v.

ANA MARI CAUCE, *et al.*,

                              Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Western District of Washington
CASE NO. 2:22-cv-00964-JHC

_____

**BRIEF OF *AMICUS CURIAE* MANHATTAN INSTITUTE
SUPPORTING PLAINTIFF-APPELLANT**

_____

                                          Ilya Shapiro
                                            *Counsel of Record*
                                         Tim Rosenberger
                                         MANHATTAN INSTITUTE
                                         52 Vanderbilt Ave.
                                         New York, NY 10017
                                         (212) 599-7000
                                         ishapiro@manhattan.institute

September 30, 2024

## CORPORATE DISCLOSURE STATEMENT

The Manhattan Institute has no parent companies, subsidiaries, or affiliates, and does not issue shares to the public.

Dated: September 30, 2024                                   s/ *Ilya Shapiro*
                                                            Ilya Shapiro

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES .................................................................................. iii

INTEREST OF *AMICUS CURIAE* .........................................................................1

SUMMARY OF ARGUMENT .................................................................................2

ARGUMENT .............................................................................................................3

   I. The District Court Failed to Properly Consider the University's Adverse Employment Actions ...................................................................................3

      A. The First Amendment Protects Professors from University Retaliation for Their Speech ........................................ **Error! Bookmark not defined.**

      B. The University's Retaliatory Acts Undermine Free Speech on Campus and Nationwide ...................................................................................5

   II. The District Court Failed to Properly Consider the Professor's Free Speech Rights .........................................................................................................8

CONCLUSION .......................................................................................................11

CERTIFICATE OF COMPLIANCE .....................................................................12

CERTIFICATE OF SERVICE ...............................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Demers v. Austin,* 729 F.3d 1011 (9th Cir. 2013) .............................................. 3, 4, 8

*Garcetti v. Ceballos,* 547 U.S. 410 (2006) ........................................................ 9–10

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
    385 U.S. 589 (1967) ........................................................................................ 10

*Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992) ........................................................ 4

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ........................................................ 8

*Sweezy v. New Hampshire,* 354 U.S. 234 (1957) ................................................ 8, 10

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................... 3

**Other Authorities**

Eric Kaufmann, *We Have the Data to Prove It: Universities Are Discriminating Against Conservatives*, Newsweek (Mar. 3, 2021) .......................................... 6

Harvey Gilmore, *Has Garcetti Destroyed Academic Freedom?*, 6 U. Mass.
    Roundtable Symp. L. J. 79 (2011) ................................................................... 9

Ilya Shapiro, *I Won't Be Canceled*, Shapiro's Gavel (June 17, 2022) ...................... 7

Ilya Shapiro, *Why I Quit Georgetown*, Wall St. J., June 6, 2022 .............................. 7

John Stuart Mill, On Liberty (1859) ..................................................................... 11

Komi Frey and Sean Stevens, *Scholars under Fire: Attempts to Sanction Scholars from 2000 to 2022*, Foundation for Individual Rights and Expression (2023) .............................................................................................. 6

Litigation Update: *Reges v. Univ. of Washington*—University Acknowledgement of Indigenous Land, Federalist Society (Aug. 9, 2022) ................................ 5

Matthew Jay Hertzog, *The Misapplication of* Garcetti *in Higher Education*,
    2015 BYU Educ. & L.J. 203 (2015) ..................................................... 4, 9, 10

Sheldon Nahmod, *Academic Freedom and the Post-*Garcetti *Blues*,
    7 First Amend. L. Rev. 54 (2008) ................................................................... 9

Thomas E. Hudson, *Talking Drugs: The Burdens of Proof in Post-*Garcetti
    *Speech Retaliation Claims*, 87 Wash. L. Rev. 777 (2012) ............................. 9

## INTEREST OF *AMICUS CURIAE*[1]

The Manhattan Institute (MI) is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency across multiple dimensions. It has sponsored scholarship and filed briefs opposing regulations that interfere with constitutionally protected liberties. MI has a particular interest in defending constitutional speech protections, because its scholars have been targets of speech-suppression efforts.

MI supports a marketplace of ideas unfettered by government censorship and this case presents a blatant violation of the freedom of speech. Educational institutions are not merely places where First Amendment rights should be protected. Instead, that protection is vital to their truth-seeking mission and they are uniquely positioned to instill in the next generation an appreciation for free speech. Investigating and sanctioning faculty for expressing unpopular opinions undermines First Amendment rights and deters students, faculty, and administrators from speaking and writing freely. That in turn poses a threat to our polity.

---

[1] Pursuant to Fed. R. App. P. 29, counsel states that the parties consented to the filing of this brief. Further, no party's counsel authored any part of this brief and no person other than *amici* made a monetary contribution to fund its preparation or submission.

1

## SUMMARY OF ARGUMENT

Free speech and open inquiry are central tenets of any educational institution, especially our nation's universities. Retaliatory investigations and punishment of faculty who express unpopular opinions undermine First Amendment rights and deter students, faculty, and administrators from expressing themselves freely. Yet that's precisely what happened at the University of Washington when Professor Stuart Reges was persecuted for inserting into his syllabus a parody of the "land acknowledgement" his employer was forcing him to convey to his students.

Courts have long considered faculty speech protected from intimidating investigations and retaliatory actions taken by university administrators. While the district court acknowledged that Prof. Reges's speech was relevant to national questions of history and education, it underestimated the importance of protecting faculty speech. The court also failed to acknowledge the detrimental of effect university sanctions against professors who express unpopular opinions. Nationwide, there is a crisis on campuses precisely for the factors spotlighted in this case: university administrators' undermining the right of professors and students to speak freely—while not enforcing rules against actual disruptions of educational missions. These sanctions create a chilling effect that makes debate and open discussion increasingly difficult and fails to equip the next generation with the tools they need to productively contribute to civil discourse.

# ARGUMENT

## I. The District Court Failed to Properly Consider the University's Adverse Employment Actions

Retaliation is a pervasive tactic used by universities to silence professors who voice opinions the administration dislikes. This Court has thus upheld the right of university faculty to criticize their administrations on topics that deal with public issues. *See, e.g., Demers v. Austin*, 729 F.3d 1011, 1020-22 (9th Cir. 2013). Indeed, as the Supreme Court has made clear, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics." *W.Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Yet the district court here failed to properly consider the University of Washington's adverse employment actions, which amount to a retaliatory investigation and withholding of pay for parodying one of the school's political initiatives. Investigating a professor who fails to toe the school line when it comes to politicized land acknowledgments is an emblematic infringement of First Amendment free speech rights. Prof. Reges suffered just such retaliation for statements he made in his syllabus.

### A. The First Amendment Protects Professors from University Retaliation for Their Speech

This Court has taken steps to defend faculty specifically when they criticize their own university administration. In *Demers*, it vindicated the right of a teacher

3

who sought to advocate for a reform of the university administration after suffering multiple low performance reviews. David Demers "distributed a controversial seven step plan calling for the separation of the College's communication school into two different faculty groups, Mass Communication and Communication Studies." Matthew Jay Hertzog, *The Misapplication of* Garcetti *in Higher Education*, 2015 BYU Educ. & L.J. 203, 220 (2015). This Court held that "academic employee speech not covered by Garcetti is protected under the First Amendment, using the analysis established in *Pickering*." *Demers*, 729 F.3d at 1020. The *C*ourt declared the teacher's statements to be protected speech for which he suffered illegal retaliation.

It is likewise well settled in sister circuits that professors are protected from the indirect chilling of their speech by university administrations. For example, more than 30 years ago, the Second Circuit affirmed a district court's decision to enjoin the City University of New York from "from creating or maintaining 'shadow' or 'parallel' sections of his classes predicated solely upon Professor Levin's protected expression of ideas." *Levin v. Harleston*, 966 F.2d 85, 88 (2d Cir. 1992). Opening the alternative section undermined the professor's role as teacher and deterred him from expressing his opinions more openly.

Here, the district court failed to consider any of the adverse employment actions the university took. Prof. Reges was subject to disciplinary action and an investigation, as well as the withholding of his pay, after including a satirical version

4

of a land acknowledgement in his syllabus. A university official, Defendant Balazinska, demanded that Reges remove the statement from his syllabus, stating that it was "offensive" and caused a "toxic environment." Balazinska's email shook Reges's confidence in his academic position, thereby chilling his speech. Indeed, Reges was asked repeatedly to change his syllabus and told that his statement caused disruption. To add insult to injury, university officials then had Reges's statement removed from his syllabus by the IT department.

After the semester, the school opened an investigation into Prof. Reges's conduct and withheld his pay. The next semester, when Professor Reges still had the parodied statement in his syllabus, the school created an alternative section for Reges's class—just like the Second Circuit's *Levin* case. Additionally, the school gave Reges a much lighter course load. *See* Litigation Update: *Reges v. Univ. of Washington*—University Acknowledgement of Indigenous Land, Federalist Society (Aug. 9, 2022), https://tinyurl.com/y7e7bwcn (providing video and transcript of event discussing the twists and turns of this litigation). The district court did not analyze the significance of these actions, which all constituted retaliation for Prof. Reges's speech.

### B. The University's Retaliatory Acts Undermine Free Speech on Campus and Nationwide

The University of Washington's retaliatory actions are part of a larger attempt to clamp down on free speech on college campuses throughout the country. Since

5

2022, there have been over 1,080 sanction attempts against university professors. Komi Frey and Sean Stevens, *Scholars under Fire: Attempts to Sanction Scholars from 2000 to 2022*, Foundation for Individual Rights and Expression (2023), https://tinyurl.com/5ehjanpx. Almost two-thirds of these attempts have led to penalties for faculty, including 225 terminations. *Id*.

A staggering one in three conservative academics and students have been disciplined or threatened with retaliatory action for sharing their views. *Id.* Retaliation for voicing unpopular views has created a culture where 75 percent of conservative academics say their departments are a hostile environment and indeed 7 in 10 conservative academics self-censor. *Id.* Social science scholar Eric Kaufmann writes that the chilling of free speech for political minorities on campus stems from fears of retaliatory action, comparable to the adverse employment actions suffered by Prof. Reges. Eric Kaufmann, *We Have the Data to Prove It: Universities Are Discriminating Against Conservatives*, Newsweek (Mar. 3, 2021), https://tinyurl.com/258ykjbp. On campuses, where those on the political left outnumber the right by a ratio of more than ten to one, retaliatory action creates a great deterrent against open expression. These statistics reveal the frightening state of free speech on campus, where bureaucratic investigations and heckler's vetoes silence unpopular opinions.

Counsel of record has experienced this dynamic personally. In January 2022, he tweeted in opposition to President Biden's decision to limit his consideration of potential Supreme Court nominees based on race and sex. A backlash emerged among faculty and students at Georgetown University, where Counsel Shapiro was due to start a new job less than a week later. Although Counsel Shapiro's contract was not rescinded, he was immediately placed on administrative leave pending an investigation into his social-media commentary. He was even prohibited from setting foot on campus. Once the semester was over—because it takes more than four months to "investigate" a tweet—Counsel Shapiro was reinstated on the technicality that he was not yet a Georgetown employee when he tweeted. But it was made clear to him that any further statements that caused offense would subject him to renewed investigation and discipline. Realizing that he wouldn't be able to do what he'd been hired to do, which included teaching and public speaking, he resigned. *See* Ilya Shapiro, *Why I Quit Georgetown*, Wall St. J., June 6, 2022, https://tinyurl.com/4ktyuy7j.

Ultimately, the anti-free speech culture on campus undermines faculty of all political persuasions. As counsel of record wrote after his saga concluded, "It was an experience I wouldn't wish on anyone . . . Georgetown had made it impossible to fulfill the duties I had been hired to perform."  Ilya Shapiro, *I Won't Be Canceled*, Shapiro's Gavel (June 17, 2022), https://tinyurl.com/y8x9e6uz. Given the national

7

crisis in higher education, it is imperative that the Court consider the role that adverse employment actions play in undermining and eroding the First Amendment rights of professors like Stuart Reges.

## II. The District Court Failed to Properly Consider the Professor's Free Speech Rights

Given the centrality of freedom of expression in educational environments, the Supreme Court has long repeatedly emphasized the importance of First Amendment protections on university campuses. Nearly 70 years ago, the Court wrote: "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Indeed, as a public university, the University of Washington has a unique responsibility to guarantee the faculty's free speech rights. These sentiments lay behind this Court's ruling in *Demers v. Austin*, which protected the speech even of faculty at public universities. In *Demers,* the Court found that faculty speech is protected when it (1) relates to matters of "public concern," and (2) it outweighs any administrative interests in regulating speech. *Demers v. Austin*, 729 F.3d 1011, 1020 (9th Cir. 2013) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968)).

Here, the district court agreed with Prof. Reges that his words related to a public concern, namely the appropriateness of indigenous land acknowledgments.

8

Yet it decided that the University of Washington had a greater interest in silencing Reges because of concerns raised by students and administrators about his comments. But the Defendants could not show that Reges's comments caused any actual disruption on campus or inhibited his students from learning the course material. None of his classes were cancelled or disrupted. Indeed, even when an alternative section was opened for Reges' class, very few students switched into the new section. So the university's concerns, regardless of their validity, were overblown.

The district court devoted much of its opinion to a discussion of *Garcetti v. Ceballos*, 547 U.S. 410 (2006). As one scholar has noted, however, *Garcetti* "did not explicitly involve academic freedom." Sheldon Nahmod, *Academic Freedom and the Post-Garcetti Blues*, 7 First Amend. L. Rev. 54, 55 (2008). Many other scholars have noted that a misapplication of *Garcetti* can lead to egregious results, particularly when it comes to retaliation against professors who speak their minds. *See*, *e.g.*, Matthew Jay Hertzog, *The Misapplication of Garcetti in Higher Education*, 2015 BYU Educ. & L.J. 203 (2015); Thomas E. Hudson, *Talking Drugs: The Burdens of Proof in Post-Garcetti Speech Retaliation Claims*, 87 Wash. L. Rev. 777 (2012); Harvey Gilmore, *Has Garcetti Destroyed Academic Freedom?* 6 U. Mass. Roundtable Symp. L.J. 79 (2011). And the *Garcetti* Court itself noted that "expression related to academic scholarship or classroom instruction implicates

9

additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Garcetti,* 547 U.S. at 425.

Indeed, the lower court wholly failed to consider the countervailing interests and special protections due to First Amendment free speech rights on a university campus. Teaching and writing are "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967). "Although the protections awarded the professoriate through academic freedom and freedom of speech were clearly established in *Keyishian* . . . these principles are once again being challenged within the U.S. legal system." Hertzog, *supra*, at 223.

The district court considered the interests and opinions of only a handful of students and faculty who were disappointed with Prof. Reges's views. Given that Reges was participating in the nationwide debate about land acknowledgments, however, his speech interests are very high. As the Court said in *Sweezy*, "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." 354 U.S. at 250.

Moreover, the University of Washington itself has an interest in protecting free speech, which promotes inquiry and the creation and dissemination of knowledge. As John Stuart Mill wrote in criticizing those who would silence unpopular opinions: "If the opinion is right, they are deprived of the opportunity of

10

exchanging error for truth; if wrong, they lose, what is almost as great a benefit, the clearer perception and livelier impression of truth produced by its collision with error." John Stuart Mill, On Liberty 31 (1859).

## CONCLUSION

For the foregoing reasons, and those stated by the Plaintiff-Appellant, this Court should reverse the judgment below.

Respectfully submitted,

s/ *Ilya Shapiro*
Ilya Shapiro
   *Counsel of Record*
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

September 30, 2024

11

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-1770

I am the attorney or self-represented party.

**This brief contains 4,285 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.
[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated _____.
[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Ilya Shapiro          **Date** September 30, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

12

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit for filing and transmittal of a Notice of Electronic Filing to the participants in this appeal who are registered CM/ECF users.

DATED: September 30, 2024            s/ Ilya Shapiro
                                                                     Counsel for *Amici Curiae*