No. 24-3518

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STUART REGES,

*Plaintiff-Appellant,*

v.

ANA MARI CAUCE, in her official capacity as President of the University of Washington, MAGDALENA BALAZINSKA, in her official and individual capacities as Director of the Paul G. Allen School of Computer Science & Engineering, DAN GROSSMAN, in his official and individual capacities as Vice Director of the Paul G. Allen School of Computer Science & Engineering, and NANCY ALLBRITTON, in her official and individual capacities as Dean of the College of Engineering,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON,
No. 2:22-cv-00964-JHC. (Hon. John H. Chun)

## BRIEF OF AMICUS CURIAE PEN AMERICAN CENTER, INC.
## IN SUPPORT OF PLAINTIFF-APPELLANT

Katherine Blankenship, FL Bar # 1031234
PEN America Center, Inc.
250 Catalonia Avenue, #405
Coral Gables, Florida 33134
*Counsel for Amicus Curiae*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that *amicus curiae* PEN American Center, Inc. has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

/s/ *Katherine Blankenship*
Katherine Blankenship, FL Bar # 1031234
PEN America Center, Inc.
250 Catalonia Avenue, #405
Coral Gables, Florida 33134
*Counsel for Amicus Curiae*

# Table of Contents

Corporate Disclosure Statement ........................................................ i

Table of Contents .......................................................................... ii

Table of Authorities ...................................................................... iii

Interest of Amicus Curiae ............................................................... 1

Introduction ................................................................................. 2

Factual Background ....................................................................... 3

Argument ..................................................................................... 4

   I.   The District Court Erred in Its *Pickering* Analysis ................................ 4

       A. When considering a state's interests in maintaining productive workplace environments, courts must be careful not to mistake discomfort for disruption. ............................................. 5

       B. The discomfort caused by Professor Reges' Statement does not constitute disruption sufficient to outweigh First Amendment interests. ...................................................................... 9

  II.  The University Has Better Means of Addressing Harm and Offense. ... 12

  III. Upholding the District Court's *Pickering* Analysis Would Have Disastrous Consequences for Academic Freedom. .................................................... 14

Conclusion ................................................................................. 17

Certificate of Compliance ............................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Scribner*, 812 F.2d 426 (9th Cir. 1987) ........................................................7

*Bauer v. Sampson*, 261 F.3d 775 (9th Cir. 2001) ........................................................6

*Connick v. Myers*, 461 U.S. 138 (1983)........................................................7

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)....................................................2, 5

*Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767 (9th Cir. 2022) ............. 5, 6, 7, 8

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .............................................................2

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967) . 2, 3, 16

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)............................................... *passim*

*Rankin v. McPherson*, 483 U.S. 378 (1987) .............................................................6

*Reges v. Cauce*, 2024 WL 2140888 (W.D. Wash. 2024) ............................... *passim*

**Other Authorities**

Alex Kane, *The Push to Deactivate Students for Justice in Palestine*, Jewish
Currents (Nov. 21, 2023), https://jewishcurrents.org/the-push-to-deactivate-
students-for-justice-in-palestine-sjp ...................................................................16

CNN, *Analysis: How well-meaning land acknowledgements can erase Indigenous
people and sanitize history* (Oct. 10, 2022),
https://www.pbs.org/newshour/nation/analysis-how-well-meaning-land-
acknowledgements-can-erase-indigenous-people-and-sanitize-history.................8

Jonathan Friedman, *Suspensions of Students for Justice in Palestine Chapters
Raise Questions and Concerns about Chilled Campus Environments*, PEN
America (Dec. 8, 2023), https://pen.org/suspensions-of-students-for-justice-in-

palestine-chapters-raise-questions-and-concerns-about-chilled-campus-environments/............................................................................ 15, 16

Matt Hamilton, *A Jewish professor at USC confronted pro-Palestinian students. He's now barred from campus* (November 26, 2023), https://www.latimes.com/california/story/2023-11-26/a-usc-professor-called-for-hamas-to-be-killed-hes-now-banned-from-campus............................................16

Maya Pontone, *Providence College Cancels Exhibition Over "Anti-Catholic" Artwork,* Hyperallergic (May 8, 2024), https://hyperallergic.com/912796/providence-college-cancels-exhibition-over-anti-catholic-artwork/............................................................................15

Michael C. Lambert, Elisa Sobo & Valerie L. Lambert, *Rethinking Land Acknowledgments*, Anthropology News (Dec. 20, 2021), https://www.anthropology-news.org/articles/rethinking-land-acknowledgments/ 8

Mohammad Fadel, *The Palestine Exception to Academic Freedom Must Go*, Chron. of Higher Ed. (Apr. 24, 2024), https://www.chronicle.com/article/the-palestine-exception-to-academic-freedom-must-go ............................................16

PEN America, *Campus Free Speech Guide* (last visited Sept. 30, 2024), https://campusfreespeechguide.pen.org ................................................. 10, 13, 15

PEN America, *Cancellation of Samia Halaby Exhibition at Indiana University Represents "An Alarming Affront to Free Expression"* (Jan. 12, 2024), https://pen.org/press-release/cancellation-of-samia-halaby-exhibition-at-indiana-university-represents-an-alarming-affront-to-free-expression-says-pen-america....
................................................................................................................ 15

PEN America, *Citing Grave Free Speech Concerns, PEN America Rejects Florida Campus Ban on Students for Justice in Palestine* (Oct. 26, 2023), https://pen.org/press-release/citing-grave-free-speech-concerns-pen-america-rejects-florida-campus-ban-on-students-for-justice-in-palestine/ ........................15

PEN Charter (1948), https://pen.org/pen-charter/......................................................1

Shanti Escalante-De Mattei, *Art Exhibit Canceled After State College of Florida Wants Words 'Diversity' and 'Inclusion' Banned*, Art News (Feb. 21, 2023), https://www.artnews.com/art-news/news/state-college-of-florida-embracing-our-differences-exhibit-cancelled-ron-desantis-diversity-1234658516/....................15

## INTEREST OF AMICUS CURIAE

PEN American Center, Inc. ("PEN America" or "Amicus") is a nonpartisan, not-for-profit organization with an abiding interest in protecting free expression as the cornerstone of a robust and healthy democracy.[1] PEN America has done extensive advocacy and research on educational censorship and campus free speech.[2] In today's debate over free speech on campus, PEN America is guided by the 1948 PEN Charter to stand for the "unhampered transmission of thought," to "oppose any form of suppression of freedom of expression," and to "dispel race, class, and national hatreds." PEN America advocates for nurturing campus communities that uphold these values, protecting speech to the utmost and allowing for academic and social discourse that is truly inclusive and transcends boundaries. With this brief, Amicus seeks to situate the law and the facts of this case within this framework, demonstrating that suppression of speech is not the answer to creating diverse and inclusive campuses.

---

[1] Per Fed. R. App. P. 29(a)(4)(E), Amicus declares that: (1) no party's counsel authored the brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (3) no person, other than Amicus, its members, or its counsel, contributed money intended to fund preparing or submitting the brief. All parties consent to the filing of this brief pursuant to Fed. R. App. P. 29(a)(2).

[2] PEN Charter (1948), https://pen.org/pen-charter/.

## INTRODUCTION

PEN America respectfully submits this brief to address a single issue[3] with the District Court's decision—namely, the way it applied the *Pickering* balancing test, giving insufficient weight to the considerable First Amendment protections due University of Washington Professor Stuart Reges' ("Professor Reges") speech on a matter of public concern.

The District Court specifically erred in treating offense as workplace disruption sufficient to outweigh the heightened First Amendment interests in this case. While offense may be real and deeply felt, causing distress and discomfort, such concerns cannot eclipse core personal liberties. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 602 (1967) (even if "the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that

---

[3] Amicus will not focus on other points at issue, except to express agreement with the District Court's finding that the government speech doctrine is inapplicable to this case. The unconstrained expansion of the government speech doctrine has become the *issue du jour* in many states across the country, but here the District Court got it right. Because, while the government speech doctrine "respect[s] the needs of government employers attempting to perform their important public functions," the Supreme Court has acknowledged an important exception in cases such as the one before us, where "expression related to academic scholarship or classroom instruction implicates additional constitutional interests" of academic freedom. *Garcetti v. Ceballos*, 547 U.S. 410, 420, 425 (2006); *see also Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014) (holding that *Garcetti*'s employee speech jurisprudence does not apply to "speech related to scholarship or teaching"). In such instances, it is the *Pickering* balancing test that applies and as the District Court correctly found, that is true here. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

broadly stifle fundamental personal liberties when the end can be more narrowly achieved.").

The District Court veered into the dangerous waters forewarned in *Keyishian*. The principles of free expression and academic freedom require a commitment to protecting unpopular and controversial ideas, which is especially true in higher education, the quintessential "marketplace of ideas." *Id*. at 603. If left to stand, the District Court's decision risks continuing a trend of justifying censorship in the name of preventing or redressing offense or harm, a trend which has become increasingly common in the higher education sector. Amicus urges this Court to reconsider.

## FACTUAL BACKGROUND

The facts are relatively straightforward. The University of Washington's Allen School (the "University") invited faculty to include a Native American land acknowledgment on their syllabi. Professor Reges, who was teaching an introductory computer science course, included what he claims was a parody of the University's sample acknowledgment (the "Statement") on his syllabus.[4] A number of teaching assistants, staff, and students responded with outrage, accusing Professor Reges' Statement of creating a toxic school environment. Many of them spoke and

---

[4] The text of the Statement read: "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington." 2-ER-321.

wrote of feeling unwelcome, fearful, and intimidated, particularly Native American students. 2-ER-127-135.

In response, the University removed the Statement from Professor Reges' course syllabus, opened an investigation, and found that the Statement violated a University Executive Order, EO #31, which states that faculty can be disciplined for inappropriate and unacceptable conduct even if that conduct does not rise to the level of legal discrimination or harassment. 3-ER-558. The University then initiated a disciplinary process, with potential consequences up to and including dismissal should Professor Reges fail in the future to comply with its dictates. *Id*. Professor Reges sued for viewpoint discrimination and retaliation under the First Amendment. The District Court rejected that challenge, and Professor Reges appealed.

Amicus writes now to urge the Court to reconsider how the University applied the *Pickering* balancing test to Professor Reges' Statement.

## ARGUMENT

### I. The District Court Erred in Its *Pickering* Analysis.

While Amicus agrees with the District Court's decision that this case should be decided under the *Pickering* balancing test, the court erred in its application of that test. As a result of that misapplication, the court has established a steep and slippery slope that will inevitably lead to increased censorship and viewpoint discrimination in public higher education.

4

Applying the first step of the *Pickering* test, the District Court appropriately found that Professor Reges was speaking on a matter of public concern, which this Court has defined as "relat[ing] to any matter of political, social, or other concern to the community." *Demers*, 746 F.3d at 415. As the court found, the Statement represented Professor Reges' views on the value and appropriateness of land acknowledgments, an issue that has spawned a significant amount of social and political debate. *See Reges v. Cauce*, 2024 WL 2140888, at *11 (W.D. Wash. 2024).

It is the second part of the test—weighing the legitimate interests of the state against the First Amendment rights of Professor Reges—where the District Court faltered. The District Court incorrectly found that the discomfort experienced by a group of students and staff, and speculation over potential future impacts, resulted in—or effectively constituted—disruption severe enough to outweigh First Amendment interests.

### A. *When considering a state's interests in maintaining productive workplace environments, courts must be careful not to mistake discomfort for disruption.*

As the District Court explained, "'promoting workplace efficiency and avoiding workplace disruption' is a valid government interest that can justify speech restrictions." *Id*. (internal citations omitted). Preventing workplace disruption can be a valid government interest because it can impair "harmony among co-workers . . .

[and] interferes with the regular operation of the enterprise." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782 (9th Cir. 2022).

Yet this is only the beginning of a court's inquiry. The decision in *Dodge*, a case involving a middle school teacher who wore a MAGA hat to teacher trainings, is helpful here. In *Dodge*, this Court did not stop in its acknowledgement that disruption may be a valid state interest. Instead, it noted that these interests did *not* justify suppression of speech. *See id.*, 783-84. (finding that "it was patently unreasonable" for the school to suppress a middle school teacher's speech "to quell what was, in reality, nothing more than the natural effect that disfavored political speech often has on those with different viewpoints.").

This Court in *Dodge* understood that evaluating disruption must not be done in a vacuum—consideration of the specific facts and circumstances is critical. *See also Rankin v. McPherson*, 483 U.S. 378, 388 (1987). This is even more important in institutions of higher education. As this Court has repeatedly held, concerns of interpersonal harmony and other similar goals are not necessarily relevant in a university setting. In fact, discord and debate are often necessary for scholars, whether faculty, visitors, or students aspiring to scholarship, to effectively perform their duties. *See, e.g., Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001) ("Given the nature of academic life, especially at the college level, it was not necessary to enjoy a close working relationship requiring trust and respect...the vigorous

6

exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams.") (cleaned up).

While vigorous debate and "resulting tension" *id*., are essential parts of a university environment worthy of special consideration, so too is the nature of Professor Reges' speech. When considering the University's interests in regulating speech to "promote workplace efficiency and avoid workplace disruption," *Dodge*, 56 F.4th at 781 (cleaned up), courts should carefully consider the particularly high bar set when the speech at issue involves matters of public concern, which "occupies the highest rung of the hierarchy of First Amendment values." *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir. 1987); *see also Connick v. Myers*, 461 U.S. 138, 152 (1983) (holding that "a stronger showing may be necessary" if the speech involves matters of public concern).

Land acknowledgments have been the subject of much public debate, both in the larger public sphere and within academia. Some Native American and Alaskan Native scholars and groups, for example, have challenged the utility and widespread adoption of land acknowledgments, questioning if they in fact redress past ills and represent the present-day concerns of indigenous communities or whether instead they function primarily to "sanitize" the worst parts of the United States' history.[5]

---

[5] *See e.g.*, CNN, *Analysis: How well-meaning land acknowledgements can erase Indigenous people and sanitize history*, October 10, 2022, https://www.pbs.org/newshour/nation/analysis-how-well-meaning-land-

This debate underscores that the Statement is one that regards an area of public concern. This key fact should lead the Court's analysis.

Even acknowledging that the Statement gave rise to considerable offense, that offense, standing alone, does not present the level or kind of disruption to university functions necessary to overcome the exceedingly high bar that is set when determining whether to suppress speech. *See Dodg*e, 56 F.4th at 782 ("'The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made.").

Indeed, the District Court noted that offense alone cannot countervail core First Amendment protections. *See Reges* 2024 WL 2140888, at 45 ("offense alone does not amount to a legitimate interest to justify limiting speech."). Despite that finding, the District Court nonetheless found that the University's "interests in mitigating disruption outweighs Plaintiff's interest here." *Id*. at *25. This finding was in error. The disruption cited by the University consists of certain University community members' subjective reactions to the Statement. To hold that these subjective responses created disruption sufficient to limit protected speech is contrary to law.

---

.acknowledgements-can-erase-indigenous-people-and-sanitize-history. *See also* Michael C. Lambert, Elisa Sobo & Valerie L. Lambert, *Rethinking Land Acknowledgments*, Anthropology News (Dec. 20, 2021), https://www.anthropology-news.org/articles/rethinking-land-acknowledgments/.

**B.** ***The discomfort caused by Professor Reges' Statement does not constitute disruption sufficient to outweigh core First Amendment interests.***

The University alleges that Professor Reges' Statement created disruption significant enough to overcome heightened First Amendment protections for speech of public concern in three ways: 1) the Statement interfered with the work of the recruiter for diversity and access (the "Recruiter") whose job is in part to increase the enrollment of Native American students in the school; 2) teaching assistants claimed they felt uncomfortable mentioning their own views related to land acknowledgments and to diversity, equity, and inclusion ("DEI"); and 3) students reported feeling unsafe, alienated, and unable to engage with the course or have productive relationships with Professor Reges. *See Reges* 2024 WL 2140888, at *48. Amicus will address these allegations of disruption in turn.

**a. The Recruiter**

The University argues that the Recruiter's ability to perform their job functions, specifically the goal of attracting and retaining a diverse student body, including increased enrollment and retention of Native American students, would be adversely impacted by the Statement. Yet speculative concerns of future harm do not tip the balancing test in the University's favor.

 This is especially true when the University can take steps to address the harm other than censoring Professor Reges' speech – and indeed has done so, such as

creating another section of the course.[6][7] The interests in protecting speech regarding matters of public concern should win the day over the speculative impact on the Recruiter's future ability to attract students to the University.

Indeed, to hold otherwise would have enormous implications for the core functions of the academy. It would be irresponsible to suggest, for example, that a scientist's scholarship and teaching about stem cell research might constitute "disruption" for the potential recruitment of students who reject the use of stem cells on religious grounds. Similar to a heckler's veto, this would effectively give those taking the most offense the ability to stifle a professor's speech. Such an outcome infringes on First Amendment principles, and the District Court's decision regarding the Recruiter should be reversed.

### b. Teaching Assistants

The District Court also erred in its analysis in weighing the impact on teaching assistants. The court relied on an email from the teaching assistants' union, which stated that teaching assistants in Professor Reges' class feared retaliation should they

---

[6] *See* §II infra.

[7] Note that when there is no evidence that students are being unfairly or unequally graded or treated, creation of an alternative section may be an unduly punitive measure that violates the spirit of academic freedom. There should be policies in place to ensure that such decisions are not arbitrary. Amicus takes no position on whether this solution was, in fact, an appropriate way of addressing harm in this case. *See also* Campus Free Speech Guide, PEN America (last visited September 30, 2024), https://campusfreespeechguide.pen.org/issue/diversity-and-inclusion/.

mention their own views on topics related to land acknowledgments and DEI. *See* 1-ER-41. But Professor Reges gave no indication that he would retaliate against those who spoke out against the Statement, and thus, to the extent that teaching assistants felt impaired in their ability to speak freely, it was traceable only to the offense they took and their purely speculative fear that they would be retaliated against.

To this end it is notable that despite the offense taken from Professor Reges' Statement, part of his stated intention was to "make fun of land acknowledgments," "caus[e] trouble on purpose" 2-ER-211, and "challenge[] his students and fellow faculty to think about the utility and performative nature of land acknowledgment[s]." *Reges*, 2024 WL 2140888, at *1. Based on Professor Reges' stated intent, subjective fears of retaliation should not bear significant weight, especially without evidence of an actual threat of same.

This is true even if the Statement "goes against the Allen School's commitment to create an inclusive environment for people of all backgrounds" 2-ER-98. The University, as discussed herein, can take steps to uphold its commitments to create an inclusive campus environment without stifling speech. Amicus thus disagrees with the court's conclusion that "Plaintiff's speech caused disruption with respect to teaching assistants" to a level that justified limiting his speech. *See* Reges, 2024 WL 2140888, at *22.

### c. Students and the University community

Similarly, the effect on students is traceable only to their subjective responses and lacks a showing of disruption to their ability to take part in university life. Amicus does not deny, nor dismiss as unimportant, the fact that some students experienced hurt and fear in response to Professor Reges' Statement. It is deeply concerning that indigenous students "felt despised" or that a student "felt compelled to drop out of the university." *See* 2-ER-127 *and Reges*, 2024 WL 2140888, at *4. Indeed, the University has an obligation to support impacted students and staff. *See* §II, *infra*. But while the need to address feelings of offense and harm is real; these concerns do not rise above the Constitution.

## II. The University Has Better Means of Addressing Harm and Offense.

The University should be even more hesitant to act on anticipated harm or feelings of offense when it has many other tools besides censorship at its disposal. It is undisputed that many students and University employees were highly offended by the Statement, and the University can take steps to offer resources, support, and means for such concerns to be taken seriously. For example, its decision to create an alternative section of the class available to students who wished to take the course from a different professor may have been a reasonable ameliorative measure.[8]

---

[8] *See supra* n. 6.

As institutions of higher education, universities are in a unique position to use controversial topics and heightened emotions as teachable moments about free speech and academic freedom. PEN America advocates for a number of different strategies to address complex and controversial issues, such as providing public fora for discussion and debate on the issue of land acknowledgments, creating spaces for students to be in community with one another and to share how difficult speech or experiences impacted them, and specific outreach and engagement with those most impacted.[9] The University could have also provided information about how it weighs First Amendment protections with controversial or harmful speech and demonstrate how speech that some find harmful or offensive should be an entry point for dialogue, and an opportunity to have more speech and ideas brought into the conversation, not less. Finally, while protecting Professor Reges' free speech rights, the University could also have used its own speech and platforms to state that Professor Reges' Statement does not reflect its values, nor how it wishes to treat its community.

Defending academic freedom will often require defending speech that some find offensive, as well as making an investment in creating alternative ways of addressing and repairing harm that do not involve censorship. This is such a time.

---

[9] *See* PEN America, "Our Principles," *Campus Free Speech Guide*, https://campusfreespeechguide.pen.org/pen-principles/.

**III.     Upholding the District Court's *Pickering* Analysis Would have Disastrous Consequences for Academic Freedom.**

Academic freedom is under attack. This Court is one of many across the country grappling with questions of faculty free speech and state censorship. These controversies arise at the same time as censorship is more generally on the rise, particularly in public education. It is undeniable—and deeply challenging for universities—that these controversies often involve real and deeply felt offense and discomfort, and universities have struggled to respond to those reactions while upholding First Amendment rights and free expression values.

Examples of using offense or feelings of harm to justify the suppression of free speech on university campuses abound. PEN America has spoken out against so-called "cancel culture" in the university context and beyond, emphasizing that academic and creative freedom are essential for creating nuanced dialogue about challenging and complex issues. Yet calls to cancel campus events or discipline professors for their speech have become an everyday reality of college and university operations.[10]

---

[10] *See, e.g.,* PEN America, *Invited Speakers*, *Campus Free Speech Guide*, https://campusfreespeechguide.pen.org/issue/invited-speakers/.

The erosion of academic freedom is evidenced by the many university art exhibitions canceled due to offense taken over issues of religion,[11] DEI,[12] or the political views of the artist.[13] Recently, the failure in higher education to appropriately and productively address faculty and student speech amid the heightened tensions surrounding the Israel-Palestine conflict have led many universities to turn to censorship, often in deference to heightened offense and emotional responses to political speech.[14]

---

[11] *See, e.g.,* Maya Pontone, *Providence College Cancels Exhibition Over "Anti-Catholic" Artwork,* Hyperallergic, May 8, 2024, https://hyperallergic.com/912796/providence-college-cancels-exhibition-over-anti-catholic-artwork/.

[12] *See, e.g.,* Shanti Escalante-De Mattei, *Art Exhibit Canceled After State College of Florida Wants Words 'Diversity' and 'Inclusion' Banned* February 21, 2023, https://www.artnews.com/art-news/news/state-college-of-florida-embracing-our-differences-exhibit-cancelled-ron-desantis-diversity-1234658516/.

[13] *See, e.g.,* PEN America, *Cancellation of Samia Halaby Exhibition at Indiana University Represents "An Alarming Affront to Free Expression"*, January 12, 2024, https://pen.org/press-release/cancellation-of-samia-halaby-exhibition-at-indiana-university-represents-an-alarming-affront-to-free-expression-says-pen-america/.

[14] Florida serves as a cautionary tale of the slippery slope that can emerge when the state uses the offense taken by some as justification for state overreach. For example, the state has attempted to shut down nonviolent pro-Palestinian student groups, deeming their speech and existence so offensive as to justify suppression. *See, e.g.*, PEN America, *Citing Grave Free Speech Concerns, PEN America Rejects Florida Campus Ban on Students for Justice in Palestine*, October 26, 2023, https://pen.org/press-release/citing-grave-free-speech-concerns-pen-america-rejects-florida-campus-ban-on-students-for-justice-in-palestine/. This is happening on campuses across the country as well. *See, e.g.,* Jonathan Friedman, *Suspensions of Students for Justice in Palestine Chapters Raise Questions and Concerns about Chilled Campus Environments*, PEN America (Dec. 8, 2023), https://pen.org/suspensions-of-students-for-justice-in-palestine-chapters-raise-

Controversial speech is, by definition, challenging and uncomfortable, likely to cause offense and hurt. These conflicts arise frequently in higher education; rigorous debate, working through deep disagreement, and developing greater knowledge are the life blood of academia.

Yet these tensions and freedoms are hard to balance, especially these days. We find ourselves in a rapidly changing world, rife with polarization and movements to censor academia, arts, and culture. In these troubled times, there is deep confusion and debate about how we can create welcoming and inclusive learning environments, particularly in higher education. But these challenges require great diligence to ensure that the university can continue to operate as a "marketplace of ideas." *Keyishian*, 385 U.S. at 603. It is in such environments that the courts must

---

questions-and-concerns-about-chilled-campus-environments/; Alex Kane, *The Push to Deactivate Students for Justice in Palestine*, Jewish Currents (Nov. 21, 2023), https://jewishcurrents.org/the-push-to-deactivate-students-for-justice-in-palestine-sjp. Censorship of faculty speech regarding the conflict is also on the rise. *See, e.g.,* Matt Hamilton, *A Jewish professor at USC confronted pro-Palestinian students. He's now barred from campus*, November 26, 2023, https://www.latimes.com/california/story/2023-11-26/a-usc-professor-called-for-hamas-to-be-killed-hes-now-banned-from-campus; Mohammad Fadel, *The Palestine Exception to Academic Freedom Must Go*, Chron. of Higher Ed. (April 24, 2024), https://www.chronicle.com/article/the-palestine-exception-to-academic-freedom-must-go (discussing examples of "weak institutional defense of speech on behalf of Palestinians"). These examples also demonstrate how elevating offense to justify censorship of protected speech occurs across a wide political spectrum, embroiling universities in choosing whose offense to elevate and operationalize over others– creating censorship instead of resolution.

scaffold the pillars of the First Amendment – particularly where, as here, it is brought to bear on protected speech of public concern.

## CONCLUSION

For the foregoing reasons, PEN America urges the Court to reverse the District Court's decision.

Dated: September 30, 2024        Respectfully submitted,

/s/ Katherine Blankenship
Katherine Blankenship, FL Bar # 1031234
PEN America Florida
250 Catalonia Avenue, #405
Coral Gables, Florida 33134
*Counsel for Amicus Curiae*

## Certificate of Compliance

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,724 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using a proportionally-spaced typeface in 14-point font.

Dated: September 30, 2024

/s/ *Katherine Blankenship*
Katherine Blankenship, FL Bar # 1031234
PEN America Center, Inc.
250 Catalonia Avenue, #405
Coral Gables, Florida 33134
*Counsel for Amicus Curiae*