*No. 24-3518*

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STUART REGES

*Plaintiff-Appellant*,

v.

ANA MARI CAUCE Et Al.,

*Defendants-Appellees*

Appeal From the United States District Court
for the WESTERN DISTRICT OF WASHINGTON
Hon. John H. Chun, Case No. 2:22-cv-00964-JHC

## BRIEF OF *AMICUS CURIAE* STUDENTS FOR LIBERTY IN SUPPORT OF PLAINTIFF-APPELLANT AND OVERTURNING DISTRICT COURT ORDER

Michael McGinley
*Counsel of Record*
Ross Ufberg
Andrew Figueiredo
*Counsel for Amicus Curiae*
**DECHERT LLP**
2929 Arch St.
Philadelphia, PA 19104
Telephone: (215) 994-2463
michael.mcginley@dechert.com
ross.ufberg@dechert.com
andrew.figueiredo@dechert.com

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1

INTEREST OF *AMICUS CURIAE*...........................................1

ARGUMENT .......................................................................2

I.    Viewpoint Discrimination is Antithetical to Academic Freedom. ................2

    A.    Defendants Plainly Engaged in Viewpoint Discrimination. ...............3

    B.    The *Pickering* Test Exists To Root Out Viewpoint Discrimination. ......................................................4

        1.    *Pickering* Protects Free Speech At Public Universities............6

        2.    History Confirms The Central Importance Of Academic Freedom At Public Universities................8

II.    Under *Pickering*, Disruption Must Be More Than Offense in Disguise......11

III.    Schools Cannot Invite Controversial Statements, Then Claim Disruption. ......................................................16

CONCLUSION ....................................................................18

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)..............................................................................8

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
  39 F.4th 95 (3d Cir. 2022) ...................................................................5

*Bauer v. Sampson*,
  261 F.3d 775 (9th Cir. 2001) ...................................................6, 13, 14

*Brewster v. Bd. of Educ.*,
  149 F.3d 971 (9th Cir. 1998) ..............................................................14

*Connick v. Myers*,
  461 U.S. 138 (1983)...............................................................................5

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) ...............................................2, 4, 5, 12

*Dodge v. Evergreen Sch. Dist. #114*,
  56 F.4th 767 (9th Cir. 2022) ...................................................7, 15, 16

*Gilley v. Stabin*,
  2024 WL 3507982 (D. Or. July 23, 2024).............................................7

*Green v. Miss United States of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) ................................................................8

*Healy v. James*,
  408 U.S. 169 (1972)........................................................................16, 17

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988)..................................................................................4

*Hyland v. Wonder*,
  972 F.2d 1129 (9th Cir. 1992) ............................................................12

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021)..........................................................8, 12

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964).................................................................11

*Novak v. City of Parma*,
932 F.3d 421 (6th Cir. 2019) .........................................................4

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*,
391 U.S. 563 (1968)...........................................................*passim*

*Reges v. Cauce*,
2024 WL 2140888 (W.D. Wash. May 8, 2024) ......................3, 16, 17

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) .......................................................6, 7

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).....................................................................4

*Salter v. City of Jackson*,
176 So. 2d 63 (Miss. 1965)............................................................9

*Settlegoode v. Portland Public School*,
371 F.3d 503 (9th Cir. 2004) ...................................................14, 15

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991).....................................................................5

*Snyder v. Phelps*,
562 U.S. 443 (2011)..................................................................6, 12

**OTHER AUTHORITIES**

Andrew Lapin, *Universities take action against pro-Israel faculty for inflammatory speech about Israel-Hamas war*, JERUSALEM POST (Dec. 2, 2023),
https://tinyurl.com/5f4v2a5n.......................................................10

Benjamin Franklin, *On the Freedom of Speech and the Press*, PENN. GAZETTE (Nov. 1737), in JARED SPARKS, THE WORKS OF BENJAMIN FRANKLIN (1840),
archived at https://tinyurl.com/28p7rrat ..........................................1

Emily Medeiros, *Texas College Reinstates Biology Professor Fired for Teaching Chromosomes Determine Sex*, TEXAS SCORECARD (Feb. 21, 2024),
https://tinyurl.com/yc4br4p6 .......................................................10

Graeme Wood, *'Land Acknowledgments' Are Just Moral Exhibitionism*, THE ATLANTIC (Nov. 28, 2021), https://tinyurl.com/3z5rvfdu ...................................17

In Memoriam, Leon Wofsy, Univ. of Calif. (2019), https://tinyurl.com/34z7u79d ........................................................................................................................9

*Interview with Hunter Bear (John Salter)* (last visited Sept. 17, 2024), https://tinyurl.com/4y7jwsc3 .................................................................................9

Ryan Quinn, *'Preaching' in Biology Class?*, INSIDE HIGHER ED. (June 28, 2023), https://tinyurl.com/457v9xdm.................................................................................10

Sabrina Franza et al., *Adjunct professor fired by DePaul after optional assignment about Gaza*, CBS NEWS (May 24, 2024), https://tinyurl.com/mww2uenh ........10

Ted Ownby, *John R. Salter, Jr.*, MISSISSIPPI ENCYCLOPEDIA (last visited Sept. 27, 2024), https://tinyurl.com/bdepucr9 ....................................................................9

Trip Gabriel, *H. Bruce Franklin, Scholar Fired for His Antiwar Views, Is dead at 90*, N.Y. TIMES (June 7, 2024), https://tinyurl.com/45dry86f ............................10

Zaid Jilani, *New Jersey College Suspended a Professor After Being 'Inundated' with Complaints Over Her Fox News Debate. Here's What Really Happened*, THE INTERCEPT (Jan. 26, 2018), https://tinyurl.com/2hzwb3rb..........................10

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 & 29(a)(4)(A), Students for Liberty has no parent corporations and no corporation owns stock in *amicus*.  The parties consent to this filing.

## PREPARATION OF AMICUS BRIEF

Pursuant to Fed. R. App. P. 29(a)(4)(E), Students for Liberty states that: (i) neither party's counsel authored the brief in whole or in part; (ii) neither party nor their counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person other than *amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

"Freedom of speech is a principal pillar of a free government." Benjamin Franklin, *On the Freedom of Speech and the Press*, PENN. GAZETTE (Nov. 1737), in JARED SPARKS, THE WORKS OF BENJAMIN FRANKLIN 285 (1840), archived at https://tinyurl.com/28p7rrat. That core constitutional principal is all the more important in the university setting—where freedom of speech dovetails with academic freedom. This case strikes at the heart of these two freedoms. The decision below elevated inflated concerns about disruption over Professor Reges' First Amendment rights. That distorts the balancing required by *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968). And it threatens to chill speech on core matters of public concern in the very setting where our society most values open deliberation.

## INTEREST OF *AMICUS CURIAE*

Students for Liberty ("SFL") is a national, secular, nonpartisan, 501(c)(3) nonprofit educational organization dedicated to providing organizational support for students and student organizations devoted to liberty. Founded and operated by college students, SFL defines liberty as encompassing the economic freedom to choose how to provide for one's life, the social freedom to choose how to live one's life, and intellectual and academic freedom. To promote this understanding of

liberty, SFL supports student organizations across the ideological spectrum by providing resources and training to campus leaders and student groups.

*Amicus* submits this brief in order to protect academic freedom and, specifically, the freedom to disagree, argue, and persuade.

## ARGUMENT

## I.   Viewpoint Discrimination is Antithetical to Academic Freedom.

Professor Reges' syllabus statement draws on a long tradition of legally protected academic speech.  Viewpoint diversity and academic freedom are essential on university campuses.  It is well-recognized that academic freedom is a "special concern of the First Amendment," and the "vigilant protection" of that freedom is "nowhere more vital than in the community of American schools."  *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N. Y.*, 385 U.S. 589, 592 (1967)).

The court below undervalued Professor Reges' First Amendment interests when it rejected his viewpoint discrimination claim.  Defendants unabashedly discriminated against Reges based on his political statements—which is, by definition, viewpoint discrimination.  This targeted punishment of disfavored viewpoints is especially pernicious at a public university, where free speech rights should be at their zenith.

2

## A.   Defendants Plainly Engaged in Viewpoint Discrimination.

The facts here are not complicated.  Defendants punished Professor Reges based on his viewpoints regarding issues of public concern.  That triggers the longstanding body of case law governing viewpoint discrimination.  Yet, the decision below scarcely mentioned Professor Reges' rights beyond passing references to the need to balance those rights against his public employers' objectives. *See Reges v. Cauce*, 2024 WL 2140888, at *19-20 (W.D. Wash. May 8, 2024) ("Op.").  Then, the court dispatched with Reges' viewpoint discrimination claim in a single paragraph.  In addition to contradicting the proper constitutional analysis, that cursory treatment endangers academic freedom.

There is no doubt that Defendants engaged in viewpoint discrimination.  In response to a suggestion that professors include a land acknowledgment in their syllabi, Professor Reges chose to use his own parody version of a land acknowledgement.  Op. at *1.  Director Balazinska ordered Professor Reges to remove the statement from his syllabus within hours of learning about it, on the view that it was "offensive" and supposedly created a "toxic environment." *Id.* at *3.  She also immediately ordered UW's IT staff to remove that portion of the syllabus.  Dkt. 60, Plaintiff's Mot. for Summ. J. ("Plaintiff's MSJ") at 7.  Balazinska complained to the press that the statement was "inappropriate" and "offensive" and that the very

"invocation of Locke's labor theory of property" contradicted UW's own political land acknowledgement. *Id.* at 8.

In fact, Balazinska's actions are part of a larger pattern of viewpoint policing. She asked two other faculty members to modify their land acknowledgments because they "may have been insensitive to more conservative students" and she told Professor Reges that she would "ask any instructor who uses a land acknowledgement other than the UW [one] to remove it." Dkt. 77, Def's Opp. to Plaintiff's MSJ at 18; Plaintiff's MSJ at 7. In short, Defendants punished Professor Reges for failing to adhere to the school's orthodoxy around a supposedly optional political statement.[1] That exemplifies viewpoint discrimination.

### B. The *Pickering* Test Exists To Root Out Viewpoint Discrimination.

Courts apply *Pickering* to speech by university professors precisely to *prevent* this sort of viewpoint discrimination.[2] In *Demers*, 746 F.3d at 406, this Court held

---

[1] The fact that Professor Reges' dissent took the form of parody does not reduce its constitutional protection. On the contrary, the Supreme Court has clarified that, "[f]rom the viewpoint of history it is clear that our political discourse would have been considerably poorer" without satire of a "sometimes caustic nature." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54-55 (1988). This is why American law maintains a "long-held First Amendment protection for parody." *See Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019).

[2] The Supreme Court has long recognized viewpoint discrimination as especially disfavored because it strikes at the heart of free speech. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-829 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the

that *Pickering*, not *Garcetti*, applies to speech related to scholarship or teaching. Because "teaching and academic writing are at the core of the official duties of teachers and professors," they are "a special concern of the First Amendment," and circumscribing that right would "directly conflict with . . . important First Amendment values." *Id.* at 411.

The decision below runs roughshod over the *Pickering* test. "Concern over viewpoint discrimination is the very reason *Pickering* rejected the older rule that the First Amendment does not protect government-employee speech." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022). *Pickering* was rooted in precedents that invalidated government actions seeking "to suppress the rights of public employees to participate in public affairs." *Connick v. Myers*, 461 U.S. 138, 144-145 (1983). Because participation in public affairs is "the essence of self-government," *id.* at 145 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)), *Pickering* demands an especially protective treatment of academic speech on public affairs.

---

message it conveys. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("[T]he government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace. The First Amendment presumptively places this sort of discrimination beyond the power of the government.") (citation omitted).

### 1. *Pickering* Protects Free Speech At Public Universities

A trifecta of Ninth Circuit cases establishes that *Pickering* prioritizes First Amendment rights, creating a high barrier to government suppression of speech.

Even where statements "no doubt created some disharmony," this Court has been unwilling to quash speech because "[e]xpression involving a matter of public concern enjoys robust First Amendment protection." *Bauer v. Sampson*, 261 F.3d 775, 783, 785 (9th Cir. 2001). In *Bauer*, a college professor insulted and satirized members of the university community in a campus newspaper he created. *Id.* at 780. Despite his disharmonious speech, this Court held that the First Amendment interests implicated in the professor's opinionated statements "clearly outweigh[ed]" the government's interests in silencing the expression. *Id.* at 785. Importantly, the speech in *Bauer* dealt with on-campus events, distinctly less political in nature than Reges' speech.

More recently, in *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 727 (9th Cir. 2022), the Court balanced disruption to a school employer against "controversial, unique political discourse," which was "'entitled to special protection' given [its] contribution to the public political discourse." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). In *Riley's Am. Heritage Farms*, this Court overturned a grant of summary judgment for school district defendants where

the school district canceled a contract with a longtime vendor due to the vendor's political Tweets. *Id.* at 716.

Even more recently, this Court emphasized that speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values", and in particular, "the First Amendment affords the broadest protection to political expression." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782 (9th Cir. 2022) (quotations and citations omitted). In *Dodge*, a principal tried to stifle the speech of a teacher who wore a MAGA hat to training sessions. But this Court cautioned that "[g]iven the nature of [plaintiff's] speech, [defendant] has a particularly heavy burden under the *Pickering* test." *Id.* Reges' expression was similarly political expression on a matter of public concern. Under *Pickering*, this means that Defendants face a "particularly heavy burden" to overcome his First Amendment Rights.

Unlike the decision below, other district courts within this Circuit recognize that the First Amendment prohibits public schools from trampling on free speech about matters of public concern. *See, e.g.*, *Gilley v. Stabin*, 2024 WL 3507982 (D. Or. July 23, 2024) (on remand) (granting preliminary injunction against university account hiding, muting, or deleting professor's controversial replies to its Tweets). That is because college professors have the right to "speak [their] mind[s] regardless of whether the government considers [their] speech sensible and well intentioned or

deeply misguided, and likely to cause anguish or incalculable grief." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (quotation and citation omitted). And "[c]ompelling individuals to mouth support for views they find objectionable violates core First Amendment Protections . . . in most contexts, any such effort would be universally condemned." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 783 (9th Cir. 2022) (citation and quotation omitted).

The freedom of professors to weigh in on political issues is a "cardinal constitutional command" meriting respect under *Pickering*, which the court below failed to heed. *See Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018)).

### 2. History Confirms The Central Importance Of Academic Freedom At Public Universities

While this case concerns a contemporary debate over a specific matter of public concern, it reflects an impulse that unfortunately has repeatedly cropped up throughout our Nation's history. At various times in American history, the government and universities have sought to enforce the intellectual and ideological orthodoxies of the day—to the detriment of the sort of open dialogue and free exchange of ideas that our universities are designed to secure.

In the 1960s, Tougaloo University Professor John R. Salter Jr. helped organize a sit-in for civil rights in the heart of Mississippi. He faced harassment, extreme violence, and even arrest for his involvement in these protests.[3] The City of Jackson, enraged by the Jackson Freedom Movement, issued a sweeping injunction crushing civil rights protests, which the Mississippi Supreme Court later overturned, with Salter as the lead plaintiff.[4] Academics like Salter were integral to the civil rights movement, battling repression in all forms and paving the way for open discussions about racial justice.

Later that decade, Professor Leon Wofsy at the University of California, Berkeley, took a bold stand when he backed student protesters' demands during the UC Berkeley Free Speech Movement. In turn, he was met with attempted retaliation from University Regents wielding surveillance the FBI had conducted on Wofsy.[5] Wofsy resisted these efforts and persuaded the Faculty Senate to uphold students' rights to demonstrate, becoming a First Amendment hero in the process.

When war broke out in Vietnam, professors like H. Bruce Franklin vociferously opposed what they saw as an unjust intervention. Franklin's

---

[3] Ted Ownby, *John R. Salter, Jr.*, MISSISSIPPI ENCYCLOPEDIA (last visited Sept. 27, 2024), https://tinyurl.com/bdepucr9.

[4] *See Interview with Hunter Bear (John Salter)* (last visited Sept. 17, 2024), https://tinyurl.com/4y7jwsc3; *Salter v. City of Jackson*, 176 So. 2d 63 (Miss. 1965).

[5] *In Memoriam, Leon Wofsy*, UNIV. OF CALIF. (2019), https://tinyurl.com/34z7u79d.

controversial statements led to his firing from Stanford University, the first time a tenured professor had been fired since the McCarthy era.[6] Despite forceful pleas on behalf of academic freedom, Franklin was never rehired at Stanford.

Today, faculty speech continues to be a flashpoint in an increasingly polarized society. Some professors have come under fire for pro-Palestine stances, while others have faced threats for favoring Israel's actions in the region.[7] Professors frequently face attempted discipline for expressing controversial viewpoints. For example, a public HBCU professor in Texas was fired (and later reinstated as part of a settlement) for controversial comments in the classroom on sex and gender.[8] And, in New Jersey, a public college suspended a professor for challenging a conservative media host on Black Lives Matter.[9]

---

[6]     Trip Gabriel, *H. Bruce Franklin, Scholar Fired for His Antiwar Views, Is dead at 90*, N.Y. TIMES (June 7, 2024), https://tinyurl.com/45dry86f.

[7]     *See* Sabrina Franza et al., *Adjunct professor fired by DePaul after optional assignment about Gaza*, CBS NEWS (May 24, 2024), https://tinyurl.com/mww2uenh; Andrew Lapin, *Universities take action against pro-Israel faculty for inflammatory speech about Israel-Hamas war*, JERUSALEM POST (Dec. 2, 2023), https://tinyurl.com/5f4v2a5n.

[8]     Ryan Quinn, *'Preaching' in Biology Class?*, INSIDE HIGHER ED. (June 28, 2023), https://tinyurl.com/457v9xdm; Emily Medeiros, *Texas College Reinstates Biology Professor Fired for Teaching Chromosomes Determine Sex*, TEXAS SCORECARD (Feb. 21, 2024), https://tinyurl.com/yc4br4p6.

[9]     Zaid Jilani, *New Jersey College Suspended a Professor After Being 'Inundated' with Complaints Over Her Fox News Debate. Here's What Really Happened*, THE INTERCEPT (Jan. 26, 2018), https://tinyurl.com/2hzwb3rb.

If allowed to stand, the decision below would eviscerate these crucial protections for controversial campus speech and normalize viewpoint-based discipline. Weakening the *Pickering* test by undervaluing the First Amendment would make it easier for governments to crack down on dissenting speech in the academic setting—which would undermine the free exchange of ideas that forms the backbone of public education in our country.

## II. Under *Pickering*, Disruption Must Be More Than Offense in Disguise.

If the District Court's ruling is allowed to stand, then universities and other public entities will be empowered to cleverly dress up allegations of mere *offense* as *disruption* to cancel out a professor's First Amendment right to speak up on an issue of public importance. Earnest or not, that would run directly counter to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). And that would threaten to reduce the speech tolerated on campus to anodyne kumbaya-isms that neither allow for advancements in knowledge nor challenge students to consider ideas before accepting them.

As the Sixth Circuit noted in the *Pickering* context: "If professors lacked free-speech protections when teaching, a university would wield alarming power to

compel ideological conformity.  A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as 'comrades.'" *Meriwether v. Hartop*, 992 F.3d at 506.  Unorthodox thought is critical to diversity of ideas, and being offended is an inescapable part of intellectual discovery and the health of a democracy.  That freedom—to offend, to disturb, to give pause—is at the core of the First Amendment, and "this Nation has chosen to protect even hurtful speech on public issues to ensure that public debate is not stifled." *Snyder*, 562 U.S. at 446.

As noted above, courts in this circuit give *considerable* weight to the guarantee of free expression by faculty, even when such expression offends, alarms, or disturbs others.  Indeed, academic speech, as a category, is especially cherished, as the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Demers v. Austin*, 746 F.3d at 411.  Consequently, academic speech on public matters is afforded even more weight than other types of speech, when performing the *Pickering* balancing test.  "The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992).  A review of three First Amendment education cases from this circuit makes this clear—one of them in a college setting, two involving high school faculty.

In *Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001), this Court upheld summary judgment in favor of a professor, Bauer, who disseminated critical drawings and writings in an underground self-published magazine. The material was highly disparaging of various public university administrators, and contained depictions or descriptions of a "fantasy" "funeral for a district trustee," the asphyxiation of the college president, a caricature of that same president beheading his enemies, "a two-ton slate of polished granite" that the author hoped one day to drop upon the head of that same college president. *Id.* at 780.

The college president called Bauer to a meeting and told him to avoid discrimination or harassment of college employees and cease his threats and violent behaviors, as outlined in various university policies, as well as attend counseling sessions. *Id.* at 780. Furthermore, the president informed Bauer that, if Bauer failed to comply with these terms, a letter warning of consequences would be placed in his file. *Id.* at 780-81. Bauer sued. Because both parties agreed the issue was a matter of public concern, the court examined the five *Pickering* factors which had previously been adopted in this Circuit.[10]

---

[10]    Those factors are:

(1) whether the employee's speech disrupted harmony among co-workers; (2) whether the relationship between the employee and the employer was a close working relationship with frequent contact which required trust and respect in order to be successful;

The Court determined that Bauer's First Amendment right to free speech outweighed any disruptions that speech might have had on campus. *Id.* at 785. Bauer's expression created disharmony, but the campus was going through a contentious period, and Bauer was not ultimately the root cause of that turmoil. *Id.* at 785. There was no showing that Bauer's speech negatively impacted his teaching or other professional responsibilities, his speech was distributed to the college community, and his expressions were "clearly opinion, not factual assertions that could be proven false." *Id.* A professor had created materials fantasizing about the deaths of college trustees, imagined the college president as a murderer, and depicted people he disliked dying and suffering, and was still guaranteed the protections of the First Amendment under the *Pickering* balancing test.

*Settlegoode v. Portland Public School* involved a teacher for disabled students in the Portland school district who wrote a series of letters to administrators expressing her concern about the way students were being treated. 371 F.3d 503, 507 (9th Cir. 2004). When her teaching contract was not renewed, Settlegoode sued, claiming the declination of renewal was retaliatory, in violation of her First

---

(3) whether the employee's speech interfered with performance of his duties; (4) whether the employee's speech was directed to the public or the media or to a governmental colleague; and (5) whether the employee's statements were ultimately determined to be false.

*Brewster v. Bd. of Educ.*, 149 F.3d 971, 980–81 (9th Cir. 1998).

14

Amendment rights. *Id.* at 509. A jury found for Settlegoode, the district court reversed, and on appeal, this Court sided with the jury. This Court noted that there had been no testimony of "actual injury,"—*i.e.*, "actual injury to . . . legitimate interests beyond the disruption that necessarily accompanies [controversial] speech." *Id.* at 513 (cleaned up, citation omitted). Several teachers said they were "hurt or upset"; one testified she was "furious," "outraged," and "upset." *Id.* at 514. But hurt feelings were not enough to outweigh Settlegoode's important First Amendment right to express herself.

Finally, and most recently, in *Dodge v. Evergreen School District #114*, 56 F.4th 767, 782 (9th Cir. 2022), this Court reaffirmed its commitment to protecting the First Amendment in an academic setting, when it sided with a high school teacher who claimed he was retaliated against by his school district after he wore a "Make America Great Again" (MAGA) hat to a teacher training. *Id.* at 788. The Court held that "[s]peech that outrages or upsets co-workers without evidence of any actual injury to school operations does not constitute a disruption." *Id.* at 782 (quotations and citation omitted). When Dodge brought the MAGA hat to the training— repeatedly, three days in a row, despite being told not to—the professor leading the training claimed to feel intimidated and traumatized. *Id.* at 773. Another teacher cried, saying she found the hat threatening. *Id.* The principal called Dodge a "homophobe and a racist and a bigot and hateful," and accused him of

"insubordination." *Id.* at 774. Yet, this Court held that the case could not be resolved at summary judgment because offense is not equivalent to disruption. *Id.* at 788.

These three cases, taken together, make clear that the type of disruption *Pickering* contemplates, when translated into an academic setting, must be far greater than merely giving offense. The facts here fall far short of that high bar. The district court pointed to statements from the Recruiter for Diversity and Access that Professor Reges' statement would make her role in recruiting diverse students more difficult. Op. at *20-21. But that is simply another way of cloaking offense as disruption. Indeed, the same theory would allow a school to punish a professor if a recruiting staffer for a Jewish Studies or Muslim Studies program complained that the professor taught about the Israeli-Palestinian conflict in a way that *the staffer was worried* might lead potential recruits to feel their "history is questioned and their rights are denied." Op. at *21.

In short, much of the evidence of "disruption" presented here is simple *disagreement*—which is precisely what the First Amendment protects.

## III. Schools Cannot Invite Controversial Statements, Then Claim Disruption.

Finally, this Court should be especially skeptical where, as here, a school invites a statement on a controversial topic and then claims disruption when a disfavored viewpoint is expressed. "First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case."

16

*Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 383 U.S. 503, 506 (1969)).  Here, the University of Washington *invited* its professors-employees to comment on an issue of public concern when it suggested that faculty include an "Indigenous Land Acknowledgment Statement" in their syllabi.  Op. at *1.  When Professor Reges included his statement, the University claimed disruption.  This is a bit like the (perhaps apocryphal) Abraham Lincoln quote about the boy who murders both his parents then begs for the mercy of the court on the basis that he is now an orphan.

The University defendants testified they were aware that land acknowledgments were not a universally accepted practice and that there existed a viewpoint *critical* of them.  Plaintiff's MSJ at 17.  Nonetheless, the University pressured professors of engineering to adopt the company line, knowing there were divergent views. For example, Vice Director Grossman and Director Balazinska both testified to having seen an article in *The Atlantic* entitled *'Land Acknowledgments' Are Just Moral Exhibitionism*, which includes the lines, "A land acknowledgment is what you give when you have no intention of giving land. It is like a receipt provided by a highway robber, noting all the jewels and gold coins he has stolen." [11]  Plaintiff's MSJ at 24.Whatever the level of offense that ensued, the

---

[11]     Graeme Wood, *'Land Acknowledgments' Are Just Moral Exhibitionism*, THE ATLANTIC (Nov. 28, 2021), https://tinyurl.com/3z5rvfdu.

Court should consider the "special characteristics of the . . . environment" here: A public University invited comment on an issue, a faculty member took the school up on the offer, but then the school sought to shut down his viewpoint as disfavored. That attempt by the government to dictate the acceptable viewpoints in an academic setting is fundamentally inconsistent with the First Amendment.

## CONCLUSION

For the foregoing reasons, *Amicus* respectfully requests that this Court reverse the district court's ruling.

Dated: October 2, 2024                         Respectfully submitted,


By: */s/ Michael McGinley*

Michael McGinley
Ross Ufberg
Andrew Figueiredo
**DECHERT LLP**
2929 Arch St.
Philadelphia, PA 19104
Telephone: (215) 994-2463
michael.mcginley@dechert.com
ross.ufberg@dechert.com
andrew.figueiredo@dechert.com
*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | No. 24-3518

I am the attorney or self-represented party.

**This brief contains** | 4,063 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Michael McGinley | **Date** | 10/02/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  October 2, 2024    By:  */s/ Michael McGinley*
             Michael McGinley
             **DECHERT LLP**
             2929 Arch St.
             Philadelphia, PA 19104
             Telephone: (215) 994-2463
             michael.mcginley@dechert.com