No. 24-3518

### IN THE
# United States Court of Appeals for the Ninth Circuit

STUART REGES,

*Plaintiff-Appellant*,

*v.*

ANA MARI CAUCE, in her official capacity as President of the University of Washington; MAGDALENA BALAZINSKA, in her official and individual capacities as Director of the Paul G. Allen School of Computer Science & Engineering; DAN GROSSMAN, in his official and individual capacities as Vice Director of the Paul G. Allen School of Computer Science & Engineering; NANCY ALLBRITTON, in her official and individual capacities as Dean of the College of Engineering,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Western District of Washington
No. 2:22-cv-00964-JHC, Hon. John H. Chun

### APPELLEES' ANSWERING BRIEF

R. David Hosp
Katherine Kerrick
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116

Robert M. McKenna
Aaron P. Brecher
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101
(206) 839-4300

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 4

STATEMENT OF THE ISSUES ................................................................ 5

CONSTITUTIONAL AND REGULATORY AUTHORITIES.................... 5

STATEMENT OF THE CASE .................................................................. 6

    The University adopts an inclusive land-acknowledgment statement. ................................................................................. 6

    A diversity committee at the University's Allen School suggests a land acknowledgment for course syllabi. ............................ 8

    Reges includes his "parody" statement in a Winter 2022 syllabus to create disruption. ........................................................... 9

    Reges's "parody" statement causes significant disruption.................... 10

    The University never "silences" or "censors" Reges........................... 11

    Reges launches this litigation. .......................................................... 16

    The district court grants summary judgment for the University on Reges's First Amendment retaliation and viewpoint-discrimination claims. ............................................................... 16

    The district court dismisses Reges's overbreadth and vagueness claims. ................................................................................. 17

SUMMARY OF ARGUMENT ................................................................. 18

STANDARD OF REVIEW ..................................................................... 20

ARGUMENT ........................................................................................ 21

    I.    The district court correctly granted summary judgment for the University on Reges's First Amendment retaliation claims. ................................................................................. 21

        A.    The district court correctly balanced the University's interests in efficient operations against any de minimis burden on Reges's expression. ......................................... 22

1. Because the University imposed only minor restrictions on his speech, Reges's expressive rights count for little in the *Pickering* balance.................... 23

2. Because Reges caused substantial disruption, the University's interests in maintaining its learning environment weigh heavily under *Pickering*. ............ 28

3. Because the district court recognized the University's academic mission, Reges's argument for reversal based on that mission fails. ................... 36

B. Because Reges was not speaking as a citizen, his speech is unprotected in any event............................................. 40

II. Because *Pickering* also applies to Reges's viewpoint-discrimination claim, that claim similarly fails........................... 44

III. Reges's facial challenges to the University's anti-harassment policy fail. ................................................................... 46

A. Because the Order, properly construed, does not reach substantial protected expression, it is not overbroad. ........ 47

1. The Order's full text confirms that it is limited to conduct closely resembling unlawful harassment..... 48

2. Reges relies on inapposite authorities in urging that the Order is overbroad..................................... 55

B. Because the Order gives adequate notice about what conduct it prohibits and is not subject to arbitrary enforcement, it is not unconstitutionally vague................ 58

CONCLUSION....................................................................................... 63

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Trs. of Univ. of N.C.*,
  640 F.3d 550 (4th Cir. 2011) .................................................................. 42

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) .................................................48, 50, 52, 60

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) ....................................................................... 54, 55, 61

*Bauer v. Sampson*,
  261 F.3d 775 (9th Cir. 2001) .................................................................. 39

*Benavidez v. County of San Diego*,
  993 F.3d 1134 (9th Cir. 2021) ................................................................ 20

*Berg v. Hunter*,
  854 F.2d 238 (7th Cir. 1988) .................................................................. 22

*Berry v. Dep't of Soc. Servs.*,
  447 F.3d 642 (9th Cir. 2006) .................................................................. 45

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .........................................................................48, 53

*Connick v. Myers*,
  461 U.S. 138 (1983) ................................................................... 22, 35, 36

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999) ....................................................................55, 56, 57

*DeJohn v. Temple University*,
  537 F.3d 301 (3d Cir. 2008)......................................................... 57, 58, 62

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) ....................................... 3, 17, 20, 40, 41, 42

iv

*Desire, LLC v. Manna Textiles, Inc.*,
986 F.3d 1253 (9th Cir.), *cert. denied*, 142 S. Ct. 343 (2021) ...................... 20

*Dodge v. Evergreen Sch. Dist. #114*,
56 F.4th 767 (9th Cir. 2022) ....................................................... 24, 28, 37

*Downs v. L.A. Unified Sch. Dist.*,
228 F.3d 1003 (9th Cir. 2000)................................................ 41, 42, 43, 44

*Edge v. City of Everett*,
929 F.3d 657 (9th Cir. 2019) .................................................................. 59

*Flores v. Bennett*,
No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) ........................ 57

*Ford Motor Co. v. Tex. Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) .................................................................. 61

*Fowler v. Bd. of Educ.*,
819 F.2d 657 (6th Cir. 1987) .................................................................. 61

*Franklin v. Atkins*,
562 F.2d 1188 (10th Cir. 1977)............................................................... 32

*Gammoh v. City of La Habra*,
395 F.3d 1114 (9th Cir. 2005)............................................................60, 62

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ............................................................. 37, 40, 41, 42

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..........................................................................59, 63

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .............................................................................. 28

*Hernandez v. City of Phoenix*,
43 F.4th 966 (9th Cir. 2022) ......................................48, 53, 54, 55, 57, 60

*Jeffries v. Harleston*,
52 F.3d 9 (2d Cir. 1995) ........................................................................ 24

*Johnson v. M'Intosh,*
    21 U.S. (8 Wheat.) 543 (1823) ............................................................... 28

*Johnson v. Poway Unified School District,*
    658 F.3d 954 (9th Cir. 2011) ..........................................................42, 43

*Keyishian v. Board of Regents,*
    385 U.S. 589 (1967) ............................................................................. 39

*Levin v. Harleston,*
    966 F.2d 85 (2d Cir. 1992) .................................................................... 26

*Maples v. Martin,*
    858 F.2d 1546 (11th Cir. 1988) ............................................................ 22

*McCauley v. Univ. of the V.I.,*
    618 F.3d 232 (3rd Cir. 2010) .................................................... 57, 58, 63

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024) ................................................................. 38

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................................ 26

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024).......................................................................... 55

*Nunez v. Davis,*
    169 F.3d 1222 (9th Cir. 1999)............................................................... 33

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968) ....................................................................*passim*

*Port of Seattle v. Pollution Control Hr'gs Bd.,*
    90 P.3d 659 (Wash. 2004) ..................................................................... 52

*Puget Soundkeeper Alliance v. State,*
    356 P.3d 753 (Wash. Ct. App. 2015) ..................................................... 50

*Rankin v. McPherson,*
    483 U.S. 378 (1987)........................................................................22, 33

*Riley's Am. Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022) ...................................................... 24

*Rodriguez v. Maricopa County Community College District*,
    605 F.3d 703 (9th Cir. 2010) ................................................38, 39

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .................................................................... 41

*San Filippo v. Bongiovanni*,
    961 F.2d 1125 (3d Cir. 1992) ...................................................... 61

*Smith v. Goguen*,
    415 U.S. 566 (1974) .................................................................... 62

*State v. Day*,
    638 P.2d 546 (Wash. 1981) ......................................................... 52

*State v. Evergreen Freedom Found.*,
    432 P.3d 805 (Wash. 2019) ......................................................... 50

*State v. Roggenkamp*,
    106 P.3d 196 (Wash. 2005) ......................................................... 51

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
    330 F.3d 1110 (9th Cir. 2003) ..................................................... 20

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
    17 F.4th 950 (9th Cir. 2021) ..................................................20, 40

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) .................................................................... 39

*Tucson v. City of Seattle*,
    91 F.4th 1318 (9th Cir. 2024) ................................................55, 62

*United States v. Hansen*,
    599 U.S. 762 (2023) .................................................................55, 58

*United States v. Stevens*,
    559 U.S. 460 (2010) .................................................................... 48

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................49, 59

*Utter v. Bldg. Indus. Ass'n of Wash.*,
   341 P.3d 953 (Wash. 2015) ................................................ 50

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) .............................................................. 59

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) .............................................................. 41

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) .............................................................. 48

**Statutes & Constitutional Provisions**

28 U.S.C. § 1291 ........................................................................... 4

28 U.S.C. § 1331 ........................................................................... 4

28 U.S.C. § 1343 ........................................................................... 4

42 U.S.C. § 1983 ........................................................................ 16

First Amendment................................................................*passim*

Title IX....................................................................................... 56

Wash. Rev. Code § 34.05.010(2).............................................. 49

Wash. Rev. Code § 34.05.010(3).............................................. 49

**Rules**

Fed. R. App. P. 4(a)(1)(A).......................................................... 4

Fed. R. Civ. P. 12(b)(6) ............................................................ 20

Fed. R. Civ. P. 56 ..................................................................... 20

**Other Authorities**

Ned Blackhawk, THE REDISCOVERY OF AMERICA: NATIVE PEOPLES AND THE UNMAKING OF U.S. HISTORY (2023)............................ 29

Kathleen Brown-Rice, *Examining the Theory of Historical Trauma Among Native Americans*, 3 PROF'L COUNSELOR 117 (2013)........................ 29

Coll Thrush, NATIVE SEATTLE (2d ed. 2017) .................................................. 6

Waterlines Project Map, Burke Museum of Natural History and Culture, (last visited Nov. 1, 2024), https://www.burkemuseum.org/static/waterlines/project_map.html ...................................................................................................... 6

Charles Wilkinson, TREATY JUSTICE: THE NORTHWEST TRIBES, THE BOLDT DECISION, AND THE RECOGNITION OF FISHING RIGHTS (2024) ......................................................................................... 29

## INTRODUCTION

The University of Washington and its administrators care deeply about free expression. Indeed, the primary mission of the University is the preservation, advancement, and dissemination of knowledge. The University and its administrators work to foster a University community where all stakeholders—including faculty, staff, students, and student employees—are a part of achieving that mission. So when computer science Teaching Professor Stuart Reges disrupted that learning environment with a mock land acknowledgment in a course syllabus that was designed, as he put it, for "trolling" the University, the University took limited, appropriate action.

In this appeal, Reges relies on a false narrative: that the University "silenced" and "censored" him by removing his land acknowledgement from the online version of a class syllabus during the Winter 2022 quarter, preventing him from expressing unpopular ideas within the public debate over land acknowledgments, and punishing him when he did express those views.

But facts are stubborn things. The University did not silence (or even try to silence) Reges. Instead, it invited him to express his views publicly in numerous University-related outlets. And Reges took (and continues to take) full advantage of that invitation without punishment or interference:

1

- He includes the statement in the signature block of his University email.

- He posts his statement outside the door of his University office.

- Reges's recitation of his "parody" land acknowledgment has remained accessible online in the recording of his opening lecture for his Winter 2022 class.

- He has included his land acknowledgment on all class syllabi after the Winter 2022 quarter.

- He has invited faculty to join him for discussion groups regarding land acknowledgements.

- He has given interviews to the media—including University-funded media—about his land acknowledgment.

These facts are not disputed, yet Reges never acknowledges them in his opening brief. Instead, he insists that the district court's decision below "gave a green light to an unconstitutional heckler's veto," where "the speaker is *silenced*," because of the reactions of his listeners. OB 47 (emphasis added). Having established his false narrative, Reges waxes passionately about the role of college classrooms as "peculiarly the marketplace of ideas," OB 21, warning the Court that "[i]f the First Amendment does not bar censorship and punishment of Professor Reges's speech related to teaching on public issues, university classrooms in this Circuit will cease to be the marketplace of ideas required to sustain a free nation," OB 7–8.

But soaring rhetoric cannot obscure the facts—particularly where, as here, the Court must apply a balancing test, weighing "the interests of the teacher, as a citizen" against "the interests of the State, as an employer." *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Reges's opening brief cheats the scales by asserting that the University's removal of Reges's land acknowledgment from a single quarter's online syllabus in response to significant campus disruption "prohibited" his "public expression of ideas." OB 23. In reality, the University's muted reaction struck the appropriate balance between protecting Reges's right to express his views and maintaining a conducive learning environment.

And, contrary to Reges's account, significant disruption did occur. Reges relies on the absence of "any *in-class* reaction." OB 11 (emphasis added); *see also* OB 5. But this is misleading. There was no "in-class" disruption because the lecture introducing his online syllabus was delivered remotely, so there were no students "in class" that day.

In fact, the disruption was immediate and significant, with students taking to online forums to stress their concerns that they would have to drop the class to avoid being targeted by Reges. Administrators had to create a second section of the class to accommodate those students who did not believe

that Reges could be fair in teaching his class. Given this clear disruption, the University's limited response of removing Reges's land acknowledgment from the online version of the class syllabus for one quarter while permitting Reges to express his views everywhere else struck a reasonable balance.

Last, Reges's claims that the University's anti-harassment policy, Executive Order 31, is unconstitutionally vague and overbroad rest on fundamental misapplications of the law. Such challenges must begin by construing the policy at issue. Doing so here confirms that the Order does not sweep in substantial protected expression relative to its legitimate scope. It also sufficiently puts members of the University community on notice of their obligations.

This Court should affirm the district court in full.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Reges's claims arise under federal law. SER-106, SER-126–38. The district court issued a final judgment on May 3, 2024, and an amended order resolving all issues on May 8, 2024. SER-3; 1-ER-2–49. Reges filed a timely notice of appeal on May 30, 2024. Fed. R. App. P. 4(a)(1)(A); 3-ER-580–81. This Court thus has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly granted summary judgment for the University on Reges's First Amendment retaliation claims when the undisputed facts show that the University's mission in safeguarding the learning environment far outweighed the minimal restriction on Reges's expression.

2. Whether the district court correctly granted summary judgment for the University on Reges's viewpoint-discrimination claim when the same balance of interests tipped against his expressive rights and the record shows that the University did not act based on Reges's viewpoint.

3. Whether the district court correctly dismissed facial overbreadth and vagueness challenges to a University policy when that policy, properly construed, neither sweeps in substantial protected expression nor leaves the University community subject to arbitrary enforcement or without reasonable notice of what the policy proscribes.

## CONSTITUTIONAL AND REGULATORY AUTHORITIES

Relevant constitutional provisions and regulations are in the Addendum filed by Reges. *See* Dkt. 10.2, ADD-1–12.

5

## STATEMENT OF THE CASE

***The University adopts an inclusive land-acknowledgment statement.***

The University of Washington acknowledges that the Coast Salish peoples remain part of the community in the Puget Sound region. SER-38.

The Coast Salish peoples have deep roots in the Seattle area. Seattle's namesake, Seeathl, was a "local indigenous leader … who facilitated the city's founding." Coll Thrush, NATIVE SEATTLE 5 (2d ed. 2017). The area immediately surrounding the present-day University campus included "an important town," Little Canoe Channel, "with at least five longhouses and a large fishing weir." *See id.* at 250–51. Other Indigenous placenames nearby abound, *see id.* at 221, 224–25, with researchers lamenting that known placenames reflect only a portion of Indigenous activity in the area, *see id.* at 213–14.[1]

The University seeks to provide a welcoming environment for Indigenous people—particularly Native students who attend the University. *See* SER-38. To that end, it crafted a land acknowledgment:

> The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all

---

[1] *See also* Waterlines Project Map, Burke Museum of Natural History and Culture, (last visited Nov. 1, 2024), https://www.burkemuseum.org/static/waterlines/project_map.html.

tribes and bands within the Suquamish, Tulalip and Muckleshoot nations.

*Id*. This acknowledgment signals to Indigenous people that they are welcome at the University. *Id.*

The University's land acknowledgment grew out of a years-long process in which University officials worked with the Office of the Governor of Washington, Tribal leaders from throughout the state and region, and other stakeholders. *Id.* As the University's Office of Tribal Relations explains, the University understands that Washington State includes "tribal lands or co-managed public lands, therefore it is important for the University … to develop strong working relationships with tribal citizens and leaders." 2-ER-236. Those relationships have already led to benefits for all sides, "including sharing knowledge, research opportunities, and educational opportunities for tribal members and descendants." *Id.*

The University's efforts to work cooperatively with Indigenous people and Tribal governments also track its commitments under a memorandum of understanding with regional tribes. *See* 2-ER-247–49. That memorandum commits the University to enhancing "efforts to recruit, retain, and successfully graduate more American Indian undergraduate, graduate and professional students." 2-ER-247. It likewise commits the University to

7

integrating "American Indian culture, knowledge and history into the academic curriculum, institutional programs and university community." *Id.*

Efforts like the land acknowledgment, and the process from which it stemmed, also cohere with the "government-to-government" approach the University takes in interacting with Tribal governments. *See* SER-38; *see also* 2-ER-236, 2-ER-248.

### *A diversity committee at the University's Allen School suggests a land acknowledgment for course syllabi.*

The Paul G. Allen School of Computer Science and Engineering sits within the University's College of Engineering. 2-SER-90. The Allen School is led by Director Magda Balazinska, with Professor Dan Grossman serving as Vice Director. 2-ER-109; SER-47. Dean Nancy Allbritton leads the College of Engineering. 2-ER-90.

In its "Best Practices for Inclusive Teaching" document, the Allen School's Diversity Committee suggests including a welcoming land acknowledgment (using the University's statement as an example) to create a more inclusive environment. SER-47, SER-50–56. The Best Practices document contains no mandatory provisions. *Id.*; *see also* 2-ER-176–77.

***Reges includes his "parody" statement in a Winter 2022 syllabus to create disruption.***

Reges is an instructor in the Allen School. Reges has a history of stirring controversy, having been the subject of complaints within the University system "many times." 2-ER-162–63; *see also* 2-ER-164–71, 2-ER-232–33. To highlight his objection to what he calls "the equity agenda," Reges crafted his own "parody" land acknowledgment. 2-ER-183–85, 2-ER-208.

In December 2021, Reges first circulated to Allen School faculty his version of a land acknowledgment:

> I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington.

2-ER-115.

Weeks later, Reges included his mock land acknowledgment in the Winter 2022 syllabus for his introductory computer science course, CSE 143—Computer Programming II. *See* 2-ER-239–40; *see also* 2-ER-194. Reges included his parody land acknowledgment on the University syllabus for his course even though he knew that, far from advancing the purpose of the University's suggested land acknowledgement—creating a more welcoming environment—it would instead have the opposite effect and likely offend a significant segment of the University's community, including his students. *See* 2-ER-186–90; *see also* 2-ER-172–74, 2-ER-178–79, 2-ER-192–93, 2-ER-198.

He acknowledged that including the statement on the syllabus would make it "clear that [he] is trolling." 2-ER-188.

**_Reges's "parody" statement causes significant disruption._**

Reges's land acknowledgment prompted an immediate and substantial disruption. While there was no "in-class" reaction because the lecture was delivered by video, 2-ER-198–99, Reges admits that the statement garnered a "significant amount of attention" immediately on Reddit, "almost all [of it] negative," 2-ER-197, 2-ER-201.

Over the following hours, days, and weeks, Director Balazinska saw the disruption caused by Reges's actions. First, Reges's mock land acknowledgment had, predictably, not only failed to advance the University's goal of creating a welcoming environment for Indigenous students, it had the opposite effect. At least one student in the class felt "intimidated" in a required course for her program. 2-ER-122. Another said that Reges's statement "tarnishes the reputation of the Allen School." 2-ER-124. Student members of the Allen School Diversity Committee complained. 2-ER-124–25. An Indigenous student at the Allen School felt "despised" and ultimately took a leave of absence from the University. 2-ER-127; _see also_ 2-ER-103.

The disruption interfered with University staff functions as well. Balazinska learned that staff were "at a loss for how to best express their

concern and frustration about this situation," and they worried about the effect on prospective students. 2-ER-133. After Reges vowed to include his land acknowledgment on another syllabus the next quarter, the University saw more disruption. 2-ER-110. The Allen School's recruiter for diversity and access complained that Reges had undermined her function within the School. 2-ER-137–38.

Teaching assistants also experienced disruption. When Reges promised to repeat his land acknowledgment on the syllabus for the Spring 2022 quarter, representatives of the University's union for academic student employees informed Balazinska that some teaching assistants felt "fear of retaliation from Stuart Reges" and that other student employees' "feelings of belonging in the Allen School have been negatively impacted by the fact that Stuart Reges' behavior has been allowed to continue." 2-ER-140.

***The University never "silences" or "censors" Reges.***

Reges repeatedly asserts that the University and its administrators "censored" him (OB 4, 7, 11, 12, 15, 16, 39, 43, 49); "silenced" him (OB 6, 23, 47); and prevented him from commenting on a "matter of public concern" (OB 30, 38). But the undisputed evidence demonstrates that Reges was afforded virtually unlimited opportunities to express his views, including

on campus and in University forums. And he has availed himself of those opportunities without interference.

Reges has included his land acknowledgement on his University email signature block. 2-ER-180–82. He has posted his land acknowledgment outside his University faculty office. 2-ER-202. He has given interviews to the press—including to University-funded media—expressing his views on land acknowledgments. *See* 2-ER-203–06, 2-ER-222. He has talked about land acknowledgments in his classes, and even been permitted to include his land acknowledgement in University course syllabi if and when doing so did not disrupt or interfere with the learning environment at the University. *See* 2-ER-226–227, 2-ER-229–31. In fact, Reges has included his statement on all syllabi after Winter 2022, and—faced with less disruption in later quarters—the University never again removed it. *See id.* Reges's opening brief omits these facts. *See generally* OB.

Even in removing Reges's statement from the online syllabus for the Winter 2022 quarter, the University twice *invited* Reges to share his views publicly in contexts other than on a University syllabus. When Director Balazinska asked him to remove the statement from the introductory course syllabus in January 2022, she expressly noted that Reges is "welcome to voice [his] opinion and opposition to land acknowledgments, as [he has], in

12

other settings." 2-ER-118. And when Balazinska informed Reges that she was removing the statement from the online course syllabus, she reiterated that it "goes without saying that you have the right to have discussions about land acknowledgments …." SER-61. Contrary to Reges's assertion (OB 12–13), the University did not "encourage" students "to file complaints against him." Instead, Balazinska "assure[d] everyone that they can expect to be treated fairly and respectfully in this class." 3-ER-450. Only if students had "experiences to the contrary" should they "submit a complaint." *Id.*

To accommodate students, Balazinska and Grossman worked together to create an alternative section for the introductory course in Winter 2022. 2-ER-109–10; SER-47. About 170 students—a third of the class—switched to that new section. 2-ER-207.

By late January 2022, Reges was griping that "interest in [his] case seems to have dropped to nearly zero." 2-ER-212. Eventually frustrated that colleagues were "just ignoring" him, Reges hatched plans to "make people pay attention." 2-ER-223–24; *see also* 2-ER-219–21. Reges's announcement in February 2022 that he planned to continue including his land acknowledgment on course syllabi going forward did just that—including by prompting a complaint from the union representing academic student employees and further complaints from other students and staff. *See supra* 11; 2-ER-110. The

13

University did not remove Reges's statement from his Spring 2022 introductory course syllabus, but Balazinska and Grossman worked to create an alternative class section for the course. *See* 2-ER-111; SER-47.

In response to the academic student-employee union complaint and other disruption, Balazinska initiated the process (under Faculty Code Section 25-71) for addressing potential misconduct by University faculty. 2-ER-110. She met with Reges regarding his potential violations of University policy. 2-ER-110, 2-ER-149–51, 2-ER-153–54. When Reges refused any proposal to revise his land acknowledgment or remove it from course syllabi and proposed no solution of his own, Balazinska continued the Faculty Code process, referring the matter to Dean Allbritton. 2-ER-111, 2-ER-156.

After a meeting between Allbritton and Reges also failed to yield resolution, Allbritton convened a special investigating committee in accordance with the Faculty Code. 2-ER-90, 2-ER-93–94. Allbritton charged the faculty committee with gathering information about what had transpired. 2-ER-90, 2-ER-97–99; *see also* 2-ER-243–45.

The committee spoke to key witnesses and gathered considerable information. *See* SER-76–98. It also invited Reges to speak with its members, but he declined. SER-76. In October 2022, the committee orally conveyed its findings to Allbritton. 2-ER-90; SER-41, SER-43–45. In a June 2023 letter,

14

Allbritton summarized the committee's findings for Reges and shared her own conclusions resolving the Faculty Code process. 2-ER-91, 2-ER-102–07. As Allbritton conveyed to Reges, the committee found that the inclusion of Reges's land acknowledgment on the University syllabus "created an immediate and significant disruption to the University teaching environment." 2-ER-102–03.

Despite this finding, Allbritton "decline[d] to impose any sanction." 2-ER-106. She also reinstated Reges's merit pay increase, which had been held in abeyance during the Faculty Code process. *Id.* Reges's opening brief omits that his merit pay had been held in abeyance in accordance with a standard University practice pending the conclusion of a Faculty Code investigation. *Compare* OB 17, *with* SER-41.

Dean Allbritton last explained that, if Reges continued to include his land acknowledgment on University syllabi "*and* if that inclusion leads to further disruption," she would conclude that Reges intended the disruption, and the University would "proceed with next steps in accordance with the Faculty Code." 2-ER-106–07 (emphasis added). She nowhere threatened to "discipline him" automatically for violating University policy "if administrators received new complaints," as Reges claims. *Contra* OB 17.

15

As Reges admits, he was not fired. He was not suspended. He was not demoted. His salary was not reduced. He was not barred from campus. *See generally* OB 17. And he remained free to express his views on land acknowledgments—including in the same language he used on the syllabus—in myriad contexts, including all his course syllabi after Winter 2022.

**Reges launches this litigation.**

Reges filed a lawsuit. OB 16. He alleged that the University's administrators violated his First Amendment rights by engaging in viewpoint discrimination. SER-126–29. He also alleged under 42 U.S.C. § 1983 that the administrators had retaliated against him in violation of the First Amendment. SER-129–32. And he brought two facial challenges to the constitutionality of the University's anti-harassment order, Executive Order 31. *See* SER-133–37. He alleged that the Order was overbroad, SER-133–35, and that it was unconstitutionally vague, SER-135–37.

**The district court grants summary judgment for the University on Reges's First Amendment retaliation and viewpoint-discrimination claims.**

The administrators sought dismissal of all claims, and the parties cross-moved for summary judgment. 1-ER-11. The district court decided the motion to dismiss and the cross-motions for summary judgment together because the parties had completed discovery before the court ruled on the dismissal motion. *Id.* The district court ruled that Reges's mock land acknowledgment is

speech related to scholarship or teaching on a matter of public concern under *Demers*, 746 F.3d at 406. 1-ER-20. Yet the court, noting the significant disruption caused by Reges's land acknowledgement, also determined that the University's interest in preventing that disruption to its operations outweighed Reges's asserted expressive rights, particularly given that the University allowed Reges to express his views in many other ways and did not punish Reges for expressing those views. 1-ER-47–48. The University showed, the court stated, "actual and reasonably anticipated disruption of staff functions, teaching assistant cohesiveness, and students' learning environment resulting from Plaintiff's own acknowledgment statement in the syllabus." *Id.*

The court thus denied Reges's motion for summary judgment on his First Amendment retaliation and viewpoint-discrimination claims and granted summary judgment on those claims for the University. *Id.*

***The district court dismisses Reges's overbreadth and vagueness claims.***

The district court also dismissed Reges's claims that Executive Order 31 is unconstitutionally overbroad and vague on its face. In doing so, it interpreted the Order to proscribe conduct "resembling" discrimination, harassment, or retaliation, reasoning that the policy's prohibition on "unacceptable" or "inappropriate" conduct was directly tied in linguistic

context to actions related to discrimination, harassment, or retaliation. 1-ER-31–32, 34.

This appeal followed.

## SUMMARY OF ARGUMENT

*First*, Reges's retaliation claims fail. The balancing test under *Pickering*, 391 U.S. at 568, favors the University. On the one hand, Reges's expressive interest in including the land acknowledgement on his Winter 2022 syllabus is limited: he has had ample alternative means to express his views about land acknowledgments with which the University has never interfered. The University's interests in orderly operations, on the other hand, weigh heavily under *Pickering*. The University faced substantial disruption to the learning environment for students, student employees, and staff. The University's interests in maintaining an environment where students do not fear discrimination and in responding to a complaint from the union representing student employees justify the modest restriction on Reges's expression. Contrary to Reges's assertions, the district court honored, rather than ignored, the University's mission to foster free inquiry. In any event, summary judgment is appropriate even without balancing, since Reges in the Winter 2022 University course syllabus was not speaking in his capacity as a

citizen but as an employee. A University syllabus constitutes government speech entitled to no First Amendment protection.

*Second*, as Reges conceded below and does not dispute here, the *Pickering* test also applies to his viewpoint-discrimination claim. Thus, the same analysis above forecloses relief on that claim.

And *third*, Reges's facial challenges fail. The University's Executive Order 31 must be construed in accordance with state law to avoid constitutional infirmity and to give effect to all its provisions. Applying those principles, the district court correctly interpreted the Order to reach only conduct rising to or closely resembling unlawful harassment, discrimination, or retaliation. That limitation, assessed under this Court's precedent holding that a modified *Pickering* analysis also applies to facial challenges like Reges's, ensures that the Order does not prohibit substantial protected expression relative to its legitimate sweep. It also suffices to put members of the University community on notice of proscribed conduct and does not lend itself to arbitrary enforcement. The Order is thus neither overbroad nor unconstitutionally vague.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *See Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir.), *cert. denied*, 142 S. Ct. 343 (2021). Thus, the Court applies the same standard used by the trial court under Federal Rule of Civil Procedure 56 to determine whether summary judgment on Reges's retaliation and viewpoint-discrimination claims was proper. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003); Fed. R. Civ. P. 56(a). In turn, Rule 56 provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court thus credits Reges's evidence and draws justifiable inferences in his favor. *Demers*, 746 F.3d at 409. The Court "may affirm the district court's grant of summary judgment on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground." *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 966 (9th Cir. 2021).

The Court also reviews dismissals under Rule 12(b)(6) de novo. *See Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021). Thus, this Court will determine for itself the merits of Reges's facial challenges to the University's Executive Order 31.

# ARGUMENT

## I. The district court correctly granted summary judgment for the University on Reges's First Amendment retaliation claims.

The district court's careful order appropriately evaluated the record to conclude that Reges's retaliation claims fail as a matter of law. 1-ER-36–48. Reges's arguments to the contrary rest on false premises and misunderstandings of law. First, the *Pickering* balance mandates summary judgment. Reges repeatedly overstates the University's restriction on his speech, and understates the disruption that he caused to duck that fact-bound inquiry. *See* § I.A. He portrays the University's actions as "censoring" his speech and casting a "pall of orthodoxy" on the contested issue of land acknowledgments. OB 7, 12, 26. No such censorship occurred and no such pall was cast. Reges had ample means to express his message both on and off campus. § I.A.1. On the other side of the scales, Reges consistently downplays the substantial disruption that he caused. § I.A.2. Contrary to Reges's assertions, the district court in fact accounted for a university's mission to support free inquiry in applying *Pickering*. Reges leans on authorities in which restrictions on academic freedom or campus speech involved severe sanctions or choked off key avenues of expression. § I.A.3. In any event, the Court need not reach the *Pickering* test because Reges included his purported land

acknowledgment on a University course syllabus in accordance with his official duties. As a result, the statement is constitutionally unprotected. § I.B.

**A.** **The district court correctly balanced the University's interests in efficient operations against any de minimis burden on Reges's expression.**

Reges's retaliation claims fail under the *Pickering* balancing test. Under *Pickering*, a retaliation claim cannot succeed when "the interest[s] of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweigh "the interests of the teacher, as a citizen, in commenting upon matters of public concern." *Pickering*, 391 U.S. at 568.

Relevant under *Pickering* are "the time, place, and manner in which the speech was made as well as the context in which the dispute arose." *Maples v. Martin*, 858 F.2d 1546, 1554 (11th Cir. 1988) (affirming judgment for university for transferring professors to other departments based on disruption caused by professors' writings); *see also Connick v. Myers*, 461 U.S. 138, 152–53 (1983). When a university employee's conduct undermines a university's "ability to maintain discipline and harmony among" its workforce, that "adverse impact on the efficient administration of public education" justifies restricting expression. *Berg v. Hunter*, 854 F.2d 238, 243–44 (7th Cir. 1988) (affirming discharge of college athletic coordinator); *see also Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (listing factors courts consider in weighing

*Pickering* balance). Here, *Pickering* mandates affirming the district court's judgment.[2]

> **1. Because the University imposed only minor restrictions on his speech, Reges's expressive rights count for little in the *Pickering* balance.**

Reges casts the weight of his free speech interest in absolutist terms, but that interest must be weighed based on the degree to which his speech was restricted. In removing Reges's mock land acknowledgment from a single course syllabus, the University imposed a minimal restriction on Reges's expression, thus reducing the weight that expressive interest bears under *Pickering*. Reges was never punished for his land acknowledgment and remained free to communicate that statement across many channels at the University. Consistent with the rest of his opening brief, Reges pitches his expressive interest at the highest level of generality, invoking platitudes about his "powerful" interest in political speech and his interest in joining "a political debate the American public was and is having about the history of our nation and its land." OB 39. Crucially, however, he cannot explain how he was stymied from participating in that debate. *Pickering* requires the very "fact-

---

[2] Reges's drive-by suggestion that a genuine dispute over a material fact related to disruption may support remand was not just waived but affirmatively disclaimed below. *Compare* OB 47 n.11, *with* SER-27 (conceding that "this case is appropriate for summary judgment for both sides").

sensitive" analysis that Reges avoids. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 781 (9th Cir. 2022) (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022)).

To start, Reges had and still has every opportunity to speak about land acknowledgments, both on and off campus. Reges has remained free to append his land acknowledgment to the bottom of his emails. 2-ER-180–82. He can likewise send his statement to his colleagues and post it outside his office on campus. 2-ER-191, 2-ER-202. Reges has repeatedly given interviews about his land acknowledgment stunt, *e.g.*, 2-ER-203–06, 2-ER-222, belying any suggestion that he could not speak his mind. Nor has the University barred Reges from writing books, staging a public protest, or organizing discussions with interested students, faculty, or staff. Moving past Reges's abstractions, the Court need only ask itself who has been deprived of Reges's purported contribution to this debate due to the University's actions. The answer is, no one.[3] *See Jeffries v. Harleston*, 52 F.3d 9, 13–15 (2d Cir. 1995) (ruling that a

---

[3] Comparing Reges's experience to the circumstances described in the Manhattan Institute's amicus brief supporting Reges is instructive. The Institute's counsel was placed on administrative leave and "prohibited from setting foot on campus" during a four-month investigation of a social media post. Br. of Amicus Curiae Manhattan Inst. Supporting Plaintiff-Appellant ("Manhattan Inst. Br.") 7. The post there did not occur on campus, on the syllabus of an introductory course required for the major, and it led to a severe

university was justified in removing professor as department chair in response to controversial off-campus speech when university reasonably anticipated disruption and the plaintiff was "still a tenured professor" whom the university did not try to "silence").

Nor did expressions of distaste for Reges's views by University administrators silence or punish Reges. Rather, they added to the public debate that Reges claims to support. Even the PEN American Center, which has submitted an amicus brief supporting Reges, acknowledges that it is appropriate for the University to "use[] its own speech and platforms to state that Professor Reges' Statement does not reflect its values, nor how it wishes to treat its community." Br. of Amicus Curiae PEN American Center, Inc. in Support of Plaintiff-Appellant ("PEN American Br.") 13.

Reges also asserts that the University's offering a separate section of the introductory programming course for students who did not wish to take the class from Reges constituted punishment. But he musters no support for the theory that students within a required class for the Computer Science major must be forced to listen to his viewpoint. Once again, Reges's amici

---

sanction. Not so here. Reges has remained on campus, in the classroom, sharing his views on land acknowledgments at all times since this dispute arose.

acknowledge that creating the alternative section is not "punishment," but rather "[the University's] decision to create an alternative section of the class available to students who wished to take the course from a different professor may have been a reasonable ameliorative measure" to address the disruption to students' education. PEN American Br. 12.[4]

Reges's reliance on *Meriwether v. Hartop*, 992 F.3d 492, 506–10 (6th Cir. 2021), is misplaced. *Contra* OB 38–40. *Meriwether* held that a university unconstitutionally silences a professor's viewpoint by forbidding *any* expression on a particular topic, including in a syllabus. *Meriwether*, 992 F.3d at 506. That case centered on a professor's disagreement with the school's policy on preferred pronouns. *Id.* at 498. After being directed to "eliminate all sex-based references from his expression" or refer to students only by their preferred pronouns, the professor asked to express his views in another way

---

[4] The Manhattan Institute is wrong to invoke *Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992). *See* Manhattan Inst. Br. 4–5. In *Levin*, the university lacked a valid concern that the professor's statement offended its students or harmed the educational process within the classroom. Unlike this case, the district court there determined that "the shadow classes were established with the intent and consequence of stigmatizing Professor Levin solely because of his expression of ideas." *Levin*, 966 F.2d at 88 (internal quotation marks and citation omitted). Here, by contrast, there was substantial disruption. *Infra* § I.A.2. And the University, far from trying to stigmatize Reges, in fact avoided drawing any "explicit connection" between the alternative section offering and Reges's statement in communications with students because it was "not trying to tell anyone what to do." SER-67.

and suggested that one avenue could be by "plac[ing] a disclaimer in his syllabus" explaining his "personal and religious beliefs about gender identity." *Id.* at 499–500. The university rejected this request and offered no other venue for him to express his views. *Id.* The Sixth Circuit concluded that the university violated the professor's rights because it forbade him from describing his views on gender identity in any outlet, whether in the classroom, in the syllabus, or elsewhere. *Id.* at 506. That conclusion does not mean that any restrictions on offensive speech on a university syllabus violate the First Amendment; it shows that universities must offer reasonable alternative outlets for expression and must have weighty interests in limiting that expression.

Here, the University provided Reges with many ways to communicate his message. In fact, it invited him to do so. 2-ER-118; SER-61. It also imposed no discipline following the completion of the Faculty Code investigation, despite the special investigating committee's findings that Reges caused substantial disruption. 2-ER-106. Because Reges's right to express his views has been protected in so many ways by the University, his expressive interest in including his land acknowledgment specifically on the online University syllabus of his Winter 2022 class counts for little in the *Pickering* balance.

**2. Because Reges caused substantial disruption, the University's interests in maintaining its learning environment weigh heavily under *Pickering*.**

Reges next tries to evade the other side of the *Pickering* ledger: the disruption he caused. Reges's stunt caused disruption among students, staff, and student employees. Despite Reges's deflections, the record shows substantial evidence of disruption for each of those constituencies. Applying the required "fact-sensitive and deferential weighing of the government's legitimate interests," that disruption supports the district court's conclusion that the University's interests outweighed Reges's. *Dodge*, 56 F.4th at 781 (internal quotation marks omitted).

***First***, Reges's actions disrupted the learning environment for students. This was especially true for Indigenous students. To brush this off as merely offense or hurt feelings reflects profound historical ignorance. *Contra* OB 21, 29. From the Supreme Court's labeling federal courts "the Courts of the conqueror" in 1823, *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 588 (1823), to Justice Gorsuch's recitation of the "disastrous consequences" of the federal government's Indian boarding-school system two centuries later, *Haaland v. Brackeen*, 599 U.S. 255, 297–305 (2023) (Gorsuch, J., concurring), courts have long recognized the devastating consequences of colonization for Indigenous people.

That dark history also unfolded in the Pacific Northwest. "Colonialism always brought disease" and "the combination of violence and diseases undercut the sovereign authority of tribal communities" in the West. Ned Blackhawk, THE REDISCOVERY OF AMERICA: NATIVE PEOPLES AND THE UNMAKING OF U.S. HISTORY 273 (2023) (discussing the Pacific Northwest). "The Pacific Northwest Natives suffered the same cataclysmic population loss as Indian people nationally, almost all of it due to the epidemics." Charles Wilkinson, TREATY JUSTICE: THE NORTHWEST TRIBES, THE BOLDT DECISION, AND THE RECOGNITION OF FISHING RIGHTS 39 (2024).

Bound up with this history of epidemics, dispossession, and forced assimilation is its current legacy—supported by peer-reviewed literature—of cross-generational historical trauma for Indigenous people. Social scientists tether the "greater risk" Indigenous adults face of "psychological distress" to trauma associated with these past events. Kathleen Brown-Rice, *Examining the Theory of Historical Trauma Among Native Americans*, 3 PROF'L COUNSELOR 117, 117 (2013) (examining theory and evidence behind historical trauma accounts).

It was precisely those issues that lay behind some of the disruption that Reges caused, and to which the University reasonably responded.

An Indigenous student at the Allen School felt "despised" and ultimately took a leave of absence. 2-ER-127; *see also* 2-ER-103. At least one student in the class felt "intimidated" and worried about whether she could be "successful in this required course for [her] major." 2-ER-122. Another said that Reges's "trauma-mocking statement tarnishes the reputation of the Allen School." 2-ER-124. Student members of the Allen School Diversity Committee complained that Reges's parody statement "appears in the intro-to-CS course, where students, including those from under-represented indigenous communities, first encounter … the Allen School culture." 2-ER-124–25; *see also* 1-ER-42–44 (district court summarizing several written student complaints).

Nor do these written complaints tell the full story. During its investigation, the special investigating committee gathered evidence of significant disruption, particularly for Indigenous students:

> Native students were very negatively impacted. Minorities in Tech were contacted by three Indigenous students who felt alienated in [Reges]'s class in the first week of January. Native faculty reported meeting and working with Native students a lot during this period.

SER-84 (footnotes omitted). The committee heard that Reges's stunt "reinforced" stereotypes of Indigenous people "as backward and lazy," and that "outcomes are worse for Native students due to systemic inequities [and] generational trauma." SER-88.

30

The committee also learned that "students felt too intimidated" to raise the issue with Reges and "instead brought it up with TAs, or in some cases with Allen School student services or administrators" during "many long and difficult conversations." SER-81. The number of student complaints about a class, so the committee learned, was "unprecedented." SER-83; *see also* 2-ER-109–10 (summarizing Balazinska's understanding that "many students and staff found" Reges's actions "offensive and distracting" and her observation that there was "a disruption to the learning environment").

In turn, the special investigating committee reported these findings to Dean Allbritton. As one committee member described it, the "level of disruption was extraordinary." SER-44. There was "significant impact" to the "morale of Native American students, and their learning." SER-43. Allbritton's letter to Reges closing the Faculty Code investigation without discipline summarized the findings she relied on:

- Student and staff complaints about Reges's "denigrating" statement that "were serious and well founded."

- A "Native American student feeling compelled to take a leave of absence from the University."

- A "Native American student feeling compelled to drop out of the University."

- "Multiple Native American students" worrying that "they were being targeted in a matter that would disadvantage them in their education."

2-ER-103.

Reges urges that the evidence does not support the existence of an Indigenous student who dropped out of the University altogether. OB 18 & n.5; OB 44. But that is irrelevant. The University's administrators "are not jurors to whom are submitted only those facts purified by filtration through the rules of evidence. Instead, they must do the proper sorting for themselves of the great variety of information." *Franklin v. Atkins*, 562 F.2d 1188, 1189–90 (10th Cir. 1977) (affirming rejection of First Amendment retaliation claims brought by applicant for university teaching position). Reges nowhere contests that Allbritton relied on the faculty committee's findings in good faith to support her decision—a decision that led to no discipline for Reges.

The number of students who opted to take the alternative class sections also underscores the degree of disruption Reges caused among students. Ultimately, 170 students switched to the alternative class section in Winter 2022. *See* 2-ER-207. Reges's contention that some students may have switched in the hope that the new section would have more favorable grading policies misses the mark. *Contra* OB 45. In fact, as the district court explained, the evidence shows that students would be informed that the grading system would not change for the alternative class section. 1-ER-45 (citing 3-ER-504–

05); *see also* SER-68 (noting that "policies/structure between the two courses will likely be largely the same (no resubmissions, traditional exams, etc.").

Put simply, Reges's actions had a "detrimental impact" on the student–faculty relationship for which "confidence" is necessary. *Rankin*, 483 U.S. at 388. The district court thus rightly concluded that the University "provided evidence of interference with students' ability to learn in the class." 1-ER-47 (internal quotation marks omitted).

***Second***, Reges's actions disrupted University staff functions. The Allen School's recruiter for diversity and access expressed frustration that Reges had undermined her function within the School: "How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?" 2-ER-138. Reges's actions thus "impair[ed] … harmony among co-workers" and "interfere[d] with the regular operation of" the Allen School. *Rankin*, 483 U.S. at 388.

The district court rightly accounted for the disruption facing the Allen School's recruiter. *See* 1-ER-39–40. By undermining a colleague's work and making it more difficult for her to fulfill her responsibilities, Reges "interfered 'with the regular operation of the enterprise.'" 1-ER-40 (quoting *Nunez v. Davis*, 169 F.3d 1222, 1228 (9th Cir. 1999)).

*Third*, and critically, teaching assistants also experienced the disruption, contending that Reges's actions put the University in breach of its collective-bargaining agreement with the University's student-employee union. Union representatives complained to Balazinska that some teaching assistants feared "retaliation from Stuart Reges" and that other student employees' "feelings of belonging in the Allen School have been negatively impacted by the fact that Stuart Reges' behavior has been allowed to continue." 2-ER-140. Reges's actions, so the union representatives conveyed, conflicted with the anti-discrimination provisions of the union's collective bargaining agreement with the University. *Id.* As a result, the representatives asked the university to "*take prompt action to address this behavior.*" 1-ER-141 (emphasis in original). Even Reges has admitted that his land acknowledgment was at least partially responsible for creating a "split" among the teaching assistants. 2-ER-210.

As the University's correspondence to Reges informing him of the beginning of the Faculty Code investigation and the charging letter to the committee each bear out, the union's complaint spurred the investigation. *See* 2-ER-98, 2-ER-149–50.

Based on this evidence, the district court correctly recognized that "[c]learly, Plaintiff's speech caused disruption with respect to teaching assistants." 1-ER-41. The complaint raised "the specter of a grievance if

prompt action were not taken." *Id.* Reges offers no authority or reasoning from which this Court can conclude that a university is barred from even *investigating* faculty speech in the face of a complaint from its student-employee union and an accusation that it may be in breach of contractual obligations.

\* \* \*

This extensive evidence of actual disruption distinguishes this case from those discussed by the James G. Martin Center in its amicus brief supporting Reges. *See* Br. of Amicus Curiae James G. Martin Ctr. for Academic Renewal in Support of Plaintiff-Appellant 5–9. The Martin Center's cited cases did not involve students fearing discrimination and flocking to an alternative section (or, in one instance, taking a leave of absence from the University)—much less a union complaint accusing a university of violating its collective bargaining agreement. Most also involved far more significant restrictions on expression, including termination from employment.

And while Reges's actions in fact caused a significant disruption, the University need not have "allow[ed] events to unfold to the extent that the disruption of the [classroom or the school] … [wa]s manifest before taking action." *Connick*, 461 U.S. at 152. Employers can take proactive steps to safeguard their interests, even when there is some effect on an employee's speech interests.

35

In *Connick*, for instance, an assistant district attorney (Myers) sued her boss, the New Orleans District Attorney (Connick), alleging that, after she refused an office transfer, she was wrongfully terminated for distributing a questionnaire about office policies. 461 U.S. at 140–41. The Court found no free-speech violation after weighing "the manner, time, and place in which the questionnaire was distributed." *Id.* at 152. Connick, the Court explained, had a valid interest in maintaining close working relationships at the office and avoiding insubordination, and "the fact that Myers … exercised her rights to speech at the office support[ed] Connick's fears that the functioning of his office was endangered." *Id.* at 153. Myers's limited First Amendment interest was thus outweighed by Connick's interests. Here, not only is the evidence of actual disruption substantially more compelling, but Reges was not fired and his ability to express his views faced no interference except for the removal of his land acknowledgment statement from the University's online syllabus for his Winter 2022 course.

### 3. Because the district court recognized the University's academic mission, Reges's argument for reversal based on that mission fails.

Neither the University nor the trial court ever denied the importance of free speech on a university campus. Indeed, the University's care in ensuring that Reges had and continues to have myriad ways to share his ideas confirms

that. The district court, too, was careful. In urging otherwise, Reges contends that the district court "ignored the University's core mission to foster pursuit of truth and the exchange of ideas, including those that may offend." OB 31. Not so. The district court fully acknowledged the special role that universities play in fostering the exchange of ideas by applying the *Pickering* test in the first instance, as well as in its care in deciding which evidence proffered by the University showed meaningful disruption. Reges's authorities are unavailing.

As discussed below, were it not for the deference given to the role of institutions of higher learning, because he was speaking as an employee of the state, Reges's land acknowledgement enjoys no protection under *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). *See infra* § I.B. Thus, that the district court conducted a *Pickering* analysis at all underscores the deference given to a university professor's right of free speech.

The district court, contrary to Reges's suggestions that it rubber-stamped censorship, instead examined each piece of evidence to determine whether it carried weight under *Pickering*. For instance, the district court disregarded University staff's "concern and frustration," reasoning that it "does not serve to tilt the balance" in the University's favor given case law that mere emotional reactions do not disrupt school operations. 1-ER-39 (applying *Dodge*, 56 F.4th at 782). The district court likewise rejected the significance of a viral Reddit

37

thread about Reges's mock land acknowledgment, explaining that "this alone merely shows discussion of the statement outside the classroom." 1-ER-42. The district court applied and—where appropriate—distinguished authorities arising from the university setting to weigh the competing interests at play. *See* 1-ER-46–48.

By contrast, Reges wrenches generalities from First Amendment cases— many of them those in which the government was not acting as an employer. Those authorities get him nowhere. Worst, perhaps, is Reges's reliance on *Meinecke v. City of Seattle*, 99 F.4th 514 (9th Cir. 2024). *See* OB 48. There, as Reges acknowledges, police arrested a street preacher who refused to leave a public place after being assaulted. 99 F.4th at 518–19. This Court applied *strict scrutiny* to prohibit punishing protected speech based on the potential reaction of the audience where the government was acting as sovereign—not as employer. The case is irrelevant to a public-employment dispute where the Court must apply a balancing test. So too for Reges's other "heckler's veto" cases—none of which arose in the government-employment context or applied *Pickering*. *See* OB 47 (citing cases).

Reges fares no better citing cases in which a university effectively cut off expression through threats of termination or else showed no evidence of disruption. Reges cites *Rodriguez v. Maricopa County Community College*

*District*, 605 F.3d 703, 708–09 (9th Cir. 2010). OB 31–32. But *Rodriguez* considered an equal-protection suit by college employees based on the college's decision *not* to discipline a faculty member for offensive speech. *Rodriguez*, 605 F.3d at 708–09. It says nothing about *Pickering*'s application here. Nor does Reges get mileage out of *Keyishian v. Board of Regents*, 385 U.S. 589, 591–93 (1967), a pre-*Pickering* case addressing a statute that barred persons who uttered "seditious" words from public employment. *See also Sweezy v. New Hampshire*, 354 U.S. 234, 237–45 (1957) (pre-*Pickering* case examining a contempt conviction following a professor's refusal to answer questions about communist beliefs).

This Court's decision in *Bauer v. Sampson* is also inapposite. *See* 261 F.3d 775 (9th Cir. 2001). There, the restriction—barring a professor from making future statements like those that led to his discipline, forcing him to undergo counseling, placing a disciplinary note in his file, and threatening more severe punishment in the future—is far greater than what Reges faced. *See id.* at 779, 780–81. On the other side of the scales, *Bauer* involved no evidence of disruption beyond "disharmony" among Bauer's colleagues and "tension between the administration" and faculty. *Id.* at 785. That case did not involve the record of disruption this Court confronts here: a union complaint

39

based on teaching assistants' fear of retaliation, students' fears of discrimination, and a colleague undermined in her own role at the University.

### B. Because Reges was not speaking as a citizen, his speech is unprotected in any event.

This Court may affirm a grant of summary judgment on any basis supported by the record, even if the district court itself rejected that basis. *See Sw. Fair Hous. Council*, 17 F.4th at 966. Here, while the district court correctly granted summary judgment, it erred in ruling that Reges's land acknowledgement was entitled to constitutional protection. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. And while this Court held in *Demers v. Austin* that *Garcetti* does not apply to speech related to scholarship or teaching, 746 F.3d at 406, Reges's statement falls outside that exception. As a result, summary judgment should also be upheld because Reges's land acknowledgment warrants no protection in the first place.

It is undisputed that the University's land acknowledgment was recommended for use on syllabi to create a more inclusive environment. "[A]s a general matter, when the government speaks, it is entitled to promote a program, to espouse a policy, or to take a position" and, "[i]n doing so, it

40

represents its citizens and it carries out its duties on their behalf." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). "When the government is formulating and conveying its message, 'it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Reges included his land acknowledgment in the University's Winter 2022 syllabus for his introductory course and mentioned it on the first day of class to convey a message antithetical to the University's position. *See* 2-ER-195. The University may constitutionally prevent Reges from garbling its own message with an offensive land acknowledgment intended to undermine its mission to welcome all people, and its particular interest in welcoming Indigenous people. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 411–12.

*Demers* does not help Reges. Reges's syllabus statements are not the type of "scholarship" or "teaching" that the Supreme Court envisioned protecting.

*See Garcetti*, 547 U.S. at 425. Far from the independently published pamphlet in *Demers* or the external publications in *Adams*, Reges's speech was in a University document required to be distributed—precisely the type of university-directed policy administration that *Adams* recognized would *not* constitute "scholarship or teaching" under *Garcetti*. *Adams v. Trs. of Univ. of N.C.*, 640 F.3d 550, 563–34 (4th Cir. 2011).

Reges's speech is closer to the speech in *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), and *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000). In *Johnson*, a high school math teacher hung two banners in his classroom referring to God or a "creator." 658 F.3d at 958. After the school required Johnson to remove the banners because they could make students feel unwelcome or ostracized, Johnson sued the school. *Id.* at 959. This Court held that the school did not violate Johnson's constitutional rights because he had not spoken as a private citizen:

> Johnson did not make his speech while performing a function not squarely within the scope of his position. He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. Rather, Johnson hung his banners pursuant to a long-standing [school] policy, practice, and custom of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

*Id.* at 967 (internal quotation marks and citations omitted); *see also id.* at 966–70. The Court contrasted Johnson's speech with that at issue in *Pickering*:

42

"Unlike Pickering, who wrote a letter to his local newspaper as any citizen might, … Johnson took advantage of his position to press his particular views upon the impressionable and 'captive' minds before him." *Id.* at 968 (internal citation omitted). Nothing "prevent[ed] Johnson from himself propounding his *own opinion* on 'the religious heritage and nature of our nation' or how 'God places prominently in our Nation's history' … on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations. He may not do so, however, when he is speaking as the government, unless the government allows him to be its voice." *Id.* at 970 (internal quotation marks and citation omitted); *see also Downs*, 228 F.3d at 1014 (restricting a teacher's ant-gay bulletin board post was acceptable because "[a]n arm of local government—such as a school board—may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives.").

As in *Johnson* and *Downs*, nothing prevents Reges from propounding his opinion on land acknowledgements "on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations." *Johnson*, 658 F.3d at 970; *Downs*, 228 F.3d at 1016. As discussed above (*supra* 12–13), the University never tried to prevent Reges from debating this topic on

43

University grounds in appropriate fora. But Reges cannot do so "when he is speaking as the government." *Johnson*, 658 F.3d at 970 (citation omitted); *Downs*, 228 F.3d at 1016.

## II. Because *Pickering* also applies to Reges's viewpoint-discrimination claim, that claim similarly fails.

Reges contends that the University tried to "silence" him because it and others in the University community thought his purported land acknowledgment was "offensive." OB 23. But his viewpoint-discrimination claim cannot survive. First, Reges concedes that the *Pickering* test governs this claim. So the same analysis above controls. The claim is not viable separate from Reges's retaliation claims. Second, Reges ignores the facts showing that the University did not single out Reges's land acknowledgement based on the viewpoint it reflects but rather responded to the disruption to the learning environment Reges caused.

To begin, Reges acknowledges that a viewpoint-discrimination claim in the context of restrictions on a university professor's speech is subject to *Pickering* balancing. *See* SER-22 (Reges conceding at oral argument below that his "viewpoint discrimination claim is subject to the *Pickering* balancing test"); *see also* OB 29–49 (merging discussion of retaliation and viewpoint-discrimination claims under *Pickering*'s rubric). *Pickering* "applies regardless of the reason an employee believes his or her speech is constitutionally

44

protected." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 650 (9th Cir. 2006). Thus, the analysis of Reges's retaliation claims above (*supra* § I) dooms his viewpoint-discrimination claim. *See* 1-ER-48.

In any event, the University did not discriminate based on Reges's viewpoint. The record confirms that the University responded to the disruption Reges caused, not the view he expressed.

When Reges first announced his intention to include his statement on the University syllabus for his introductory course, the University took no action. When Reges included his statement in his email signature block and outside his faculty office, the University took no action. When Reges announced his desire to discuss his views in a forum with other faculty, the University took no action. *See supra* 12. The University's lack of action demonstrates that it is not Reges's viewpoint that caused an investigation. Instead, the record proves that the University acted only in response to a significant disruption to the learning environment that it could not ignore. Indeed, when Reges put his statement back on course syllabi in later quarters and less or no disruption ensued, the University did not remove the statement—confirming that its objection was not to the statement's point of view, but to the disruption it had caused when he introduced it on the Winter 2022 syllabus.

Nor does the University force faculty to parrot its recommended land acknowledgment or to include one at all on course syllabi. Another faculty member circulated an article opposing such statements and faced no sanction. *See* 2-ER-115. No faculty member has been disciplined for not using the Allen School's recommended land acknowledgment; one of the Appellees—Professor Grossman—does not himself include a land acknowledgment on the syllabi for his courses. SER-47. Director Balazinska also asked two other faculty members—whose alternative land acknowledgments may have been insensitive to more conservative students—to change the syllabi for their courses. *See* 2-ER-110–11. Thus, the facts suggest no discrimination based on partisan or ideological perspective. Indeed, the University left Reges free to disseminate by several other means the exact message it removed from the Winter 2022 syllabus: affixing it to his email signature, hanging it outside his faculty office, discussing it with students, and so on. Thus, Reges's claim that his views led to the University's removal of his land acknowledgment from one course syllabus lacks support.

## III. Reges's facial challenges to the University's anti-harassment policy fail.

The University's Executive Order 31 is neither overbroad nor unconstitutionally vague. The Order does not sweep in substantially more protected speech than unprotected conduct. It is therefore a poor candidate for

the severe remedy of facial invalidation. Instead, the Order, properly construed, reaches only conduct akin to unlawful discrimination, harassment, or retaliation. § III.A. Similarly, the Order is not unduly vague. It gives reasonable members of the University community notice of what conduct the Order prohibits. Nor is it susceptible to arbitrary enforcement. § III.B.

### A.    Because the Order, properly construed, does not reach substantial protected expression, it is not overbroad.

The Order reaches only conduct closely resembling unlawful discrimination and harassment. Considered within the public-employment setting—as this Court's precedent commands—it does not sweep in substantially more protected than unprotected conduct. Even if applying the Order in some cases might restrict expression, those applications constitute just a fraction of the Order's applications that do *not* affect expression. Reges's arguments to the contrary fail. He invokes cases in which the government acts as a sovereign rather than as an employer and confuses the scope of anti-harassment law with that of a university's interest in restricting expression when its interests in orderly operations outweigh the speaker's expressive rights. This Court should therefore affirm the district court's dismissal of Reges's claim.

### 1. The Order's full text confirms that it is limited to conduct closely resembling unlawful harassment.

First, a law or policy is overbroad only if "a substantial number of its applications are unconstitutional, judged in relation to [the law or policy's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The overbreadth doctrine is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Nor do courts strike down laws as overbroad "when a limiting construction has been or could be placed on the challenged statute." *Id.*; *see also Arce v. Douglas*, 793 F.3d 968, 985 (9th Cir. 2015) ("It would be inappropriate for us to read the statute more broadly to find that this provision [is invalid,] … as the provision is readily susceptible to the more narrow construction we have identified.").

Overbreadth challenges "in the public employment context" turn on a "modified *Pickering* balancing analysis that closely tracks the test used for First Amendment retaliation claims." *Hernandez v. City of Phoenix*, 43 F.4th 966, 980 (9th Cir. 2022). After determining that "the challenged restriction applies to employees' speech in their capacity as private citizens on matters of public concern" courts "then ask whether the government has an adequate

justification for treating its employees differently from other members of the general public." *Id.*

Reges's overbreadth claim stumbles from the start. "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). But Reges misinterprets the Order. Reges plucks a single clause from the Order to assert that it is overbroad: "the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation." OB 49 (quoting Exec. Order 31 § 1, ADD-3). But extracting just this phrase with the words "unacceptable" and "inappropriate" and omitting the Order's limiting language to claim that the Order sweeps in substantial protected expression flouts core precepts of statutory interpretation.

The University is a state agency, and the Order constitutes agency action. *See* Wash. Rev. Code § 34.05.010(2) (defining agency to include an "institution of higher education"); *id.* § 34.05.010(3) (defining agency action to include "the adoption or application of an agency rule or order"). Washington courts read laws as a whole and construe them to avoid constitutional

49

infirmities. *See Arce*, 793 F.3d at 984 (applying state-law interpretive principles in considering overbreadth challenge to state law); *State v. Evergreen Freedom Found.*, 432 P.3d 805, 809 (Wash. 2019) (holding that construction is necessary if more than one interpretation of plain language is reasonable and that the meaning of words in a statute is gleaned from "all the terms and provisions of the act in relation to the subject of the legislation, the nature of the act, the general object to be accomplished and consequences" of one construction over another (quotation marks omitted)); *Utter v. Bldg. Indus. Ass'n of Wash.*, 341 P.3d 953, 971 (Wash. 2015) ("We construe statutes to avoid constitutional doubt."). And Washington courts "apply the same principles used to interpret statutes" when interpreting agency regulations. *Puget Soundkeeper Alliance v. State*, 356 P.3d 753, 757 (Wash. Ct. App. 2015).

With those principles in mind, the Order addresses not all "inappropriate" conduct but only conduct closely resembling unlawful retaliation and discrimination, even if the conduct does not meet the test under those employment-law concepts. Reges ignores these principles, urging that no saving construction is possible. OB 60.

The Order's text shows otherwise. The Order's central concern is combatting discrimination, harassment, and retaliation:

> The University … is committed to providing equality of opportunity and an environment that fosters respect for all members of the University community. This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. To facilitate that goal, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

Exec. Order 31 § 1, ADD-3.

Reges contends that the Order "rejects any balance between unlawful harassment and academic speech" because it authorizes corrective action "regardless of" of whether the offending conduct is itself unlawful. OB 52. He is wrong. Immediately after the language that Reges emphasizes, the Order lists specific policies aimed at discrimination, harassment, and retaliation. *Id.* And it defines key terms and explains that terms in the Order are meant "to have the meaning given to them by applicable federal or state laws and regulations." *Id.* § 4, ADD-5. The Order thus tethers the words "unacceptable" and "inappropriate" to the concepts of unlawful discrimination and retaliation. *See State v. Roggenkamp*, 106 P.3d 196, 200 (Wash. 2005) (explaining that "a single word in a statute should not be read in isolation" and that the meaning

of words "may be indicated or controlled" by other words with which they are associated).

The Order also commits the University, in language Reges ignores, to interpreting it "in the context of academic freedom in the University environment." Exec. Order 31 § 5(A), ADD-6; *see Arce*, 793 F.3d at 985 (rejecting overbreadth challenge in part because policy stated that it would not be construed to prohibit instruction on historical oppression). Thus, far from rejecting any balance between unlawful harassment and protected speech, the Order expressly *demands* such a balance. *See Port of Seattle v. Pollution Control Hr'gs Bd.*, 90 P.3d 659, 672 (Wash. 2004) (explaining that "deference to any agency's interpretation of its own regulations is … appropriate"). Even the titles of the Order and of the relevant subsection refer to "Nondiscrimination" and "Nondiscrimination and Non-Retaliation." *See State v. Day*, 638 P.2d 546, 547 n.4 (Wash. 1981) ("It is a well recognized rule of statutory construction that the title of the act may be resorted to as one means of ascertaining intent.").

In short, and as the district court concluded, the Order means that conduct punishable as "unacceptable" or "inappropriate" must resemble discrimination, harassment, or retaliation, even if it need not be independently unlawful under those employment-law concepts. 1-ER-27 ("Given the stated

52

goal of the policy, and the context in which challenged terms reside, the Court agrees with Defendants' limiting construction of the EO.") The First Amendment does not limit permissible *workplace* discipline to conduct that is itself illegal under the employment laws. In any event, the Order does not sweep in substantial protected expression relative to its total coverage. So it is not unconstitutionally overbroad.

Next, the same analysis that requires dismissing Reges's retaliation and viewpoint-discrimination claims precludes invalidating the Order as overbroad. Just as under *Pickering*, courts ask whether the challenged restriction applies to employees' private speech and, if so, whether the restriction is justified. *See Hernandez*, 43 F.4th at 980. But unlike Reges's as-applied claims about purported retaliation, his facial challenge aims at a policy that does not target protected expression at all in most instances, and will satisfy *Pickering* in almost every other. *See Broadrick*, 413 U.S. at 616 (identifying content and viewpoint neutrality as factors weighing against facial invalidation based on overbreadth). Put simply, the Order does not facially restrict what members of the University community say in private or post on social media. It instead prohibits *conduct*—rarely expressive in the first place—with no place in the university setting or that of any other employer. The Order is thus necessarily on firmer constitutional footing than policies that facially target expression.

*Hernandez* is instructive. There, this Court affirmed—with two caveats— the dismissal of plaintiffs' overbreadth challenge to a police social-media policy restricting "a broad category of expression" when the policy advanced the employer's interest in prohibiting speech "undermin[ing] the employer's mission or hamper[ing] the effective functioning of the employer's operations." 43 F.4th at 980–83. The policy, which restricted even off-duty social media posts "detrimental to the mission and functions of the Department" or which undermined "the goals and mission of the Department or City," closely "track[ed] interests that the Department may constitutionally pursue." *Id.* at 980–81. The court therefore could not "say that a substantial number of the policy's applications are unconstitutional." *Id.* at 981 (internal quotation marks and citation omitted). Here, prohibiting conduct, much of it independently actionable, that conflicts with the University's mission in combatting discrimination and harassment should lead to the same result, especially where the policy sweeps in far less presumptively protected expression. Reges's opening brief ignores *Hernandez* in discussing overbreadth. OB 49–62.

Other courts have rebuffed overbreadth challenges to similar policies. In *Arnett v. Kennedy*, for instance, the Supreme Court rejected an overbreadth challenge to a civil-service statute authorizing the dismissal of a government

employee "for such cause as will promote the efficiency of the service." 416

U.S. 134, 158 (1974) (citation omitted). *Arnett* explained that "the infinite

variety of factual situations in which public statements by Government

employees might reasonably justify dismissal" supported such a broad

restriction. *Id.* at 161. The provision covered no more than was needed to

protect the reputation and efficiency of the employing agency. *See id.* at 162; *see

also Hernandez*, 43 F.4th at 981 (upholding police department's social media

policy barring posts "detrimental to the mission and functions of the

Department") (citation omitted).

### 2. Reges relies on inapposite authorities in urging that the Order is overbroad.

To overcome the district court's reasoning, Reges engages in sleight of

hand. Besides ignoring this Court's binding law about how to assess

overbreadth in the public-employment context, he stacks authorities in which

the government acted as a sovereign, rather than as an employer or in other

settings in which *Pickering* applies. *See, e.g.*, OB 50–51 (citing *Moody v.

NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024), *United States v. Hansen*, 599

U.S. 762, 769 (2023), and *Tucson v. City of Seattle*, 91 F.4th 1318, 1327 (9th

Cir. 2024)). This will not do.

Nor is his reliance on *Davis v. Monroe County Board of Education*, 526

U.S. 629 (1999), availing. Reges asserts that *Davis* "defin[es] unlawful

55

harassment in the academic setting," and establishes a "rule" that the First Amendment protects offensive speech unless it is "so severe, pervasive, and objectively offensive that it denies its victims … equal access to education." OB 51, 52. Reges thus concludes that "expression *must* rise to [the level of unlawful discrimination, harassment, or retaliation] to lose First Amendment protection." OB 24 (emphasis in original). That is not the law, and it is not what *Davis* stands for.

First, *Davis* did not address overbreadth or the First Amendment at all; it is a Title IX case. Nor did it even establish a general standard for unlawful harassment. Rather, it addressed the circumstances under which a municipal school board can be held liable for monetary damages based on sexual harassment committed by one student against another student: "[I]n the context of student-on-student harassment, damages are available only where the behavior is *so severe, pervasive, and objectively offensive that it denies its victims* the *equal access to education* that Title IX is designed to protect." 526 U.S. at 652 (emphasis added). Reges's reliance on the italicized language to suggest that Davis establishes a "rule" applicable to First Amendment overbreadth jurisprudence cannot be sustained.

Second, it is well established that a public employer's policies may reach even expressive conduct so long as its interests outweigh those of the speaker.

*See Hernandez*, 43 F.4th at 980 (explaining that a "modified *Pickering* balancing analysis" like the test used for First Amendment retaliation claims applies to overbreadth analysis in the public-employment setting). *Davis* does not, therefore, supply the relevant limit for the University's authority.

All Reges's other authorities are distinguishable because the challenged provisions at issue lacked limiting language and context showing that those provisions covered conduct akin to unlawful or unprotected speech. Unlike the Order here, some even address regulations that exclusively target expression. *See, e.g.*, *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 249–50 (3rd Cir. 2010) (invalidating ban on "offensive" signs when the requirement lacked "any requirement akin to a showing of severity or pervasiveness" and thus contained no "shelter for core protected speech"). A ban directed expressly at *signs* will necessarily target speech in all its applications.[5] Thus its permissible sweep will be far narrower than the Order's here. As for *DeJohn v. Temple University*, 537 F.3d 301, 317–18 (3d Cir. 2008), it invalidated a student-conduct prohibition on "hostile" or "offensive" conduct without a "requirement akin to a showing of severity or pervasiveness." The Order here, by contrast, is replete with

---

[5] The same is true of the "flyer policy" at issue in this Court's unpublished decision in *Flores v. Bennett*, No. 22-16762, 2023 WL 4946605, at *1–2 (9th Cir. Aug. 3, 2023), which Reges invokes, OB 53–54. *See also* 1-ER-30–31 (distinguishing *Flores*).

textual and contextual limits on its application constituting a "requirement akin to" showing unlawful conduct absent in *McCauley* and *DeJohn*.

The Supreme Court's recent decision in *Hansen*, on which Reges relies, OB 50–52, 61, in fact favors the University, *see* 599 U.S. at 781–85. The Court addressed a statute aimed at any person who "encourages or induces" unlawful conduct. *Id.* at 773. Hansen tried to impose an expansive meaning on those words—just as Reges tries to do with "unacceptable or inappropriate." But the Court rejected his effort to morph an "ordinary solicitation" offense into a "novel and boundless restriction on speech." *Id.* at 777. Just as it was "fairly possible" to employ a limiting construction in *Hansen*, this Court should do the same with the words on which Reges fixates. *Id.* at 781 (quotation omitted).

**B.** **Because the Order gives adequate notice about what conduct it prohibits and is not subject to arbitrary enforcement, it is not unconstitutionally vague.**

Reges's second facial challenge—that Executive Order 31 is unconstitutionally vague—also fails. Because the Order, properly construed, addresses conduct like discrimination, harassment, or retaliation—even if the conduct falls short of what is unlawful and legally actionable—reasonable members of the University community are on notice of what sort of conduct is "unacceptable" or "inappropriate" under the Order. Together with the greater

58

leeway given for civil, rather than criminal, restrictions and for restrictions aimed at public employees, rather than the public at large, properly construing the Order sinks Reges's vagueness claim.

The vagueness doctrine flows from the Constitution's due process guarantee. A law is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But the law has never required "perfect clarity and precise guidance … even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (citation omitted). "[W]e can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. The vagueness doctrine incorporates two main requirements. First, the law or policy must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (quoting *Grayned*, 408 U.S. at 108).[6] Second, the policy must avoid arbitrary enforcement. *See id.* at 665. The vagueness doctrine applies with less force when, like the Order, the restriction imposes only civil consequences. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). And "policies governing public employee speech may be framed in language that might be deemed impermissibly vague if applied to

---

[6] This requirement is heightened in First Amendment cases. *See Edge*, 929 F.3d at 664.

the public at large." *Hernandez*, 43 F.4th at 982. As with his overbreadth challenge, Reges again ignores *Hernandez* and the public-employment context.

Reges's assertions that restrictions on "unacceptable" and "inappropriate" conduct are unconstitutionally vague fail to persuade. The Order relates to conduct closely resembling unlawful discrimination, harassment, and retaliation. *Supra* § III.A. And it qualifies the references to inappropriate conduct. *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005) ("[O]therwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity."). This narrowing construction puts a member of the University community of reasonable intelligence on notice of the conduct the Order prohibits. *See, e.g.*, *Arce*, 793 F.3d at 988 (statute prohibiting coursework promoting resentment toward a race or class of people not void for vagueness "[f]or many of the same reasons" it was not overbroad). In other words, the statutory construction underlying the overbreadth analysis also shows that the Order is definite enough to be understood as applying to specific categories of conduct that the law allows public employers to restrict. Thus, its provisions "cannot be deemed unconstitutionally vague on their face." *Hernandez*, 43 F.4th at 982.

Nor does the Order invite arbitrary enforcement. In fact, it must be interpreted "in the context of academic freedom in the University

environment." Exec. Order 31 § 5(A), ADD-6. Nothing supports reading Reges's cherry-picked phrase and concluding that the Order is meaningless. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (reasoning that a civil law is void for vagueness only if its terms are "so vague and indefinite as really to be no rule or standard at all" or if it is "substantially incomprehensible" (citation omitted)).[7]

Courts have rejected vagueness challenges to provisions as broad as or broader than those in the Order. In *Arnett*, the Supreme Court upheld a standard allowing the government to dismiss employees for any cause "as will promote the efficiency of the service." *See* 416 U.S. at 159–60. The Sixth Circuit ruled similarly in upholding an employment policy prohibiting "conduct unbecoming a teacher." *Fowler v. Bd. of Educ.*, 819 F.2d 657, 664–66 (6th Cir. 1987). So too with the Third Circuit's approving a regulation authorizing dismissal of professors who failed to "maintain standards of sound scholarship and competent teaching." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992).

---

[7] Reges's assertion that the University "enforced EO-31 against" him is unsupported. OB 62. The University *investigated* whether he had violated the Order, but ultimately imposed no discipline under the Order.

And, in a case Reges cites (OB 61), this Court reversed a trial court's vagueness-based injunction against an ordinance prohibiting "writ[ing], paint[ing], or draw[ing]" figures or marks on property without the owner's permission. *See Tucson*, 91 F.4th at 1323, 1329–30. Like the plaintiff there, Reges fails to show that the Order is "vague in the vast majority of its intended applications," and ignores that it is "readily subject to a narrowing construction by the state courts." *Id.* Thus, this Court should reject his vagueness challenge.

Next, unlike in the cases Reges cites, the Order's language expressly qualifies the references to "inappropriate" and "unacceptable" conduct by tethering them to the specific context of harassment, discrimination, and retaliation, and by requiring the University to interpret the Order in the context of its commitment to academic freedom and by reference to federal employment law. *Compare Gammoh*, 395 F.3d at 1120, *with* OB 58 (citing cases). This narrowing construction offers enough specificity to put a member of the University community of reasonable intelligence on notice of the conduct the Order prohibits. Reges's contrary authorities lack comparable textual guidance on what the regulations at issue in those cases proscribed, arose in the criminal context, or else did not address vagueness challenges at all. *See, e.g.*, *Smith v. Goguen*, 415 U.S. 566, 573–75 (1974) (addressing flag

contempt statute whose language failed "to draw reasonably clear lines" between criminal and noncriminal conduct); *Grayned*, 408 U.S. at 108–14 (rejecting vagueness challenge); *McCauley*, 618 F.3d at 250 (not addressing vagueness challenge at all); *DeJohn*, 537 F.3d at 317 (same).

The Order survives Reges's vagueness challenge.

## CONCLUSION

For these reasons, this Court should affirm the judgment below and award costs to Appellees.

November 22, 2024                   Respectfully submitted,

                                    */s/Robert M. McKenna*

R. David Hosp                       Robert M. McKenna
Katherine Kerrick                   Aaron P. Brecher
ORRICK, HERRINGTON &                ORRICK, HERRINGTON &
  SUTCLIFFE LLP              SUTCLIFFE LLP
222 Berkeley Street, Suite 2000     401 Union Street, Suite 3300
Boston, MA  02116                   Seattle, WA  98101
                                    (206) 839-4301


*Counsel for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-3518

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** *s/ Robert M. McKenna*          **Date** Nov. 22, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                    *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-3518

I am the attorney or self-represented party.

**This brief contains 13,219 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs;
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/Robert M. McKenna*      **Date** Nov. 22, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*