No. 24-3518

IN THE

# United States Court of Appeals for the Ninth Circuit

STUART REGES,

*Plaintiff-Appellant*,

*v.*

ANA MARI CAUCE, in her official capacity as President of the University of Washington; MAGDALENA BALAZINSKA, in her official and individual capacities as Director of the Paul G. Allen School of Computer Science & Engineering; DAN GROSSMAN, in his official and individual capacities as Vice Director of the Paul G. Allen School of Computer Science & Engineering; NANCY ALLBRITTON, in her official and individual capacities as Dean of the College of Engineering,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Western District of Washington
No. 2:22-cv-00964-JHC, Hon. John H. Chun

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 1

R. David Hosp
Katherine Kerrick
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116

Robert M. McKenna
Aaron P. Brecher
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101
(206) 839-4300

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

Judgment in a Civil Case,
    Dkt. No. 89, filed May 3, 2024 ........................................................... SER-3

Transcript of April 22, 2024 Hearing,
    Dkt. No. 87, filed April 29, 2024 ....................................................... SER-4

Declaration of Chadwick Allen re: Defendants' Motion for
    Summary Judgment,
    Dkt. No. 70, filed December 18, 2023 ............................................. SER-37

Declaration of Aileen Trilles re: Defendants' Motion for Summary
    Judgment,
    Dkt. No. 69, filed December 18, 2023 ............................................. SER-40

Declaration of Daniel Grossman re: Defendants' Motion for
    Summary Judgment,
    Dkt. No. 68, filed December 18, 2023 ............................................. SER-46

Exhibit S to Declaration of Gabriel Walters: Email
    correspondence dated Jan. 6, 2022 from M. Balazinska to S.
    Reges,
    Dkt. No. 62-18, filed December 18, 2023 ......................................... SER-60

Exhibit X to Declaration of Gabriel Walters: Email
    correspondence dated Jan. 7, 2022 from D. Grossman to M.
    Natsuhara,
    Dkt. No. 62-23, filed December 18, 2023 ......................................... SER-66

Exhibit BB to Declaration of Gabriel Walters: Email
    correspondence dated Jan. 12, 2022 from J. Hiigli to Student,
    Dkt. No. 62-27, filed December 18, 2023 ......................................... SER-71

Exhibit RR to Declaration of Gabriel Walters: Draft Report by L.
    Mackenzie,
    Dkt. No. 62-43, filed December 18, 2023 ......................................... SER-75

Amended Complaint for Civil Rights Violations,
    Dkt. No. 46, filed August 2, 2023 .................................................... SER-99

# UNITED STATES DISTRICT COURT

### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| STUART REGES<br><br>Plaintiff,<br><br>v.<br><br>ANA MARI CAUCE et al.<br><br>Defendant | **JUDGMENT IN A CIVIL CASE**<br><br>CASE NUMBER 2:22-cv-00964-JHC |

☐   **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒   **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT

Defendants' motion to dismiss as to Plaintiff's facial overbreadth and facial vagueness challenges is granted. Defendants' motion for summary judgment as to Plaintiff's retaliation and viewpoint discrimination claims is granted. Thus, all of Plaintiff's claims are dismissed with prejudice.

Dated May 3, 2024.

Ravi Subramanian
Clerk of Court

*/s/Ashleigh Drecktrah*
Deputy Clerk

1                UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

                                    )
4    STUART REGES,                  ) C22-00964-JHC
                                    )
5                    Plaintiff,     ) SEATTLE, WASHINGTON
                                    )
6    v.                             ) April 22, 2024 -
                                    ) 10:00 A.M.
7    ANA MARI CAUCE, et al.,        )
                                    )
8                                   ) ORAL ARGUMENT
                     Defendants.    )
9                                   )

10   _____

                VERBATIM REPORT OF PROCEEDINGS
11            BEFORE THE HONORABLE JOHN H. CHUN
                UNITED STATES DISTRICT JUDGE

12   _____

13   APPEARANCES:

14   For the Plaintiff:      Joshua T. Bleisch
                             Foundation for Individual Rights
15                           and Expression
                             700 Pennsylvania Avenue S.E.
16                           Suite 340
                             Washington, D.C. 20003
17
                             Carl J. Marquardt
18                           Law Office of Carl L. Marquardt
                             1126 - 34th Avenue, Suite 311
19                           Seattle, WA 98122

20
     For the Defendants:     Robert M. McKenna
21                           Aaron Brecher
                             Orrick Herrington & Sutcliffe
22                           401 Union Street, Suite 3300
                             Seattle, WA 98101

23

24

25

     Proceedings stenographically reported and transcript produced with computer-aided technology

```
 1              THE COURT:  Good morning, everyone.  Please be seated.
 2              THE CLERK:  Now calling case C22-964-JHC, Stuart Reges
 3    v. Ana Mari Cauce, et al.
 4         May I please have appearances?
 5              MR. BLEISCH:  Joshua Bleisch for plaintiff, Stuart
 6    Reges.
 7              MR. MARQUARDT:  Carl Marquardt, co-counsel for
 8    Mr. Reges.
 9              MR. MCKENNA:  Rob McKenna, counsel for the defendants.
10              MR. BRECHER:  Aaron Brecher, also counsel for the
11    defendants, Your Honor.
12              MR. MCKENNA:  And, Your Honor, also listening on the
13    phone, with the court's permission, is our co-counsel for the
14    defendants, David Hosp, and another of the defendants, Dan
15    Grossman.
16              MR. BLEISCH:  And, Your Honor, on plaintiff's side,
17    listening in as well, are my co-counsel Jay Diaz and Gabe
18    Walters.
19              THE COURT:  Thank you.  And is that Professor Reges
20    sitting next to you at counsel table?
21              MR. BLEISCH:  Yes, yes.
22              THE COURT:  And for the record, who is setting next to
23    counsel?
24              MR. MCKENNA:  Aaron Brecher, co-counsel, and Dr. Magda
25    Balazinska, one of the defendants.
```

1          THE COURT:  Great.  Thank you.

2      So before we get started with the substance of the motions on

3  this hearing, I want to disclose something that I learned last

4  week.  I learned that Rob McKenna, one of the lawyers for

5  defendants, recommended me for a judicial fellowship program with

6  the Rodel Institute, and I also understand that Mr. McKenna is

7  one of the board members of the institute.  My understanding is

8  that this fellowship is a judicial leadership development

9  program.  For what it's worth, I also understand that one of our

10  State Supreme Court's justices recommended me to the program, and

11  I'm inclined to participate in it.

12      I have no reason to believe that this recommendation by Mr.

13  McKenna or my involvement in the program would affect in any way

14  my ability to be fair and impartial in this case; nevertheless,

15  I'm making this disclosure because I thought it's something that

16  the plaintiff's side might want to know about.

17      And so, Mr. Bleisch, are you the lead today?

18          MR. BLEISCH:  Yes, I am, Your Honor.

19          THE COURT:  Yes.  Do you have any concerns?  Would you

20  like to discuss this with your client --

21          MR. BLEISCH:  No concerns, Your Honor.

22          THE COURT:  -- or with Mr. McKenna?

23      Okay.  Mr. McKenna, I don't know if you recall this, but do

24  you have any concerns on your side?

25          MR. MCKENNA:  No, none at all, Your Honor.  Thank you.

1          THE COURT:  Okay.  Great.

2      All right.  So each side will get 20 minutes today -- I think

3  that's plenty of time -- and I'd suggest that you present your

4  oral argument as you see fit, but I want to tell you about what

5  I'm most curious about right now.  The first question that I'm

6  turning over in my mind is, was plaintiff's speech related to

7  scholarship or teaching?  Put another way, is the Ninth Circuit

8  case of *Downs* distinguishable?

9      The other question that I have turning over in my mind is

10  regarding the *Pickering* balancing determination by the court.

11  Case law seems to suggest that the balancing test must be

12  determined by the judge, that is, it's for the court to actually

13  do the balancing, but there appears to be -- and perhaps you'll

14  disabuse me of this during oral argument -- but there appears to

15  be an underlying dispute of fact regarding whether and to what

16  extent the plaintiff's statement caused disruption at the Allen

17  School and in the University setting.

18      So my question is, assuming the court reaches the cross

19  motions for summary judgment, why shouldn't it deny both motions

20  as to the retaliation and discrimination claims because of the

21  underlying issues of fact?

22      On a related note, and this is a little bit outside the scope

23  of the motions, if this matter proceeded to trial, what would

24  that look like?  Would it be bifurcated?  I want you to tell me

25  how the jury's findings and the court's *Pickering* balancing would

1    fit together, and I'm curious as to whether there's an example

2    out there of another similar case where you had to have a

3    combination of a jury's findings and a judge's balancing of the

4    *Pickering* factors.

5         So we will start with the defendants.  Mr. McKenna, would you

6    like to reserve any time for rebuttal?

7              MR. MCKENNA:  I would, Your Honor.  I would like to

8    reserve five minutes for rebuttal.

9              THE COURT:  All right.

10             MR. MCKENNA:  Thank you.

11        Judge Chun, and may it please the court, I'm Rob McKenna,

12   counsel for defendants.

13        Your Honor, we think there are really just two questions to

14   decide this First Amendment case on summary judgment.  First,

15   when plaintiff posted his own land acknowledgment statement in

16   the University syllabus for winter of 2022, was he speaking for

17   the University as a government employee, so that the test from

18   *Garcetti* and *Connick* applies, or was his speech that of a teacher

19   which related to scholarship or teaching, bringing it under

20   *Pickering*?  If it's the latter, does the *Pickering* balancing, as

21   applied to the facts of this case, favor the University or

22   plaintiff; that is, does the University's interest in its orderly

23   operations and an inclusive learning environment outweigh any

24   minimal burden on plaintiff's expressive rights?  The answer to

25   each of these questions turns on the facts before the court, as

 1   they did in the First Amendment cases cited by both sides in this

 2   case.

 3        Now, this case, speaking of the facts, arises from the

 4   decision of University of Washington officials to, in one

 5   instance, remove plaintiff's statement concerning Native American

 6   Tribes from an official University document, the syllabus for a

 7   mandatory computer science course taught by plaintiff in winter

 8   of 2022.  Plaintiff's statement in that University document

 9   caused serious disruption to the University's and Allen School's

10   learning environments, as evidenced by numerous student, teaching

11   assistant, and faculty complaints, and by decisions of some

12   students to consider withdrawing from the University or to delay

13   their computer science education.

14        The University's message was provided in a recommended

15   "Indigenous Land Acknowledgment Statement" for optional inclusion

16   in University course syllabi.  The statement was intended to be

17   welcoming to its Native American students, but University

18   officials felt plaintiff's statement distorted and garbled the

19   University's own message in an official document, a message which

20   was designed to promote a welcoming and inclusive learning

21   environment.

22             THE COURT:  What was the University's policy at issue?

23   And, here, I'm comparing the policy in *Downs.*  Because, there,

24   there's a policy of -- and, I'm sorry, I'm paraphrasing here --

25   of inclusion or tolerance.  Here, are we talking -- is the policy

Case: 24-3518, 11/22/2024, DktEntry: 56.1, Page 10 of 139
Case 2:22-cv-00964-JHC   Document 87   Filed 04/29/24   Page 7 of 33

April 22, 2024 - 7

 1   embodied in the actual suggested land acknowledgment?  Is the

 2   policy EO 31?  Or is it a combination thereof?

 3          MR. MCKENNA:  The policy is not limited to the

 4   recommended "Indigenous Land Acknowledgment Statement."  That

 5   statement was produced as part of the broader policy to create an

 6   inclusive and welcoming learning environment for all students,

 7   including Native American students.  And the Allen School, and

 8   the University more generally, have been concerned for a long

 9   time about increasing the number of Native American students at

10   the University and in the Allen School and in helping them

11   successfully complete the program.

12      So the optional statement was not the policy.  The optional

13   statement was a product of the policy and was specifically

14   recommended by the Allen School's Diversity and Inclusion

15   Committee, which included a large number of students, and the

16   students recommended to the administrators of the Allen School

17   that the statement be provided for optional inclusion in Allen

18   School course syllabi.  But the statement itself was not a

19   policy.

20      Now, EO 31 is a policy, of course, which prohibits behavior

21   that is retaliatory, discriminatory, harassing, even if it

22   doesn't rise to the level of unlawful discrimination, harassment,

23   or retaliation.  So that is also a policy of the University, Your

24   Honor.

25      If I may, Your Honor, let me offer just another hypothetical.

Case: 24-3518, 11/22/2024, DktEntry: 56.1, Page 11 of 139
Case 2:22-cv-00964-JHC   Document 87   Filed 04/29/24   Page 8 of 33

April 22, 2024 - 8

1    Another optional policy statement that the University has created

2    for optional inclusion in the University's syllabi is the

3    University's disability accommodation policy.  Now, if plaintiff

4    were to have included a distorted or garbled version of that

5    policy in a University syllabus and, in so doing, caused

6    disruption, officials then would also be compelled to remove it,

7    because, as in *Downs*, it would have confused the message, garbled

8    and distorted the message, that the University was trying to

9    deliver about welcoming students with disabilities.  Similarly,

10   the Indigenous Land Acknowledgment Statement, designed to create

11   a more welcoming and inclusive environment for students of Native

12   American descent.

13       Now, in terms of impacts, in terms of the steps the

14   University took, the plaintiff's own land acknowledgment

15   statement was removed from a University syllabus just one time,

16   in winter 2022.  At the same time, the University allowed

17   plaintiff to disseminate that same statement in his University

18   e-mails, in the signature block; on his University of Washington

19   web page; outside his office door; in messages to the Allen

20   School's diversity-allies listserv; orally in front of his class

21   at the beginning of his lecture, on that first day of class; in a

22   YouTube video of that lecture; and, critically, in University

23   syllabi for plaintiff's courses after winter 2022, provided it

24   did not, again, seriously disrupt the school's learning

25   environment, as it did the first time it was used.

Case: 24-3518, 11/22/2024, DktEntry: 56.1, Page 12 of 139
Case 2:22-cv-00964-JHC   Document 87   Filed 04/29/24   Page 9 of 33

April 22, 2024 - 9

1      Now, under *Garcetti*, *Downs,* and *Johnson*, public employees who

2   make statements pursuant to their official duties are not

3   speaking as citizens, and the Constitution does not insulate

4   their communications from employer action.

5           THE COURT:  Does it matter that this is a university

6   context versus a high-school situation, like in *Downs*?

7           MR. MCKENNA:  In both cases, you have educational

8   institutions who are concerned with conveying their message.  In

9   *Downs*, it was the Los Angeles Unified School District's desire to

10  convey a welcoming message to students who are lesbian, gay,

11  bisexual, trans, and so forth.  Here, it's the University -- in

12  this case, we're dealing with the University policy specifically

13  addressing Native American students.  And so, no, I don't think

14  it matters that you had a public school district in the one hand

15  and a public university on the other.  In both cases, we're

16  talking about public educational institutions.

17      Now, again, under the *Garcetti*, *Downs*, and *Johnson* tests --

18  *Johnson*, of course, being the case in which a teacher chose to

19  put up banners declaring God as the creator in his classroom --

20  public employees who make statements pursuant to their official

21  duties are not speaking as citizens, and the Constitution does

22  not insulate their communications from employer action.  Here, a

23  course syllabus at the University is a University document

24  reflecting the University's views.  University faculty are

25  required, as part of the teaching duties, to provide course

 1  information in course syllabi, and in so doing, they're speaking

 2  as the University.  It's an official document of the University.

 3  If they choose to include University policies in the syllabi for

 4  their courses, like the disability policy or this land

 5  acknowledgment statement, they do not have a right to garble,

 6  distort, or misrepresent those policies, and the University may

 7  choose, as their employer, to correct the official syllabus so

 8  that it accurately reflects University policy.

 9       THE COURT:  Is there any evidence in the record showing

10  that somebody thought that the statement by plaintiff was the

11  University's statement versus plaintiff's statement?

12       MR. MCKENNA:  Yes, because the students, the faculty,

13  the teaching assistants who complained, complained to University

14  administration.  They said that this statement in the

15  University's syllabus is not consistent with the University's

16  policy and the Allen School's policy of inclusiveness.  They said

17  that this damages the University's and Allen School's

18  reputations, and they demanded that the University take action to

19  remove it, in that winter-quarter instance, because they felt

20  that it came across as communication by the University.  Again,

21  the University syllabus is a University document, not an

22  individual document like a faculty member's website, for example.

23       THE COURT:  Regarding the teaching assistants, there was

24  an e-mail in the record.  Other than the e-mail, is there any

25  other evidence of disruption caused in connection with the

1    teaching assistants?  For example, is there anything in the

2    record showing that any teaching assistant requested switching

3    out of plaintiff's section?

4          MR. MCKENNA:  Not of that particular issue, of switching

5    out.  However, in that e-mail, which conveyed the union's

6    collective bargaining agreement complaint, alleging that the

7    University may have violated an article -- I think it was

8    Article 20 of the collective bargaining agreement -- you know,

9    they're claiming a potential violation of the CBA, so that's

10   something the University had to respond to, and it was that

11   event, Your Honor, that triggered the 25-71 process.  That

12   process wasn't started when the University took down the

13   statement for winter quarter; that process commenced after the

14   teachers -- the teaching assistant union filed its collective

15   bargaining complaint.

16      In that same e-mail, Your Honor, the teaching assistant union

17   also said that they were made aware that teaching assistants felt

18   very uncomfortable and felt that they may not -- they could not

19   express their own views or they were worried they couldn't

20   express their own views about these issues or even about this

21   statement, that they felt it might hurt their own careers if they

22   did so.  So that e-mail has a lot in it for a short e-mail, but

23   one of the key pieces of it, in addition to the report that

24   teaching assistants were very unhappy and felt that the statement

25   was inappropriate, was the fact they claimed there might have

1    been, as a result, a CBA violation.

2         Now, Your Honor, even if the *Pickering* balancing test is

3    applied to the facts of this case, because the court concludes

4    that plaintiff's alternative statement is related to scholarship

5    or teaching, which we do not believe it is, that balancing still

6    favors the University's decision to remove plaintiff's statement

7    from its syllabus when that statement causes serious disruption

8    to the University learning environment.  That is, under *Pickering*

9    balancing, the University's interest in avoiding disruption

10   outweighs plaintiff's expressive rights, especially given the

11   minimal restriction involved, i.e., removing the alternative

12   statement one time from one course.

13        THE COURT:  Do you concede that plaintiff spoke on a

14   matter of public concern?

15        MR. MCKENNA:  You know, we don't say that it's not a

16   matter of public concern.  The University believes that creating

17   a welcoming environment is a matter of public concern.  But we

18   don't believe that that gives any faculty member a right to

19   distort or garble a message that the University is trying to

20   convey in an official University document.

21        Further, we don't believe that the plaintiff in this instance

22   was speaking as a citizen in this official University document.

23   He was speaking as a government employee, carrying out his

24   official duties.  Even one of the cases that both sides cite,

25   *Adams v. University of North Carolina Wilmington,* which applied

1    the *Pickering* balancing test in favor of a faculty member who had

2    published controversial material outside the university, even

3    that case noted that a public university faculty member's

4    assigned duties include a specific role in declaring or

5    administering university policy as opposed to scholarship or

6    teaching, and that *Garcetti* may apply to the specific instances

7    of the faculty member's speech carrying out those duties, which

8    we think was the case here.

9         Your Honor, I would just like to, if I may, briefly address

10   the two claims of retaliation.  One is in relation to the

11   creation of an alternate section for two of the plaintiff's

12   courses; the other is the 25-71 process.

13        So, just briefly, the alternative section was created for the

14   winter and spring CSC 143 and 412 courses, but it was created by

15   the Allen School to help students, not to punish plaintiff.  It

16   was not retaliatory.  There is ample evidence that there was an

17   educational purpose to establishing those alternative sections

18   for those two quarters only.  For example, in the record, it

19   stated that one Native American student told Allen School

20   officials they felt despised; another said she would drop this

21   mandatory introductory course, disrupting her education; and yet

22   another felt intimidated and was worried about not being graded

23   fairly in plaintiff's class.  Then you have the complaints

24   relayed by the teaching assistant union on top of that.

25        Finally, on the 25-71 process, Your Honor, that was commenced

1    after a union complaint was received alleging a CBA violation,

2    and it led to no discipline.  Plaintiff received his full merit

3    increase at the end.  That's because the 25-71 process is a

4    normal, routine process designed to protect faculty members'

5    rights to a fair, confidential review of allegations made against

6    them.

7        I will reserve the balance of my time for rebuttal, Your

8    Honor.

9             THE COURT:  You have about seven minutes left.

10            MR. MCKENNA:  Okay.  Thank you.

11            THE COURT:  All right.  Mr. Bleisch.

12            MR. BLEISCH:  Good morning, Your Honor.

13            THE COURT:  Good morning.

14            MR. BLEISCH:  My name is Joshua Bleisch for --

15            THE COURT:  Bleisch.  Sorry.

16            MR. BLEISCH:  No, no.  It's no problem.

17        I'm representing plaintiff, Stuart Reges.  And I would like

18    to reserve three minutes for my surrebuttal.

19            THE COURT:  Okay.

20            MR. BLEISCH:  The University of Washington here told

21    their faculty that they could discuss historical ownership of

22    state land on their syllabi.  This is despite the fact that they

23    know that this is a hotly debated topic that is inherently

24    political.  But Professor Reges, he disagreed with the

25    University's stance on this, so he wrote his own land

1    acknowledgment, satirizing the University's statement.  When

2    defendants got offended by what Professor Reges had to say, they

3    began taking adverse action against him.  They censored his

4    syllabus, they siphoned students away from his courses, they

5    launched a yearlong disciplinary investigation into him that

6    carried the threat of potential suspension or termination, and

7    they continue to threaten him with future punishment if anyone

8    else complains about what he has to say.  The First Amendment

9    forbids U.W. from doing any of this.

10        And so I would like to turn to Your Honor's questions first

11   about whether his speech was related to scholarship and teaching.

12   Defendants continue to improperly rely on *Garcetti* for the point

13   that Professor Reges wasn't speaking as a citizen and, therefore,

14   his speech is not protected by the First Amendment.  That's not

15   the correct inquiry for this court, Your Honor.  The correct

16   inquiry is first whether Professor Reges was speaking on a matter

17   of public concern.  And, in fact, defendants have conceded the

18   fact that a land acknowledgment statement is a matter of public

19   concern, so we don't need to deal with that.  Second, the inquiry

20   for this court is whether or not Professor Reges was speaking --

21   or his speech was related to scholarship and teaching.

22        And addressing your questions about *Downs* and *Demers*, *Downs*

23   is a case -- I think it's easily distinguishable, *Downs*, and

24   *Johnson* especially, because those are K-12 cases, and despite

25   what defendants say, it absolutely matters, the setting and the

1  difference between a university and a K-12 institution.

2  　　　　THE COURT:  With respect to this issue, what authority

3  says that, that makes a difference?

4  　　　　MR. BLEISCH:  The cases themselves say that.

5  　　So, in *Johnson*, I would direct Your Honor to page 966, Note

6  12 of that opinion, where the court recognized that its analysis

7  excludes university faculty, and so it's expressly considering

8  only K-12 faculty.

9  　　*Demers* does this as well.  *Demers* recognizes that the

10  interests involved in a K-12 school, where students are mandated

11  to attend, where the curriculum is set by a democratic process of

12  local government and state government, and teachers there are

13  directed to teach certain set standards, are very different from

14  a university setting, where you have adults teaching other

15  adults, in settings where the Supreme Court has long recognized

16  for 50 years, more than 50 years, that the First Amendment is a

17  special concern on university campuses.

18  　　　　THE COURT:  But is that distinction, though, between the

19  university setting and the high school setting made in the

20  context of analyzing the question of whose speech is it, to

21  paraphrase from *Downs*?

22  　　　　MR. BLEISCH:  Yes, it is.  So if we're discussing -- I

23  think Your Honor is getting at the kind of government-speech

24  argument that defendants are making.  If we're going to do a

25  government speech -- or if they're making a government-speech

1  argument, we should do a government-speech analysis, and

2  *Shurtleff v. Boston* starts and ends that, where the holistic

3  inquiry that courts undertake, when looking at government speech,

4  is the history of the speech, and I think that's what we're

5  getting at here, is that the history of faculty speech, of

6  university professors, speaking to their students has long been

7  protected by the First Amendment.  And then there's the

8  perception and the control.  Defendants are incorrect that there

9  was any confusion about who was speaking when Professor Reges

10  included his land acknowledgment statement on his syllabus.  It's

11  true that students did complain and it's true that some folks

12  believed that it, in their eyes, reflected poorly on the

13  institution, but that doesn't mean that they were actually

14  confused by who was speaking.  They understood that a statement

15  that begins, in Professor Reges' case, with "I acknowledge," he

16  is the speaker here.

17       And turning to the syllabus itself, whether a syllabus is

18  government speech or faculty speech, it's instructive, I think,

19  to look at the facts here.  The University of Washington

20  maintains a syllabus-guideline policy.  They have a lot of

21  suggestions, but nothing in it is mandatory.  They suggest that

22  faculty include different bits of information, but nothing is

23  required.  There's also no oversight from administrators about

24  what faculty include on their syllabi.  There's no preapproval

25  process.  Faculty members are not required to submit their

1  syllabi to administrators to make sure that the message that they
2  are sharing is the government's preferred message.  And I think,
3  most importantly, a syllabus really is the written preview of
4  what a faculty member is planning to teach in class.  If they
5  have the academic freedom to select their readings, to choose how
6  they're going to run their course, they have the academic
7  freedom -- the syllabus, the protection -- the academic freedom
8  and protection on the syllabi derives from that in-class
9  protection.
10      So because Professor Reges' syllabus is -- and, actually, I
11  would like to, before I move on, go to *Demers* itself as well.  In
12  that case, Professor Demers was a faculty on the
13  communications -- was a member of the communications faculty at
14  Washington State, and his speech there was a pamphlet that he
15  wrote about the reorganization of the faculty.  And the court in
16  that instance said that even though, you know, this wasn't any
17  speech that was in his classroom, it was related to
18  scholarship -- his speech was related to scholarship and teaching
19  because it would have drastically altered the way that courses
20  were taught at the university.  And it also noted that, in that
21  case, it wasn't a particularly close call that Professor Demers'
22  pamphlet was related to scholarship and teaching.  So Professor
23  Reges' syllabus-based speech here is at least as related to
24  scholarship and teaching as Professor *Demers*' pamphlet was.
25      Turning to the *Pickering* balancing, Professor Reges has a

1   bedrock First Amendment interest in being able to comment --

2           THE COURT:  Actually, before you get there, I have a

3   couple quick questions.

4           MR. BLEISCH:  Uh-huh.

5           THE COURT:  Do you agree that your viewpoint

6   discrimination claim is subject to the *Pickering* balancing test?

7           MR. BLEISCH:  Yes, Your Honor.  All that means is that

8   this court is going to need to balance the interests of the

9   University against the interests of Professor Reges here.

10          THE COURT:  Okay.  And what are the elements of a

11  viewpoint discrimination claim?

12          MR. BLEISCH:  So a viewpoint discrimination claim is

13  unlike a retaliation claim where you have several elements.  You

14  have protected speech, you have an adverse action, and that

15  adverse action has to be motivated by the protected speech, or a

16  substantial motivation.

17      In a viewpoint discrimination claim, there's not really any

18  factors that a court has to tick off.  It's whether the

19  university has taken some action based on the speaker's

20  viewpoint.  And there's absolutely no government interest in

21  viewpoint discrimination on a university campus.

22      So balancing an interest in speaking on a matter of public

23  concern and Professor Reges joining this debate, which, by the

24  way, the University opened the door to this debate when they told

25  faculty members that they can include a land acknowledgment

1    statement on their syllabi, that interest vastly outweighs the

2    defendants' interest in either an academic environment, a sedate

3    academic environment that is free of complaints or discord.

4    Courts have, again, long recognized that public universities,

5    their efficiency can't be purchased at the expense of stifling a

6    debate on campus.  In the Ninth Circuit, there's no compelling

7    university interest in a sedate academic environment.  And that

8    comes from *Adamian*, which I think it's important to recognize too

9    that that case is from the Vietnam War era, where there were very

10   tense -- they were tense times.  The professor in that instance

11   was protesting the Kent State shootings.

12          THE COURT:  What you are arguing, though, I mean, makes

13   assumptions about the underlying facts.  And this goes to a

14   question I asked before you all started arguing.  What does trial

15   look like, if this goes to trial?

16          MR. BLEISCH:  So, first of all, Your Honor, I don't

17   think this needs to go to trial because I don't think there are

18   any disputed material facts in this instance.  The parties don't

19   dispute that Professor Reges said what he said, and we don't

20   dispute the actions that defendants took, and we also don't

21   dispute, Your Honor, that there were complaints.

22          THE COURT:  Okay.  So you're saying that there isn't a

23   dispute over disruption or the extent of disruption or the types

24   of disruption?

25          MR. BLEISCH:  We don't dispute that there were

1    complaints, but as a matter of law, listener reaction and

2    complaints cannot justify government censorship of speech.  And

3    that's why, Your Honor, this isn't a case that needs to go to a

4    jury.  As a matter of law, listener reactions can't justify

5    speech restrictions, and that's what happened here.  Defendants

6    say that listeners were offended by what Professor Reges had to

7    say.  Some of them e-mailed defendants.

8         THE COURT:  What about 170 students going to a different

9    section?

10        MR. BLEISCH:  Yeah.  So, Your Honor, defendants never

11   took any pains to investigate why any of those students actually

12   left.  The best we can tell, there was one student who was

13   offended and wanted to leave.  There are a lot of other reasons

14   they could --

15        THE COURT:  But doesn't that imply that there's an

16   underlying fact issue?

17        MR. BLEISCH:  No, Your Honor, because, again, the point

18   is that they took these actions based on the listener complaints.

19   They took these actions based on listener reactions to Professor

20   Reges' speech, and those reactions were because people were

21   offended by what he had to say.

22        THE COURT:  How about the point that the Supreme Court

23   made in the *Connick* case, that an employer need not "allow events

24   to unfold to the extent that the disruption of the office and the

25   destruction of working relationships is manifest before taking

 1  action"?

 2          MR. BLEISCH:  Yes, Your Honor, I think that's

 3  distinguishable because, first of all, look at *Pickering*, the

 4  base case here, *Pickering* itself acknowledged that different

 5  workplaces will get different treatment.  And, Your Honor, that's

 6  at page 570 of that opinion.  And so it's helpful here to look at

 7  what a university is.  And that's why all of these -- all of this

 8  precedent from the Supreme Court down, about universities being a

 9  place where conflict is not unknown, where debate is sometimes

10  heated and intense and even disrespectful sometimes, but on a

11  public university campus, the government cannot be in the

12  business of stifling any of that speech.  And so a public

13  university is very different from a district attorney's office

14  and especially so from a police department.  The interests there

15  are just not the same.

16      And so in a case like *Connick*, where you have a government

17  office, it's a DA's office, it's true that the government might

18  not need to wait.  But, also, in the Ninth Circuit, the

19  government can't rely on speculative ills -- or, I'm sorry,

20  that's from the Fourth Circuit -- the government can't rely on

21  speculative ills when deciding to take action; there has to be a

22  real concrete interest that the government is trying to preserve

23  here, and they just don't have that.

24          THE COURT:  Is the *Pickering* balancing a question of

25  law?

1          MR. BLEISCH:  Yes, Your Honor.

2          THE COURT:  How about *Dodges*, the *Dodges* Ninth Circuit

3    case, their statement that promoting workplace efficiency and

4    avoiding workplace disruption is a valid government interest that

5    can justify speech restrictions.  Does that principle apply here?

6          MR. BLEISCH:  No, it doesn't, Your Honor.  And it's for

7    the same reason, this is a -- and I think we should look at what

8    actually happened here too.  This is a university campus where a

9    faculty member wanted to start a debate about a matter of public

10   concern.  And we know that this is what he wanted to do because

11   he said so in an e-mail, that he would be happy to meet with a

12   group of people to discuss land acknowledgments.  And this is a

13   communication from a faculty member to his students trying to get

14   them to think critically about a matter of public concern.  And

15   the government has no interest in stifling that kind of

16   discussion on a university campus.

17         THE COURT:  And am I correct that it doesn't matter that

18   this is a computer science course and the land acknowledgment

19   doesn't have anything to do with computer science?

20         MR. BLEISCH:  Yes, Your Honor, that doesn't matter,

21   because it's the University that opened the door to this kind of

22   discussion when they recommended that faculty members can include

23   a land acknowledgment statement on their syllabi.

24         THE COURT:  Okay.  Going back to my question about

25   summary judgment versus trial, you say that there are no disputes

1    of -- or material issues of fact here.  So are you saying that

2    assuming the court reaches the summary judgment questions on

3    retaliation and discrimination that it needs to -- that it should

4    grant summary judgment for one side or the other?

5          MR. BLEISCH:  Yes, Your Honor.  This court needs to

6    grant summary judgment for Professor Reges.  As I mentioned,

7    there is no dispute of material facts here.

8          THE COURT:  And if it doesn't, then the only other

9    option is to grant summary judgment for the other side?

10         MR. BLEISCH:  No, Your Honor, because I don't think that

11   they have satisfied their burden as a matter of law.

12         THE COURT:  I understand your -- I understand that that

13   is your position.  But what I'm saying is, just as matter of

14   logic, are you saying that because there are no material issues

15   of fact, I need -- assuming I reach these summary judgment

16   issues, I need to rule for one side or the other versus denying

17   both motions for summary judgment and proceeding to trial?

18         MR. BLEISCH:  Assuming that you reach the summary

19   judgment issue, this case is appropriate for summary judgment for

20   both sides.

21         THE COURT:  Okay.  Thank you.

22         MR. BLEISCH:  And I'm unaware of how much time I have

23   remaining.

24         THE COURT:  You have about a little less than three

25   minutes.

April 22, 2024 - 25

1    MR. BLEISCH:  Okay.  I would like to reserve that for
2    rebuttal.
3        THE COURT:  Okay.
4        MR. BLEISCH:  Thank you.
5        MR. MCKENNA:  Your Honor, we agree with plaintiff that
6    there are no material issues of fact in dispute here.  Of all the
7    cases cited for *Pickering* balancing by both sides, they're all
8    cases in which the *Pickering* balancing decision was made by the
9    court, not by a jury.  So we couldn't -- we looked, actually, for
10   cases involving jury decisions, and we couldn't find any.
11       So the parties, in other words, agree on the material facts
12   of what happened here.  What they disagree about is the legal
13   significance of those facts.  So, again, we think deciding this
14   case at summary judgment is appropriate.
15       We think that if there are facts where there are
16   disagreements around the edges, they're not material.
17       We also think that this would -- there's a good reason that
18   these *Pickering* balancing cases are decided by the court, not by
19   juries, because they would be unwieldy.  I mean, the jury is not
20   as well equipped as the court is to conduct a *Pickering* balancing
21   analysis and to make that decision because it is a case -- these
22   cases are all about viewpoint discrimination, right?  They're
23   about whether the public institution's rights to have its message
24   conveyed to deliver its program to serve the public outweigh
25   burdens that are imposed on the speech of the public employee

1    involved.

2        Here, there was no stifling of debate.  If land

3    acknowledgment statements are controversial, even though the

4    University believes they're a useful tool to advance its policy

5    to create a welcoming and inclusive learning environment, the

6    plaintiff had every opportunity to raise his disagreement with

7    the optional statement, to disagree with land acknowledgment

8    statements in general in every other forum, and even in the

9    course syllabi was only unable to do so in one instance where

10   serious disruption was created.

11       The record evidence shows it wasn't just students complaining

12   about the optional statement being included in the University

13   document, it wasn't just the teaching assistants and their union

14   complaining that there was a collective bargaining agreement

15   violation; you had the recruiter for Diversity and Inclusion at

16   the Allen School e-mailing the administrators of the Allen School

17   shortly after the winter-quarter syllabus was posted that she was

18   having a very difficult time doing her job because of the

19   statement.  The 25-71 committee, three faculty members from

20   outside the Allen School who were appointed by the Dean of

21   Engineering, reported to the dean at the end of that process that

22   they found that there was extraordinary disruption created by the

23   plaintiff's action in the winter of 2022.  And that finding is in

24   the record in the declaration of Dean Allbriton.

25       So the evidence is quite strong that there was serious

 1   disruption, and it's the disruption which justified the

 2   University's decision to remove the statement from the course

 3   syllabus that one time.  They chose not to do it later because

 4   the level of disruption that they were seeing was not as

 5   significant, there were not as many complaints later on, for

 6   example, for spring quarter.

 7       And they created the alternate section not as in the case --

 8   as in other cases cited by the parties, as a means of

 9   retaliation, but as a means to help students avoid harming their

10   own educational progress by not taking a course which is an

11   introductory course for computer science education and is

12   mandatory; you have to take it.  If you don't take it when it's

13   offered, it delays your entire education.  So they had a

14   legitimate educational purpose for creating the alternate

15   section.

16       On the issue of the plaintiff citing *Shurtleff*, *Shurtleff*

17   actually helps our case because *Shurtleff* was a case involving a

18   public forum, the flagpole outside of the state house.  It was

19   not a case involving speech by public employees.  The point of

20   *Garcetti* and *Connick* and also the Plaintiff Pickering in the

21   *Pickering* line of cases is that public institutions need to be

22   allowed to fulfill their missions, and sometimes that means that

23   a public employee will not be free to speak and, for example, to,

24   you know, put items up on a bulletin board outside of their

25   classroom in a high school when it would undermine the school

1  district's ability to communicate its message of inclusivity and

2  welcoming.  There's no meaningful distinction in the *Downs* case

3  between a high school setting and a university setting.  *Downs*

4  cites a number of university-based cases, like *Rodriguez {sic} v.*

5  *University of Virginia*.  So what these cases have in common,

6  whether we're talking about *Downs* or *Johnson* or we're talking

7  about *Pickering* or this case, is that we're talking about public

8  institutions of education attempting to fulfill their function

9  without disruption and attempting to advance their statement of

10  their policy without it being distorted or garbled.

11      THE COURT:  When subject to the *Pickering* analysis, do

12  the retaliation and discrimination claims rise and fall together?

13      MR. MCKENNA:  We think that the plaintiff's viewpoint

14  discrimination claim collapses into and is subsumed into its

15  retaliation claim, yes, exactly.

16      THE COURT:  Okay.

17      MR. MCKENNA:  And we do brief that in some detail.

18      Finally, I want to just make one other point.  There's a lot

19  of cases being cited, there are a lot of cases about *Pickering*

20  balancing and about the *Garcetti* test, *Connick*, et cetera.  And

21  the plaintiff relies heavily on cases like *Levin v. Harleston*,

22  for example, or *Meriwether* and others as well, but we encourage

23  the court to really look carefully at the facts in those cases

24  and to recognize that the facts there are very different from the

25  facts here.  You know, for example, in *Levin v. Harleston*, a

1   university case, where an alternate section was created, there

2   was no finding of an educational purpose for creating that

3   alternate section.  In that same case, the university president

4   appointed a special ad hoc committee to investigate Professor

5   Levin's ability to teach, as opposed to this case where the 25-71

6   process was started after the teaching assistant union complaint

7   was filed.  A process that was created and is in the faculty code

8   to protect the faculty is anything but ad hoc.  And it, in any

9   event, resulted in no disciplinary action whatsoever.  It did,

10  however, produce findings that there was serious disruption in

11  winter of 2022.

12      So we encourage the court to look closely at the facts of

13  these cases, that both sides cite, to see which cases really are

14  similar to the University's case and which are similar to the

15  claims that the plaintiff is making.

16          THE COURT:  Thank you very much.

17          MR. MCKENNA:  Thank you, Your Honor.

18          THE COURT:  Mr. Bleisch, I will give you six minutes.

19          MR. BLEISCH:  Thank you, Your Honor.  I'm not sure that

20  I will need it all, but thank you.

21      I will first start with the discussion of *Downs*.  It truly is

22  distinguishable because of the facts of *Downs* compared to the

23  facts here.  In that case, at issue was a bulletin board in a

24  shared hallway, where it was -- in the record, in that case, that

25  the administration had significant control over that bulletin

 1   board.  They didn't have preapproved, but they had approval after

 2   the fact.  That's not the case here.  As discussed, faculty's

 3   syllabi are their own, there's no oversight, and there are no

 4   requirements for any particular bit of information that needs to

 5   be included on a syllabus.

 6        Second, the point about the union grievance or complaint, the

 7   University has a collective bargaining agreement with their

 8   student employee union, and if they understood their complaint to

 9   be a formal complaint, a formal grievance, they would have

10   followed the process that's laid out in their collective

11   bargaining agreement with the union.  They didn't do that here.

12   Instead, they used their faculty disciplinary process to go after

13   Professor Reges because of those listener reactions, the student

14   employees' reactions to Professor Reges' speech and the offense

15   that they took at that.

16        Next, speaking about adverse action --

17             THE COURT:  As a practical matter, though, what's a

18   university to do when you've got this course that's required, you

19   have to take it if you want to be in computer science, it's a

20   required course, and a bunch of students are thinking, jeez, like

21   I don't want to take a course with this professor because of

22   these views stated in that?  What's a university supposed to do,

23   just work its way around that somehow?

24             MR. BLEISCH:  So if a university wants to spend its

25   resources to support students in other ways, it absolutely can.

1    And in this case, however, there were a few e-mails, best we can

2    tell from the record, complaints from a handful of students and

3    staff about Professor Reges' speech.  Defendants themselves

4    acknowledge that they had no concern that Professor Reges would

5    be -- would engage in any kind of discrimination, that he would

6    retaliate against his students.  That was never their worry, from

7    the beginning.  In their disciplinary process, they never accused

8    him of treating anybody differently.  The concern was only, and

9    always, listener reactions.  And I think the University has to

10   realize that their students are adults.

11       And *Meriwether* is helpful in this.  In that case, you had a

12   professor who wanted to -- or who objected to the university's

13   policies about preferred gender pronouns for transgender

14   students, and he didn't want to use those preferred gender

15   pronouns, and he sought a resolution with the university where he

16   could either use just the student's last name, without an

17   honorific, or whether he could, on his syllabus, state his

18   objection to the policy, and the university wouldn't let him do

19   that.  The court said that part of the problem in that case was

20   that the university wouldn't let him speak about this matter of

21   public concern even on his syllabus.  And that's a case of

22   preferred gender pronouns, transgender issues, that is similarly

23   a very, very fraught topic and can really seriously offend

24   students.  But the court in *Meriwether* mentioned that this was a

25   teaching opportunity, it is a learning opportunity for students

1     to be able to have this kind of debate, and the university

2     deprived those students of that ability to have this teaching

3     moment, to have this learning moment.

4          Going to the adverse action, that's helpful because, in *Levin*

5     as well, the court there, the Second Circuit, said that the

6     district court did not abuse its discretion when it discounted

7     the university's claims that what they were doing, like here, the

8     university in *Levin* claimed that what they were doing was in the

9     students' interests, that they were just trying to support

10    students by creating the shadow course, but there was no evidence

11    about that.  And like here, in *Levin*, the dean e-mailed all of

12    the students in that -- or not e-mailed, this was early -- but

13    sent a communication rather to all of the students calling what

14    Professor Levin said offensive, and in this case, they went

15    further, they encouraged students to file complaints.  Defendants

16    recognized that starting a shadow course would be unprecedented,

17    and one of the defendants said that they should encourage

18    students to -- ask students to file complaints because that would

19    make it easier for them to take action.

20         And then going forward to the committee's findings, in that

21    document, all of their findings are still, once again, based only

22    on student complaints.  And so to defendants, complaints equals

23    disruption, and this just cannot be.  This means that a

24    conservative student might be able to complain about the

25    existence of a land acknowledgment statement in a faculty

1   member's syllabus, saying that they feel left out or that they're

2   worried about being treated differently because of their beliefs,

3   and that can't be the case.

4       So for the reasons that have been discussed today and in the

5   briefing, this court should grant plaintiff's motion for summary

6   judgment and deny defendants' motions to dismiss and for summary

7   judgment.

8       Thank you, Your Honor.

9           THE COURT:  Thank you very much.

10  Counsel, thank you very much for your thorough and thoughtful

11  briefing, as well as the thorough presentations today.

12      I will try to get an order out forthwith.  Take care.

13          THE CLERK:  All rise.  Court is in recess.

14                  (Adjourned.)

15

16              C E R T I F I C A T E

17

18      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

19  United States District Court in the Western District of

20  Washington at Seattle, do certify that the foregoing is a correct

21  transcript, to the best of my ability, from the record of

22  proceedings in the above-entitled matter.

23

24              /s/ Nickoline Drury

25              Nickoline Drury

Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STUART REGES,

        Plaintiff,

   v.

ANA MARI CAUCE, et al.,

        Defendants.

Case No. 2:22-cv-00964-JHC

**DECLARATION OF CHADWICK
ALLEN RE: DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

ALLEN DECLARATION RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1    I, Chadwick Allen, declare as follows:

2    1.    I am over the age of 18 and competent to testify.

3    2.    This Declaration is in connection with Defendants Ana Mari Cauce, Magdalena

4    Balazinska, Daniel Grossman, and Nancy Allbritton's Motion for Summary Judgment in the

5    above-captioned matter.

6    3.    I am the Associate Vice Provost for Faculty Advancement at the University of

7    Washington. I also serve as a Professor of English and Adjunct Professor of American Indian

8    Studies at the University. My role at the University includes serving on the executive leadership

9    team of the Office of Minority Affairs and Diversity, which helped create the University's land

10   acknowledgment statement.

11   4.    A land acknowledgment statement acknowledges that an institution like the

12   University is situated on lands that were already in the possession of indigenous people before the

13   formation of the institution. The University's land acknowledgment strives to signal to American

14   Indian, Alaska Native, indigenous Hawai'ian, and other indigenous people that they are welcome

15   at the University. It also signals the same to the University's Tribal partners and their

16   communities.

17   5.    The University's land acknowledgment reads: "The University of Washington

18   acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of

19   all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations." Through this

20   statement, the University of Washington acknowledges that the Coast Salish peoples remain part

21   of the community in the Puget Sound region.

22   6.    The University's land acknowledgment grew out of a years-long process in which

23   University officials worked with the Governor's Office of Indian Affairs, Tribal leaders from

24   throughout the state and region, and other stakeholders.

25   7.    As a state entity, University officials receive training on American Indian

26   sovereignty and government-to-government relations as part of fulfilling obligations under the

27   Centennial Accord between the State of Washington and the federally recognized Tribes within

28   the State.

ALLEN DECLARATION RE: DEFENDANTS'                    1                Orrick Herrington & Sutcliffe LLP
MOTION FOR SUMMARY JUDGMENT                                                401 Union Street, Suite 3300
Case No. 2:22-cv-00964-JHC                                                    Seattle, Washington 98101
                                                                              tel+1-206-839-4300

1    I declare under the penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3        Signed this 18th day of December, 2023 at Seattle, Washington.

_____

Chadwick Allen

ALLEN DECLARATION RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

2

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

SER-39

Honorable John H. Chun

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

STUART REGES,

11          Plaintiff,

12     v.

13  ANA MARI CAUCE, et al.,

14          Defendants.

Case No. 2:22-cv-00964-JHC

**DECLARATION OF AILEEN TRILLES RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRILLES DECLARATION RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

I, Aileen Trilles, declare as follows:

1.      I am over the age of 18 and competent to testify.

2.      This Declaration is in connection with Defendants Ana Mari Cauce, Magdalena Balazinska, Daniel Grossman, and Nancy Allbritton's Motion for Summary Judgment in the above-captioned matter.

3.      I am the Senior Director of Human Resources for the College of Engineering at the University of Washington. As part of my role, I oversee standard-of-conduct issues for faculty within the College of Engineering arising under the University's Faculty Code Section 25-71.

4.      On October 14, 2022, I was present when, across two video conferences, the members of the special investigating committee charged with assessing Stuart Reges's conduct reported to Dean Allbritton on the evidence they had gathered. My role at the meeting was to take notes on the committee's report. A copy of those notes is attached as **Exhibit 1.**

5.      When a Faculty Code Section 25-71 investigation is pending, it is standard practice to hold any merit-based salary increases in abeyance until the investigation has concluded. Merit-based salary increases are not an entitlement but rather based on "merit," so the investigation's outcome may affect whether a faculty member merits a pay increase. This has been a consistent practice across the investigations I have observed in my role at the College of Engineering.

6.      Other than the filing of a lawsuit, the Faculty Code processes applied to Professor Reges were consistent with those of other Faculty Code investigations I have observed in my role.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this 18th day of December, 2023 at Seattle, Washington.

Aileen Trilles

TRILLES DECLARATION RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

1

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

# EXHIBIT 1

**Meeting with Special Investigating Committee: <u>Steve Muench, Eric Schnapper and Louisa MacKenzie</u>**
**Dean Nancy Allbritton and HR Director Aileen Trilles**
**Oral Report Out**
**October 14, 2022**
**Zoom**

(Nancy Allbritton)
Opened the call.

Expressed appreciation to the committee and recognized the impact this work may have had on their regular responsibilities.

(Steve Muench)
Louisa Mackenzie is the meticulous notetaker and can provide details from moment by moment. Step-by-step.  I will give a general perspective.

We reached out to several different individuals: staff, students and talked to faculty and others in the native American community. Stuart declined to talk to the SIC.

Stuart was antagonizing leadership on various fronts:
- There was a lack of empathy on the faculty members part on how people may respond to different things.
- The topic was a method at confrontation at the next level.
- Stuart Reges didn't think how his actions would effect others
- The response from CSE seemed reasonable and measured, made sense and were proportionate to what happened.
- The impact had impact across campus to students in the class and to the greater student population who was affected second hand, and the Native American community.
- By not taking decisive action, the university was perceived as passively siding with Stuart Reges.

(Louisa Mackenzie)

As an overview, their actions were initiated by a 25-71 process and was reframed due to the lawsuit.

We could not be aware of the details of (lawsuit).  We served on this committee because we had no personal involvement.  We had significant findings due to impact:
- Impact well-being and learning
- Native American community
- Stuart's claim that there was no impact to students is demonstrably false

The SIC interviews included but is not limited to, the Director of the Allen School,  Allen School Director of Student Services, students in and external to CSE 143 and the former Director for the Intellectual house. There was significant impact.

- Impact of morale of Native American students, and their learning
- One native student took a leave of absence

UW_Reges_0009312

- One student felt despised by the language used in the syllabus
- There were students who identified themselves as allies of students who were affected
- One student felt that Stuart was "playing games with her education"
- Student felt shadow class as excellent
- SIC find this a reasonable concern; a faculty member who goes out of his way to denigrate is a reasonable concern for students to have.
- There was an overwhelming sense that he violated their dignity-----this was a bad faith attempt to spark discussion
- Another student dropped out from the UW
- Staff complained about workload implications due to the faculty members actions
- He met minimum standards.  The land acknowledgment was suggested to make Native American students feel more welcomed in the class. It calls into question his professionalism as a faculty member
- Misrepresentation of UW's view with regard to a land acknowledgement
- The one person who has been political is Stuart himself; He is responsible for politicizing.
- The Director of the Allen School responded in a fair, balanced and consistent way.  There were other faculty who published a different land acknowledgement and she spoke with them and they responded accordingly by making the requested change.
- Bad faith – he saw this ----he named this as a vulnerability in the UW system. He's calling this the equity agenda.  His use of his syllabus was inappropriate.
- The UW has received complaints and been asked to sanction him for what he's published in the Quilette and other external media sources and the UW did not silence him; his freedom of speech was maintained there.
- He deliberately crossed the line to use the syllabus as a political stunt on land acknowledgments.

24-33 of the Faculty Code violated:
- Obligation to respect dignity of others (dignity of native community)
- Promoted political opinion over faculty
- Sustained disruption

(Eric Schnapper)
- The level of disruption was extraordinary. It was a willful indifference to the students
- He just didn't care
- He said students who are 18 are fragile
- He had no interest in solving the problem
- The land acknowledgement is meant to make students feel comfortable in the university; it's not political correctness; it's a key part of the job of the faculty to ensure they are making students feel welcomed and willfully fighting a fight.  The classroom is not where to pick that fight. He thought it was the forum to insight the most attention. This was a way to get a lot of attention at the expense of the students
- If a student signs up for a class with controversial readings, that's fine.  That's the forum.
- It's not a misunderstanding on his part; it's a deliberate stunt.
- The impact on native concerns wasn't the only group concerned.  Our students aren't in silos.  It was offensive to all; the assessment is not limited to native americans only.
- Students complained and the UW cannot not do something.  If the students consistently complaining about the issue, the UW must address is.
- He is violating policy in a way to object it.

UW_Reges_0009313

- Free speech is a red-herring.
- He's inconsistent in his interviews with news outlets and podcast (welcome to the lunaversity), etc. He refused to meet with SIC.
- If he wants to provoke leaders of tribes, but you don't direct to the civilian students.  He found the weakest group of students
- A Third of a class left the class and they elected to take a class at 8AM in the morning. That's extraordinary.
- It's about professional misconduct, not politics.


(Nancy Allbritton)
- This is very impactful work; It's of huge consequence.
- Expressed appreciation for time and effort for serving on committee

##

(End of call)

5

UW_Reges_0009314

Honorable John H. Chun

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

STUART REGES,

11              Plaintiff,

12      v.

13   ANA MARI CAUCE, et al.,

14              Defendants.

Case No. 2:22-cv-00964-JHC

**DECLARATION OF DANIEL
GROSSMAN RE: DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSSMAN DECL. RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

SER-46

1    I, Daniel Grossman, declare as follows:

2    1.    I am over the age of 18 and competent to testify.

3    2.    This Declaration is in connection with Defendants Ana Mari Cauce, Magdalena

4    Balazinska, Daniel Grossman, and Nancy Allbritton's Motion for Summary Judgment in the

5    above-captioned matter.

6    3.    I am the Vice Director of the Paul G. Allen School of Computer Science and

7    Engineering at the University of Washington, and a professor within the School. I am one of the

8    named Defendants in this lawsuit.

9    4.    In early fall 2018, I developed the idea that the Allen School's Diversity

10   Committee could create a document detailing best practices for inclusive teaching. I started an

11   initial draft before handing the project over to the Diversity Committee, which includes both

12   student and faculty members. A copy of the "Best Practices for Inclusive Teaching" document,

13   updated as of September 2020, is attached as **Exhibit 1**. The practices recommended by the

14   document are just that: recommendations. The Allen School does not mandate including, for

15   example, a land acknowledgment statement in course syllabi.

16   5.    I do not include a land acknowledgment statement in the syllabi for courses I

17   teach.

18   6.    During the Winter and Spring 2022 quarters, I worked with Allen School Director

19   Magda Balazinska to create alternative sections of Professor Stuart Reges's introductory-level

20   courses taught by another professor to accommodate any students who did not wish to take the

21   courses with Professor Reges.

22   7.    Attached as **Exhibit 2** is a copy of a January 9, 2022 email thread including me,

23   Director Balazinska, and staff within the Allen School.

24

25

26

27

28

GROSSMAN DECL. RE: DEFENDANTS'          1          Orrick Herrington & Sutcliffe LLP
MOTION FOR SUMMARY JUDGMENT                        401 Union Street, Suite 3300
Case No. 2:22-cv-00964-JHC                         Seattle, Washington 98101
                                                   tel+1-206-839-4300

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3    Signed this 18th day of December, 2023 at Seattle, Washington.

_____

Daniel Grossman

GROSSMAN DECL. RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

2

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

SER-48

# EXHIBIT 1

*Last updated: September 2020*

These are *best practices* worth considering as you prepare and deliver your course, so that your teaching is as effective as possible for all types of students. They have been compiled and reviewed by the Allen School Diversity Committee with input from others, including significant contributions from the Allen School Student Advisory Council.

This document should be revisited and updated over time. Send thoughts to diversity@cs.uw.edu. These ideas are designed to help you be a more effective teacher and better role model for more of your students; they are not prescriptions. Some are acquired skills where improvement, not perfection, is the goal.

This list is focused toward undergraduate courses, though many items apply more broadly.

Course planning and management:
- The following can make a course syllabus more inclusive:
  - A statement that your class welcomes all students of all backgrounds
    - An example statement: This course welcomes all students of all backgrounds. The computer science and computer engineering industries have significant lack of diversity. This is due to a lack of sufficient past efforts by the field toward even greater diversity, equity, and inclusion. The Allen School seeks to create a more diverse, inclusive, and equitable environment for our community and our field. You should expect and demand to be treated by your classmates and the course staff with respect. If any incident occurs that challenges this commitment to a supportive, diverse, inclusive, and equitable environment, please let the instructor know so the issue can be addressed.
  - A statement requiring mutual respect among students and staff
  - A statement about accommodating students' needs and pointing to DRS for disability accomodations
    - An example statement: Embedded in the core values of the University of Washington is a commitment to ensuring access to a quality higher education experience for a diverse student population. Disability Resources for Students (DRS) recognizes disability as an aspect of



EXHIBIT
1
Reges 8/22/23
PENGAD 800-631-6989

Reges 000122

diversity that is integral to society and to our campus community. DRS serves as a partner in fostering an inclusive and equitable environment for all University of Washington students. The DRS office is in 011 Mary Gates Hall.
Please see the UW resources at http://depts.washington.edu/uwdrs/current-students/accommodations/.

- o A statement about accommodating students' religions.
    - See the *required* syllabi language from https://registrar.washington.edu/staffandfaculty/syllabi-guidelines/
- o A sexual harassment statement, text to use follows:
    - University policy prohibits all forms of sexual harassment. If you feel you have been a victim of sexual harassment or if you feel you have been discriminated against, you may speak with your instructor, teaching assistant, the chair of the department, or you can file a complaint with the UW Ombudsman's Office for Sexual Harassment. Their office is located at 339 HUB, (206)543-6028. There is a second office, the University Complaint Investigation and Resolution Office, who also investigate complaints. The UCIRO is located at 22 Gerberding Hall.
    Please see additional resources at http://www.washington.edu/about/ombudsman/role.html and http://f2.washington.edu/treasury/riskmgmt/UCIRO.
- o A list of resources students can access (such as this for CSE majors or this for all students)
- o An Indigenous Land Acknowledgement.
    - An example statement: The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations.
- o Be clear that you are open to feedback throughout the quarter, and provide a means of feedback for students to voice concerns. Let students and TAs know that they can also submit feedback through the Allen School's anonymous feedback tool.
- Create accessible slides.
- For group projects, provide procedures for pairing/grouping students. This is especially helpful for students who are newer to the program (such as new transfer

Reges 000123

students starting at the UW as juniors and CSE majors), or who are simply not comfortable asking others to partner.

- Consider religious holidays when planning major course activities. This can include noting holidays when students may be fasting, such as during Ramadan, and adjusting exam times or allowing alternate times.
- Encourage your TAs to participate in the Allen School's Inclusive Community Workshop.
- Use gender-neutral names in examples: instead of Alice and Bob, try Alex and Jun. Consider names that reflect a variety of cultural backgrounds: Xin, Sergey, Naveena, Tuan, Esteban, Sasha ...
- Be thoughtful when writing examples and questions:
  - Avoid relying on cultural knowledge that may be unfamiliar to people from different backgrounds, ages, etc, such as knowledge regarding particular sports, pop culture, theater, literature, or games.
  - Note that topics/scenarios are troubling to different people for reasons you don't personally experience. A couple assumptions to avoid: that gendered "pairs" should match men with women; that dieting and weight-loss are always good (problematic for the many college students with eating disorders). If a student lets you know that a reference bothers them, respect their feelings even if you don't fully understand their reasoning.
- Be mindful of when you schedule office hours, as students' personal obligations may prevent them from staying late on campus. Many students have financial needs and family obligations that require substantial time for working, commuting, or in other commitments.
- If feasible for yourself or your TAs, offer two hours of office hours per week to allow students more flexibility in attending.
- Utilize policies that allow all students extra flexibility. For example, instead of requiring a doctor's note to excuse a missed assignment or quiz, allow a fixed number of no-penalty late days, or drop the lowest score across all quizzes. Students have complex and unpredictable lives outside of school, and many are not comfortable asking for special exceptions. Providing flexibility to all students ensures consistency.
- Provide a mid-quarter evaluation, instead of just the end, so you can identify areas to improve while the course is still in progress.
- Add a page to your class website with common problems students run into on assignments or in the class, and tips for working through them.

Reges 000124

- Allow participation outside of class discussions, such as online or via questions submitted digitally during lecture. Students may be uncomfortable speaking in class due to language skill, stuttering, disabilities, shyness, or anxiety.
- Do not rely on computing knowledge not covered in pre-requisites; or, where necessary, provide resources for students who many not have such knowledge.

Instruction and interpersonal communication:

- In office hours, when a student asks a question, ask questions to gauge their baseline knowledge. Then fill in the gaps, and then answer their original question. This helps avoid assuming what students do and don't know.
- Be understanding of students who do not grasp the content quickly. Many people do not have much CS background other than what is taught in classes, individuals pick things up at different speeds, and some may require multiple explanations.
- Remember that some students are shy or anxious, and consider proactively reaching out to students who you see are having trouble.
- Avoid phrases that suggest something is simple and obvious, as it can alienate students with less background or who are struggling. Examples include "of course," "obviously," "you probably already know," "it's easy," etc.
- Remember that many students are not native English speakers. Someone's comfort speaking in English does not indicate their intelligence or qualifications.
- Do not make any comments that traffic in stereotypes of any sort, such as with regard to gender, race, nationality, or sexual orientation.
- Avoid gender assumptions and terms. Avoid only using "he" in examples. Try replacing "you guys" with "folks," "everyone," or "ya'll." Try saying "all genders" instead of "men and women."
- Say your own pronouns and ask for pronouns when possible (in class and at office hours). This helps us avoid assuming gender, especially useful for trans* or non-binary students.
- Be considerate of challenges you can't see, such as neurodiversity, mental health issues, and "hidden" disabilities like chronic illnesses. These impact many students, but are often invisible or manifest in ways that are easy to misinterpret.
  - Neurodiverse students, like those with autism, may use atypical communication styles or habits. Avoid judging individuals for body language or mannerisms, and avoid disparaging stereotypes about "socially awkward" computer scientists.

Reges 000125

- - Avoid slang that references mental health issues, such as "crazy," "depressing," or "makes me want to kill myself." These can be painful references to people dealing with mental health issues.
- In classroom discussions or when fielding questions, give time and space for quieter participants to have their voices heard. There are lots of strategies for this:
  - 5 Ways to Encourage Participation from All Students
  - How to Encourage Student Participation
- Particularly in office hours, remember many students are intimidated by TAs and instructors just by virtue of your position, even if you think you cannot possibly be intimidating.
- Be mindful that many students, like many people, are constantly absorbing indirect signals and processing whether they "fit in." Model welcoming behavior by showing patience, speaking to everyone in an equally friendly manner, encouraging people (especially when they seem to show self-doubt), and normalizing struggles.
- Remember that our students pursue a range of careers. While most become software developers and many join large companies, keep a broad view of the opportunities our students pursue, especially when you discuss how coursework may apply to their future work.
- Encourage further opportunities for students who do well in your class or who could benefit from more engagement in CS: Invite them to work on research, be a TA, take a more advanced class, talk with you about graduate school, or simply send a nice note to say they're doing well or to thank them for their contributions in class. Encouragement is great for all students, but can be particularly meaningful for student who doubt their place in tech.

Instructions for When Receiving a Disability Resources for Students Notification Letter

- Per the recommendation of the DRS Classroom Services Manager, Dominic Evans, we advise the following procedure. This procedure aims to reduce the administrative costs on professors and course staff, while simultaneously providing equitable testing conditions for students with disabilities.
  - When the Faculty Notification Letter form is sent out, the instructor should designate one TA as an alternate contact so the TA may have access to DRS students' information for the course. This TA, known as the DRS liaison, will be the facilitator between the DRS students and the course staff.
    - A TA may also be added as an alternative contact by emailing Dominic Evans (devans13@uw.edu) with the following information: course

Reges 000126

number and title, TA UW NetID, and TA email address. The instructor may send the email or must be CC'd otherwise in the TA's email.
- ○ For each exam in the course, it is recommended that the instructor should ensure that students taking exams through the DRS have a shorter period (e.g. 2 days) to schedule exams. This will help facilitate scheduling TAs to be present during the exam.
- ○ Two weeks (i.e. 10 business days) prior to each scheduled exam, the DRS liaison will email Dominic Evans (devans13@uw.edu) requesting the students scheduled exam times.
- ○ The DRS liaison will facilitate scheduling TAs according to the scheduled exams. TAs should ideally be present for the entire testing session, and certainly no less than half an hour (longer if suggested by DRS). This will allow students to have time to have clarifying questions answered.
- Instructors may want to consider briefing TAs in how questions should be answered for students. If the instructor wishes to answer questions themselves, the TA could have the instructor's cell phone number.


Notes:
- Improving inclusiveness for all students is ongoing work. This means accepting input from others, updating our practices, and acknowledging when we make mistakes. We all say and do things that impact people in ways we don't intend. Just remember to take responsibility and apologize as needed.
- The UW offers many resources to support you and your students in creating a supportive, productive educational experience:
  - ○ Summary of Diversity & Inclusion resources for Allen School students
  - ○ AccessComputing and DO-IT for students with disabilities
  - ○ Universal Course Design tips
  - ○ The Allen School Inclusiveness Statement
  - ○ The diversity-allies email list is used to share resources and info
  - ○ The Office of Educational Assessment offers tools to make courses inclusive, such as help proctoring make-up exams and building student surveys
  - ○ The Center for Engineering Learning & Teaching and the Center for Evaluation and Research for STEM Equity both research and evaluate instructional efficacy

Reges 000127

More resources:

- CS Teaching Tips from professor Colleen Lewis at Harvey Mudd College
- Inclusive Classroom Best Practices from Cynthia Lee at Stanford
- Repository of engagement practices and activities from EngageCSedu:
  - https://www.engage-csedu.org/
  - https://www.engage-csedu.org/engagement/make-it-matter
- Teaching strategies for teaching students with disabilities (NCWIT)
- Inclusive Teaching in CS guidelines from Stanford
- NCWIT's tips for Interrupting Bias In Academic Settings
- NCWIT article on Broadening Participation by Supporting Great Teaching, from ACM Inroads
- Overview of research and case studies on increasing retention with inclusive pedagogy
- Allen School Inclusive Community Workshop

*Contact the Diversity Committee about this document: diversity@cs.uw.edu.*

Reges 000128

# EXHIBIT 2

---

Message

---

| | |
|---|---|
| **From**: | Magdalena Balazinska [magda@cs.washington.edu] |
| **Sent**: | 1/9/2022 11:00:37 PM |
| **To**: | Dan Grossman [djg@cs.washington.edu] |
| **CC**: | Crystal Eney [ceney@cs.washington.edu]; Chloe Dolese Mandeville [cdolese@cs.washington.edu]; Jenifer Hiigli [jenifer@cs.washington.edu] |
| **Subject**: | Re: [143a] [CSE 143] 143 honors section |

If (2) is possible, that might be the simplest option. If (2) is not possible, we could ask someone to run an additional offering of the seminar. Alternatively, could we let honors students take a CSE590 instead and still count toward honors credit? How can we confirm if (2) is possible?

thanks
magda

On Sun, Jan 9, 2022 at 2:56 PM Dan Grossman <djg@cs.washington.edu> wrote:

Genuine thanks for the heads up -- this is news to me, though he has chosen provocative similarish books in the past that at least had /some/ connection if I recall correctly to university life or something. So I'm not surprised.

Here's what I think is going to end up happening:

1. We don't intervene here.

2. Under the new principle of "nobody should be forced to take a class from Stuart" given his offensive syllabus incident, students in the honors program who were taking 143 for honors credit will be allowed to delay their honors seminar to next quarter when someone else is leading it.  This is the call of the honors college, though I'd anticipate it and recommend it.  They don't have to delay taking 143.

3. While the only paragraph I've ever found describing our 14x honors seminars is very broad, including things like discussing philosophy and current events from a CS perspective, I think as part of 3QIS we should revamp this just like our courses and draw a closer connection to technology and the computing field.  I met with the Honors Program last month by the way, and have some specific ideas, including a different model for a 163 honors section to complement 122 and 123 (I'd skip having one for 121).

Some more on (1): I have strongly urged us in the past -- and can find those impassioned emails for us again -- not to restrict the book choice here.  To put it very succinctly, universities can and should study Mein Kampf, what matters is how you do it.  We shouldn't intervene just because of the book choice.  We have many seminars in the Allen School that have a range of provocative readings -- this is not a smart path to start going down.  Nor do we require faculty to be 'experts' -- I teach CSE 480 regularly despite having no formal training in computer ethics.  And course evals from prior honors sections (admittedly after the self-selection of who takes them) have not indicated a problem.

I'm not saying I like this provocative move, especially the inherent offensiveness of using 'woke' perjoratively in the title, but I like to be on very solid ground and with consistent policies.  Last week's incident was entirely inappropriate in place and manner.  Discussing a book with students *in a discussion seminar* is far more nuanced.

--Dan

UW_Reges_0002587

On Sun, Jan 9, 2022 at 1:48 PM Crystal Eney <ceney@cs.washington.edu> wrote:
Might want to check out the honors reading. This is an email from an honors student. Might get some more emails.

---------- Forwarded message ---------


https://www.amazon.com/dp/1641772069
Link to the book in case you couldn't find it. So much for keeping politics separate, even if this is more discussion based.

On Sun, Jan 9, 2022 at 12:43 PM
Just thought you should see this- in particular you might want to take a look at the assigned reading for the honors section.
---------- Forwarded message ---------
From: **Stuart Reges** <reges@cs.washington.edu>
Date: Sun, Jan 9, 2022 at 12:36 PM
Subject: [143a] [CSE 143] 143 honors section
To: cse143-announce <cse143-announce@cs.washington.edu>


I am offering an honors section this quarter for honors students
taking cse143 and for others who had high grades in CSE142.  You can
read about it here:

   https://homes.cs.washington.edu/~reges/honors.shtml

I am asking interested students to fill out this catalyst form by
Tuesday, 1/11, at 10 am:

   https://catalyst.uw.edu/webq/survey/reges/417682

If you are not an honors student, then I would generally be expecting
that you got a grade of 3.6 or higher in CSE142, although I will
consider all students who apply.  Even if you have already registered
for the course, please fill out the survey so that I can get an
accurate head count.

--Stuart Reges, Teaching Professor, Computer Science & Engineering
   https://homes.cs.washington.edu/~reges
_____
Cse143a_wi22 mailing list
Cse143a_wi22@u.washington.edu
http://mailman11.u.washington.edu/mailman/listinfo/cse143a_wi22

UW_Reges_0002588

*Reges v. Cauce, et al.*

# Exhibit S
# to Declaration of
# Gabriel Walters

Message
_____

**From:**      Magdalena Balazinska [magda@cs.washington.edu]
**Sent:**      1/6/2022 2:36:00 AM
**To:**        Stuart Reges [reges@cs.washington.edu]
**CC:**        karentb [karentb@uw.edu]; DANIEL M. RATNER [dratner@uw.edu]; Philip J. Reid [pjreid@uw.edu]
**Subject:**   Re: Land acknowledgment statement in your course syllabus


Dear Stuart,

Because the current text under "Indigenous Land Acknowledgement" in your CSE143 syllabus is causing a
disruption to instruction in your class and because it is not related to the course content, it needs to be
removed. Since you are not willing to make the change yourself, I have removed that section from the syllabus.
I have also asked our IT team to update the syllabus on your course website.

It goes without saying that you have the right to have discussions about land acknowledgements, but we ask
that you please take those discussions outside of your classroom.

I'm going to email your class to explain the change. In that email, I will reassure the students that everyone in
your class should expect to be treated fairly, as this is a concern that students have raised. I will also provide
links to standard resources in case a student wants to raise any additional concerns.

Regards,
Magda

On Tue, Jan 4, 2022 at 7:06 PM Magdalena Balazinska <magda@cs.washington.edu> wrote:
  Dear Stuart,

  The statements you used are offensive and students have raised complaints. I ask you to please update your
  syllabus. Until then, I have asked our IT staff to take the syllabus down. I request that you do not post the
  original version of your syllabus in any form.

  Separately, if you would like to bring up your concerns about land acknowledgments with the UW, I'm sure we
  can help you find the right people to talk to.

  thanks,
  magda


  On Tue, Jan 4, 2022 at 6:11 PM Stuart Reges <reges@cs.washington.edu> wrote:
    That expresses a particular political viewpoint.  If you're going to allow
    people to include that, then you need to allow me to include mine.  So
    I'll say again that if you tell all winter instructors that they must
    remove any land acknowledgment, then I will comply.

    --Stuart

    On Tue, 4 Jan 2022, Magdalena Balazinska wrote:

    > Hi Stuart,
    >
    > Here it is:

UW_Reges_0001714

> https://www.washington.edu/omad/about-omad/
>
> magda
>
>
> On Tue, Jan 4, 2022 at 5:59 PM Stuart Reges <reges@cs.washington.edu> wrote:
>         There is no UW land acknowledgment as far as I know.
>
>         --Stuart
>
>         On Tue, 4 Jan 2022, Magdalena Balazinska wrote:
>
>         > Dear Stuart,
>         >
>         > I will ask any instructor who uses a land acknowledgment other
>         than the UW
>         > land acknowledgment to remove or replace it.
>         >
>         > thanks,
>         > magda
>         >
>         > On Tue, Jan 4, 2022 at 5:48 PM Stuart Reges
>         <reges@cs.washington.edu> wrote:
>         >         You haven't addressed the issue of consistency.  If you
>         instruct
>         >         all of
>         >         the winter CSE instructors to remove any land
>         acknowledgment
>         >         from their
>         >         syllabus then I will comply.  But if you are asking me
>         and only
>         >         me to
>         >         remove my land acknowledgment, then the answer is no.
>         >
>         >         --Stuart
>         >
>         >         On Tue, 4 Jan 2022, Magdalena Balazinska wrote:
>         >
>         >         > Dear Stuart,
>         >         >
>         >         > I acknowledge your view point on land acknowledgments.
>         I'm
>         >         sorry if I missed
>         >         > that you actually planned to include this offensive
>         statement
>         >         in your course
>         >         > syllabus this quarter. I recall that you wanted to
>         discuss
>         >         land
>         >         > acknowledgments. An in person discussion with
>         colleagues is
>         >         certainly a good

UW_Reges_0001715

```
>     >     > place to have these conversations.
>     >     >
>     >     > I'm not asking you to change the recording of your
>     first
>     >     lecture. I'm asking
>     >     > you to change the pdf of the course syllabus that is
>     posted on
>     >     the course
>     >     > website.
>     >     >
>     >     > thanks,
>     >     > magda
>     >     >
>     >     >
>     >     > On Tue, Jan 4, 2022 at 4:57 PM Stuart Reges
>     >     <reges@cs.washington.edu> wrote:
>     >     >     I'm disappointed that you did not discuss this
>     with me
>     >     last
>     >     >     month when I
>     >     >     emailed the faculty mailing list and said that I
>     planned
>     >     to
>     >     >     include my
>     >     >     version of the land acknowledgment on my winter
>     syllabus
>     >     for
>     >     >     cse143.  I
>     >     >     thought it was best to get feedback before the
>     quarter
>     >     began.  I
>     >     >     mentioned
>     >     >     that it is listed as a best practice on our
>     diversity
>     >     resource
>     >     >     page.  You
>     >     >     had said that you didn't want to have any email
>     discussion of
>     >     >     it.  I said
>     >     >     that I would be happy to discuss it in person
>     with
>     >     anyone who
>     >     >     was
>     >     >     interested and I even offered to help organize a
>     meeting, but
>     >     >     nobody
>     >     >     responded.
>     >     >
>     >     >     Here's the problem that I have.  I have been
>     encouraged
>     >     to
```

UW_Reges_0001716

```
>      >      >      include a land
>      >      >      acknowledgment.  I have done that.  Now you want
>      me to
>      >      remove it
>      >      >      because
>      >      >      you find it offensive.  I think you need to have
>      a
>      >      consistent
>      >      >      policy on
>      >      >      this.  Other CSE instructors have included land
>      >      >      acknowledgments.  Are you
>      >      >      asking them to remove theirs as well?  If not,
>      then I
>      >      don't
>      >      >      understand the
>      >      >      justification for treating me differently
>      because I have
>      >      a
>      >      >      different
>      >      >      viewpoint on this subject.
>      >      >
>      >      >      It isn't really possible to eliminate it at this
>      point.
>      >      The
>      >      >      syllabus is
>      >      >      shown in the first recorded lecture for the
>      course.  So
>      >      I'm
>      >      >      going to leave
>      >      >      it in place for now.  As I said, I would be
>      happy to
>      >      discuss
>      >      >      this in
>      >      >      person with you or anyone else who wants to
>      participate.
>      >      >
>      >      >      --Stuart
>      >      >
>      >      >      On Tue, 4 Jan 2022, Magdalena Balazinska wrote:
>      >      >
>      >      >      > Hi Stuart,
>      >      >      >
>      >      >      > I ask that you remove the "land
>      acknowledgment"
>      >      statement from
>      >      >      your course
>      >      >      > syllabus immediately. It is offensive and it
>      creates a
>      >      toxic
>      >      >      environment in
>      >      >      > your course, which is a required course in our
>      major.
```

UW_Reges_0001717

```
>       >       >       >
>       >       >       > You are welcome to voice your opinion and
>       opposition
>       >       to land
>       >       >       > acknowledgments, as you have, in other
>       settings. The
>       >       current
>       >       >       statement in
>       >       >       > your course syllabus is inappropriate and must
>       be
>       >       removed.
>       >       >       >
>       >       >       > For context, I'm attaching the course syllabus
>       that I
>       >       just
>       >       >       downloaded from
>       >       >       > your course website.
>       >       >       >
>       >       >       > regards,
>       >       >       > magda
>       >       >       >
>       >       >       >
>       >       >
>       >       >
>       >       >
>       >
>       >
>       >
>       >
>       >
>       >
```

UW_Reges_0001718

*Reges v. Cauce, et al.*

# Exhibit X
# to Declaration of
# Gabriel Walters

Message

| | |
|---|---|
| **From:** | Dan Grossman [djg@cs.washington.edu] |
| **Sent:** | 1/8/2022 5:53:45 AM |
| **To:** | Miya Natsuhara [mnats@uw.edu] |
| **CC:** | Hunter Schafer [hschafer@cs.washington.edu] |
| **Subject:** | Re: 190Y, 143 (plural), and you |

I don't know who added that column -- presumably Leslie? I'm flexible!

On Fri, Jan 7, 2022 at 9:51 PM Miya Natsuhara <mnats@uw.edu> wrote:
This is all very helpful, thanks to you both for your speedy responses!

Would it be helpful for me to mark my Startup students as such in the spreadsheet? I don't want to mess with data if it's unwelcome, but it's easy enough for me to do and I already recognize at least 7 names without looking too hard.

Miya

On Fri, Jan 7, 2022 at 8:40 PM Dan Grossman <djg@cs.washington.edu> wrote:

Thank you, Miya!!

Everything Hunter said. :)  A couple additional thoughts:

* That Startup column in the spreadsheet is surely not filled in yet (?). Anyway, as you (Miya) are a highly relevant instructor here, I'm just going to add you to the spreadsheet so you can see who plans to switch. It's anyone on the spreadsheet that has column B /not/ checked.

* Magda sent two emails to CSE 143 students that are publicly posted like all 143 announcement emails at http://mailman11.u.washington.edu/pipermail/cse143a_wi22/2022/date.html. While the second did not explicitly refer back to the first email, it makes sense to read them as a pair and it's fine for that to come up in discussion with students. The lack of explicit connection is because we are framing 143e (Hunter's 143) as an alternative available to anyone who wants to switch while students who don't have any reason/need to switch don't need to. Since it's an "alternative opportunity" and we're not trying to tell anyone what to do, we avoiding an explicit connection, however 'obvious' it is to some.

Best,
Dan

On Fri, Jan 7, 2022 at 8:30 PM Hunter Schafer <hschafer@cs.washington.edu> wrote:
Hi Miya,

To answer your bullet points.

• So yes, we told students to fill it out by noon tomorrow so we will know most of the students then. There will probably be a *few* stragglers, but we expect the majority of the class list to be decided. As one (maybe noisy) data point, the advisors have added a STARTUP column in our spreadsheet of responses and so far no students are marked as STARTUP in this list of ~130 names. There is a chance advising is just behind and hasn't filled that column out though. If you send me a list of emails in your class, I can sync that column to see how many we would have.



EXHIBIT 56
WIT: Grossman
DATE: 6-22-23
Lauren G. Harty, CCR, RPR

UW_Reges_0002570

- Calendars are a bit of an unknown at this point. Stuart and I have mostly similar calendars except for a few topics (namely inheritance). I'll try my best by the end of this weekend to give you a super clear diff of our calendars and help you plan any changes as necessary.
- Yes, I decided to stick with a traditional grading scheme this quarter for a few reasons. I'm almost surely going to stick with the points system and no resubmissions. Exams are unclear at the moment, only because of COVID. Will have more info ASAP.

re: why we are doing this

Yes, that event was a large part of why this was happening. The statement in his syllabus was deeply offensive and many students feel very uncomfortable in his class. So we are trying our best to provide students an alternative to CSE 143 this quarter that can still allow them to participate in an inclusive learning environment. I'm not sure how explicit we are making this connection in public announcements (re: Magda's email), so I will defer to Dan for how to talk with staff vs. students.

re: your support

Thanks so much! My brain is definitely a little scrambled. I'll definitely send any TAs out to help out. We're hoping for a very modest course size so it's likely I won't have a huge logistical mess of a regular 14x quarter. I still appreciate your offer of support (and compliment of my brain state □) ☺

-Hunter


On Fri, Jan 7, 2022 at 8:11 PM Miya Natsuhara <mnats@uw.edu> wrote:
Hi all,

Thank you for the heads up, I heard whispers of this brewing earlier today so it's not catching me completely by surprise.

What would be most disruptive / problematic is to have sizable numbers of students across both courses **and** have the courses differ significantly in structure, policy (e.g., resubmissions), topics calendar, and/or assignments.
(I am sure that these sorts of logistics are currently being worked out as the on-the-fly syllabus is being formed).

My current thoughts on the situation: *(I note and acknowledge that necessary info may not be available or known yet)*
- It would be great to have an idea of when this information would be available (it looks like the responses should be in by Saturday 1/8 at 12pm noon) - would it be possible to know which of the 190Y students will be taking each offering?
- The largest disruption for me in terms of difference between the two offerings would be significant changes to the topics calendar (judging from 21au vs. 22wi's predicted calendar, the first half of the quarters look identical with some deviation in the second half).
- It sounds like policies / structure between the two courses will likely be largely the same (no resubmissions, traditional exams, etc.) - any changes to this assumption would be welcome sooner rather than later :)

UW_Reges_0002571

A related question: I noticed in Magda's email that no particular reason was provided for the alternate course offering...I have an informed guess at the series of events that likely led to this new development, but I wasn't sure if there has been an explicit connection made publicly and/or whether I should avoid making such connections in my communications with my course staff and students.

@Hunter Schafer -- I can't imagine the state of your brain right now (though I'm sure I would be very impressed by it under these circumstances). I'm sure you're rallying and pulling everything together as you tend to do, and I am happy to offer the help that I can. I'm not sure how the staffing is working out, but I figure you may be pulling together TAs for lead TA positions who may not have done it before or who are a bit less experienced, or who may just be stretched a little thin. I'm happy to be suggested to them as a good reference if they have questions or want my organizational structure or email templates or anything else that would be helpful (might as well put some of the rotting head TA knowledge and experience in my head to some use). If you could benefit from anything else from the logistical front or otherwise, please let me know and I'll do what I can!

Here's to the end of an eventful week,
Miya

On Fri, Jan 7, 2022 at 2:16 PM Dan Grossman <djg@cs.washington.edu> wrote:

Miya (Hunter cc'ed),

As you may have heard, Hunter is the hero of the decade for offering a new alternative CSE 143 offering starting on Monday for students who prefer it to continuing in Stuart's course. (It's been a very long week and this came to be only a few hours ago.)

We wanted to reach out first of all because 190Y is obviously impacted. We anticipate you'll have students in both 143 offerings. We apologize for the additional challenges, but this is something we felt we needed to do. Hunter has had only a few hours to start putting a plan in place -- you can see a student-facing FAQ at https://docs.google.com/document/d/1BTaPK5dQDZgWgPBomEHzEdCDExm1K3Afh1YiiO-s9Sg/edit and the message students received at http://mailman11.u.washington.edu/pipermail/cse143a_wi22/2022/000004.html.

If there's anything I can do to help 190Y remain successful in the face of these additional challenges, please let me know.

Conversely, Hunter is truly moving mountains here to create an unusual course offering a week into the quarter with almost zero time to launch. Anything you can do as Miya the Incredible to help Hunter would also be spectacular.

In any case, that's the update (!!).

Best,
Dan


--
Miya Natsuhara
She/Her
Instructional Lecturer

UW_Reges_0002572

University of Washington - Mathematics & Computer Science
mnats@cs.washington.edu
(425) 306-1827

--
Miya Natsuhara
She/Her
Instructional Lecturer
University of Washington - Mathematics & Computer Science
mnats@cs.washington.edu
(425) 306-1827

UW_Reges_0002573

*Reges v. Cauce, et al.*

# Exhibit BB
# to Declaration of
# Gabriel Walters

Message

| | |
|---|---|
| From: | Jenifer Hiigli [jenifer@cs.washington.edu] |
| Sent: | 1/12/2022 8:59:13 PM |
| To: | |
| CC: | Ugrad Adviser [ugrad-adviser@cs.washington.edu] |
| Subject: | Re: [143a] Additional offering of CSE143 available |

Hi! Moving Magda to BCC.

    I'm happy to move you, but you can't stay in the same quiz section. You'll need to pick one of the available quiz sections that go with lecture E. If you want one at the same time, looks like there are some options for that. Let me know if you still want to switch and what quiz section you'd prefer!

**JENIFER PESICKA HIIGLI**
Assistant Director of Advising
Paul G. Allen School of Computer Science & Engineering
she/her/hers

CSE2 167
Bill & Melinda Gates Center for Computer Science and Engineering
Paul G. Allen Center Box 352355
3800 E Stevens Way NE
206.543.8522 / fax 206.543.2969
jenifer@cs.uw.edu / cs.washington.edu

Land Acknowledgement: The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations.

On Wed, Jan 12, 2022 at 11:56 AM                    wrote:
I hope I can still be in the same section, AW!

    On Wed, Jan 12, 2022, 10:52 AM                    wrote:
    Hello Magdalena,

    I hope you are well! I hope you don't feel inconvenient with all my emails. I wanted to ask if I can switch to Hunter's course. All my friends have switched, and it feels lonely to be in Stuart's class alone. So, I hope you can switch me to his class.

    Thank you for your help!

    On Mon, Jan 10, 2022, 11:53 AM                    wrote:
    Thank you Crystal for the update!



Confidential

UW_Reges_0005232

On Mon, Jan 10, 2022, 11:52 AM Ugrad Adviser <ugrad-adviser@cs.washington.edu> wrote:
This has been resolved, no changes will be made to your schedule.

Crystal Eney
Director of Student Services
Paul G. Allen School of Computer Science & Engineering
University of Washington
ceney@cs.washington.edu

https://iotrs.cs.washington.edu/ATN=20220108018

On 01/08/2022 16:42, ▉▉▉▉▉▉▉▉▉▉ wrote:
Great, thank you so much! I appreciate your quick response!

On Sat, Jan 8, 2022, 3:28 PM Magdalena Balazinska <magda@cs.washington.edu> wrote:
Hi ▉▉▉

No problem at all. I'm copying Jenifer Hiigli and the advising team who can help track your final decision.

regards,
magda

On Sat, Jan 8, 2022 at 3:26 PM ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ wrote:
Hello Magdalena,

My name is ▉▉▉▉ I filled out the form for the new Cse 143 offering with Hunter. But I no more want the offering. Honestly, I am doing well with my TA. So, I hope you can disregard my application form.

Thank you!

Sincerely,

On Fri, Jan 7, 2022, 9:52 AM Magdalena Balazinska <magda@cs.washington.edu> wrote:
Dear CSE143 Students,

We are opening a new offering of CSE143, which will run independently of the current course with a different instructor. This course offering will have one lecture section, meeting 2:30-3:20 on MWF on the time schedule. However, lectures will be pre-recorded (from Fall 2021) with the lecture time being used for synchronous Q&A. Therefore, time conflicts will be waived if necessary. The course will start remote, but we are looking for a classroom.

To switch to this new offering, please fill out this form by noon Saturday. You do not need to take any other action beyond the form. You do not need to drop your current CSE143. We apologize for the very short timeframe, but we have limited time to launch this offering. It is your choice whether you wish to switch.

There will not be any additional fees charged for switching to the new offering. We will handle the official registration changes for you in the coming days.

If you switch to this new offering, your Tuesday/Thursday recitation section and TA will also change. We will let you know your recitation section time as soon as possible. (The form asks what times you are available; please be as flexible as possible.)

The instructor will be Hunter Schafer. The course will have its first meeting on Monday, January 10, and the course will assume you have completed the first week of your current CSE143 in terms of lecture and recitation section. However, you will be asked to rewatch the videos for this new offering from the

UW_Reges_0005233

beginning. Again, it will operate independently from the current CSE143. Hunter will follow-up with the students in this offering with more detail.

The first homework will be the same and will still be due on Thursday January 13.

If you have any questions about the logistics of switching courses, please write to Crystal Eney Director of Allen School Undergraduate Student Services (ugrad-adviser@cs.washington.edu). If you have concerns about anything else, you are welcome to reach out to Crystal, Allen School Vice Director, Dan Grossman (djg@cs.washington.edu) or me.

Thank you,
Magda

Magdalena Balazinska (she/her/hers)
Professor and Director, Paul G. Allen School of Computer Science & Engineering
University of Washington

---

Cse143a_wi22 mailing list
Cse143a_wi22@u.washington.edu
http://mailman11.u.washington.edu/mailman/listinfo/cse143a_wi22

Confidential

UW_Reges_0005234

*Reges v. Cauce, et al.*

# Exhibit RR
# to Declaration of
# Gabriel Walters

Special Investigatory Committee for Stuart Reges

## Introduction and scope of activities

On July 11th 2022, pursuant to section 25-71.D.3 of the Faculty Code of the University of Washington, Dean Nancy Allbritton of the College of Engineering charged a special investigatory committee (SIC) to assist her in the "informational and confidential gathering of information and documentation" related to specific conduct of Teaching Professor Stuart Reges of the Allen School of Computer Science and Engineering, and subsequent complaints by UW community members. The SIC members are: Associate Professor Louisa Mackenzie (French and Italian Studies), Professor Steve Muench (Civil and Environmental Engineering), and Professor Eric Schnapper (School of Law). Together, we respectfully submit this report, and are solely responsible for its content.

None of us were personally or professionally impacted by or involved in the events and conduct under investigation. We were able to execute our charge in a spirit of neutrality. In addition to information-gathering, the committee was tasked with "advis[ing] the dean in its interpretation." The committee was neither asked nor authorized to decide upon a particular course of action by the UW administration. It is important to emphasize this because of a potential misunderstanding of the language used to describe the SIC's role to Professor Reges himself: Dean Allbritton wrote in an e-mail to Professor Reges on April 21st that she was working to "identify the faculty who will comprise the committee and then prepare the charge."[1] The meaning of "prepare the charge" was *not* that the SIC itself would issue Professor Reges with formal charges of misconduct, but that Dean Allbritton would describe the SIC's tasks ("charge") in a letter prepared for that purpose. In other words, it was the SIC that was being charged, not Professor Reges. The SIC from the beginning understood the parameters and limits of our task.

The committee worked together gathering and interpreting information, identifying and interviewing stakeholders, and generating internal reports. We invited Professor Reges to talk with us (by e-mail on August 12). He declined this invitation via e-mail on August 16th as was his right. On August 24th, 2022, we received an e-mail from Nancy Allbritton which informed us that our activities had been put on hold. We immediately ceased our work. The work resumed on September 28th, authorized by an e-mail from Director of Human Resources Aileen Trilles, with a focus on preparing a report.

Our research pertained to a specific conduct complaint brought against Professor Stuart Reges (SR) by the Dean of the College of Engineering, Nancy Allbritton (NA), under section 25.71 of the Faculty Code. The conduct in question is Professor Reges's use of course material and UW e-mail to express opinions (related to indigenous land acknowledgments) in a way that may have violated UW and College rules. The conduct took place between December 2021 and March 2022. While our findings relate to this particular conduct, we also provide context to aid in interpretation where appropriate. *Context* includes detailed timelines of events, the history of Reges's seeking out of political controversy, his media interviews, the issue of land acknowledgements at UW and in national debate. We assess *impact on pedagogy* (effects on student learning and morale; degree of alignment with best practices); and *impact on relations* between UW and Native community. We provide additional information we have found informative. In addition to

---

[1] Reges- 25-71 Consultation.eml

information-gathering, in the spirit of "assisting … in interpretation", we offer in the final section some more subjective thoughts on the question of rights (rights of instructor, rights of students, rights of UW to assert professional standards), and the political nature of this conduct, as well as possible conclusions about *compliance with Faculty Code*. The timeline in the Appendix summarizes the events we investigated and documented, as well as our work from July 11-August 24. Some key quotations from documents are footnoted.

Context: Land acknowledgments
Events: Facts
Events: Important additional information
      Allen School political neutrality
      Definition of "disruption"
Events: media attention, political culture wars
Impacts: Overview
Impacts: Students
      Awareness of Student Complaints
      Function of a Syllabus
Impacts: Native community
SIC Interpretations Informed by Faculty Code
Appendix (p.16-22)

## Context: Land acknowledgments

Land acknowledgements are increasingly used in cultural, professional and academic settings in North America as a small signal of commitment to recognizing the history and presence of Indigenous peoples on the land. [2] They are usually developed in coalition with Native advisory groups. There is debate, including in Native communities, about their use and the limits of something that can be seen as performative.[3] It is understood that they are not equivalent to working to repair injustice. However, if presented with willingness to enter into dialogue on the part of a non-Indigenous individual, a land acknowledgement can make Native and Indigenous people feel a little more included within a given space. The Burke Museum defines its own land acknowledgement as a "living statement" that changes over time, reflecting changing understanding between peoples.[4]

The University of Washington does not have a standard land acknowledgment on web pages, but does have a template spoken by leadership during events.[5] It is the same used by the Tribal Relations Office: **"The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations."[6]** The UW considers this a statement of fact and not a political position on land rights, ownership, or US history. [7] It

---

[2] https://nativegov.org/news/a-guide-to-indigenous-land-acknowledgment
[3] https://www.cherokeephoenix.org/opinion/opinion-land-acknowledgments-fall-short-in-honoring-indigenous-people/article_cdf8233f-f107-5cb6-a9c5-e89823a10e2d.html
[4] https://www.burkemuseum.org/news/acknowledging-land-building-deeper-relationships
[5] https://www.washington.edu/omad/about-omad/
[6] https://www.washington.edu/tribalrelations/
[7] Victor Balta, E-mail to Fox News. "Commonly utilized land acknowledgments are not politicized statements

Confidential

UW_Reges_0008752

was developed with guidance from the Governor's Office and federal regulations and adheres to tribal sovereignty. However, the UW does not require any employee to use a land acknowledgement, nor does it prescribe language for those who do. It does provide resources--centrally and at the unit level--to employees so they can learn and consider using the practice in their own work.[8] Some units recommend language based on that used by the UW's Tribal Relations Office. Chad Allen explained to the SIC that best practice is to include one if it comes from a place of reflection and willingness to dialogue and educate (and be educated).

Land acknowledgements are suggested by teaching and learning experts at the UW,[9] as one of many tools an instructor might use to create an inclusive environment where Native students feel welcome. In September 2020, the Allen School circulated a 6-page document of suggested best teaching practices "worth considering"; the document included land acknowledgements as one suggestion among many, providing the UW's Tribal Relations statement as a suggestion.[10] The context in which the Allen School suggested inclusion of a land acknowledgment in a syllabus was thus pedagogical, as one way in which an instructor might help Native students feel included.

## Events: Facts

(Please see Timeline in Appendix, for table overview with references to relevant documentation in SIC's Teams drive.)

On December 8, 2021, Professor Ed Lazowska of the UW's Allen School of Computer Science forwarded an Atlantic article to two listservs (faculty and diversity_allies). The article argued that land acknowledgements are "just moral exhibitionism".[11] Professor Magda Balazinska, Director of the Allen School, replied with a request that discussion happen in-person rather than on-list. Teaching Professor Stuart Reges replied, stating that he was thinking about including "[his] version" of a land acknowledgment on his CSE 143 syllabus in Winter 2022, offering to facilitate a discussion in person, and including his statement below his signature.[12] At the time, no-one responded to Reges's stated intent to include this statement, or his invitation to in-person discussion. The SIC heard two explanations for this silence: 1) it was a deliberate choice on the part of SR's colleagues, because he has a history of trying to start controversy and other instructors had no interest in amplifying the fight; and 2) some colleagues did not really believe he would include his statement in his syllabus[13].

about land claims or ownership nor expressions of personal viewpoints about land ownership, but are rather statements of fact — the purpose being to acknowledge that the university sits on the historical ancestral lands of the Coast Salish people." https://www.foxnews.com/us/university-washington-professor-toxic-environment-indigenous-land-acknowledgement

[8] for example: https://www.washington.edu/uwra/about/board/committees/acknowledgments/

[9] E.g. The Center for Teaching and Learning: https://teaching.washington.edu/topics/inclusive-teaching/inclusive-teaching-strategies/supporting-indigenous-students-in-the-classroom/

[10] Allen-School-Best-Practices .. .pdf

[11] https://www.theatlantic.com/ideas/archive/2021/11/against-land-acknowledgements-native-american/620820/

[12] 1-email on Faculty Mailing List Dec 8th.pdf
 "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."

[13] Crystal Eney Interview Notes by Steve.doc

Confidential

UW_Reges_0008753

Stuart Reges (SR) included the statement on his CSE 143 syllabus for Winter 2022, which started in the first week of January 2022.  Students shared screenshots on social media[1415] and over the next week, many complained to the Allen School and to the Bias Incident committee.[16] On January 4 2022, Magda Balazinska (MB) asked SR by e-mail to remove the language from the syllabus but recognized his right to oppose land acknowledgements elsewhere. SR stated that no-one had replied to his December 8 message; MB replied that she had "missed" that SR truly intended to include the statement and repeated her request; SR stated that he would only comply if every instructor was told to remove their land acknowledgement. MB said she would ask all instructors using a land acknowledgement to only use the UW's version. SR replied "That expresses a particular political viewpoint. If you're going to allow people to include that, then you need to allow me to include mine."[17]

On January 5th, MB e-mailed SR stating that she had removed the statement from SR's syllabus and asked IT to remove it from the document in his course web site. The exchange is as follows: MB: "Because the current text under "Indigenous Land Acknowledgement" in your CSE143 syllabus is causing a disruption to instruction in your class and because it is not related to the course content, it needs to be removed. Since you are not willing to make the change yourself, I have removed that section from the syllabus. I have also asked our IT team to update the syllabus on your course website. SR "You have silenced me while not silencing others because you don't approve of my political beliefs.  That is a violation of my first amendment rights."[18]

MB sent two e-mails to students in CS 143 during this first week. On January 5th, she apologized on behalf of the Allen School for the statement in SR's syllabus and alerted students to three ways in which they could voice their opinions, including anonymous means.[19] Complaints were received, including from Native students, one of whom took a leave of absence.[20] On January 7th, MB informed students that a shadow section had been set up for students who preferred not to work with SR.[21] 157 of SR's enrolled students made the switch, out of 440. Some students may have switched for reasons not related to the statement, but MB heard directly from many students for whom that was the primary motivator. MB and other student-facing personnel of the Allen School met with and/or corresponded personally with many students during this period, including Teaching Assistants.[22]

---

Balazinska notes-1.doc

[15] https://www.reddit.com/r/udub/comments/rvjw5m/stuart_reges_version_of_the_land_acknowledgement/
[16] Student Concerns USST reporting Committee Version - Winter 2022.pdf
Bias reports BIAC.doc (not in Team drive)
Crystal Eney Interview Notes by Steve.doc
[17] 3-email thread with instructor.pdf
[18] 3-email thread with instructor.pdf, 4-email to students on Jan 5.pdf
[19] 5-email to students on Jan 7th.pdf
[20] Student Concerns USST reporting Committee Version - Winter 2022.pdf
CAIIS meeting summary.doc
EMAIL_Native faculty and staff statement.pdf
[21] 5-email to students on Jan 7th.pdf
[22] 8b - Details regarding exchange with UAW students.pdf
12 - Initial Set of Complaints.pdf
Student Concerns USST reporting Committee Version - Winter 2022.pdf

Confidential

UW_Reges_0008754

On February 24 2022, SR posted a link to an Inside Higher Ed article to the CS listserv diversity_allies.[23] The article was critical of land acknowledgements and mentioned SR's "protest". SR announced his intention to continue to use his own statement in CS 142 in the Spring quarter, on paper as it's "harder to censor". He did so, and a shadow section was again offered with robust enrolment (178, with denials because of classroom size). On February 24th and 25th, multiple complaints were submitted to leadership and staff members of the Allen School in response to the diversity_allies post. The complaints were from undergraduates, ASEs, and UW community members at large.[24] The Recruiter for Diversity and Access, Kayla Shuster, submitted an extensive Bias Incident Report.[25]

In late February there was a lot of communication about how to proceed. Associate Dean for DEI, Karen Thomas-Brown, said she would forward complaints to UCIRO, but then the Allen School was informed (by the AG office?) that the 25-71 process should be followed instead.[26] The reasons for UCIRO not taking this on were not clear to the SIC. Had we continued our work, we would have interviewed Dean Thomas-Brown.

On March 2 2022, Dean Nancy Allbritton (NA) notified SR by e-mail of a formal "25-71" meeting to discuss possible violations of Faculty Code 25-71, 24-33, Executive Order 31, and UAW's collective bargaining agreement for ASEs.

The meeting took place on March 8, 2022. Stuart Reges brought legal counsel. NA was joined by Human Resources Director Aileen Trilles, and Professor and Vice Director Dan Grossman. NA's suggested resolution was rejected by SR by e-mail on March 19.[27][28] On March 28, over 20 Native faculty and staff sent a letter to the Allen School protesting alienation and harm to the Native community.[29]

NA informed SR on April 21 that she was charging a Special Investigatory Committee to assist her, as per faculty code.[30] She did *not* inform SR that a formal misconduct charge was being prepared against him. The SIC notes the potential for misinterpretation of this language, and notes that FIRE appears to have misinterpreted it in this way (article 78 of their Complaint states: "On April 21, 2022, Dean Allbritton notified Professor Reges she intended to proceed with formal charges against him"[31].. She then formed the SIC, charged on July 11.[32] The SIC worked through August 24th gathering information and interviewing

---

[23] 7-email to Diversity Allies.pdf

[24] 8 - Text of reports and comments following diversity-allies email.pdf
8b - Details regarding exchange with UAW students.pdf

[25] Bias Incident Report.pdf
[26] 8b - Details regarding exchange with UAW students.pdf
[27] Reges_25-71_Resolution Agreement_2022_03_09.pdf
[28] 9 - Reges response to letter of March 9th.pdf
[29] EMAIL_Native faculty and staff statement.pdf
[30] e-mail from NA to SR on April 21: " Stuart, Thank you for following up. After my consultation with you and the director, I have decided to form a committee of three UW faculty members to look into this matter pursuant to Section 25-71.D. I am working to identify the faculty who will comprise the committee and then prepare the charge. Thank you,Nancy"
Reges- 25-71 Consultation.eml
[31] Complaint.pdf
[32] FINAL_Charge Letter to SIC for SR_2022_07_11.pdf

Confidential

UW_Reges_0008755

affected parties as described in the "impact" section and summarized in the timeline. We note that Professor Reges declined an invitation to speak with us. We have drawn no conclusions from this choice. We resumed work on September 28, preparing an oral report based on this written one.

## Events: Important additional information

Allen School political neutrality

SR claims that all other land acknowledgements on CS syllabi were allowed, except his. This is not entirely accurate. Kevin Lin and Lauren Bricker had land acknowledgements in their syllabus which appeared to veer into progressive political statements. MB suggested that they modify their wording in order not to alienate conservative students.[33] Both instructors did so and taught their classes without incident. (The SIC would have likely interviewed these instructors if we had continued our work). SR was likewise given the option to cooperate in order not to alienate students, but he chose not to.

Definition of "disruption"

SR claimed that there was no disruption *in* his class due to his statement. The SIC heard evidence of severe disruption for his students and TAs, Allen School staff, peer mentors, and advisors, staff and advisors from other units, and the UW Native community, and that it lasted for weeks. The reason SR believes there was no disruption is because students did not speak up in the moment as the syllabus was presented during class time. They did not have the chance: SR glossed over the statement when presenting the syllabus to students live. A Redditor claiming to be a student in 143 (supported by their including a screen shot from the actual syllabus) wrote this: "he just breezed over this in the syllabus and I had to look at it a few times because I just assumed it would be the same as all the other UW land acknowledgments. While whipping through the later part of the syllabus he goes "religious accommodations, my version of the land acknowledgment, and then the software you will need".[34] He did not invite discussion of the statement in class.            , a student with whom the SIC talked directly, confirmed this, and said she would not have been made aware of the statement if it had not been protested on social media. Students in CSE143 are mostly young, in their first year, not used to university classes, and not used to speaking up in class about difficult issues. They don't necessarily know how or when to complain, or feel comfortable articulating any opinion even outside class. Students may not have reacted in the moment, during class time (especially since SR offered no invitation to discuss his statement). Rather, the disruptions happened outside class. We repeatedly heard that students felt too intimidated to bring it up with SR himself, and instead brought it up with TAs, or in some cases with Allen School student services or administrators. There were many long and difficult conversations happening.

## Events: media attention, political culture wars

---

[33] Balazinska-notes1

[34] https://www.reddit.com/r/udub/comments/rvjw5m/stuart_reges_version_of_the_land_acknowledgement/

SER-81

It is impossible to detach these events from broader political debates taking place nationally. Indeed, SR himself has repeatedly sought to place his own actions firmly within this context. Since January 2022, SR has given many interviews with partisan media outlets about these events.[35] In most interviews, he emphasizes that his intention was to provoke a reaction from the UW administration in order to make a broader point about his objection to what he calls "the equity agenda" in higher education.[36] He has said "this was an experiment on my part"[37]He reminds readers and viewers that he has a long history of defending supposedly controversial viewpoints and he presents himself as something of a free speech crusader.[38]

In addition, during media interviews, SR has misrepresented the UW's land acknowledgement as "a particular view of American history that they wanted you to affirm, you know, that the United States is evil and that we stole land from native tribes and so forth."[39] The UW does not affirm, or require employees to affirm, that the USA is evil, and they are very careful to avoid saying that land was stolen. (They do affirm the fact that it is occupied.[40]) From the Native perspective in fact, the UW is far too conservative in this regard.

As confirmed by staff in the Allen School,[41] SR has a long history of taking public stances on controversial issues. He reminds the public of these stances in media interviews, including being fired from Stanford in 1991 for what he claims was "protesting the war on drugs". The specifics of his conduct[42] at Stanford complicate this picture: his actionable behavior was bringing drugs onto campus and purchasing alcohol for underage students, *not* the fact that he held or had expressed a viewpoint opposed to university policy (and the law). The Dean of Stanford's School of Engineering made this clear: "My determination of professional misconduct is not based on the fact that you hold or state your opinion regarding this University policy [on illegal substances]. There are many acceptable ways to object to a policy with which you disagree. However, violating the policy is not an acceptable form of objection, especially in a community such as ours that promotes full and free discussion of opposing views."

Since arriving at the UW, SR has for the most part expressed political opinions using his own, rather than university, resources, for example publishing on his own blog or the opinion web site Quillette.[43] The committee notes that his right to do so has not been called into question. We also note that he removed the Allen School logo from a personal web page when asked to do so.[44] His opinions expressed outside the university context-- in particular articles on women in coding and land acknowledgements--are known to some of his students from word of mouth and social media. Some female students and BIPOC students

---

[35] some oral interviews in "video audio files" folder in Teams; written interviews in "outside correspondence-stories" folder.
[36] https://www.youtube.com/watch?v=iHyabeTDlUI_@_4:30. "I took the opportunity to make a political statement I knew they wouldn't be happy with"
[37] Ratnz interview 8.10: "This was an experiment on my part"

[38] FIRE video 3.49 "a lifetime exploration" of free speech issues
[39] https://www.foxnews.com/us/university-washington-professor-sues-school-alleging-school-free-speech-violation
[40] https://www.washington.edu/omad/about-omad/
[41] Crystal Eney Interview Notes by Steve.doc
[42] https://news.stanford.edu/pr/91/910510Arc1386.html
[43] Quick links can be found on his personal web page https://www.stuartreges.com/
[44] Reges-censorshipclaims.doc

Confidential

UW_Reges_0008757

have expressed discomfort at having to take a gateway class with an individual who they believe to be prejudiced against their ability to succeed in computer science, or against their lived identities more generally. In 2019, a petition and compilation of student complaints requested that SR's teaching contract not be renewed based on his article "Why Women Don't Code."[45] However, the UW has not sanctioned SR for expressing these opinions.

## Impacts: Overview

At the time of cessation of activities by the SIC, we were still in the process of gathering more details about who complained and the exact number of complaints, but we have already gathered and read many. Most that we are aware of have been compiled into collective responses, with the identifying information removed if complainants requested. We interviewed a member of the UW's Bias Incident Advisory Committee, a student in SR's 143 class, four Native faculty and staff who had worked with and for Native students during these events, the Director of Student Services at the Allen School, the Director of the Allen School, the Assistant Director of the Intellectual House, and the interim director of OMAD and board member of the Intellectual House. The ASEs of CSE submitted written responses to our questions. SR declined an invitation to present his perspective to the SIC (invitation sent by e-mail on August 12, rejected by SR on August 16th). The Timeline provides dates and overviews of interviews.

The overall impression is of serious disruption to student (undergraduate and graduate) experience and well-being in CS143 and the Allen School, harmful ripple effects throughout the Native UW community, and a challenge to the trust between Native people in the region and the UW more generally. We heard concern about lasting harm to the UW's reputation as a supportive space for Native people, and harm to the UW's ability to recruit and retain Native students in STEM, and in general. ASEs in the Allen School who had to work with SR charged that they were experiencing a discriminatory work environment. In addition, there was significant workload escalation for many in the Allen School as student-facing staff dealt with complaints and met with affected students, administrators figured out how to respond (they could not choose to ignore it since there had been student complaints), a faculty colleague overloaded to teach the shadow class, TAs had to be reassigned and had to process events with students in their sections, and staff working to ensure that the Allen School can support diverse students felt like any progress they made was compromised by these events.

## Impacts: Students

MB told us that "The number of complaints about the "land acknowledgement" was unprecedented, the largest number ever about a class."[46] This was confirmed by Lincoln Johnson (Bias committee) and Crystal Eney (student services). Casey Wynecoop (Intellectual House) also forwarded student e-mails to Rickey Hall: "The students that brought this to my attention are both appalled and bewildered by it."[47]

---

[45] Letter_complaints2019.pdf

[46] Balazinska-1-notes.doc
[47] 12- Initial Set of Complaints.pdf

Confidential



The impact on students is summarized by ▇▇▇▇▇, who was in SR's 143 class in Winter 2022 and switched to the shadow section: "[Reges] was playing games with my education."[48] ▇ is the one student from CSE 143 in Winter 2022 with whom we spoke directly; she wanted to talk with us to represent other, younger students in the class who felt less confident speaking up (▇ is a non-traditional student in her ▇; most CS143 students are 18-20 years old). We e-mailed other students whose identifying information we could find in the complaint reports, but none replied. ▇▇▇▇ felt that the Allen School did right by students as much as it could, and she liked the shadow class. She reported that she felt disgust at the idea she might have to take a class with SR next quarter: "I feel that it costs me a small part of my dignity to have to interact with him on a daily basis and it does feel gross that this man is in a position of power over me while I am a student in his class. I would give absolutely anything to be able to take this course with a different professor next quarter".[49] ▇▇▇▇ assessment in her conversation with the SIC was that SR was compromising undergraduate learning in order to perform a political stunt, and stated this was not only harmful, but also meant students were not getting their money's worth for tuition paid.

Native students were very negatively impacted. Minorities in Tech were contacted by three Indigenous students who felt alienated in SR's class in the first week of January.[50] Native faculty reported meeting and working with Native students a lot during this period.[51] They, and students, expressed frustration that SR has not been held accountable for the impact on students.

One Native student took a leave of absence. ▇▇▇▇▇▇ communicated with SIC via the CAIIS faculty: "They are taking a leave of absence for the Spring quarter due to the continued impacts of alienation from this event, a lack of communication around this experience from the Allen school and wider community, and a lack of academic support."[52] In their initial communication with the Allen School, they said "this whole incident has made me feel so directly despised and unsafe". Their friend ▇▇▇▇▇ wrote "the statement itself and the placement within the syllabus are openly alienating of Indigenous students. A syllabus is one of the first things new students see when coming into a class – this syllabus sends a clear message that Indigenous students are not welcome in Professor Reges' classroom".[53]

The redacted summary of complaints to student services provided to the SIC shows 2 pages of complaints and concerns, mostly from the first two weeks of January alone; more complaints were compiled and submitted by Lincoln Johnson of BIAC[54]. The summary of initial complaints is 14 pages long.[55] Both indicate that staff were significantly impacted, too, as they tried to respond to students. We provide just a few selected quotations.

---

[48] ▇▇▇▇ SIC meeting summary.doc

[49] Student Concerns USST reporting Committee Version - Winter 2022.pdf

[50] Student Concerns USST reporting Committee Version - Winter 2022.pdf (written complaints from students in 143, compiled by Allen School student services)

[51] CAIIS meeting notes.doc

[52] CAIIS meeting notes.doc

[53] Student Concerns USST reporting Committee Version - Winter 2022.pdf

[54] Student Concerns USST reporting Committee Version - Winter 2022.pdf
bias reports BIAC.doc

[55] 12-Initial Set of Complaints.pdf

"…the impact that this incident is having on my team. In these situations, I think the first instinct is to think about our students (which is right) but I think it's important to also mention that Stuart's words have a very real negative impact on our entire community including staff." (Chloe Mandeville, Assistant Director for Diversity and Access)

"staff are feeling disillusioned about the DEI&A work we are charged to do given Stuart's negative impact on our community & prospective students." (anon. staff, via Chloe)
"We are currently forcing students to delay or change their academic plans OR choose to take a course with someone that has been openly hostile" (anon. staff, via Chloe)

"I feel very uncomfortable" (Jan 13); "I am very uncomfortable with staying in Stuart Reges' class." (Jan 8); "I feel very uncomfortable with Stuart's statements as well as being in his class" (Jan 10); "wanting to be excused from any duties of their job that would involve potential interaction with Professor Reges" (Jan 8) "being uncomfortable in the class and that the situation was exacerbated" (Jan 7); "My indigenous friend in your program is devastated, I'm disappointed in my major...do something." (Jan 28)

 "The actions like those from Stuart (and Perdo) [sic] often overshadow the DEIA work we're doing especially from an external/prospective student perspective."

These concerns extended to affect Spring enrolments:
""I really want to take and learn CSE 142, but I don't know how comfortable I would be with attending Stuart Reges' section" (Feb 7); "a 1st year STARS student asked how the Allen School is handing Stuart's land acknowledgment in the CSE 143 syllabus and Pedro's tweet"

"This sort of factually wrong, intentionally inflammatory, and trauma-mocking statement tarnishes the reputation of the Allen School. …Having a professor like this, with a history of misogynistic and racist statements, and who places statements like this in their course policies, signals an environment in our department which I do not think aligns with our department's goals of being inclusive."

"I was hopeful that something would come of his most recent stunt, but apparently he knows better than I that he would get away with it."

The DEI student committee reported having heard from 6 students.
"he has formally and publicly expressed his unsubstantiated perspective into a UW class syllabus, thus harming students in the course and beyond (note that by emboldening the few biased students the harm goes on beyond the course) ….This clearly contradicts the Allen School's promise for creating an inclusive environment."

There was an extensive college-level complaint from Kayla Shuster, Recruiter for Diversity and Access, concluding that her job had become more difficult as it related to recruiting and retaining underrepresented students [56]:

---

[56] Bias Incident Report.pdf

Confidential
UW_Reges_0008760

"Between the work put into creating the second section option for students and the efforts to support students who were upset by the statement, the Undergraduate Student Services Team lost nearly two weeks of time for our regular duties."

"With the creation of my position we are seeking to increase our recruitment of native students. How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?"

"Mr. Reges was made aware that his language caused significant emotional harm to students. As a lecturer, he is responsible for creating an environment that is conducive to learning. Once he saw the hurtful impact of his words, demonstrated by students opting out of being in a classroom with him and reporting their concerns to the university, he should have stopped and found another forum for his views outside of the classroom. Mr. Reges has stated his intentions to repeat the action again next quarter. … I do not believe that Stuart Reges is capable of performing his job duties as a lecturer. Too many of our students will be alienated and unfocused in his courses and he has shown no remorse for the disruptions to learning that he has created. He has expressed intentions to cause further learning loss in future courses."

The impact on ASEs was conveyed in written response to the SIC's questions over e-mail:[57] UAW representatives claimed that events violated Article 20 of their contract, as well as Allen School commitment to inclusion.

"Professor Reges' statement made us realize that there are senior and influential people in our workplace environment who are working against a diverse, equitable, and inclusive workplace environment."
"increased workload throughout the quarter"
"TAs observed widespread discontent from students regarding Stuart Reges' actions. They received several oral complaints from students who felt uneasy or unwelcome in Stuart Reges' classroom environment. TAs not only had to respond to those student concerns, but they further had to struggle with the fact that Stuart Reges' actions significantly derailed their attempts at the start of the quarter to build an inclusive environment for students from all backgrounds.
"TAs work very hard to dispel concerns and reservations that students have about joining the CS field."

TA concerns were also transmitted via anonymous channels, e.g. "As long as he is allowed to teach classes with TAs, all TA applicants must be offered a clear and safe way (hidden from Stuart and free from the possibility of retaliation by him) to opt out of being assigned to his class."[58]

## Awareness of Student Complaints

SR was informed that undergraduate and graduate students, including some of his Teaching Assistants, had complained. The UW is obliged to respond to formal student complaints, and instructors should do so too. SR's response to complaints was to repeat the offending action rather than address it. In media interviews, SR has been somewhat inconsistent with regards to when he was informed about student complaints,

---

[57] ASE Response to Special Investigative Committee Regarding Stuart Reges
[58] bias reports BIAC.doc
[59] Balazinska-notes-1.doc

Confidential                                                                                   UW_Reges_0008761

however MB informed him on Jan 4 by e-mail that students had complained,[59] and he was made formally aware during the March 8 25-71 meeting.

## Function of a Syllabus

A syllabus is a university document even though it is created by individual instructors. It presents the course and the instructor to students, often for the first time, and students must read and consult the syllabus which becomes a de facto contract between them and the instructor.

While instructors have great freedom in deciding what to include in the syllabus, it is ultimately a document for which the UW is responsible and to which it is answerable. The UW does have the authority to intervene where a syllabus may contradict legal requirements, for example all faculty are obliged to include specific language related to religious accommodation.[60] If faculty omit or even slightly change this language, the UW has the right to demand that we change the language in the syllabus. This is true whatever the instructor's sincerely held religious or moral beliefs may be. An atheist instructor could not refuse to include religious accommodation language. This illustrates the principle that a syllabus is a UW document, not a personal one, and that the UW's legal and professional interests trump individual beliefs.

Unlike religious accommodation, a land acknowledgement is not required by the UW, and the UW cannot force an instructor to include one on a syllabus. However, the UW can force an instructor to remove or change content according to the Faculty Code. Language considered offensive can be sanctioned if it is found not to meet the standards of the faculty *collectively* responsible for curriculum. The faculty code balances instructors' freedom of expression with the need for some collective approval of content and presentation: "It is the responsibility of the faculty members to present the subject matter of their courses *as approved by the faculty* in their *collective* responsibility for the curriculum. *Within the approved curriculum,* faculty members are free to express ideas and teach as they see fit" (our emphasis).[61] SR has claimed that "faculty have the right to control course content and content of syllabus"[62]. This right is not absolute, however, as the Faculty Code clearly states: course content must be *approved* by faculty who have *collective* responsibility for curriculum. This collective faculty includes program directors and department chairs.

### Impacts: Native community

The overwhelming sentiment among our interviewees was summed up by Chad Allen: "This was about denigrating Native people"[63]

On March 28, Chad Allen forwarded a list-serv posting signed by 20 Native faculty and staff, to MB and NA. The message stated that the UW was not honoring the terms of the MOU between Native Northwest regional tribes and the UW from 2010. In this MOU, the UW agrees, among other items, to "enhance efforts to recruit, retain, and successfully graduate more American Indian undergraduate, graduate and

---

Stuart-Reges-and-Madgalena-Balazinska-Email-Exchange-January-4-2022_Redacted.pdf
[60] https://registrar.washington.edu/staffandfaculty/religious-accommodations-policy/
[61] UW Faculty Code 24-33
[62] https://www.youtube.com/watch?v=iHyabeTDlUI_ @ 10:06
[63] ChadAllenSICMeetingNotes.doc

professional students", and to "expand and integrate American Indian culture, knowledge, and history into the academic curriculum, institutional programs and university community". The letter argued that the first of these terms is directly compromised by SR's actions.[64] It pointed out the emotional impact on Native UW community members, and the negative impact on learning. It further made the point that violations of Native dignity run counter to Faculty Code 24-33 which enjoins all speaking in UW contexts to respect the dignity of others.

To get a more complete picture of impact on Native community members, the SIC met with staff and faculty of the CAIIS, Casey Wynecoop, and Chad Allen, and this paragraph sums up some of the main points we heard.[65] All conversations indicate an overall existing lack of trust between Native UW community members and the institution. SR's words caused great harm to people already vulnerable. "this signals to Native community that STEM is not for them ... Also sends message that UW is not a safe place to go. The UW claims that it's a safe space for all; Reges is overtly working against that."

Stereotypes of Native people as backward and lazy, are reinforced by SR's statement. These stereotypes do direct harm to Native people trying to navigate systems dominated by people whose biases are influenced by them.

With his deliberately offensive throw-away comment, SR was ignoring the actual expertise of specialists of Native history and continued presence on land. He was not seeking to engage in scholarly conversation, it was a stunt. The "labor theory of property" is not a serious contribution to Native history, to the debates about land acknowledgements, or even to studies of Locke himself.[66] It is not clear that SR himself believes in the Lockean theories of property embedded in his statement; he has called himself a "Georgist" with respect to claims to land[67].

Native students are not well-supported in the state and outcomes are worse for Native students due to systemic inequities, generational trauma. There is the sense that any progress is fragile, and easily undone by this kind of event. The Native student who took a leave of absence after SR's stunt should have been a success story, exactly the kind of student the UW is trying to support and promote. SR is not being held accountable in a proportionate way for these huge impacts on students' learning and lives.

Native faculty and staff from the CAIIS and the Intellectual House worked closely with Native students to support their well-being during Winter and Spring. This was a significant time commitment and emotionally draining for all. When it was clear that SR intended to include his statement again in the Spring syllabus, Native faculty and staff encouraged students to try not to engage him. The sense was that SR was trying to provoke and bring a fight which they had no interest in giving him, on his terms.[68]

---

[64] e.g. Kayla Shuster, Recruiter for Diversity and Access: "How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?" Bias Incident Report.pdf
[65] CAIIS meeting summary.doc
ChadAllenSICMeetingNotes.doc
[66] https://www.tandfonline.com/doi/full/10.1080/10848770.2017.1416766
[67] https://www.stuartreges.com/miscellaneous/land.shtml
[68] Casey Wynecoop SIC meeting.doc
CAIIS meeting summary.doc

Confidential

UW_Reges_0008763

## SIC Interpretations and Findings

The preceding pages established facts and represented the viewpoints of impacted parties. In this final section, the SIC executes its charge to "assist ... in interpretation" of this information informed where appropriate by the Faculty Code.

The SIC believes that SR's statement violates the dignity of Native people and thus **violates Faculty Code 24-33 "an obligation to respect the dignity of others".** Inasmuch as his statement perpetuates a harmful stereotype, ignores or ridicules Native history and culture, and reduces Native issues to a soundbite in a political culture war, the SIC further finds that if UW were to allow this to continue, it would run counter to the article of the Tribal MOU (2010) by which the UW agrees to "expand and integrate American Indian culture, knowledge, and history into the academic curriculum, institutional programs and university community".[69]

SR claims that the UW is forcing a political viewpoint by requiring only certain versions of land acknowledgements. However, the UW, and the Allen School, specifically avoid politicizing land acknowledgements; the **recommended language is a statement of fact not of partisan allegiance**. The one term about which there might be debate is OMAD's explanation of their land acknowledgement template: "This language template is spoken by UW leadership during events to acknowledge that our campus sits on occupied land."[70] However the acknowledgement itself does not use the word "occupied", and it is also a historical fact that non-Native populations in North America were occupiers. We note that the UW does not use "stolen", which could be interpreted as a political position.

The SIC finds, rather, that **SR is the one actor in these events who has consistently sought to politicize the debate.** The multiple interviews SR has given with partisan media outlets, and his own statements about his intentions to provoke the UW administration, back this up. We concur with CSE 143 student ▨▨▨▨▨▨▨▨ who felt that SR was "playing games" with her education.

SR's use of a course syllabus **exposed students to a politicized fight which they had no hand in creating.** As an instructor, he chose to include this language; students could not choose to avoid it. By blurring the boundaries between instructional and personal speech, SR indicated to students that his **political campaign against the "equity agenda" was more important than students' learning.**

In addition, we find that the **Allen School director has acted in a fair and balanced way** by asking two other instructors to change their land acknowledgements, which might have been alienating for conservative students. The SIC feels this is important information that complicates the notion of CS administrators as supporting one political agenda. In our view, administrators and staff acted in the interests of the students and to minimize disruption in their learning; **their objection to SR's statement was not political but**

---

[69] reges—tribalMOU.pdf

[70] https://www.washington.edu/omad/about-omad/

SER-89

**professional and pedagogical**, and they acted to make as many students as possible feel included, including conservative students.

The recommendation to include a land acknowledgement in a syllabus is not an attempt to politicize course materials; rather, these are evidence-based suggestions made by people with expertise in how people learn. Students are motivated to learn when they feel included, and land acknowledgements are suggested simply as a way to *help Native students feel a little more recognized in class*. **It is a pedagogical recommendation**. Best practices in teaching and learning are the result of scholarly research and real results obtained by experts in the field, not political grandstanding, and the events are best understood as a debate about teaching and learning.

One of the basic principles of effective teaching is to listen to and take seriously student complaints, particularly if there are many and they are made over time about the same issue. SR's refusal to consider adapting his behavior based on student feedback indicates **a lack of commitment to best teaching practices**.

We believe that SR's statement **violates Faculty Code 24-33 by trying to promote his viewpoint over and above the collective approval of the facult**y responsible for CS curriculum: "It is the responsibility of the faculty members to present the subject matter of their courses *as approved by the faculty* in their *collective* responsibility for the curriculum" (our emphasis).

We believe that **SR's statement further violates Faculty Code 24-33 because it caused sustained and serious disruption**. The Code states: "The expression of dissent and the attempt to produce change, therefore, may not be carried out in ways that injure individuals and damage institutional facilities or disrupt the classes of one's instructors or colleagues." SR's claim that there was "no disruption" is demonstrably false as it relies on a limited definition of "disrupt" to mean: speaking up in the moment. Students not only did not have the chance to engage with SR's statement in the moment (in class), they would very likely not have felt comfortable doing so even if invited. The disruption took place everywhere but in the class session itself.

We find that **UW's responses to SR's statement were consistent with Faculty Code 25-71** : "the University also has the obligation to maintain conditions which are conducive to freedom of inquiry and expression in the maximum degree *compatible with the orderly conduct of its function*s" (our emphasis). Inasmuch as the orderly conduct of functions was seriously disrupted, the UW had the right to insist that SR remove his statement, and to create another class for students to mitigate damage to learning.

The SIC finds that the **UW has not sought to sanction SR for any opinions expressed strictly outside the university** and classroom context, despite the protests of some female students who feel that he discourages women from learning coding. **His right to free speech outside the campus context has not been violated.** The UW has the right to challenge speech made within the context of its own mission (in this case, teaching), and using UW resources, in this case, e-mail, course syllabus, the classroom itself, and the Learning Management System. The line between UW and non-UW contexts was clearly crossed the moment SR used a course syllabus to make a political point. Our impression is that SR crossed this line deliberately, while also creating confusion in his interviews about the line itself. He has said he's "not

allowed to" say what he believes; however he is not making the distinction in his public statements between his personal free speech, which the UW is not supressing, and the syllabus, which is a UW document. For example, interviewed on the <u>Jason Rantz</u> show he said: "And if you're not willing to say their version of it, they won't let you say anything at all." This disregards the many forums in which SR has made his opinion clear, with no suppression from the UW.

It is the SIC's impression (backed up by SR's own interviews with partisan media) that SR included the statement as a deliberate **political stunt**, not a sincerely held belief. His intention was to escalate beyond the UW and become a figurehead for partisan politics; he was using UW resources because he knew the UW would be forced to respond. Since he had not been sanctioned by the UW for exercising his right to free speech off-campus, he escalated by involving UW students, resources, and documents. Rather than being coerced or a victim, he **created the conditions under which he knew he would be reprimanded**. Just as he did at Stanford, he **violated a policy as a way of objecting to that policy.** The Stanford events are relevant for the case under consideration at the UW, since the conduct by SR that is potentially actionable is not his expressing of a viewpoint, but his potential violation of university policy as a form of protest.

Genuine debate about land acknowledgements was not the main point. SR's statement is not a sincerely-held belief he holds, but language crafted to provoke a response which he can politicize. His mention of the "labor theory of property" is not an academic intervention he can defend with any expertise (or that he seems to believe in himself), and it has in fact been debunked by people with real knowledge of 17th-century political theory[71], indigenous land use,[72] and Native histories in the Pacific Northwest. In sum, **to present SR's one-sentence statement as a serious attempt to engage in debate is a denial of actual expertise**, the expertise of Native scholars and community members at the UW and beyond.

Ultimately, students and Native UW community members paid the price; Native well-being and student learning were, if not intended targets, at least collateral damage. SR's intention may not have been to alienate anyone; however this does not diminish the impact. It was not unreasonable for Native students to take this statement as an expression of hostility, or for non-Native students concerned about inclusion to be concerned about SR's ability to serve students from diverse backgrounds. This would have been the case whatever the course taught; the impact was even greater given that the courses, CSE 142 and 143, are gateway courses into one of the most challenging, but also professionally beneficial, majors on campus. A computer science degree is a great tool for social mobility; CS students often land six-figure salary jobs right after graduating.[73] The UW has a responsibility to the state of Washington to be an engine for social mobility for all residents. Instructors thus have a responsibility to make students of all backgrounds feel welcome and included. Computer Science already has a reputation as being unwelcoming to women and underrepresented minorities, a fact recognized by Apple CEO Tim Cook. Inasmuch as SR's statement made Native students feel "despised" (in one Native student's words), it directly works against several aspects of the UW's and the Allen School's missions[74].

---

[71] https://www.tandfonline.com/doi/full/10.1080/10848770.2017.1416766

[72] https://nfu.org/2020/10/12/the-indigenous-origins-of-regenerative-agriculture/#:~:text=Indigenous%20Americans%20practiced%20agroforestry%2C%20or,wildlife%20populations%20and%20improve%20hunting.

[73] Balazinska-notes1.doc

[74] https://www.cs.washington.edu/diversity/

Confidential

UW_Reges_0008766

Appendix: Timeline

| Date | Type | Details | Document in Team drive |
|---|---|---|---|
| | | | |
| Date | Type | Details | Document in Team drive |
| Sept 2010 | Background | MOU UW and NW regional tribes | Reges--tribalMOU |
| 2019 | Background | Compiled messages to NA re. SR's conduct and impact on student learning, esp. re. gender. Impact attributed to opinions expressed by SR *outside of UW context* as well as in class[75] | Letter_complaints2019 |
| | | | |
| Sept. 2020 | Background | Allen School best practices for inclusive teaching. LA one of a list of recommendations in spirit of inclusivity to students of multiple backgrounds[76] | Allen-School-Best-Practices... |
| Dec. 8 2021 | List-serv exchange | Ed Lazowska forwarded Atlantic article to CS listservs, critiquing LAs. MB replied requesting in-person discussions rather than on-list. SR replied w intent to include his LA in syllabus, offered to help arrange in-person discussion (no response)[77] | 1-email on Faculty Mailing List Dec 8th |
| Jan 4-5, 2022 | e-mails between MB and SR re LA in CSE143 syllabus | MB demands SR remove LA from PDF syllabus[78] SR refuses, asks why no-one wanted to discuss, asks why other LAs stay on other syllabi[79] | |

[75] "Reges' position as a Principal Lecturer impacts student experiences and learning….While Reges is in a position of great influence, his teaching directly makes engineering less accessible. ….we ask that the College not renew his position".

[76] "These are best practices worth considering as you prepare and deliver your course, so that your teaching is as effective as possible for all types of students. They have been compiled and reviewed by the Allen School Diversity Committee with input from others, including significant contributions from the Allen School Student Advisory Council. … The following can make a course syllabus more inclusive. A statement that your class welcomes all students of all backgrounds
■      An example statement: This course welcomes all students of all backgrounds. The computer science and computer engineering industries have significant lack of diversity. …
○      An Indigenous Land Acknowledgement.
■      An example statement: The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations."
https://usdac.us/nativeland/

[77] "I'm glad that Ed posted this because I have been thinking a lot about land acknowledgments. I was going to include my version (see below) on my cse143 syllabus next quarter because the Allen School lists this as a diversity best practice. But I have my doubts about whether it really is a good idea to do so. Magda doesn't want us to use these email lists to discuss topics like this and I'm happy to oblige. I would be willing to help organize an opportunity for people to get together to discuss this in person if others are interested. – Stuart. I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."

[78] "I ask that you remove the "land acknowledgment" statement from your course syllabus immediately. It is offensive and it creates a toxic environment in your course, which is a required course in our major. You are welcome to voice your opinion and opposition to land acknowledgments, as you have, in other settings. The current statement in your course syllabus is inappropriate and must be removed."

[79] "I'm disappointed that you did not discuss this with me last month when I emailed the faculty mailing list and said that I planned to include my version of the land acknowledgment on my winter syllabus for cse143. I thought it was best to get feedback before the quarter began. I mentioned that it is listed as a best practice on our diversity resource page. You had said that you didn't want to have any email discussion of it. I said that I would be happy to discuss it in person with anyone who was interested and I

| | | MB states all LAs that are not UW's LA will be removed[80] | |
|---|---|---|---|
| Jan 5, 2022 | email from MB to SR explaining her actions; SR responds<br><br>e-mail from MB to CSE143 students re LA in SR's syllabus. | MB explains actions to SR[81]<br><br>MB apologizes to students for LA in SR's syllabus, says it's been removed digitally, and invites students to submit complaints online via 3 options | 3-email thread with instructor<br><br>4-email to students on Jan 5 |
| Jan 7, 2022 | e-mail from MB to CSE143 students explaining shadow course | MB presents shadow course option [82] | 5-email to students on Jan 7th |
| Jan 6, 2022 | e-mail to news media | Copy of statement generated by Allen School , Victor Balta, Chad Allen, sent to multiple media sources. Focuses on SR's use of *syllabus* as inappropriate for political commentary; insists it's not aligned with Allen School and UW values[83] | 6-email to news media on Jan 6 |
| Jan 9 2022 | Article in mynorthwest.com | Calls SR's LA a "hilarious joke". First media article on this issue?[84] | https://mynorthwest.com/3301858/rantz-uw-admin-war-seattle-professors-land-joke/ |

even offered to help organize a meeting, but nobody responded. I have been encouraged to include a land acknowledgment. I have done that.  Now you want me to remove it because you find it offensive.  I think you need to have a consistent policy on this. Other CSE instructors have included land acknowledgments.  Are you asking them to remove theirs as well?  If not, then I don't understand the

justification for treating me differently because I have a different viewpoint on this subject." MB "I'm sorry if I missed that you actually planned to include this offensive statement in your course syllabus this quarter." SR " If you instruct all of the winter CSE instructors to remove any land acknowledgment from their  syllabus then I will comply.  But if you are asking me and only me to remove my land acknowledgment, then the answer is no"

[80] MB "I will ask any instructor who uses a land acknowledgment other than the UW land acknowledgment to remove or replace it." SR "That expresses a particular political viewpoint. If you're going to allow people to include that, then you need to allow me to include mine.MB "The statements you used are offensive and students have raised complaints. I ask you to please update your syllabus."

[81] MB: "Because the current text under "Indigenous Land Acknowledgement" in your CSE143 syllabus is causing a disruption to instruction in your class and because it is not related to the course content, it needs to be removed. Since you are not willing to make the change yourself, I have removed that section from the syllabus. I have also asked our IT team to update the syllabus on your course website. SR "You have silenced me while not silencing others because you don't approv e of my political beliefs.  That is a violation of my first amendment rights."

[82] preface to e-mail "The evening of January 6th, I spoke with a student on zoom who indicated that she was going to drop the class the next day even though that was going to have very bad ramifications for her own education" "This course offering will have one lecture section, meeting 2:30-3:20 on MWF on the time schedule. However, lectures will be pre-recorded (from Fall 2021) with the lecture time being used for synchronous Q&A."

[83] The statement Stuart Reges included in his syllabus was inappropriate, offensive and not relevant to the content of the course he teaches. The invocation of Locke's labor theory of property dehumanizes and demeans Indigenous people and is contrary to the long-standing relationship and respect the UW has with and for the Coast Salish peoples and the federally recognized tribes within the state of Washington. The Allen School and the UW reserve the right to amend academic materials in this way, as the syllabus for an intro to computer programming course is not the appropriate place or manner for a debate about land acknowledgements. Reges' statement, in fact, is not a land acknowledgement — and neither the UW nor the Allen School require a land acknowledgement to be included in a course syllabus. It first came to our attention due to student complaints and has already created a significant disruption to the academic purpose of the course.

[84] "Reges said he added his snarky land acknowledgment to make a point about the lack of ideological diversity at the UW. ...' For example, one of the questions I keep asking is, 'Do you want to include conservatives? Do you want to include people who have different ideas than your own?' And they keep saying that what inclusion means is that people like me have to be silenced so that we don't upset people that they care more about."

| Jan 11 2022 | FIRE letter to AMC | Argues that UW must be bound to First Amendment rights above all[85] | Reges_FIREletter[72748] |
|---|---|---|---|
| January-March 2022 | Complaints submitted to Allen School, College of Engineering, and BIAC | Multiple complaints, most by students, many by Engineering students, some by Native students, describing negative impact | Student Concerns USST reporting Committee Version - Winter 2022.pdf<br>Bias reports BIAC.doc (not in Team drive)<br>8 - Text of reports and comments following diversity-allies email.pdf |
| Feb 24, 2022 | e-mail from SR to diversity-allies listserv | SR forwards IHE article critical of LA, mentions plan to continue to use his own LA in Spring, on paper as harder to censor[86] | 7-email to Diversity Allies |
| Feb 25, 2022 | MB indicates that ■■ ■ ■ to post SR's e-mail | Some complaints wondered why SR's message was posted [87] | 8b – Details regarding …<br><br>Reges-censorship claims |
| c.Feb24, 2022 | Emails in response to SR post to diversity-allies | Compiled messages from ASEs, staff, and students, some anonymous, complaining about SR's post and reporting multiple bias report submissions[88] | 8-text of reports and comments … |
| Feb 25, 2022 | Bias incident report | Kayla Shuster, recruiter for Allen School, indicates recruiting Native students is harder to do due to SR's known position[89] | Bias Incident Report |
| Feb 25, 2022 | Allen School ASEs complaint | Submitted by UAW reps, claim Article 20 of their contract is violated, demand (non-specific) action[90] | |

---

[85] "UW Requires Faculty to Include the University-Selected Land Acknowledgment Statement, and No Other Statement on the Topic, in Their Syllabi" "the Allen School's requirement that faculty must use the university's chosen land acknowledgment statement or refrain from speaking on this topic in their syllabi is an impermissible viewpoint-based regulation, violating the First Amendment rights of all faculty. Second, UW's censorship of Reges's syllabus and creation of an alternative course section are retaliatory actions taken against Reges due to his views, violating his First Amendment rights."

[86] "The article explores the pros and cons of land acknowledgments and describes what happened this quarter when I included a version of the land acknowledgment on my course syllabus that the university found offensive. He also mentions my plans to continue this protest when I teach the CSE142 course in spring and will have the opportunity to distribute a syllabus on paper (more difficult to censor)."

[87] ■ ■ ■ ■ , I let Stuart's email through on the diversity-allies@ mailing list (first email below)."

[88] "If this man has an issue he should not force others to be apart of it while also hiding behind the UW name." – ■ ■ . "I had to unsubscribe from the Diversity-Allies list … announced his plans to harass more students next quarter with his inflammatory land acknowledgement. I know this person to be racist from past personal interactions" (anon). "an attack that harasses Indigenous individuals" "Mr. Reges' Land Acknowledgment Statement is reasonably attributable to the university as it is being forced on students in a required course taught by a faculty member that we are paying to teach there." (anon, compiled by Mara Stevens).

[89] "This statement caused significant disruption to the daily functioning of the Allen School. The statement had a profound emotional impact on students, as evidenced by the fact that 30% of the students in the class opted to join an additional section …the Undergraduate Student Services Team lost nearly two weeks of time for our regular duties. … by posting this in a public forum, Mr. Reges displayed a deliberate attempt to cause further disruption .. Mr. Reges was made aware that his language caused significant emotional harm to students…my primary concern is the result of these statements: his creation of a classroom where students feel unwelcome and concerned about their professor's grading integrity …I do not feel comfortable bringing students into a school where their introductory courses are taught in a way that is not conducive to learning."

[90] "We have heard from TAs who no longer feel comfortable mentioning their own views on topics related to land acknowledgements and DEI, for fear of retaliation from Stuart Reges. We have heard from other ASEs whose feelings of belonging in the Allen School have been negatively impacted by the fact that Stuart Reges' behavior has been allowed to continue." article 20: "A discrimination or harassment complaint may be filed with the University Complaint Investigation and Resolution Office (UCIRO) and/or as a grievance in accordance with Article 8 of this Agreement. Employees may also

| | | SIC received written feedback from ASEs on Aug 10[91] | |
|---|---|---|---|
| Feb 25, 2022 | MB response to ASEs | Suggests meeting. UCIRO possible route, abandoned in favor of 25-71 | 8b-details regarding… |
| Late Feb. 2022 | Associate Dean for DEI notified: Karen Thomas-Brown | Associate Dean suggests UCIRO; UCIRO abandoned[92] | 8b-details regarding… |
| March 2 | Email from MB to SR | Notification of 25-71, possible violations by SR (LA, posting to listserv, ASE complaint). Invite to meeting March 8. Notified of attendees, and right to counsel[93]  Faculty code[94] | Reges_25-71_Notification  Reges-faculty code 24-33  Reges-faculty code 25-71  RegesExecOrder31 |
| March 8, 2022 | 25-71 meeting with SR | With MB. Aileen Trilles and Dan Grossman also attended[95] | Reges-24-71 Resolution Agreement |

file discrimination complaints with appropriate federal or state agencies.  The parties agree to encourage the filing of discrimination complaints through the University Complaint Investigation and Resolution Office. … When a grievance or complaint is filed, the University will implement interim measures as appropriate. Such measures shall be designed to allow the ASE to learn and work in an environment free from discrimination. … The parties agree that all employees should be free from everyday exchanges—including words and actions—that denigrate or exclude individuals based on their membership in a group or class. – article 20"

[91] "Professor Reges' statement made us realize that there are senior and influential people in our workplace environment who are working against a diverse, equitable, and inclusive workplace environment." "Stuart Reges' actions significantly derailed [TAs'] attempts at the start of the quarter to build an inclusive environment for students from all backgrounds" "Another significant impact was increased workload throughout the quarter."

[92] "The Associate Dean for Diversity, Equity, and Inclusion in the College of Engineering, Dr. Karen Thomas-Brown, plans to forward the contact information of those who submitted complaints last week to UCIRO" "First, the associate dean for DEI said that she was going to send all the complaints to UCIRO. Then I learned that we were supposed to go with the 25-71 process instead, so the UCIRO piece was canceled."

[93] "your conduct in course instruction and in email communications using university resources which may be a violation of University policies.  The allegations, if true, may constitute a violation of Executive Order 31, which prohibits discrimination or harassment against a member of the University community.  The allegations, if true, may also constitute a violation of Faculty Code Sections 24-33 and 25-71A and UW's policy on providing a safe workplace.  The possibility of an unwelcome, hostile or offensive academic environment may also arise if the faculty member fails to separate clearly personal interests from his or her professional decision-making. In addition, these actions may also constitute a violation of the collective bargaining agreement, Article 20: Non-Discrimination and Harassment, between the University of Washington and the United Auto Workers.…Unwelcome and unsolicited language or conduct that is of a personal/non-technical nature and that is sufficiently severe, persistent, and pervasive that it could reasonably be expected to create an intimidating, hostile, or offensive working or learning environment. …I have asked CoE Human Resources Director Aileen Trilles and Professor and Vice Director Dan Grossman to attend.  Due to the nature of these allegations, it is imperative that we hold this meeting as soon as possible.
Under Section 25-71.B of the Faculty Code, you have the right to bring one person with you to this meeting.  "

[94] "the right to academic freedom and the right to examine and communicate ideas by any lawful means even should such activities generate hostility or pressure against the faculty member or the University. Their exercise of constitutionally protected freedom of association, assembly, and expression, including participation in political activities, does not constitute a violation of duties to the University, to their profession, or to students and may not result in disciplinary action or adverse merit evaluation. … make it clear that when one is speaking on matters of public interest, one is not speaking for the institution … an obligation to respect the dignity of others .. The expression of dissent and the attempt to produce change, therefore, may not be carried out in ways that injure individuals and damage institutional facilities or disrupt the classes of one's instructors or colleagues. .. to present the subject matter of their courses as approved by the faculty in their collective responsibility for the curriculum. Within the approved curriculum, faculty members are free to express ideas" 24-33
University also has the obligation to maintain conditions which are conducive to freedom of inquiry and expression in the maximum degree compatible with the orderly conduct of its functions 25-71

[95] the department chair or the dean in a non-departmentalized school or college shall fully inform the faculty member of the nature and specific content of the alleged violation and shall offer to discuss the alleged violation with the faculty member and

| | | | Reges-faculty code 25-71 |
|---|---|---|---|
| March 9, 2022 | Email from MB to SR following March 8 25-71 meeting; | MB attaches a written summary of the meeting; Proposals: SR act respectfully, remove LA from syllabus, refrain from retaliation [96] | Reges_25-71_ResolutionAgreement |
| March 10, 2022 | SR's response to MB (DG and AT copied) | SR responds declining the resolution proposed.[97] | 9-Reges response to letter .. |
| March 28, 2022 | Email from Native faculty and staff | 20 signatories, point out larger context of alienation of Native people at UW, ask that UW honor MOU (e.g. hiring)[98] | EMAIL_Native faculty and staff statement |
| March 31, 2022 | Email from SR to diversity_allies | Compilation of LAs on CSE syllabi E-mail was rejected MB noted that SR used Allen School letterhead, SR agreed to change[99] | Reges-censorshipclaims |
| April 21, 2022 | NA informs SR that formal charges will be brought | (information gathered from FIRE Complaint) | Complaint |
| | | | |
| July 11, 2022 | Charge letter to SIC | Per faculty code 25-71.D.3, for information gathering and advising dean on interpretation [100] | FINAL_Charge letter to SIC... |
| July 11-Aug 24 | Activity of SIC | Reading initial materials, research into context, requesting and reviewing additional documentation, interviewing affected parties, writing reports | All documentation in Teams Drive |
| July 13, 2022 | FIRE lawsuit filed | For SR, suing AMC, NA, MB and DG Claims: free speech violated, EO31 impermissibly vague | Complaint |
| July 20, 2022 | First (teams) meeting of SIC | Subsequent meetings July 26, Aug 3, 17, 19 | |

with the party raising the issue. The faculty member and the party raising the issue may each be accompanied by one person." 25-71

[96] "Demonstrates respect toward all … If expressing dissent or attempting to produce change in the workplace, do so in a way that remains respectful to all, .. You agree not to include the statement that you have called your version of the land acknowledgment that was published in the CSE 143 Winter 2022 online course syllabus in the online and print copy of the CSE 142 Spring 2022 syllabus or in other future course syllabi. .. You agree that you will avoid any retaliation. .. If you prefer not to accept this agreement by that date, which is your decision, we will then proceed with next steps in accordance with the Faculty Code".

[97] "Thank you for taking the time to put your proposed resolution in writing. I respectfully decline the offer."

[98] "..alienates Indigenous students from his classes. .. is not conducive to learning; at least one of the Native CSE students has taken a leave of absence because of the alienation experienced related to Reges' statement. Students in and beyond Engineering have confided in us during our classes and at events on campus that they are deeply upset and emotionally impacted by Reges' statement." "The MOU states that priorities include enhancing "efforts to recruit, retain, and successfully graduate more American Indian undergraduate, graduate, and professional students." Both Reges' original action and the silence of the UW are negatively impacting our ability to recruit, retain, and successfully graduate these students. This instructor's actions take place in a larger context of UW campus alienation of our Native community, which continues to manifest in myriad ways."

[99] MB: "Additionally, we noted that the page you created is formatted differently  from your website. It is designed to appear as an official Allen School  page. It is not. I ask you to remove the UW and Allen School logos from that  page." SR: "I agreed with the desire not to include the Allen School logos, so I immediately changed the form of the web page to make it clear that it comes from me personally and not from the Allen School."

[100] "Because meetings held in accordance with Faculty Code Sections 25-71.B and 25-71.D have failed to result in a mutually agreeable resolution, I am initiating Faculty Code Section 25-71.D.3." "a special investigating committee of three faculty members who are not directly involved in the matter being considered. The committee shall assist the dean in the informal and confidential gathering of information and documentation and shall advise the dean in its interpretation."

| Aug 2022 | Series of interviews | between SIC and affected parties (identified from written documentation). Interviewing suspended on Aug 24 | Interviews.docx |
| Aug 9, 2022 | SIC meeting with Lincoln Johnson | Associate VP, Student Life, and Co-Chair of UW Bias Incident Advisory Committee (BIAC). | SICmeetingsummary_Lincoln Johnson |
| Aug 12 | SIC invitation to Reges to interview | e-mail from SIC sent by Steve Muench | |
| (Aug 16) | (Reges declined to interview) | Reply to e-mail by SR | |
| Aug 12 | SIC meeting with ▮▮▮ | Student in CS143 in Winter 2022[101] | SICmeetingsummary_▮▮▮ |
| Aug 12 | SIC meeting with Crystal Eney | Director of Student Services, CSE[102] | CrystalEneyInterviewNotes |
| Aug 17 | SIC meeting with Casey Wynecoop | Assistant Director of Intellectual House, Office of Minority Affairs & Diversity | CaseyWynecoop_SICmeetingsummary |
| Aug 19 | SIC meeting with Magdalena Balazinska | Director of CSE[103] | Balazinska notes-1 (not uploaded to Teams before suspension of activity) |
| Aug 19 | SIC meeting with faculty and staff of CAIIS | Center for American Indian & Indigenous Studies, 4 interviewees [104] | CAIIS meeting summary |
| Aug 23 | SIC meeting with Chad Allen | Associate Vice Provost for Faculty Advancement [105] | ChadAllenSICInterviewnotes (not uploaded to Teams before suspension of activity) |

---

[101] Reges's behavior shows an "an inability to accept opposing points of view and therefore be an effective instructor for all." "Reges was 'playing games with [her] education', 'trying to start something'."

[102] "objects to the sheer number of hours her team has to spend every time Stuart writes an article or does something in his class. Her team must address the fallout. Essentially, her team must respond to Stuart's behavior on behalf of the department. Despite all the productive work they can do to make students feel more included and to create a climate of acceptance, one comment from Stuart can undo the whole thing."

[103] "The number of complaints about the "land acknowledgement" was unprecedented, the largest number ever about a class." "CS 142 is a key class, it is taken when students are still deciding on their major. It is important that all students feel … supported in it." "There were two incidents in winter 2022 in which faculty did their own land acknowledgements the content of which she felt were over the top. She suggested that the wording be changed and toned down, so that conservative students would not take offense. She raised the issue, talked to the instructors in question, and they toned down their wording. The instructors were Kevin Lin and Lauren Bricker." "she got a threatening call at home about this matter, and contacted the police."

[104] "… events happened in general context of navigating discrimination on daily basis, and doing the work of healing. … They are also trying to create a healthy space for Native students to be scholars and thrive. Even having one Native student in engineering is a big success, given the structural and other obstacles against them. Fragile progress which can be undone by events like this. There are severe ripple effect in science and STEM, and UW broadly. In general, this signals to Native community that STEM is not for them (Reges's classes are gateway/"culling" classes for most engineers). Also sends message that UW is not a safe place to go. The UW claims that it's a safe space for all; Reges is overtly working against that." "[They] Wanted not to give SR more power by responding, but still required a lot of time and emotional labor." "SR was not only being deliberately racist and offensive,  but also denying the actual expertise and scholarship of Native scholars. (Dismissing them both as people with lived experience, and with academic knowledge). Land rights, stewardship etc. are things that are engaged in a critical way, and SR was advancing a view that was not even a substantial academic claim. It's disinformation and propaganda; a political posture that shouldn't be masquerading as critical thinking. Also, his definitions of "labor" amplify racist definitions of Native cultures and histories, shoring up stereotypes that inflict harm on Native people today  - including their exclusion from academic spaces." "If [students'] only option is to take a class with someone who has gone to the trouble of including hateful statements about their very identity, this will of course compromise their education and their future."

[105] "It was a stunt." "Stuart Reges doesn't know what he's talking about, he's creating violent environment for Native students." "issue about denigrating Native people … already hard to recruit Native students … generational trauma, getting to college is a huge deal" "one of criteria of teaching is creating welcoming environment – he's not meeting criteria if he can't do that."

SER-97

| Aug 24, 2022 | SIC activities put on hold | e-mail from NA to SIC members | |
| Sept 28 | SIC activities resumed | e-mail from Aileen Trilles to SIC members | |

NA    Nancy Albritton, Dean of Allen School

MB    Magdalena (Magda) Balazinska, DIrector of Allen School

SR    Stuart Reges, Teaching Professor of Computer Science and Engineering

LA    Land Acknowledgement

AMC    Ana Mari Cauce, UW President

DG    Dan Grossman, Vice-Director of Allen School

Confidential

UW_Reges_0008773

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

STUART REGES,
     *Plaintiff,*

    v.

ANA MARI CAUCE, in her official
capacity as President of the University
of Washington;

MAGDALENA BALAZINSKA, in her
official and individual capacities as
Director of the Paul G. Allen School of
Computer Science & Engineering;

DAN GROSSMAN, in his official and
individual capacities as Vice Director of
the Paul G. Allen School of Computer
Science & Engineering; and

NANCY ALLBRITTON, in her official
and individual capacities as Dean of
the College of Engineering,
     *Defendants.*

CASE NO.    2:22–cv–00964–JHC

**AMENDED COMPLAINT FOR
CIVIL RIGHTS VIOLATIONS**

JURY DEMAND

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

JAMES M. DIAZ*
VT Bar No. 5014
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street
Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
jay.diaz@thefire.org

GABRIEL WALTERS*
DC Bar No. 1019272
JOSHUA T. BLEISCH*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
Tel: (215) 717-3473
gabe.walters@thefire.org
josh.bleisch@thefire.org

*Admitted *Pro Hac Vice*

ROBERT A. BOUVATTE, JR.
WA Bar No. 50220
ROBERT A. BOUVATTE, PLLC
P.O. Box 14185
Tumwater, WA 98511
Tel: (564) 999-4005
bob@rbouvattepllc.com

AMENDED
COMPLAINT – Page ii

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

SER-100

# TABLE OF CONTENTS

Page(s)

INTRODUCTION .................................................................................................. 1

JURISDICTION AND VENUE ............................................................................ 5

THE PARTIES ...................................................................................................... 6

FACTUAL ALLEGATIONS ................................................................................ 8

    Professor Reges Challenges the University of Washington's
    Prescribed Land Acknowledgment Statement in His Syllabus. ........................ 9

    Defendants Punish Professor Reges for His Use of the
    Dissenting Land Acknowledgment Statement. .............................................. 12

    Defendants Continue to Threaten Professor Reges with
    Disciplinary Action for His Inclusion of the Dissenting Land
    Acknowledgment Statement in His Syllabus. ................................................ 20

    Defendants Withheld Professor Reges's 2022–23 Salary Increase
    During the Pendency of Their Disciplinary Process Against Him. ................. 22

    Defendants' Actions Deprived Professor Reges of His Rights,
    Causing Financial, Emotional, and Reputational Damage. ........................... 23

FIRST CAUSE OF ACTION
Violation of Plaintiff's First Amendment Rights
(Against All Individual-Capacity Defendants) ........................................................ 25

SECOND CAUSE OF ACTION
First Amendment Retaliation Under 42 U.S.C. § 1983
(Against All Individual-Capacity Defendants) ........................................................ 28

THIRD CAUSE OF ACTION
First Amendment Retaliation Under 42 U.S.C. § 1983
(Against All Defendants in Their Official Capacities) .............................................. 30

FOURTH CAUSE OF ACTION
Facial Overbreadth Challenge to Executive Order 31
(Against President Cauce in Her Official Capacity) ................................................. 32

FIFTH CAUSE OF ACTION
Facial Vagueness Challenge to Executive Order 31
(Against President Cauce in Her Official Capacity) ................................................. 34

AMENDED
COMPLAINT – Page iii

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

SER-101

PRAYER FOR RELIEF ................................................................ 36

DEMAND FOR JURY TRIAL ...................................................... 37

AMENDED
COMPLAINT – Page iv

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

**INTRODUCTION**

1.      Stuart Reges, an award-winning educator at the University of Washington, is suing the University of Washington and its administrators to vindicate his well-established First Amendment rights. After the University encouraged professors to include a political statement on their course syllabi, it disciplined and investigated Professor Reges and continues to threaten him with further discipline for expressing a dissenting view.

2.      In September 2020, University administrators encouraged professors to include a statement on their syllabi recognizing that the land on which the University sits was once owned by indigenous people. Professor Reges disagreed with the University's "Indigenous Land Acknowledgment Statement."

3.      Because syllabi are an integral part of the teaching and construction of a college course, Professor Reges included a dissenting statement on his syllabus which challenged his students and fellow faculty to think about the utility and performative nature of land acknowledgment statements. To that end, Professor Reges's land acknowledgment stated that indigenous tribes "can claim historical ownership of almost none of the land" on which the University sits, based on philosopher John Locke's well-known labor theory of property, under which ownership derives from improving the land.

4.      University administrators punished Professor Reges for his statement, asserting that it caused a "disruption to instruction." To the contrary, Professor Reges reviewed his syllabus on the first day of class without incident.

AMENDED
COMPLAINT – Page 1

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

5.     The University created a "shadow" class section of Professor Reges's computer programming course—taught by a different professor, on tape—and invited students to switch out of Professor Reges's class section.

6.     Meanwhile, other computer science professors included their own land acknowledgment statements on their syllabi. But the University did not investigate or punish them because those statements, unlike that of Professor Reges, were consistent with the University's viewpoint.

7.     In addition, the University opened a protracted disciplinary investigation into Professor Reges in which the Defendants assembled a disciplinary committee to investigate and advise Dean Albritton in deciding whether to further punish or even terminate Professor Reges because of the views he expressed in his dissenting statement.

8.     After a nearly year-long disciplinary investigation, Dean Albritton concluded that she would not further punish Professor Reges at that time. However, she warned him that if he continues to include his land acknowledgment in his course syllabi, and it leads to "further" disruption, she would punish him. She warned him that she would "have no option but to conclude" that his "intent is to cause deliberate offense" and that she would "view that as an intentional violation" of the University's discrimination and harassment policy. This ongoing specter of punishment, up to and including termination, had and continues to have a chilling effect on Reges's speech as a public university faculty member.

AMENDED
COMPLAINT – Page 3

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

9.     The University has taken these actions despite settled law that holds public university faculty have a First Amendment right to speak on matters of public concern in their teaching and research because academic freedom is "a special concern of the First Amendment[.]" *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Faculty must remain free to express these views to fulfill their duties to educate and challenge students, and to avoid a "pall of orthodoxy" on campus. *Id.*

10.     The value and utility of land acknowledgment statements exemplify such a matter of public debate. Defendants asked their faculty to wade into this controversy by including a land acknowledgment statement in their syllabi, then unconstitutionally discriminated against Professor Reges for swimming against the current and offering a dissenting viewpoint. They did so by retaliating against him through the creation of a "shadow" class section and subjecting him to a disciplinary investigation under vague and overbroad university policies.

11.     Specifically, Defendants alleged Reges violated various University policies, including one that purports to ban any speech or conduct that is deemed "unacceptable or inappropriate," regardless of whether it rises to the level of unlaw-ful discrimination or harassment. Judged in relation to its legitimate sweep, which is minimal, this policy is unconstitutionally overbroad and vague.

12.     Academic freedom is of "transcendent value" to our constitutional tradition. *Id.* To safeguard that value, faculty like Professor Reges must remain free to express their views without retaliation or censorship.

AMENDED
COMPLAINT – Page 4

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

## JURISDICTION AND VENUE

13.     This action arises under the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

14.     Plaintiff seeks declaratory and injunctive relief against Defendants in their official capacities, including a ruling that Defendants are retaliating against him for protected academic speech in violation of his First Amendment rights. Plaintiff also seeks to enjoin Defendants from pursuing any disciplinary action based on his use of a dissenting land acknowledgment statement in his syllabus and from enforcing the University's unconstitutionally vague and overbroad policy governing faculty expression. Finally, Plaintiff seeks compensatory damages against Defendants Director Balazinska, Vice Director Grossman, and Dean Allbritton in their individual capacities for violating his clearly established right to speak freely in his teaching and academic writing.

15.     Accordingly, this Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because at least one of the Defendants resides in this District, and because all Defendants are residents of the State of Washington.

17.     Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Professor Reges's claims

AMENDED
COMPLAINT – Page 5

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

occurred in King County, Washington, which is located in the Seattle Division of the Western District of Washington.

**THE PARTIES**

**Plaintiff**

18.     Plaintiff Stuart Reges is a citizen of the United States and a resident of Seattle, Washington.

19.     For the last four decades, Professor Reges has focused on introductory instruction in computer science and programming, developing and running introductory programs at several universities.

20.     Since 2004, Professor Reges has been a faculty member at the University of Washington in the Paul G. Allen School of Computer Science & Engineering (Allen School).

21.     In addition to being an acclaimed teacher, Professor Reges has a long history as an advocate for free speech, especially for the right to express dissenting viewpoints. He has spoken publicly in local and national media about his struggle with identity and mental health as a gay man in the 1970s and 1980s. And when he was a professor at Stanford University in the early 1990s, he publicly criticized the War on Drugs. Stanford responded to this criticism by firing him.

22.     At all times relevant to this Complaint, the University of Washington employed Reges as a Principal Lecturer, or Teaching Professor, in the Allen School.

23.     Professor Reges is suing in order to vindicate his constitutional rights.

AMENDED
COMPLAINT – Page 6

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

**Defendants**

24.     Defendant Ana Mari Cauce is the President of the University of
Washington "authorized to act for the Board of Regents in formulating, prescribing
and issuing rules, regulations, and executive orders not inconsistent with the
Bylaws, Standing Orders, Regent Policies, and other orders of the Board and
applicable state law for the immediate government of the University." Bd. of
Regents Governance, Ch. 1. Defendant Cauce has been President of the University
of Washington since 2015. Twice during her tenure (in July of 2016 and August of
2020) she renewed "Executive Order 31," the source of the University's authority to
impose disciplinary or corrective action for conduct deemed "unacceptable" or
"inappropriate." She is sued in her official capacity.

25.     Defendant Magdalena Balazinska is the Director of the Paul G. Allen
School of Computer Science & Engineering at the University of Washington. She
ordered Professor Reges to remove his land acknowledgment statement from his
syllabus; created a "shadow" class section that met at the same time as Professor
Reges's class; and initiated the disciplinary investigation of Professor Reges for his
statement, all in violation of his constitutional rights. She is sued in both her official
and individual capacities.

26.     Defendant Dan Grossman is the Vice Director of the Paul G. Allen
School of Computer Science & Engineering at the University of Washington. By
participating in Professor Reges's first disciplinary meeting, creating a "shadow"
class section that met at the same time as Professor Reges's class, and assisting in

AMENDED
COMPLAINT – Page 7

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

1    the disciplinary investigation into Professor Reges, Vice Director Grossman is

2    responsible for violating Professor Reges's constitutional rights. He is sued in both

3    his official and individual capacities.

4        27.    Defendant Nancy Allbritton is the Dean of the College of Engineering

5    at the University of Washington. She oversees the Allen School, which is situated

6    within the College of Engineering. She charged Professor Reges with a disciplinary

7    violation under Faculty Code Section 25-71, which governs alleged violations of

8    University policy and empowers the Dean to file formal statements of charges that

9    can lead to dismissal, reduction of salary, or suspension. Dean Allbritton also

10   assembled a faculty disciplinary committee that reviewed those charges. Upon

11   conclusion of the committee's review, Dean Allbritton warned Professor Reges that

12   if he continued to include his dissenting land acknowledgment statement in his

13   course syllabi and it causes what she deems "further" disruption, she would

14   conclude he intentionally violated University discrimination and harassment policy.

15   She is sued in both her official and individual capacities.

**FACTUAL ALLEGATIONS**

17       28.    In 2011, the University of Washington awarded Professor Reges the

18   Distinguished Teaching Award, given to only seven professors each year based on

19   their subject matter expertise; enthusiasm and innovation in teaching and learning;

20   "ability to inspire independent and original thinking in students"; innovations in

21   course and curriculum design; and mentoring.

23   AMENDED
     COMPLAINT – Page 8

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

29.     Professor Reges regularly receives very positive reviews from his

students.

***Professor Reges Challenges the University of Washington's Prescribed Land Acknowledgment Statement in His Syllabus.***

30.     In a document called the "Allen School best practices for inclusive

teaching," the Allen School suggests professors "make [their] course syllabus more

inclusive" by including an "Indigenous Land Acknowledgment Statement."

31.     The Allen School recommends that professors include the following

"example" land acknowledgment statement: "The University of Washington

acknowledges the Coast Salish peoples of this land, the land which touches the

shared waters of all tribes and bands within the Suquamish, Tulalip and

Muckleshoot nations."

32.     The University Office of Minority Affairs and Diversity's webpage

states that the University's Tribal Liaison developed the land acknowledgment

statement "over the course of several years" and that among other uses it "is spoken

by [University] leadership during events to acknowledge" the view "that our campus

sits on occupied land."

33.     On December 8, 2021, a faculty member emailed an article titled *'Land

Acknowledgments' Are Just Moral Exhibitionism* to the Allen School's "diversity-

allies" listserv.

34.     Professor Reges replied to the email stating he had been "thinking a lot

about land acknowledgments" and offering to organize a group discussion on the

topic. He also shared the land acknowledgment statement he intended to include in

AMENDED
COMPLAINT – Page 9

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

his syllabus for his upcoming Winter quarter 2022 class: "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."

35.    Subsequently, Professor Reges included this land acknowledgment statement on the syllabus for his Computer Science and Engineering 143: Computer Programming II class, which the Allen School assigned him to teach during the Winter 2022 quarter.

36.    Other computer science professors also included modified land acknowledgment statements on their syllabi. These statements were consistent with, but not always identical to, the Allen School's recommended statement.

37.    On January 4, 2022, the day after Professor Reges's Computer Science and Engineering 143 class met for the first time, Defendant Balazinska, Director of the Allen School, sent Professor Reges an email ordering him to remove the statement from his syllabus because it was "offensive" and created a "toxic environment."

38.    In his reply email, Professor Reges refused to remove the statement, and questioned why the Allen School was ordering him to delete his dissenting land acknowledgment statement from his syllabus while allowing other faculty to include modified statements in their syllabi that were more consistent with the University's recommended statement.

AMENDED
COMPLAINT – Page 10

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

39.     Director Balazinska responded to Professor Reges by stating she would "ask any instructor who uses a land acknowledgment other than the [University of Washington] land acknowledgment to remove or replace it."

40.     Director Balazinska then unilaterally removed Professor Reges's dissenting land acknowledgment statement from the syllabus as it appeared on the University's class portal, an online site where students can find syllabi, class materials, and assignments.

41.     Director Balazinska also emailed Professor Reges's students to apologize for his "offensive" statement, and to provide three ways students could file complaints against Professor Reges.

42.     Despite Director Balazinska's response, other faculty at the Allen School continue to include land acknowledgment statements in their syllabi that differ from the University's own statement, so long as they express a viewpoint consistent with the University's recommended version.

43.     Thus, professors who agree with the University's viewpoint are free to include or to modify the recommended land acknowledgment statement, but faculty like Professor Reges who express a dissenting viewpoint are not.

44.     In her email response, Director Balazinska also claimed that Professor Reges's syllabus was "causing a disruption to instruction in [his] class."

45.     Director Balazinska did not provide Professor Reges any examples of disruption to instruction in his class.

AMENDED
COMPLAINT – Page 11

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

46.     In fact, no actual disruption of Professor Reges's class occurred. Professor Reges taught his first class of the Winter quarter on January 3, 2022, without incident and continued to teach nearly 400 students through the end of the quarter on March 18, 2022.

47.     During the Winter 2022 quarter, Professor Reges also helped to mentor a group of students who won a computer programming contest for the first time in several years.

### *Defendants Punish Professor Reges for His Use of the Dissenting Land Acknowledgment Statement.*

48.     On January 4, 2022, Defendant Balazinska sought to initiate a disciplinary process against Professor Reges under Faculty Code Section 25-71, which establishes a procedure for disciplining faculty following an allegation that the faculty member has violated University policy. This procedure "might lead to dismissal, reduction of salary, or suspension for more than one quarter." Defendant Balazinska contacted the University of Washington College of Engineering senior director of human resources to determine next steps if Professor Reges did not agree to remove his dissenting statement from his syllabus. In response, the senior director of human resources prepared a draft notification letter under Section 25-71 that day alleging that Professor Reges had violated multiple University policies.

49.     On January 7, 2022, Director Balazinska announced to all students in Professor Reges's Computer Science and Engineering 143 class section that they may switch into a new "shadow" class section, which would meet at the same time as Professor Reges's class section.

AMENDED
COMPLAINT – Page 12

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

50. The Allen School assigned a different professor to instruct this "shadow" class section. During the Winter 2022 quarter, that professor instructed the class using recorded lectures instead of live class sessions.

51. In a January 9, 2022, email to a news network, Director Balazinska criticized Professor Reges's "invocation of Locke's labor theory of property" in his syllabus on the asserted ground that it "dehumanizes and demeans Indigenous people." Jason Rantz, *Rantz: UW administrator goes to war over Seattle professor's hilarious land acknowledgment joke*, KTTH (Jan. 9, 2022), https://mynorthwest.com /3301858/rantz-uw-admin-war-seattle-professors-land-joke/ [https://perma.cc/EKP9-A4L4].

52. Defendant Balazinska created the "shadow" Computer Science and Engineering 143 class section to punish Professor Reges for including his land acknowledgment statement in his syllabus.

53. Approximately 170 students out of over 500 students (or around 30% of Professor Reges's class) switched to the new "shadow" class section.

54. Professor Reges continued teaching the other 70% of his students who remained in his class through the end of the Winter 2022 quarter without disruption or any other issues. He successfully administered the final exam and distributed grades.

AMENDED
COMPLAINT – Page 13

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

55.     On January 11, 2022, the Foundation for Individual Rights and Expression (FIRE)[1] sent President Cauce a letter urging the University to ensure that faculty are free to decide whether and how to address the topic of land acknowledgments in their syllabi and making clear that punishing faculty for differing viewpoints by investigating them and creating new course sections violates the First Amendment.

56.     Despite a flurry of edits and comments, by some point in January or February 2022, Defendant Balazinska chose not to finalize or send the draft version of the January 2022 25-71 letter, believing that the matter had been resolved by the creation of the "shadow" section of Computer Science and Engineering 143. She would revisit that decision after February 23, 2022.

57.     On February 23, 2022, Professor Reges sent an email to the Allen School's "diversity-allies" listserv, which is available to all students and faculty in the Allen School, in which he expressed his intent to again include his own version of a land acknowledgment statement on his Spring quarter syllabus.

58.     University administrators monitor the Allen School's "diversity-allies" listserv and review incoming messages before they are distributed to recipients.

59.     Defendant Balazinska reviewed Professor Reges's February 23, 2022, email and allowed it to pass through to the Allen School's "diversity-allies" listserv.

---

[1] Formerly known as the Foundation for Individual Rights in Education, FIRE has since expanded its mission to include protecting expressive rights outside of higher education.

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

60.     On March 2, 2022, Director Balazinska sent Professor Reges a notice letter under Faculty Code Section 25-71 that called him to a meeting to discuss allegations that "may, if true, constitute a violation of" several University policies, including University of Washington Executive Order 31.

61.     Executive Order 31 provides "the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation."

62.     Executive Order 31 applies to all members of the University of Washington community, including academic personnel and students.

63.     The notice letter cited three broad allegations against Reges  relating to his land acknowledgment statement. The letter cited: (1) Professor Reges's land acknowledgment statement; (2) Professor Reges's email to the "diversity-allies" listserv that included his land acknowledgment statement; and (3) an allegation from representatives of the student employee union that his actions violated their collective bargaining agreement with the University.

64.     On March 8, 2022, Professor Reges met with Defendants Director Balazinska and Vice Director Dan Grossman.

65.     During the March 8 meeting, Director Balazinska informed Professor Reges of the allegations against him and that she expected faculty to "interact respectfully" and create a "welcoming," "professional," and "positive" environment.

AMENDED
COMPLAINT – Page 15

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

66.     At that meeting, Director Balazinska also said if Professor Reges continued to use his land acknowledgment statement, she expected to receive more complaints, and she considered those complaints to be a disruption to the delivery of instruction.

67.     During the meeting, Professor Reges also asked Director Balazinska to confirm that he would not be in violation of University policy if he included the University's *own* land acknowledgment on future syllabi. Director Balazinska could not confirm this.

68.     Director Balazinska also indicated that if students were to complain about him including the University's land acknowledgment statement on his syllabus, Professor Reges may be in violation of University policy.

69.     Director Balazinska also could not confirm whether any of Professor Reges's students submitted the complaints, or whether they originated from other University students who heard about the controversy.

70.     On March 9, 2022, Director Balazinska provided Professor Reges with a proposed resolution to the charges against him, which is the first step to resolving alleged faculty policy violations under University of Washington Faculty Code 25-71.B. The proposed resolution would have required Reges to, among other things, "interact with peers, staff, and students in a way that demonstrates respect toward all" and "create[] and maintain[] a professional, positive, and welcoming environment."

AMENDED
COMPLAINT – Page 16

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

71.     The proposed resolution Director Balazinska provided would also require Professor Reges to "agree not to include . . . [his] version of the land acknowledgment that was published in the [Computer Science and Engineering] 143 Winter 2022 online course syllabus in . . . future course syllabi."

72.     Reges declined the proposed resolution the next day.

73.     On March 18, 2022, Nancy Allbritton, Dean of the University of Washington College of Engineering, emailed Professor Reges to set up a meeting "pursuant to [Faculty Code] Section 25-71.D," which is the second step in the faculty disciplinary process.

74.     University Faculty Code Section 25-71.D governs "alleged violation[s]" of University policy and empowers the Dean to determine whether "the alleged violation is of sufficient seriousness to justify consideration of the filing of a formal statement of charges that might lead to dismissal, reduction of salary, or suspension for more than one quarter."

75.     On March 25, 2022, Professor Reges, represented by FIRE Staff Attorney Katlyn Patton, met with Dean Allbritton as part of the second step in the faculty disciplinary process.

76.     At the March 25, 2022, disciplinary meeting, Dean Allbritton asked Reges to speculate as to how students felt about his land acknowledgment statement, and why the students who moved into the "shadow" class section chose to do so.

AMENDED
COMPLAINT – Page 17

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

77.     Professor Reges reiterated that he continued to teach hundreds of students who remained in his class section through the end of the Winter 2022 quarter without issue or disruption, despite the opportunity to join the "shadow" class.

78.     Dean Allbritton concluded the meeting by telling Professor Reges she aimed to make the best decision possible concerning the investigation, but could not guarantee a time period in which she would make that decision or a date that the investigation would conclude.

79.     Professor Reges followed through and included his dissenting land acknowledgment statement on his Spring 2022 class syllabi for Computer Science and Engineering 142 and a new C++ programming course for students who are not Computer Science majors.

80.     Director Balazinska and the Allen School again scheduled a competing section of Professor Reges's Computer Science and Engineering 142 class for the Spring 2022 quarter.

81.     On April 21, 2022, Dean Allbritton notified Professor Reges she intended to proceed with formal charges against him.

82.     Dean Allbritton also told Professor Reges she would convene a special investigating committee to "look into this matter" under University Faculty Code Section 25-71.D.3 and that she was in the process of selecting the members of the committee.

AMENDED
COMPLAINT – Page 18

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

83.     On May 19, 2022, Dean Allbritton told Professor Reges she was still "in the process of assembling the committee."

84.     On June 9, 2022, Dean Allbritton told Professor Reges that the "process of assembling the committee has taken some time," that the University has "identified potential members" of the committee, and it is "in the process of gathering their acceptance[s] to serve on the committee."

85.     By July 11, 2022, Dean Allbritton had identified three faculty members to serve on the special investigating committee.

86.     On July 11, 2022, Dean Allbritton formally charged the special investigating committee to begin its investigation of Professor Reges. The charge letter was based solely upon Professor Reges's dissenting land acknowledgment statement and, at most, five written complaints from faculty, staff, and students reacting to it. Dean Allbritton described the charge letter to the special investigating committee as "confidential" and did not provide a copy to Professor Reges at that time.

87.     Professor Reges commenced this lawsuit on July 13, 2022.

88.     On August 25, 2022, Dean Allbritton told Professor Reges that the special investigating committee's activities "have been placed on hold," without providing a reason.

89.     When Professor Reges asked Dean Allbritton for her reason for pausing the special investigating committee's work, she declined to provide one.

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

90.     On September 28, 2022, the senior director of human resources wrote to the members of the special investigating committee, copying Dean Allbritton, to inform them that the investigation was no longer on hold and to ask them to report orally to the Dean as soon as possible.

91.     Neither Dean Allbritton nor any other University administrator informed Professor Reges that the special investigating committee was resuming its investigation of him.

**_Defendants Continue to Threaten Professor Reges with Disciplinary Action for His Inclusion of the Dissenting Land Acknowledgment Statement in His Syllabus._**

92.     On June 13, 2023, eleven months after the investigation into Professor Reges began, Dean Allbritton wrote to inform him of the investigation's conclusion and to notify him of "the determinations made as a result of that process."

93.     Dean Allbritton's letter claims that Professor Reges's dissenting land acknowledgment statement "created an immediate and significant disruption to the University teaching environment." To support that conclusion, Dean Allbritton vaguely cites "numerous student and staff complaints," without providing the number of complaints.

94.     Dean Allbritton wrote that she would not impose further sanctions, but "if [Professor Reges] include[s] this statement in the future, and if that inclusion leads to further disruption, I will have no option but to . . . view that as an intentional violation of Executive Order 31, as well as Section 24-33 of the Faculty Code."

AMENDED
COMPLAINT – Page 20

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

95.     Dean Allbritton's reference to "disruption" means that as little as a single complaint from a student or staff member about the content or viewpoint of Professor Reges's dissenting land acknowledgment statement could be enough to resume the disciplinary process.

96.     Dean Allbritton, in her letter, claimed Professor Reges's dissenting land acknowledgment statement caused complaints and believes the statement "will likely continue to do so when included in a purely academic setting, such as on a syllabus or in connection with the teaching of computer science courses."

97.     The only way Professor Reges can avoid further adverse employment action is to remove his dissenting land acknowledgment statement from his syllabi.

98.     As with the Winter 2022 quarter, Professor Reges taught his Spring 2022, Fall 2022, Winter 2023, and Spring 2023 classes without a single in-class disruption.

99.     Professor Reges received positive student reviews for the Spring 2022, Fall 2022, Winter 2023, and Spring 2023 quarters, including in response to the question of whether students feel welcomed and respected in his class.

100.    Professor Reges was and remains able to teach his classes notwithstanding his decision to challenge the University's land acknowledgment statement by including a dissenting statement on his syllabus.

101.    Professor Reges is scheduled to teach Computer Science and Engineering 143 again during the Fall 2023 and Spring 2024 quarters.

AMENDED
COMPLAINT – Page 21

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

102.   Professor Reges intends to continue to exercise his expressive right to challenge the University's land acknowledgment by including his dissenting land acknowledgment statement on his Fall 2023, Winter 2024, and Spring 2024 syllabi.

***Defendants Withheld Professor Reges's 2022–23 Salary Increase During the Pendency of Their Disciplinary Process Against Him.***

103.   On June 7, 2022, Dean Allbritton informed Defendant Balazinska and other College of Engineering directors and chairs that President Cauce and the University board had authorized a 3.25 percent "merit increase" to eligible faculty members' salaries, effective September 1, 2022.

104.   Defendants deemed Professor Reges eligible for the merit increase. However, Defendants held his merit increase "in abeyance" during the pendency of the Faculty Code 25-71 disciplinary process.

105.   Before Dean Allbritton's June 13, 2023 letter to Professor Reges closing the disciplinary process, no University administrator informed Professor Reges that he was approved for a merit increase or that the University withheld it during the pendency of the disciplinary process.

106.   Dean Allbritton's letter informed Professor Reges that the University held his merit increase in abeyance, automatically, in accordance with University policy. However, Defendants are unable to identify any memorialization of that policy. Neither President Cauce's authorization letter nor the University's Office of Planning and Budgeting Merit Process Guide website capture it or identify a relevant policy document.

AMENDED
COMPLAINT – Page 22

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

107. Rather, Dean Allbritton's letter of June 13, 2023, simply informed Professor Reges that his merit "will be reinstated" and he would receive the merit increase that had been withheld.

108. Upon information and belief, Professor Reges received a portion of his 2022–23 merit pay increase on July 21, 2023.

109. To date, no University administrator has informed Professor Reges of when he would receive his 2022–23 merit increase, or whether it would be provided with interest.

***Defendants' Actions Deprived Professor Reges of His Rights, Causing Financial, Emotional, and Reputational Damage.***

110. As a direct and proximate cause of Defendants' actions, Professor Reges has suffered irreparable injury, including being deprived of his constitutional rights to freedom of speech and due process.

111. Defendants' actions—creating a "shadow" class and mounting a protracted investigation that carried the threat of termination, and issuing a threat of further punishment if Professor Reges continues to engage in similar protected speech—constitute adverse actions that are "reasonably likely to deter" a reasonable employee from engaging in protected activity under the First Amendment. *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003); *see also Levin v. Harleston*, 966 F.2d 85, 88–89 (2d Cir. 1992).

112. Because of Defendants' disciplinary process, Defendants withheld Professor Reges's 2022–23 3.25% merit pay increase.

AMENDED
COMPLAINT – Page 23

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

113. Defendants' adoption and enforcement of overbroad policies restricting faculty speech rights have caused Professor Reges and other University of Washington faculty and students not before this Court irreparable harm because the prohibition on "unacceptable" and "inappropriate" expression covers a broad universe of constitutionally protected expression judged in relation to its *legitimate* sweep—actionable harassment or retaliation, as properly legally defined. The policy chills both Professor Reges and other faculty from exercising their right to engage in expression on matters of public concern.

114. The terms "unacceptable" and "inappropriate" as included in the policy are undefined and carry no reasonably objective plain meaning, and are therefore impermissibly vague.

115. Defendants' threat of future enforcement of University policies against Professor Reges presents an ongoing injury, especially viewed in light of their recent enforcement of those policies against him, because it creates a continuing risk of tarnishing Professor Reges's professional reputation and includes the threat of punishment, up to and including termination, which would cause him additional financial, emotional, and reputational harm.

116. Professor Reges has experienced damages to his reputation and significant emotional distress as a result of Defendants' unconstitutional actions. The ongoing threat of future enforcement of University policies leaves Professor Reges in an uncomfortable and untenable limbo, both professionally and personally. While he remains employed, administrators have effectively isolated him from the

AMENDED
COMPLAINT – Page 24

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

community in which he has worked for 18 years, causing him significant emotional distress.

## FIRST CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Rights
### (Against All Individual-Capacity Defendants)

117.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

118.    It is clearly established under the First Amendment that "viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

119.    It is also clearly established that "teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor" are constitutionally protected expression if they involve matters of public concern and the professor's First Amendment interests outweigh the university's need for efficiency as an employer. *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014).

120.    The University of Washington recognizes professors' clearly established right "to discuss all relevant matters in teaching" in its own policies. University Faculty Code Section 24-33, last revised Jan. 9, 2014, https://www. washington.edu/admin/rules/policies/FCG/FCCH24.html#:~:text=Academic%20free dom%20is%20the%20freedom,shared%20governance%20and%20the%20general.

AMENDED
COMPLAINT – Page 25

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

121.    Faculty at colleges and universities construct their syllabi and course content to both instruct and challenge students to consider diverse viewpoints—these are integral parts of teaching.

122.    By inviting faculty to include land acknowledgment statements on their syllabi, the Allen School implicitly recognizes that speech about the history of the University of Washington's land (and competing moral or legal claims to it) falls within the permissible faculty uses of syllabi.

123.    Professor Reges challenged his students and fellow faculty to think about the utility and performative nature of land acknowledgment statements by including his own land acknowledgment statement on his syllabus.

124.    Professor Reges's land acknowledgment statement on his syllabus constitutes expression protected by the First Amendment, including the right to academic freedom.

125.    Professor Reges's land acknowledgment statement did not interfere with his duties as a lecturer at the University. He continued to instruct hundreds of students in his computer science class section, and recently led students to a win in a coding competition.

126.    Professor Reges expressed his view on land acknowledgment statements to his students, at the University's invitation, in the course of his teaching.

AMENDED
COMPLAINT – Page 26

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

127.   Defendants discriminated against Professor Reges on the basis of viewpoint when they required him to repeat only the University's institutional viewpoint, or to remain silent on this controversial public issue.

128.   Defendants further discriminated against Professor Reges on the basis of viewpoint when they disciplined him because he included a statement on his syllabus that expressed a view the University and its administrators did not like, and which Defendant Balazinska characterized as "offensive" and "inappropriate."

129.   As described above, Defendant Balazinska created a "shadow" class section of Professor Reges's Computer Science and Engineering 143 course and Defendants Balazinska, Grossman, and Allbritton are likely to pursue additional disciplinary action against Reges that carries with it the threat of termination if he continues to use his dissenting land acknowledgment statement on his syllabus. Defendants' actions would chill a person of ordinary firmness from engaging in further protected activity. *See Canatella v. California*, 304 F.3d 843, 853 (9th Cir. 2002).

130.   Defendants further discriminated against Professor Reges's speech by withholding the merit increase to his salary during the pendency of their disciplinary process against him for his dissenting land acknowledgment statement.

131.   As a direct and proximate result of Defendants' viewpoint-discriminatory actions, Professor Reges has suffered irreparable injury, including being deprived of his constitutional right to free expression.

AMENDED
COMPLAINT – Page 27

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

132.   Professor Reges has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

133.   As a direct and proximate result of Defendants' actions, Professor Reges has suffered emotional distress and injury to his reputation. The University has isolated him from the campus and departmental communities, placed his livelihood in jeopardy, and left the threat of termination hanging over his head for nearly a year. Dean Allbritton's letter dated June 13, 2023, threatens future discipline, up to and including termination, should Professor Reges continue to include his dissenting land acknowledgment in future course syllabi.

134.   As a direct and proximate result of Defendants' actions described above, Professor Reges was and continues to be deprived of his constitutional rights. As a legal consequence of Defendants' violation of Plaintiff's First Amendment rights, which are irreparable injuries *per se*, Professor Reges is entitled to compensatory damages and the reasonable costs of this lawsuit, including reasonable attorneys' fees. Professor Reges is seeking monetary damages against Defendants Balazinska, Grossman, and Allbritton in their individual capacities.

**SECOND CAUSE OF ACTION**
**First Amendment Retaliation Under 42 U.S.C. § 1983**
**(Against All Individual-Capacity Defendants)**

135.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

AMENDED
COMPLAINT – Page 28

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

136.     It is clearly established under the First Amendment that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983).

137.     As described above, Defendant Balazinska created a "shadow" class section of Professor Reges's Computer Science and Engineering 143 course, in direct response to his constitutionally protected land acknowledgment statement.

138.     As described above, Defendants Balazinska, Grossman, and Allbritton initiated, supported, and oversaw a disciplinary investigation into Professor Reges and threatened him with future sanction for allegedly violating University policy based on his constitutionally protected land acknowledgment statement.

139.     By creating the "shadow" class section and investigating Professor Reges for his protected speech, Defendants unconstitutionally took a calculated adverse employment action against Professor Reges in retaliation for his protected speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Demers*, 746 F.3d at 406; *Levin*, 966 F.2d at 88.

140.     Defendants Balazinska, Grossman, and Allbritton violated Professor Reges's clearly established First Amendment rights as a university professor by disciplining him for expressing a viewpoint in the course of his teaching that dissented from the University's prescribed viewpoint on a controversial public issue.

141.     Defendants further retaliated against Professor Reges by withholding his 2022–23 salary increase during the pendency of their disciplinary process.

AMENDED
COMPLAINT – Page 29

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

142.    As a direct and proximate result of Defendants' actions as described above, Professor Reges was and continues to be deprived of his constitutional rights. As a result of Defendants' violation of Plaintiff's First Amendment rights, which are irreparable injuries *per se*, he is entitled to compensatory damages and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
### First Amendment Retaliation Under 42 U.S.C. § 1983
### (Against All Defendants in Their Official Capacities)

143.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

144.    As described above, Defendants Balazinska, Grossman, and Allbritton created a "shadow" class section of Professor Reges's Computer Science and Engineering 143 course in reaction to his constitutionally protected land acknowledgment statement. In doing so, Defendants unconstitutionally took adverse employment action against Professor Reges in retaliation for his protected speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Demers*, 746 F.3d at 406; *Levin*, 966 F.2d at 88.

145.    Defendants Balazinska, Grossman, and Allbritton also unconstitutionally engaged in adverse employment action against Professor Reges by investigating him, threatening future discipline against him, and withholding his 2022–23 salary increase because his constitutionally protected land acknowledgment statement allegedly violated a vague and overbroad University policy.

AMENDED
COMPLAINT – Page 30

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

146.    Professor Reges has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

147.    As a direct and proximate result of Defendants' actions as described above, Professor Reges was and continues to be deprived of his constitutional rights. As a result of Defendants' violations of Plaintiff's First Amendment rights, which are irreparable injuries *per se*, Professor Reges is entitled to injunctive relief, including but not limited to mandating that Defendants cease their threat of future discipline against Professor Reges for his protected speech.

148.    Professor Reges is also entitled to a permanent injunction against Defendants creating "shadow" class sections in retaliation for his protected expression. Professor Reges is further entitled to a declaration that Defendants' investigating him because of his land acknowledgment statement and creating a "shadow" section of his course were unlawful retaliation for his protected expression.

149.    Defendant Reges is also entitled to a permanent injunction against Defendants withholding any unpaid portion of his 2022–23 merit increase or future salary increases because of any disciplinary process initiated due to his dissenting land acknowledgment statement.

AMENDED
COMPLAINT – Page 31

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

**FOURTH CAUSE OF ACTION**
**Facial Overbreadth Challenge to Executive Order 31**
**(Against President Cauce in Her Official Capacity)**

150.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

151.    A regulation violates the First Amendment for overbreadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations and citations omitted).

152.    Under University of Washington Executive Order 31, "the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed *unacceptable* or *inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation*." (Emphasis added).

153.    Executive Order 31 is unconstitutional on its face because it results in a substantial number of unconstitutional applications, allowing the University and its administrators to discipline faculty like Professor Reges for speech that is protected by the First Amendment, but expresses a viewpoint that the University wishes to suppress.

154.    For example, the policy would support discipline against a student or faculty member who, during a meeting, made a single offhand remark deemed "inappropriate," even if that remark was not harassing, discriminatory, or targeted at any individual. It would also support discipline against a student or faculty

AMENDED
COMPLAINT – Page 32

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

SER-133

member who posted an "unacceptable" tweet criticizing the university president or another official for their position on a public issue.

155.    The policy's legitimate sweep prohibits discrimination, harassment, and retaliation, as properly defined by law, which are unprotected by the First Amendment. *See, e.g.*, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (defining actionable harassment in the K–12 context as conduct that is "so *severe*, *pervasive*, and *objectively* offensive, and that so undermines and detracts from the victims' educational experience, that the victim students are effectively denied equal access to an institution's resources and opportunities" (emphasis added)).

156.    But by permitting "discipline" and "corrective action" against those whose speech University administrators deem "unacceptable" or "inappropriate," even when it does not meet the legal definition of discrimination, harassment, or retaliation, Executive Order 31 permits a broad range of unconstitutional applications in violation of the First Amendment, as described above.

157.    As a direct and proximate result of Executive Order 31, speakers in the University community, including Professor Reges, have suffered irreparable injury, including being deprived of their constitutional rights to free expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973).

158.    Professor Reges has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing harm to his First Amendment rights.

AMENDED
COMPLAINT – Page 33

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

159.   Without declaratory and injunctive relief from this Court, the University's unconstitutional actions will continue, and Professor Reges and other speakers in the University community will suffer irreparable harm indefinitely.

160.   As a consequence of the University and President Cauce's violation of Professor Reges's and all University of Washington students' and faculty members' First Amendment rights, Professor Reges is entitled to declaratory and injunctive relief declaring Executive Order 31 unconstitutional and enjoining its enforcement.

**FIFTH CAUSE OF ACTION**
**Facial Vagueness Challenge to Executive Order 31**
**(Against President Cauce in Her Official Capacity)**

161.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

162.   A regulation violates the Due Process clause of the Fourteenth Amendment for vagueness if a person of ordinary intelligence cannot distinguish between permissible and prohibited conduct, and when there are no explicit standards to prevent arbitrary and capricious application. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004).

163.   Under Executive Order 31, "the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed *unacceptable* or *inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.*" (Emphasis added).

AMENDED
COMPLAINT – Page 34

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

164.    Executive Order 31 does not define "unacceptable" or "inappropriate," and those terms do not carry with them any reasonably objective plain meaning.

165.    Executive Order 31 is unconstitutional on its face because it is so vague as to provide no basis for clear and consistent application.

166.    For example, Director Balazinska could not even confirm that Professor Reges could safely include the University's *own* land acknowledgment statement on his syllabus because if students complain that could mean Professor Reges violated the policy.

167.    Executive Order 31 is unconstitutional on its face because it is so vague that it authorizes arbitrary, capricious, and viewpoint-discriminatory application, and fails to provide people of ordinary intelligence a reasonable opportunity to understand what expression is "unacceptable" or "inappropriate."

168.    The denial of constitutional rights is an irreparable injury *per se*, and entitles the Plaintiff to injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

169.    Professor Reges has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his rights under the First and Fourteenth Amendments.

170.    Without declaratory and injunctive relief from this Court, the University's unconstitutional actions will continue, and Professor Reges and other speakers in the University community will suffer irreparable harm indefinitely.

171.    As a consequence of the University's and Defendant Cauce's violation of Professor Reges's First and Fourteenth Amendment rights, Professor Reges is

AMENDED
COMPLAINT – Page 35

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

1   entitled to declaratory and injunctive relief declaring Executive Order 31

2   unconstitutional and enjoining its enforcement.

3                          **PRAYER FOR RELIEF**

4          WHEREFORE, Professor Reges respectfully requests that this Court enter

5   judgment against Defendants and issue the following forms of relief:

6          A.     Compensatory damages against the individual-capacity Defendants in

7   an amount to be determined by the fact-finder to compensate Professor Reges for

8   their interference with his rights under the U.S. Constitution and for the significant

9   emotional distress and reputational harm he has experienced;

10         B.     Any remaining back pay with interest to compensate Professor Reges

11  for his withheld 2022–23 merit pay increase that has not been provided as of the

12  date of this filing;

13         C.     An injunction prohibiting Defendants from pursuing any investigation

14  or disciplinary action on the basis of Professor Reges's protected dissenting land

15  acknowledgment statement in his course syllabi;

16         D.     An injunction against Defendants from creating future "shadow"

17  sections of Professor Reges's classes in retaliation for his constitutionally protected

18  speech;

19         E.     An injunction prohibiting Defendants from withholding future salary

20  increases to Professor Reges because of any investigations or other disciplinary

21  action arising from his ongoing or future inclusion of his dissenting land

22  acknowledgment statement in his syllabus;

23  AMENDED                          FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
    COMPLAINT – Page 36                      510 Walnut Street, Suite 1250
24                                                Philadelphia, PA 19106
                                                   Tel: (215) 717-3473

F.     An injunction against Defendants from enforcing Executive Order 31 and any other vague, overbroad, or viewpoint discriminatory policy that prevents Professor Reges from including his land acknowledgment statement on his syllabus;

G.     A declaration that Defendants' disciplinary investigation into Professor Reges and threat of future enforcement against him for his constitutionally protected speech on his syllabus violates the First Amendment;

H.     A declaration that Defendants' creating "shadow" sections of Professor Reges's classes violates the First Amendment;

I.     A declaration that Executive Order 31 is unconstitutionally vague and overbroad;

J.     Attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law; and

K.     All further legal and equitable relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

In compliance with Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

DATED:     August 1, 2023

Respectfully submitted,

*/s/ Robert A. Bouvatte*
ROBERT A. BOUVATTE, JR.
WA Bar No. 50220
ROBERT A. BOUVATTE, PLLC
P.O. Box 14185
Tumwater, WA 98511

AMENDED
COMPLAINT – Page 37

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473

Tel: (564) 999-4005
bob@rbouvattepllc.com

JAMES M. DIAZ*
VT Bar No. 5014
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street
Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
jay.diaz@thefire.org

GABRIEL WALTERS*
DC Bar No. 1019272
JOSHUA T. BLEISCH*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
Tel: (215) 717-3473
gabe.walters@thefire.org
josh.bleisch@thefire.org

*Admitted *Pro Hac Vice*

*Counsel for Plaintiff Stuart Reges*

AMENDED
COMPLAINT – Page 38

FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473