No. 24-3518

# In the United States Court of Appeals for the Ninth Circuit

STUART REGES,

*Plaintiff-Appellant,*

*v.*

ANA MARI CAUCE, in her official capacity as President of the University of Washington, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington
Case No. 2:22-cv-00964-JHC

## BRIEF OF WASHINGTON STATE UNIVERSITY AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Matthew P. Gordon
Jonathan P. Hawley
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com
JHawley@perkinscoie.com

*Special Assistant Attorneys General*

*Counsel for Amicus Curiae
Washington State University*

170199228.4

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

AMICUS CURIAE'S IDENTITY AND INTEREST ...................................1

INTRODUCTION .......................................................................... 2

ARGUMENT .............................................................................. 7

    I.    Federal statutes and regulations require public colleges and universities to investigate student complaints. ................................................................. 8

    II.    WSU and other public institutions of higher education employ carefully structured procedures to investigate allegations of faculty misconduct. ........................................ 12

    III.    WSU's thoughtfully designed investigative procedures ensure equal access to educational opportunities and robust academic discourse. .................................................. 18

CONCLUSION .......................................................................... 22

CERTIFICATE OF SERVICE ........................................................... 23

170199228.4

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Pickering v. Board of Education,*
    391 U.S. 563 (1968) ................................................................ 6, 7, 8

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ................................................................ 21

*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard College,*
    600 U.S. 181 (2023) ................................................................ 9

*Whitney v. California,*
    274 U.S. 357 (1927) ................................................................ 21

STATUTES

20 U.S.C. § 1681 ........................................................................ 11

20 U.S.C. § 1682 ........................................................................ 11

29 U.S.C. § 794a(a)(2) ............................................................... 11

42 U.S.C. § 2000d ...................................................................... 9

42 U.S.C. § 2000d-4a(2)(A) ....................................................... 9

42 U.S.C. § 2000e-2(a)(1) .......................................................... 10

42 U.S.C. § 12132 ...................................................................... 11

42 U.S.C. § 12133 ...................................................................... 11

Title II of the Americans with Disabilities Act of 1990, Pub.
    L. No. 101-336, 104 Stat. 327 ......................................... 11, 13

Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352,
    78 Stat. 241 ................................................................ 9, 10, 11, 13

170199228.4

Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 ...................................................................... passim

RCW ch. 28B.110 ...................................................................... 9

RCW ch. 49.60 .......................................................................... 9

## RULES

Federal Rule of Appellate Procedure 29(a)(2) ............................................ 2

## REGULATIONS

34 C.F.R. pt. 106 ..................................................................... 11

34 C.F.R. § 100.3 ..................................................................... 9

34 C.F.R. § 100.7(c) .................................................................. 9

34 C.F.R. § 100.8(a) ................................................................. 10

## OTHER AUTHORITIES

*1940 Statement of Principles on Academic Freedom and Tenure*, Am. Ass'n of Univ. Professors, https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure (last visited Dec. 6, 2024) .................. 14

*2024 Faculty Manual*, WSU, https://facsen.wsu.edu/documents/2022/08/faculty-manual-pdf.pdf (last visited Dec. 6, 2024) ...................................................................... 15

*ADA Coordinator*, WSU, https://access.wsu.edu/ada-coordinator (last visited Dec. 6, 2024) .................................................. 11

Chad Sokol, *'Trump Wall' on WSU Campus Draws Hundreds of Supporters and Protesters*, Spokesman-Rev. (Oct. 19, 2016), https://www.spokesman.com/stories/2016/oct/19/trump-wall-on-wsu-campus-draws-hundreds-or-support ............ 19, 20

iii

*Colleges and Institutions in Washington*, Wash. Student
    Achievement Council, https://wsac.wa.gov/colleges-and-
    institutions-washington (last visited Dec. 6, 2024) ............................ 3

*Compliance & Civil Rights: Annual Report 2024*, WSU,
    https://wpcdn.web.wsu.edu/wp-ccr/uploads/sites/2951/
    2024/05/CCR-Annual-Report-2024.pdf (May 2024) ............... 15, 16, 18

Corrie Whitmore & Erik Carlson, *Making Land
    Acknowledgments in the University Setting Meaningful
    and Appropriate*, 72 Coll. Teaching 9 (2024) ........................................ 3

Danielle Douglas-Gabriel, *More College Presidents Face No-
    Confidence Votes over Handling of Protests*, Wash. Post
    (May 11, 2024), https://www.washingtonpost.com/
    education/2024/05/10/faculty-no-confidence-leadership-
    college-protests .................................................................................... 5

*Education and Title VI*, U.S. Dep't of Educ., https://
    www.ed.gov/laws-and-policy/civil-rights-laws/civil-rights-
    act-of-1964/education-and-title-vi (Nov. 18, 2024) .............................. 9

*EO 70 Compliance with Education Department Sexual
    Harassment Regulations*, UW, https://policy.uw.edu/
    directory/po/executive-orders/eo-70-compliance-with-
    education-department-sexual-harassment-regulations
    (last visited Dec. 6, 2024) .................................................................. 17

*EP15-Policy Prohibiting Discrimination and Harassment*,
    WSU, https://policies.wsu.edu/prf/index/manuals/
    executive-policy-manual/ep15 (Aug. 1, 2024) ........................ 13, 14, 16

*Faculty Senate & Governance: History*, UW, https://
    www.washington.edu/faculty/schools-colleges-campuses
    (last visited Dec. 6, 2024) .................................................................... 2

*FCG Chapter 25 Tenure of the Faculty*, UW, https://
    policy.uw.edu/directory/fcg/fcg-chapter-25-tenure-of-the-
    faculty (last visited Dec. 6, 2024) ...................................................... 17

iv

*Freedom of Speech at WSU*, WSU, https://freespeech.wsu.edu (last visited Dec. 6, 2024) ................................................................. 14

*Institutional Neutrality*, WSU, https://president.wsu.edu/institutional-neutrality (last visited Dec. 6, 2024) ............................ 21

Kelly Burmeister Long & Katherine Rose Adams, *Estimating the Effects of Diversity, Equity, Inclusion, and Social Justice Mission Statements on Student Outcomes: A Quasi-Experimental Study*, 39 J. Higher Educ. Mgmt. 82 (2024) ................................................................................................. 3

*Laws We Enforce*, U.S. Dep't of Just., https://www.justice.gov/crt/laws-we-enforce (June 15, 2023) ........................ 10

*Office of the ADA Coordinator*, UW, https://www.washington.edu/ada (last visited Dec. 6, 2024) ........................ 12

*Office of the Title IX Coordinator*, UW, https://www.washington.edu/titleix (last visited Dec. 6, 2024) ..................... 11

*Procedural Guidelines for Responding to Allegations Implicating: WSU Executive Policy #15, the Policy Prohibiting Discrimination and Harassment*, WSU, https://ccr.wsu.edu/policies-procedures/ep15-procedural-guidelines (Oct. 18, 2024). ..................................................... 14, 15, 18

RJ Wolcott, *WSU Enacting Practice of Neutrality on Controversial Political Topics*, WSU Insider (Sept. 9, 2024), https://news.wsu.edu/news/2024/09/09/wsu-enacting-practice-of-neutrality-on-controversial-political-topics ............................................................................................... 21

Stephanie Saul & Anemona Hartocollis, *College Presidents Under Fire After Dodging Questions About Antisemitism*, N.Y. Times (Dec. 6, 2023), https://www.nytimes.com/2023/12/06/us/harvard-mit-penn-presidents-antisemitism.html ................ 5

*Supportive Measures*, UW, https://www.washington.edu/titleix/supportive-measures (last visited Dec. 6, 2024). .................... 19

Susan L. Pacholski, Comment, *Title VII in the University: The Difference Academic Freedom Makes*, 59 U. Chi. L. Rev. 1317 (1992) .................................................................. 10

*Title IX*, WSU, https://ccr.wsu.edu/compliance-areas/title-ix (last visited Dec. 6, 2024).................................................. 11

*Title IX Legal Manual*, U.S. Dep't of Just., https://www.justice.gov/crt/title-ix (Sept. 14, 2023) ....................................... 11

## AMICUS CURIAE'S IDENTITY AND INTEREST

Washington State University ("WSU") is a public research university dedicated to improving lives by serving the public good. For more than 130 years, WSU has empowered students, faculty, and others to create a world where all people can thrive. WSU comprises six campuses, eleven academic colleges, extension offices in all thirty-nine Washington counties and on the Colville Reservation, and four research and extension centers. As of the fall of 2023, WSU had a total enrollment of 26,490 undergraduate and postgraduate students—35% first-generation students and 34.1% students of color.

As a land-grant institution, WSU includes among its core values the ideal of access to practical education for all, regardless of background. It further promotes the free exchange of ideas in a constructive and civil environment and the creation of an ethical and just society through an intentional commitment to equity, diversity, and inclusion. Given these values—and its position, along with the University of Washington ("UW"), as one of Washington's flagship public institutions of higher education—WSU has a clear and significant interest in the outcome of this appeal, which could influence when and how public colleges and

1

universities can redress student complaints, investigate potential violations of internal rules and guidelines, and productively balance the values of inclusivity and academic expression—all while complying with varied legal obligations at the state and federal levels.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), WSU states that all parties have consented to the filing of this amicus brief.

## INTRODUCTION

This case involves a single professor on a faculty of 4,000[1] who was investigated following student complaints and ultimately allowed to continue teaching *and* expressing his controversial views. But the ramifications of Professor Reges's lawsuit—and this Court's eventual ruling—go much further, potentially affecting how public colleges and universities can comply with legal obligations and respond to complaints and disruptions while ensuring welcoming, inclusive academic environments for students, faculty, and staff. A ruling that inhibits administrators' ability to effectively redress student and faculty complaints would have dire consequences, both for the functioning of the

---

[1] *Faculty Senate & Governance: History*, UW, https://www.washington.edu/faculty/schools-colleges-campuses (last visited Dec. 6, 2024).

2

circuit's public colleges and universities and for the students who seek equal access to educational opportunities.[2]

There are six public, four-year colleges and universities across eleven campuses in Washington State[3] and dozens more throughout this

---

[2] Although the value of land-acknowledgment statements of the sort at issue in this case is beyond the immediate scope of this amicus brief, WSU notes that these statements are themselves valuable components of inclusive educational environments. As academics from the University of Alaska have explained,

> [l]and acknowledgements matter because they anchor us to the place we are, consistent with place-based pedagogy. They tell our Indigenous students and colleagues that we believe their experience and the experience of people like them is important and meaningful to the history of our institution. They lift up a truth that is otherwise obscured: academic institutions are largely Western, settler institutions and the land we live and work on has a history longer than that of our institution.

Corrie Whitmore & Erik Carlson, *Making Land Acknowledgments in the University Setting Meaningful and Appropriate*, 72 Coll. Teaching 9, 9 (2024) (citation omitted). Moreover, contrary to suggestions that such statements are merely performative, at least one recent study has found statistical effects between the use of DEI-focused mission statements and minority enrollment and representation. *See generally* Kelly Burmeister Long & Katherine Rose Adams, *Estimating the Effects of Diversity, Equity, Inclusion, and Social Justice Mission Statements on Student Outcomes: A Quasi-Experimental Study*, 39 J. Higher Educ. Mgmt. 82 (2024).

[3] *Colleges and Institutions in Washington*, Wash. Student Achievement Council, https://wsac.wa.gov/colleges-and-institutions-washington (last visited Dec. 6, 2024).

3

circuit. These institutions are responsible for educating hundreds of thousands of students and, at times, investigating allegations of faculty, staff, and student conduct inimical to safe and productive learning environments. The need to investigate potential misconduct is not merely a practical necessity, but a legal imperative: State and federal statutes and regulations *require* public universities to comply with antidiscrimination laws and, in some instances, mandate administrative inquiry and redress. These investigations are undertaken pursuant to carefully structured, thoughtfully conceived procedures that ensure both that meritorious student complaints are given the attention they deserve *and* that free discourse and academic disagreement are allowed to flourish.

What the UW did in this case illustrates the interplay of these various dynamics. After receiving complaints from individual students, the Allen School Diversity Committee, the Allen School's recruiter for diversity and access, and the academic student-employee union, the UW's administration investigated Professor Reges's actions consistent with the university's internal policies—and then declined to impose sanctions and reinstated his merit-pay increase. These last facts are

4

critical: As much as Professor Reges and his amici paint him as a martyr for free speech and academic expression, they cannot ignore that Professor Reges *still* teaches at the UW, *still* receives his full salary, and *still* avails himself of myriad on- and off-campus opportunities to express his views free from censorship or official recrimination. This is in keeping with the policies and procedures of schools like the UW and WSU that, where feasible, employ supportive measures rather than punitive outcomes when investigating allegations of faculty misconduct.

Nor, for that matter, can Professor Reges downplay the intensity of the disruption caused by his efforts at provocation. Concerns were echoed by students, faculty, and staff alike—all at a time when higher-education administrators are facing unprecedented scrutiny for their handling of student complaints and alleged discrimination. The media has exhaustively chronicled recent outcries and legislative probing in the wake of campus protests and demonstrations.[4] Against this backdrop,

---

[4] For a sampling of this coverage, see, e.g., Danielle Douglas-Gabriel, *More College Presidents Face No-Confidence Votes over Handling of Protests*, Wash. Post (May 11, 2024), https://www.washingtonpost.com/education/2024/05/10/faculty-no-confidence-leadership-college-protests; Stephanie Saul & Anemona Hartocollis, *College Presidents Under Fire After Dodging Questions About*

5

public-university administrators' ability to effectively investigate and redress student and faculty complaints is even more critical to maintaining functional and accessible educational environments.

Fortunately, no upheaval of public-institution administration in this circuit is required—both the judgment of the district court and the UW's sound actions can be readily affirmed under the law as it exists today. More than fifty years ago, the U.S. Supreme Court recognized that courts must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *Pickering* and its progeny emerged alongside statutory developments that placed new requirements on public colleges and universities to accommodate the needs of students and investigate allegations of misconduct. As described below, WSU employs internal guidelines and procedures that give effect to the *Pickering* balancing test and promote both necessary inquiries *and* academic freedom

---

*Antisemitism*, N.Y. Times (Dec. 6, 2023), https://www.nytimes.com/2023/12/06/us/harvard-mit-penn-presidents-antisemitism.html.

6

simultaneously. The UW's investigation into Professor Reges's alleged misconduct likewise exemplifies the careful effectuation of *Pickering* and the balancing of student wellbeing and free discourse—and the district court's judgment should therefore be affirmed.

## ARGUMENT

WSU, like the UW and other public colleges and universities in this circuit, must comply with antidiscrimination statutes and regulations and, at times, investigate faculty actions that might run afoul of state and federal laws. Contrary to the intimations of Professor Reges and his amici, however, these investigations are neither arbitrary nor without procedural guardrails. Instead, WSU employs neutral decision-making and thoughtfully structured processes that strike the needed balance between what students require and what academic discourse demands. Indeed, where possible, WSU favors supportive measures—including organized dialogues and trainings—to *increase* speech rather than decrease it, thus fulfilling the First Amendment goal of combatting offensive and controversial speech in the marketplace of ideas.

These policies and procedures are relevant to the issues before the Court because they dispel Professor Reges's and his amici's claims

(implied and otherwise) that public institutions like the UW abandon open academic discourse at the slightest hint of student complaint—and, in so doing, violate constitutional protections for free speech and expression. WSU's policies, which are similar to the UW's, demonstrate that this could not be further from the truth. When addressing alleged misconduct, WSU's administration weighs the various factors, including both student wellbeing *and* academic freedom, that public colleges and universities *must* consider to ensure an inclusive and vibrant educational environment. These policies thus strike the sort of balances that *Pickering* and its progeny require—and would be jeopardized by an adverse ruling by this Court.

## I.   Federal statutes and regulations require public colleges and universities to investigate student complaints.

At the outset, it is useful to remember that internal investigations of the sort regularly undertaken by WSU and the UW are not arbitrary exercises of administrative power—they are often *required* by federal antidiscrimination laws.[5]

---

[5] WSU and the UW are further governed by Washington State's own antidiscrimination laws, including the Washington Law Against Discrimination, *see* RCW ch. 49.60, and the Gender Equality in Higher Education statute, *see* RCW ch. 28B.110.

**Title VI.** Title VI of the Civil Rights Act of 1964 ("CRA"), Pub. L. No. 88-352, 78 Stat. 241, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. § 2000d; *see also* 34 C.F.R. § 100.3. This mandate extends to public colleges and universities like WSU and the UW. *See* 42 U.S.C. § 2000d-4a(2)(A); *see also, e.g.*, *Education and Title VI*, U.S. Dep't of Educ., https://www.ed.gov/laws-and-policy/civil-rights-laws/civil-rights-act-of-1964/education-and-title-vi (Nov. 18, 2024) (explaining scope and enforcement of Title VI); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 287–90 (2023) (Gorsuch, J., concurring) (same). Alleged violations of Title VI oblige the U.S. Department of Education to "review [] the pertinent practices and policies of the" institution and "and other factors relevant to a determination as to whether [it] has failed to comply" with its legal obligations, 34 C.F.R. § 100.7(c), and noncompliance can lead to "a reference to the Department of Justice with a recommendation that

9

appropriate proceedings be brought to enforce any rights of the United States under any law of the United States," *id.* § 100.8(a).

**Title VII.** Title VII of the CRA similarly prohibits employment discrimination "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although Congress initially exempted educational institutions from the reach of Title VII, concerns about discrimination in academia compelled the removal of the exemption in 1972. *See* Susan L. Pacholski, Comment, *Title VII in the University: The Difference Academic Freedom Makes*, 59 U. Chi. L. Rev. 1317, 1317 & n.2 (1992). Like Title VI, enforcement of Title VII is overseen by the federal government—namely, the U.S. Equal Employment Opportunity Commission—and the U.S. Department of Justice can bring lawsuits against public entities under Title VII. *Laws We Enforce*, U.S. Dep't of Just., https://www.justice.gov/crt/laws-we-enforce (June 15, 2023).

**Title IX.** Title IX, a product of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, "is a comprehensive federal law that has removed many barriers that once prevented people, on the basis of sex, from participating in educational opportunities," *Title IX Legal Manual*,

10

U.S. Dep't of Just., https://www.justice.gov/crt/title-ix (Sept. 14, 2023); *see also* 20 U.S.C. § 1681. Like Title VI, compliance with Title IX is effected by terminating federal financial assistance upon express findings of noncompliance, among other remedies, *see* 20 U.S.C. § 1682, and Title IX imposes specific obligations on institutions like WSU to redress potential violations, *see* 34 C.F.R. pt. 106. Both WSU and the UW have dedicated personnel to ensure compliance with Title IX. *See Title IX*, WSU, https://ccr.wsu.edu/compliance-areas/title-ix (last visited Dec. 6, 2024); *Office of the Title IX Coordinator*, UW, https://www.washington.edu/titleix (last visited Dec. 6, 2024).

**ADA.** Title II of the Americans with Disabilities Act of 1990 ("ADA"), Pub. L. No. 101-336, 104 Stat. 327, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132. Enforcement of the ADA mirrors that of Title VI. *See id.* § 12133; 29 U.S.C. § 794a(a)(2). Both WSU and the UW have coordinators to ensure compliance with the ADA. *See ADA Coordinator*, WSU, https://access.wsu.edu/ada-coordinator (last visited

11

Dec. 6, 2024); *Office of the ADA Coordinator*, UW, https://www.washington.edu/ada (last visited Dec. 6, 2024).

Each of these statutory and regulatory regimes places requirements on public colleges and universities to ensure compliance with federal antidiscrimination laws. Public institutions, in turn, must adopt internal policies and procedures to ensure this compliance—including, at times, investigating allegations of faculty misconduct that denies students access to safe, nondiscriminatory educational environments.

## II. WSU and other public institutions of higher education employ carefully structured procedures to investigate allegations of faculty misconduct.

Like the UW and other public colleges and universities, WSU implements a multistep, context-specific set of guidelines and procedures when investigating alleged faculty misconduct. A brief survey of these processes demonstrates that, far from rubberstamping any hint of displeasure or dissent or exacting punitive measures in an arbitrary manner, WSU carefully screens complaints and employs a flexible suite of remedial options to balance student wellbeing and academic freedom.

12

Most relevant, WSU's Executive Policy #15 ("EP 15") prohibits discrimination and harassment and outlines the procedural considerations underlying its enforcement. *See generally EP15—Policy Prohibiting Discrimination and Harassment*, WSU, https://policies.wsu.edu/prf/index/manuals/executive-policy-manual/ep15 (Aug. 1, 2024). EP 15 operationalizes WSU's compliance with federal antidiscrimination laws, including Titles VI and VII of the CRA, Title IX, and the ADA. *See id.* § 2.0. As stated in its preamble, "[c]omplaints under [EP 15] are to be reviewed on a case-by-case basis to ensure that the University maintains its tradition of intellectual freedom, the trust and respect expected in the University community, and the rights of individuals." *Id.* § 1.0. Reflecting this interplay, EP 15 provides that, "[i]n determining if conduct is in violation of [the policy], the *totality of the circumstances* [is] assessed"—which includes not only the severity, frequency, and source of the alleged discrimination, but also "[w]hether or not the conduct can be reasonably considered protected speech or serving some other lawful purpose." *Id.* §§ 16.0, 18.0 (emphasis added).[6]

---

[6] WSU's commitment to balancing academic freedom and a safe educational environment is further reflected by its adoption of the

In assessing the totality of circumstances around alleged discrimination, WSU's Compliance and Civil Rights ("CCR") personnel—who operate independent from WSU's faculty and administration—employ a "fair, neutral, and equitable process" and ensure that only meritorious claims proceed to full investigation. *Id.* § 12.0. "When a complaint is submitted to CCR, it is assigned to an investigator who will review the complaint and determine whether to proceed with a grievance procedure"; complaints are dismissed outright where "[e]ven if true [they] do[] not constitute EP 15 violations" or "[t]he conduct is outside CCR's scope of authority to investigate." *Procedural Guidelines for Responding to Allegations Implicating: WSU Executive Policy #15, the Policy*

---

statement of principles promulgated by the American Association of University Professors, which provides that "[t]eachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject." *1940 Statement of Principles on Academic Freedom and Tenure*, Am. Ass'n of Univ. Professors, https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure (last visited Dec. 6, 2024). WSU's website also includes a portal with information about freedom of speech and the First Amendment, which it bases on guidance from the Department of Education; this portal reminds the university community that, while they "are likely to encounter those who share viewpoints different from their own," such "discourse [should] happen in a respectful manner." *Freedom of Speech at WSU*, WSU, https://freespeech.wsu.edu (last visited Dec. 6, 2024).

14

*Prohibiting Discrimination and Harassment*, WSU § 9.0, https://ccr.wsu.edu/policies-procedures/ep15-procedural-guidelines (Oct. 18, 2024).

Complaints that survive this initial screening then proceed to the EP 15 investigative process, which comprises notification to the concerned parties, gathering of evidence, decision-making, appeals, and, potentially, a disciplinary process dependent on the outcome. *Id.* § 11.0. For complaints against faculty specifically, "[u]pon receipt of CCR's investigation report, the Office of the Provost [] review[s] to determine whether to utilize the informal or formal discipline processes outlined in the Faculty Manual," *id.* § 13.1, which encompass a range of options from written warnings and censure to suspension and termination, *see 2024 Faculty Manual*, WSU § II(F)(4), https://facsen.wsu.edu/documents/2022/08/faculty-manual-pdf.pdf (last visited Dec. 6, 2024).

CCR's 2024 annual report documents the results of these carefully structured procedures. *See generally Compliance & Civil Rights: Annual Report 2024*, WSU, https://wpcdn.web.wsu.edu/wp-ccr/uploads/sites/2951/2024/05/CCR-Annual-Report-2024.pdf (May 2024). In 2023, CCR received 863 reports, the majority of which came from student

15

complainants and involved gender-based discrimination implicating EP 15 and Title IX—and completed just 33 investigations. *Id.* at 5–8. The annual report outlines the investigative process described above, adding color and context to WSU's procedures:

> CCR completed 33 investigations during 2023. Participants in CCR's grievance processes also have the option of voluntarily engaging in a resolution process if they are in agreement about appropriate action items.
>
> CCR serves as a neutral investigator. CCR investigators gather and assess information pursuant to the CCR Procedural Guidelines. In order for a violation to be found or recommended by CCR, it must be supported by a preponderance of the evidence. At times, CCR investigation may not result in a violation finding. This does not necessarily mean that the conduct did not occur. It may mean that CCR did not receive sufficient evidence to make a violation finding, the conduct may not have risen to the level of a violation, or the conduct may have occurred but is not discriminatory in nature and thus should be more appropriately addressed under other university policies.

*Id.* at 8. This summary underscores that, when investigating allegations of discriminatory conduct, CCR restricts itself to finding violations only where the evidence clearly supports that result. And notably, of CCR's thirty-three completed investigations, only *four* involved faculty respondents—and none led to findings of violations. *See id.* at 9–12.

Simply put, WSU faculty are not at danger of the sort of widespread, Star Chamber investigatory proceedings suggested by Professor Reges and his supporting amici. Instead, they are afforded considerable process and internal procedures that strive to balance the needs of student wellbeing and academic freedom. The UW likewise "maintain[s] conditions which are conducive to freedom of inquiry and expression in the maximum degree compatible with the orderly conduct of its functions" while, "at the same time, protect[ing] the rights and freedoms of all members of the academic community." *FCG Chapter 25 Tenure of the Faculty*, UW § 25-71(A), https://policy.uw.edu/directory/fcg/fcg-chapter-25-tenure-of-the-faculty (last visited Dec. 6, 2024). Like WSU, the UW further employs dispute-resolution policies that ensure fair procedures and neutral decision-making. *See, e.g.*, *id.* § 25-71 (general procedures to address alleged violations of university rules and regulations); *EO 70 Compliance with Education Department Sexual Harassment Regulations*, UW, https://policy.uw.edu/directory/po/executive-orders/eo-70-compliance-with-education-department-sexual-harassment-regulations (last visited Dec. 6, 2024) (compliance with Title IX).

17

### III. WSU's thoughtfully designed investigative procedures ensure equal access to educational opportunities and robust academic discourse.

Ultimately, WSU's primary goal is to ensure equal access to highest-quality education for *all* its students. An offshoot of this objective—one that impacts the investigatory procedures described above—is the use of "supportive measures" to remedy alleged violations of antidiscrimination policies. As its annual report explains, "CCR facilitates supportive measures for all individuals engaged with CCR processes, whether or not the individual chooses to file a formal complaint with the university. Supportive measures are designed to ensure students and employees continue to have equitable access to their academic and work environments and are protected from further harm." *Annual Report 2024*, *supra*, at 7; *see also Procedural Guidelines*, *supra*, § 15.0 (explaining supportive measures). Such supportive measures seek to constructively improve the educational experience while facilitating speech—not unlike the UW's decision to open an alternative section of

18

Professor Reges's mandatory class while allowing him to continue to express his views. *See* 2-ER-109–10, 207; SER-47.[7]

An illuminating example of WSU's supportive measures occurred eight years ago, in the midst of the 2016 election cycle. As *The Spokesman-Review* recounted, "a small group of students erected a plywood wall in the center of campus [at the Glenn Terrell Friendship Mall] to show support for Donald Trump and his proposal to build a wall along the country's southern border." Chad Sokol, *'Trump Wall' on WSU Campus Draws Hundreds of Supporters and Protesters*, Spokesman-Rev. (Oct. 19, 2016), https://www.spokesman.com/stories/2016/oct/19/trump-wall-on-wsu-campus-draws-hundreds-or-support. After the pro-Trump demonstration yielded students complaints—including from undocumented students who felt directly threatened by the advocacy—WSU's administration responded with *more* speech, not less, facilitating on-campus discussions of the demonstration and de-escalation training.

---

[7] Indeed, the UW also employs supportive measures "to restore or preserve equal access to [its] education programs and activities, including work environments, without burdening [] other part[ies]" in the context of Title IX investigations. *Supportive Measures*, UW, https://www.washington.edu/titleix/supportive-measures (last visited Dec. 6, 2024).

19

The pro-Trump display ultimately inspired a counter-demonstration of hundreds of protesters—mostly students—and "[t]he Friendship Mall quickly became a stage for countless topics of national discussion," leading one faculty member to remark on the unprecedented level of political engagement:

> "I've been through four elections here, and I've never seen anything like this," said Katy Fry, a history professor who started teaching at WSU in 2004. "I canceled my classes to encourage my students to come out and see the political process. I don't care what side they're on—I just want them to be observant and engaged."

*Id.*

This episode demonstrates that, far from merely inhibiting discussion, university policies can serve to *promote* a vibrant academic discourse while simultaneously safeguarding equal educational access for all students.[8] Combatting offensive or controversial speech with

---

[8] WSU recently reaffirmed its commitment to open discourse by adopting an institutional-neutrality statement, with President Kirk Schulz explaining,

> We are a public university where competing ideas should be debated vigorously in a civil fashion. It is critical that the university and its leadership not impinge on that vital process. We must do everything we can to maintain a fair and respectful public square for members of our communities across the state.

discussion and debate is a lodestar of the First Amendment. A century ago, Justice Brandeis confronted the dilemma of dangerous speech and wrote, "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). The spirit of this sentiment is alive and well at WSU. And supportive measures of the sort employed at WSU and the UW will continue to remedy allegations of discriminatory conduct and reconcile the need to protect both students and speech—so long as public institutions of higher education maintain the flexibility and freedom needed to implement their carefully considered policies and procedures.

---

RJ Wolcott, *WSU Enacting Practice of Neutrality on Controversial Political Topics*, WSU Insider (Sept. 9, 2024), https://news.wsu.edu/news/2024/09/09/wsu-enacting-practice-of-neutrality-on-controversial-political-topics. WSU's statement "encourage[s] all members of the [WSU] community—students, faculty, and staff—to engage thoughtfully and respectfully in discussions on important issues. By upholding these principles, we strive to create an inclusive and dynamic environment where the pursuit of knowledge and understanding is paramount." *Institutional Neutrality*, WSU, https://president.wsu.edu/institutional-neutrality (last visited Dec. 6, 2024) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835–36 (1995)).

170199228.4

## CONCLUSION

To ensure that this circuit's public colleges and universities can continue to foster safe and welcoming environments while balancing the (at times) competing demands of inclusivity and academic expression, WSU respectfully urges the Court to affirm.

Respectfully submitted this 9th day of December, 2024.

PERKINS COIE LLP

By: */s/ Matthew P. Gordon*
Matthew P. Gordon
Jonathan P. Hawley
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com
JHawley@perkinscoie.com

*Special Assistant Attorneys General*

*Counsel for Amicus Curiae*
*Washington State University*

170199228.4

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 9, 2024.

_/s/ Matthew P. Gordon_

23

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 24-3518

I am the attorney or self-represented party.

**This brief contains** | 4,030 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Matthew P. Gordon | **Date** | 12/09/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*