No. 24-3518

# United States Court of Appeals
## for the
# Ninth Circuit

STUART REGES,

*Plaintiff-Appellant,*

v.

ANA MARI CAUCE; MAGDALENA BALAZINSKA; DAN
GROSSMAN; NANCY ALLBRITTON,

*Defendants-Appellees,*

On appeal from the United States District Court
for the Western District of Washington at Seattle,
No. 2:22-cv-00964-JHC - Honorable John H. Chun Presiding

## APPELLANT'S REPLY BRIEF

JOSHUA T. BLEISCH
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave., Suite 340
Washington, DC 20003
Tel: (215) 717-3473
josh.bleisch@thefire.org

SARA BERINHOUT
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 717-3473
sara.berinhout@thefire.org

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ............................................................................1

ARGUMENT ....................................................................................4

    I.    The University Misapplies *Pickering* to Justify Restricting Professor Reges's Protected Speech on Matters of Public Concern. ........................................4

        A.    Professor Reges is not a government messenger but a public university professor with free speech rights.....................................5

        B.    The University's "government speech" argument threatens academic freedom. ......................10

        C.    The University misrepresents its retaliation and fails *Pickering* balancing.......................................13

            1.    Professor Reges's interest in commenting on land acknowledgments outweighs University interests in preventing offense...............................14

                a.    Professor Reges has a strong First Amendment interest ........................15

                b.    The University's interest in preventing complaints is weak, if not wholly invalid ......................................17

            2.    Professor Reges suffered retaliatory adverse employment actions because of his speech. ..........................................22

II.    Basic Rules of Statutory Interpretation and Constitutional Scrutiny Doom the University's Executive Order 31. ...........................................................25

CONCLUSION .........................................................................32

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s):**

*Abbott v. Pastides,*
   900 F.3d 160 (4th Cir. 2018) ................................................................29

*Adamian v. Jacobsen,*
   523 F.2d 929 (9th Cir. 1975) ............................................................21

*Alabama v. U.S. Sec'y of Educ.,*
   24-12444, 2024 WL 3981994 (8th Cir. Aug. 22, 2024)........................29

*Allen v. Scribner,*
   812 F.2d 426 (9th Cir. 1987) ............................................................22

*Anthoine v. N. Cent. Cntys. Consortium,*
   605 F.3d 740 (9th Cir. 2010) ............................................................22

*Bart v. Telford,*
   677 F.2d 622 (7th Cir. 1982) ............................................................22

*Bauer v. Sampson,*
   261 F.3d 775 (9th Cir. 2001) ............................................................31

*Berg v. Hunter,*
   854 F.2d 238 (7th Cir. 1988) ..............................................................8

*Blum v. Schlegel,*
   18 F.3d 1005 (2d Cir. 1994)..............................................................20

*Burnham v. Siani,*
   119 F.3d 668 (8th Cir. 1997) ............................................................11

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) .........................................................................17

*Coszalter v. City of Salem,*
   320 F.3d 968 (9th Cir. 2003) ......................................................22, 23

iv

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ................................................................ 28, 29, 30

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) .......................................................... 29

*Demers v. Austin*,
746 F.3d 402 (9th Cir. 2014) ..................................................... passim

*Dodge v. Evergreen Sch. Dist. #114*,
56 F.4th 767 (9th Cir. 2022) .......................................................... 16

*Downs v. L.A. Unified Sch. Dist.*,
228 F.3d 1003 (9th Cir. 2000) ......................................................... 7

*Dr. Suess Enters., L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) ....................................................... 16

*Duke v. Boyd*,
942 P.2d 351 (Wash. 1997) ........................................................... 26

*Flores v. Bennett*,
2023 WL 4946605 (9th Cir. Aug. 3, 2023) ................................... 27, 28

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .................................................................. 6, 12

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ...................................................................... 27

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ....................................................................... 4

*Hernandez v. City of Phoenix*,
43 F.4th 966 (9th Cir. 2022) ............................................ 14, 19, 30, 31

*Hill v. Colorado*,
530 U.S. 703 (2000) ...................................................................... 27

*Hodge v. Antelope Valley Cmty. Coll. Dist.*,
  No. CV 12-780, 2014 WL 12776507 (C.D. Cal. Feb. 14, 2014) ............ 18

*Hulen v. Yates*,
  322 F.3d 1229 (10th Cir. 2003) ........................................................ 20

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988) ........................................................................... 16

*In re Lares*,
  188 F.3d 1166 (9th Cir. 1999) .......................................................... 26

*Johnson v. Poway Unified Sch. Dist.*,
  658 F.3d 954 (9th Cir. 2011) .............................................................. 7

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
  385 U.S. 589 (1967) .................................................................. passim

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
  811 F.2d 26 (1st Cir. 1987) ............................................................... 17

*Lane v. Franks*,
  573 U.S. 228 (2014) ......................................................................... 16

*Levin v. Harleston*,
  966 F.2d 85 (2d Cir. 1992) ................................................................ 23

*Mahanoy Area Sch. Dist. v. B.L.*,
  594 U.S. 180 (2021) ........................................................................... 7

*Matal v. Tam*,
  582 U.S. 218 (2017) ...................................................................... 8, 21

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
  192 F.3d 1283 (9th Cir. 1999) .......................................................... 24

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................. 6, 10, 15, 21

*Morse v. Frederick,*
  551 U.S. 393 (2007) ............................................................. 26

*Papish v. Bd. of Curators of the Univ. of Mo.,*
  410 U.S. 667 (1973) .......................................................... 2, 19

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.,*
  641 F. Supp. 3d 1218 (N.D. Fla. 2022) ............................... 5, 12

*Pickering v. Board of Education,*
  391 U.S. 563 (1968) ................................................... passim

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ............................................................ 29

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,*
  605 F.3d 703 (9th Cir. 2010) ................................................ 9

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
  515 U.S. 819 (1995) ........................................................... 11

*Rowles v. Curators of Univ. of Mo.,*
  983 F.3d 345 (8th Cir. 2020) ............................................. 29

*Schneider v. New Jersey,*
  308 U.S. 147 (1939) ............................................................. 9

*Shurtleff v. City of Boston,*
  596 U.S. 243 (2022) ......................................................... 7, 8

*Speech First, Inc. v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) ............................................. 7

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ............................................. 29

*Tennessee v. Cardona,*
  2025 WL 63795, § III.C, *2:24-cv-00072 (E.D. Ky. Jan. 9, 2025) ........ 29

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*,
  393 U.S. 503 (1969) ................................................................ 21

*United States v. Stevens*,
  559 U.S. 460 (2010) ................................................................ 25

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) .................................................................. 8

## INTRODUCTION

Public university faculty have a First Amendment right to discuss contentious public issues in teaching and research, including on topics like indigenous land acknowledgment statements. Our "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) (cleaned up). Appellee University of Washington ignores this bedrock of American free thought, found in binding precedent, by claiming authority to limit ideas it finds "offensive." But the University's attempt here to dilute Professor Reges's First Amendment rights suffers four fatal flaws.

First, it argues that public university professors speak purely as government employees, such that their speech in that capacity is unprotected. However, this Court has squarely held academics differ from all other government employees and enjoy far more freedom to speak. *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014).

Second, instead of weighing Professor Reges's free speech interest against that of the University in preventing offense, as required by

*Pickering v. Board of Education*, 391 U.S. 563 (1968), the University tries to downplay the severity of its retaliation. But under *Pickering*, the severity of a government employer's punishment has no bearing on the employee's interest in speaking.

Third, the University conflates *disagreement* with *disruption* in asserting complaints about Professor Reges's viewpoint on land acknowledgments justified punishment. That ignores that the Supreme Court has made clear offense is not a sufficient basis for the government to interfere in university expression. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973).

Fourth, the University's Executive Order 31 (EO-31) that it used to sanction Professor Reges is unconstitutionally overbroad in expressly applying to speech "regardless of whether" it constitutes unlawful harassment or discrimination. The University's claim that this is remedied by interpreting EO-31 as applying only to speech that "resembles" harassment violates the core principle of construction that courts do not rewrite rules, and, even then, merely replaces one vague standard with another.

This case is at bottom about protecting academic freedom in public universities from government efforts to punish and chill "offensive" view-

2

points. The University attempts to reframe the dispute as one of inclusion versus exclusion, enlightenment versus historical and cultural ignorance. But reasonable, empathetic minds disagree, even within the indigenous population, on the value of land acknowledgment statements. The First Amendment prevents the University from requiring faculty to either parrot its value judgment or remain silent. This Court should reverse the decision below holding otherwise.

# ARGUMENT

## I. The University Misapplies *Pickering* to Justify Restricting Professor Reges's Protected Speech on Matters of Public Concern.

The University gives short shrift to the protection the First Amendment ensures to public university professors to speak on matters of public concern in teaching and scholarship. That protection exists to foster the "important purpose of public education and the expansive freedoms of speech and thought associated with" universities that "occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). When Professor Reges parodied land acknowledgment statements in his syllabus, the First Amendment squarely protected his speech, because college classrooms are "peculiarly the marketplace of ideas." *Keyishian*, 385 U.S. at 603. Any effort to avoid that conclusion by arguing a public university professors' course-related speech is government speech must fail. *See* Answering Brief (Ans. Br.) 40–44.

This Court held over a decade ago that public university faculty have a First Amendment right to speak on matters of public concern in the course of their teaching or scholarship. *Demers*, 746 F.3d at 412. The University's stance—that professors are mere conduits of preferred

4

government views, barred from voicing dissenting beliefs—would render First Amendment protections for academic freedom a dead letter. Whether from the left or the right, the First Amendment does not allow the government to silence disfavored opinions. *See Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) (enjoining Florida's "Stop W.O.K.E. Act" that would bar professors from advancing particular disfavored viewpoints), *appeal docketed*, No. 22-13992 (11th Cir. 2022), *and argued* (11th Cir. June 14, 2024).

With his parody land acknowledgment properly classified as academic speech and evaluated under *Pickering*, Professor Reges's interest in commenting on that matter of public concern outweighs the University's interest in avoiding complaints of offense. And its attempt to downplay the severity of its actions neither changes that balance nor shields them from the adverse action element of Reges's retaliation claim.

### A. Professor Reges is not a government messenger but a public university professor with free speech rights.

University professors are not mouthpieces for the government. As this Court squarely held in *Demers*, faculty speech related to their scholarship and teaching "is protected under the First Amendment" and

5

evaluated under the *Pickering* balancing test. 746 F.3d at 412. The University attempts to evade this plain command by arguing the general test for public employees governs Professor Reges's speech, citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Ans. Br. at 40. But as this Court explained in *Demers*, if *Garcetti* applied to teaching and academic writing, it "would directly conflict with the important First Amendment values previously articulated by the Supreme Court" of protecting academic freedom and open discourse in the academy. 746 F.3d at 411 (discussing *Keyishian*, 385 U.S. at 603).

The First Amendment right of public university faculty to comment on matters of public concern extends to their syllabi. In *Meriwether v. Hartop*, the Sixth Circuit explained that "[b]y forbidding Meriwether from describing his views on gender identity *even in his syllabus*, Shawnee State silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion." 992 F.3d 492, 506 (6th Cir. 2021) (emphasis added). So too, here. The University silenced Professor Reges's expression of a viewpoint on land acknowledgment statements that could have facilitated edifying in- or out-of-class discussion with his students and colleagues.

The University argues Professor Reges's syllabus—including his parody land acknowledgment statement—is "government speech" subject to its control, Ans. Br. at 19, but strangely absent from the argument is the actual test for the government speech.[1] That is likely because its application undercuts the University's position, as it requires that courts examine "the public's likely perception as to who (the government or a private person) is speaking" and "extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Here, no one would reasonably believe Professor Reges's parody land acknowledgment, beginning "I acknowledge…," is anything other than his own expression.

---

[1] Finding no support in controlling law governing speech in university settings, the University cites K–12 cases involving minors. *See* Ans. Br. 42 (first citing *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011); and then citing *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000)). But, as the district court explained, K–12 cases are inapposite to the university context because vast distinctions between high school and college "make a legal difference." Am. Order at 17; *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (noting difference between speech restrictions in K–12 settings, which allow less expressive freedom than college settings that grant greater freedom); *cf. Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 194 n.2 (2021) (Alito, J. concurring).

7

The University tries to bolster this argument by claiming it wanted to avoid having its own land acknowledgment statement "garbled," Ans. Br. at 41, but Professor Reges's first-person statement clearly means he spoke for himself. Opening Br. 5 n.1. As Dean of the College of Engineering Nancy Allbritton admitted, "faculty have great flexibility" to choose the content of their syllabi. 2-ER-81. This is a far cry from the "direct control" required by *Shurtleff*, 596 U.S. at 252–53 (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015)).

The University's argument illustrates why the government-speech doctrine is narrow, given how it is "susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id*. That is precisely what the University did, silencing and punishing Professor Reges because he disagrees with the school's views. The University's reliance on *Berg v. Hunter*, 854 F.2d 238 (7th Cir. 1988), does not justify its "restricting [Professor Reges's] expression." Ans. Br. at 22. Berg was an athletic coordinator, not academic faculty, 854 F.2d at 239, who unsurprisingly, did not enjoy the same academic freedom rights

8

as faculty. *Demers*, 746 F.3d at 412; *see also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) (University faculty foster "[i]ntellectual advancement" through "discord and dissent.").

The University also attempts to deny violating Professor Reges's right to speak on matters of public concern by citing the expressive freedom he enjoys *outside* his syllabus. Ans. Br. at 43. But just as someone gathering signatures cannot face ejectment from a public park based on availability of nearby sidewalks, *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939), a professor's syllabus cannot be censored based on the openness of the college quad. That is because, as the Supreme Court explained: "One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Id.*

The University's admissions in the record contradict its claims about available alternates, in any event. Defendant Nancy Allbritton, Professor Reges's dean, testified that if he made his statement in other campus forums, including public streets or sidewalks, the University could discipline him in response to complaints. 2-ER-86–88 (testifying discipline would "depend" on the nature of the complaints, regardless of

9

where Professor Reges speaks his parody land acknowledgment statement). *Meriwether*, upon which the University relies here (Ans. Br. 26), supports Professor Reges, given *Meriwether*'s above-noted holding that the university violated the First Amendment when it prohibited the professor from advancing views on gender identity "*even in his syllabus.*" 992 F.3d at 506 (emphasis added).

## B.    The University's "government speech" argument threatens academic freedom.

The contention that syllabi are University documents in which it can "create a more inclusive environment" and bar those it believes detract from that goal imperils academic freedom. Ans. Br. 40–41. If accepted—and the district court rightly rejected the argument, Am. Order at 19—universities could punish professors who dissent from preferred institutional stances, in syllabi or elsewhere, thus effectuating viewpoint discrimination at the expense of academic freedom.

The University's true issue with Professor Reges's statement is not that it appears on his syllabus; it's that it contradicts the University's viewpoint. Just read its brief. The University objects to Professor Reges's supposed "profound historical ignorance." Ans. Br. 28. Citing academic

works in history, the University urges this Court to deem the University's view on land acknowledgments the only correct one. *Id.* at 29. But academic freedom leaves these disputes to the marketplace of ideas, not a courthouse—or university administrators.

It is clearly established the First Amendment prevents universities from discriminating against views of professors who believe and speak contrary to institutional positions on contested social matters. *Burnham v. Siani*, 119 F.3d 668, 676 (8th Cir. 1997) (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 836 (1995)) (denying qualified immunity to university chancellor who discriminated against viewpoint of faculty who believed "teaching history necessarily involves a study of military history, including … military weapons"). Universities cannot cloak viewpoint discrimination as efforts at "inclusion." To be sure, every university believes *its* position advances the greater good.

But imagine a public college promoting inclusion by encouraging professors to adopt a statement welcoming "Palestinian students fleeing Israeli oppression" in their syllabi. Under the University's logic here, that college would have the power to censor professors who, instead, include a statement welcoming "Israeli students fleeing Palestinian terrorism."

11

It could even exercise that power to control *everything* a professor says in the classroom, ensuring students are taught in the most bland and inoffensive way possible, always in accord with the institution's preferred views. Our Constitution "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

The University's invocation of the government-speech doctrine to mask its claim of authority to punish and restrict faculty speech based on viewpoint mirrors Florida's unsuccessful defense of its "Stop W.O.K.E. Act." *See Pernell*, 641 F. Supp. 3d at 1230 (preliminarily enjoining law banning university-level teaching of enumerated "divisive concepts"). There, as here, the state argued teaching is government speech under *Garcetti*. *Id.* at 1238–39; *see* Ans. Br. 41–42. The court rejected that stance under the First Amendment's protection for academic freedom, enjoining Florida's law as "positively dystopian." *Pernell*, 641 F. Supp. 3d at 1230. Academic speech is not government speech in Florida, nor, as the district court here explained, is it government speech in Washington. Am. Order at 19.

Ultimately, as the district court held, Professor Reges's statement, made in the first person and in his university course syllabus, is his

12

personal, academic speech, not "government speech." *Id*. The University accordingly cannot avoid confronting the First Amendment.

### C.   The University misrepresents its retaliation and fails *Pickering* balancing.

The University violated the First Amendment when it punished and censored Professor Reges because in the *Pickering* balance, his interest in speaking outweighs that of the University's in preventing listeners from being offended by his speech. Under *Pickering*, courts weigh the employee's interest in commenting on a matter of public concern[2] against the government's interest as an employer "in promoting the efficiency of the public services it performs through its employees." *Demers*, 746 F.3d at 412 (quoting *Pickering*, 391 U.S. at 568).

Yet the University's defense of its treatment of Professor Reges does not balance these interests. It instead insists Professor Reges's interest in speaking depends on the harshness of the University's reaction. As

---

[2] Though the University contests whether Professor Reges's parody land acknowledgment statement is protected faculty rather than unprotected government speech (incorrectly, *see supra* § I.A.), it does not contest *Pickering*'s first prong: that the speech was on a matter of public concern. Ans. Br. 22.

explained below, that is not how *Pickering* works. The University has confused *Pickering*'s balancing test with the standard for adverse government action. Ans. Br. 23, 27. With the proper test applied, the University fails to clear its high bar of showing its interest in efficient operations overcomes Professor Reges's bedrock interest in commenting on a matter of public concern.

### 1. Professor Reges's interest in commenting on land acknowledgments outweighs University interests in preventing offense.

The *Pickering* balancing test favors Professor Reges. As this Court explained, "[t]he more substantially the employee's speech involves matters of public concern, the weightier the government employer's interests must be" to overcome the employee's interest in speaking. *Hernandez v. City of Phoenix*, 43 F.4th 966, 977 (9th Cir. 2022). And when assessing the government's interests, courts examine whether the speech "impedes performance of the speaker's job duties, interferes with the effective functioning of the employer's operations, or undermines the employer's mission." *Id.* There is no dispute Reges spoke on a matter of public concern, while the University's claims of "harm" all boil down to

14

readers feeling offense at Reges's expression, not actual disruption to the school.

### a. Professor Reges has a strong First Amendment interest

Professor Reges's interest here in speaking about indigenous land acknowledgments outweighs asserted University interests in promoting "inclusion" by preventing offense. Professor Reges was participating in an ongoing discussion (one started by the University, no less) about land acknowledgments and whether public institutions should use them. 2-ER-267–68. Such political speech is particularly at home on a public university campus, where the "robust tradition of academic freedom in our nation's post-secondary schools … alone offers a strong reason to protect [professor] speech." *Meriwether*, 992 F.3d at 509 (citations omitted).

Attempts to trivialize Professor Reges's parody land acknowledgment as "trolling" miss the mark. Ans. Br. 10. As the University

understands, "trolling" equates to parody,[3] and the First Amendment protects parody—especially as comment on matters of public concern—as this Court has recognized. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400 (9th Cir. 1997) (recognizing parody "as a form of social and literary criticism" with "socially significant value as free speech under the First Amendment"). Indeed, parody as a vehicle for comment on public issues is as old as the Republic. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 54 (1988).

The University does not contest that Reges spoke on a matter of public concern, and the district court held as much. Am. Order at 19–20. This leaves the University with a "particularly heavy burden under … *Pickering*" to justify its actions. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782 (9th Cir. 2022); *see also Lane v. Franks*, 573 U.S. 228, 242 (2014) ("[A] stronger showing of government interests may be necessary" if the employee's speech "more substantially involves matters of public concern." (cleaned up)).

---

[3] Ans. Br. 9–10 (arguing that "Reges included his parody land acknowledgment" statement and "acknowledged that including [it] on the syllabus would make it 'clear that [he] is trolling'").

16

### b. The University's interest in preventing complaints is weak, if not wholly invalid

The University cannot meet its heavy *Pickering* burden because what it calls "disruption" to justify its actions amounts to complaints of those offended by a parodic land acknowledgment. Professor Reges used parody to voice his view and did so in a manner which perhaps offended a few readers but did not disrupt classes or University operations. That Professor Reges mimicked and mocked the University's land acknowledgment statement is not disruption—it is the *point* of his parody. 2-ER-188. That is how parody works. "Parody needs to mimic an original to make its point." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580–81 (1994). And parody inherently risks offending those who support the target of its ridicule. *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 28 (1st Cir. 1987) (noting that "parody seeks to ridicule sacred verities and prevailing mores" and thus "inevitably offends others.").

The University insists it had to act due to concerns some students felt "intimidated" or feared Professor Reges's "pattern of intolerant speech" meant they would not be treated fairly. Ans. Br. 31; 2-ER-122–135; 3-ER-562. But that does not square with admissions in discovery

17

that administrators never had cause to believe he discriminated or retaliated against students. 2-ER-73–74; 2-ER-85.[4] The University claims one staffer believed Professor Reges's statement meant students' "rights are denied," and some student-employee union members "feared" "retaliation," Ans. Br. 31–34, but did not experience any. The University (and district court) cite no cancelled or disrupted classes, and no campus disturbance. All the University musters is a handful of students and staff upset at Professor Reges's opinion, and that is not enough. *See, e.g.*, *Hodge v. Antelope Valley Cmty. Coll. Dist.*, No. CV 12-780, 2014 WL 12776507, at *10 (C.D. Cal. Feb. 14, 2014) (holding an EMT instructor's offensive in-class language did not impact his "teaching or other professional responsibilities" so the university could not punish him).[5]

---

[4] That tracks with the fact that Defendants never accused Professor Reges of violating the University's prohibition on discrimination and retaliation.

[5] The University claims (Ans. Br. 23 n.2) that Professor Reges waived the ability to acknowledge this Court may, on *de novo* review, decide questions of material fact exist. *See* Opening Br. 47 n.11. Professor Reges and the University moved for summary judgment before the district court (Dkt. ## 60, 64), which required it to construe the facts in the light most favorable to Reges on the University's motion (and to the University on Reges's motion). *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.3d 626, 631 (9th Cir. 1987). Professor Reges still maintains no disputes

18

College campuses are "peculiarly the marketplace of ideas." *Keyishian*, 385 U.S. at 603, where opinions are occasionally upsetting. If students or staff feeling "upset" or "offended" by opinions can qualify as "disruption" sufficient to constitutionally justify discipline, few would dare speak. Contentious issues like Middle East conflicts, immigration policy, or gender identity become taboo third rails never discussed for fear of sanctions. *See* Br. of *Amicus Curiae* Students for Liberty in Support of Pl.-Appellant and Overturning District Ct. Order at 7–11; Br. of *Amicus Curiae* PEN Am. Ctr, Inc. in Support of Pl.-Appellant at 6, 13. Hearing a disquieting viewpoint does not qualify as "disruption"—it qualifies as going to college. That is why the First Amendment ensures "the mere dissemination of ideas … on a state university campus may not be shut off" simply because listeners may be offended. *Papish*, 410 U.S. at 670.

---

of material fact exist. He recognizes, however, the simple fact that this Court may determine otherwise. Reges accordingly no more waived the ability to note this by proceeding on summary judgment than did the University. Should the Court determine there are, in fact, material factual disputes (such as over the "disruption" the University claims), it may vacate the decision below on that basis and order any necessary further proceedings.

That dovetails with an important consideration on the employer's side of the *Pickering* balance the district court ignored, *see* Op. Br. § II.A, the employer's mission. *See Hernandez*, 43 F.4th at 966. Here, the University's mission is, verbatim: "the preservation, advancement, and dissemination of knowledge." Vision & Values, Univ. of Wash.[6] Yet as this Court will note, the word "mission" appears nowhere in the district court's *Pickering* analysis. Am. Order at 19–21.[7]

This is critical, because given its mission, the University's interest in avoiding offense by limiting the free flow of ideas is low. If anything, "efficient provision of services by a State university[]" depends in no small part on "dissemination … of controversial speech implicating matters of public concern." *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir.

---

[6]   Available at https://www.washington.edu/about/visionvalues (last visited Jan. 9, 2025).

[7]   Defendants are wrong that the district court sufficiently "acknowledged the special role that universities play in fostering the exchange of ideas," based on the fact that it applied the *Pickering* balancing test. Ans. Br. 37. But bare invocation of *Pickering* isn't sufficient—the test requires accurately measuring the respective speaker and university interests, so the district court's failure to examine the specific mission of the academy constituted error. *Supra* § I.A.

1994) (discussing law school's mission). In fact, "conflict is not unknown" on a university campus precisely *because* professors educate partly by challenging students and colleagues with new ideas. *Hulen v. Yates*, 322 F.3d 1229, 1239 (10th Cir. 2003). That is why this Court has acknowledged the "'discomfort and unpleasantness that always accompany an unpopular viewpoint[]' is not an interest sufficiently compelling" under *Pickering. Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975) (quoting *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 509 (1969)); *see also Meriwether*, 992 F.3d at 510 (Students "gain new maturity and understanding" from different views).

Worse still, a government employer acting on the basis of offense is unconstitutional viewpoint discrimination, because "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243 (plurality op). As this Court has held in the public employee context, subjective umbrage such as feeling "intimidated, shocked, upset, angry, scared, frustrated," or "outraged [and] offended" is merely "the disruption that necessarily accompanies controversial speech." *Dodge*, 56 F.4th at 782–83 (cleaned up) (applying *Pickering*, 391 U.S. 463). Ultimately, against Reges's "powerful" speech interest, *Meriwether*, 992 F.3d at 510, the University's interest in

21

avoiding offended students or staff cannot tip the *Pickering* balance in its favor.

### 2. Professor Reges suffered retaliatory adverse employment actions because of his speech.

The University also tries to downplay its punishment of Professor Reges, Ans. Br. 25, but the severity of adverse employer action plays no role in *Pickering*'s interest balancing. And to the extent the University does not just misapply *Pickering* but also means to dispute whether Reges suffered adverse employment action—an issue the district court never reached—that argument fails, on the law and on the facts.

An act of retaliation by a government employer "need not be severe" to violate an employee's First Amendment rights. *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 750 (9th Cir. 2010) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003)). The relevant inquiry is simply whether the government's actions "reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter*, 320 F.3d at 970. This is a low bar: Even making fun of an employee for bringing a birthday cake to the office for a colleague can be adverse action. *Bart v. Telford*, 677 F.2d 622, 624–25 (7th Cir. 1982), *cited*

22

*approvingly in Allen v. Scribner*, 812 F.2d 426, 434 n.17 (9th Cir. 1987) (under *Bart*, even insubstantial incidents can be adverse employment action).

The speed and severity of the University's actions speaks for themselves. Administrators unilaterally scrubbed Professor Reges's statement from the online Winter 2022 syllabus within hours of learning of it. 3-ER-440; 3-ER-430–31. Administrators then opened a competing course to siphon students from his class, 3-ER-391–92, a move unprecedented in Professor Reges's twenty-year career at the University. 3-ER-486, 499. Administrators also emailed his class roster to *encourage* formal complaints against him so administrators could "take action." 3-ER-435–36; 3-ER-450. And after Professor Reges informed colleagues he intended to include his statement in his Spring 2022 syllabus, the University received just two more complaints. 3-ER-567–68; 3-ER-510. But administrators used them to launch a lengthy investigation—and continue to threaten disciplinary action if others complain in the future. 3-ER-578–79; 2-ER-88.

These are actions far more serious than birthday cake taunts. Both "unwarranted disciplinary investigation" and the "threat of disciplinary

23

action" can qualify as adverse employment actions. *Coszalter*, 320 F.3d at 976. So, too, can creating "shadow sections" of a professor's course, like the University did with Professor Reges's introductory computer science courses. *See Levin v. Harleston*, 966 F.2d 85, 88 (2d Cir. 1992) (affirming injunctive relief on professor's First Amendment retaliation claim where college created "shadow classes … with the intent and consequence of stigmatizing" him). This makes sense. If a professor feared they would be investigated,  disciplined, or lose their classes for a particular opinion, they are unlikely to voice it.

Here, the University jeopardized Professor Reges's livelihood by siphoning away his students, investigating him under a policy that by its own terms allows suspension or termination,[8] and threatening future

---

[8] 3-ER-416–25. These actions differ from *amicus* Washington State University's self-touted screening process for student or faculty complaints. Br. of Wash. State Univ. as *Amicus Curiae* in Support of Defs.-Appellees and Affirmance at 14. WSU writes as if a university's ability to investigate acts of discrimination is at issue in this litigation. It is not. It is undisputed Professor Reges never discriminated against students. The University never so much as accused him of such, and Defendants admit they have no reason to believe he ever did, or would, treat students unfairly or retaliate against them. 2-ER-73–74; 2-ER-85. Rather, the University investigated him because it, and complaining

24

investigation. Far from "minor restrictions" as the University claims, Ans. Br. 23, these sanctions suffice to "chill or silence a person of ordinary firmness." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

## II. Basic Rules of Statutory Interpretation and Constitutional Scrutiny Doom the University's Executive Order 31.

The University's sanctioning of Professor Reges is exacerbated by use of an unconstitutional policy that the district court erred in failing to invalidate under the First Amendment. That policy, EO-31, bars harassment, discrimination, and retaliation by any member of the University community. And if it stuck to those offenses as defined in case law cabining them to constitutional limits, it might have a chance at withstanding First Amendment scrutiny. But its express language extends far beyond that, reaching any conduct—including pure speech—that the University deems "unacceptable or inappropriate, *regardless of whether*" it rises to the level of unlawful harassment, discrimination, or retaliation. 3-ER-518 (emphasis added). Because EO-31 expressly extends University

_____

students and faculty, disagree with his viewpoint on land acknowledgments.

disciplinary authority beyond the law's limits, vesting administrators with the power to subjectively punish even lawful speech, the policy is unconstitutionally overbroad and vague. *See* Opening Br. § III.A-B.

The University faults Professor Reges's focus on the "single clause" banning "unacceptable or inappropriate" conduct "regardless of whether it comprises constitutionally proscribable harassment or discrimination. Ans. Br. 49. But that's where the policy's constitutional defect lies. Rather than defending that express language, the University asks that the Court construe it as prohibiting only "unacceptable or inappropriate" conduct "closely resembling" harassment or discrimination. *Id.* at 50. But that's not what the policy says, and courts may not rewrite the plain text of a rule or statute. *United States v. Stevens*, 559 U.S. 460, 481 (2010) (rejecting, in First Amendment challenge to federal animal cruelty law, proposed government limiting construction that would have "require[d] rewriting, not just reinterpret[ing]" the statute). Under Washington law,[9] when "words … are clear and unequivocal," this Court must "assume the

---

[9] This Court applies state statutory construction rules in construing state law. *In re Lares*, 188 F.3d 1166, 1168 (9th Cir. 1999).

26

[drafter] meant exactly what it said and apply the [rule] as written." *Duke v. Boyd*, 942 P.2d 351, 354 (Wash. 1997) (en banc) (citations omitted).

Even were that not the law, the proffered limiting construction is *itself* unconstitutionally overbroad, which the University's application of the policy to Professor Reges illustrates. As explained above, its pursuit of Reges boils down to sanctioning language that the University deems offensive. *See supra* § I.C.1. And allowing attempts, like the University's here, to equate offensive speech with conduct "resembling harassment" necessarily sweeps in a vast amount of lawful expression, including protected political and religious speech. "After all, much political and religious speech might be perceived as offensive to some." *Morse v. Frederick*, 551 U.S. 393, 409 (2007).

Nor does the proposed limiting construction resolve the policy's unconstitutional vagueness. Punishing speech that "resembles" prohibited conduct merely replaces one vague, subjective standard for another. What "resembles" harassment or discrimination is left for students and faculty to guess at, and administrators to arbitrarily decide. *See* Opening Br. 56 (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (regulations of speech must allow those of ordinary intelligence to understand what is

proscribed)); *id.* at 57 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (noting that vague speech restrictions invite arbitrary and discriminatory enforcement)). Similarly, "unacceptable" and "inappropriate" remain vague and standardless, *especially* without a tether to legal definitions of harassment and discrimination.

EO-31 is unconstitutionally overbroad in either case because banning "unacceptable" and "inappropriate" speech exceeds a public university's lawful authority to punish harassment and discrimination. In affirming an injunction barring enforcement of a university policy that banned "inappropriate" flyers, this Court explained that "inappropriate" lacks "a core of readily identifiable, constitutionally proscribable speech." *Flores v. Bennett*, 2023 WL 4946605, at *1 (9th Cir. Aug. 3, 2023). The same logic applies to "unacceptable," which necessarily turns on the sensibilities of what a government enforcer finds "acceptable." Because political and social sensibilities differ, proscribing undefined terms like "unacceptable" and "inappropriate" will likely cover and chill "a substantial amount of protected speech." *Id.* at *2. This Court should, accordingly, follow *Flores* to hold EO-31 unconstitutionally overbroad.

EO-31 is also significantly overbroad because its reach dwarfs its legitimate sweep of preventing unlawful harassment and discrimination. Under *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), a public institution may be liable under Title IX only for deliberate indifference to conduct "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the [school's] educational opportunities or benefits." *Id.* at 650. Beyond setting a liability standard, the *Davis* Court understood itself as "defin[ing] the scope of the behavior that Title IX proscribes," *id.* at 639, and circuit courts across the country consistently apply *Davis* to evaluate the constitutionality of policies that govern harassment.[10] The University objects to *Davis* as controlling[11] but offers no viable basis for this Court to part company with sister circuits.

---

[10] *See, e.g.*, *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 358–59 (8th Cir. 2020) (applying *Davis*); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37, 337 n.16 (5th Cir. 2020), as revised (Oct. 30, 2020) (same); *Abbott v. Pastides*, 900 F.3d 160, 164 (4th Cir. 2018) (same); *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008) (same).

[11] Ans. Br. 55–56. If, as the University argues, *Davis* was not the applicable standard, then Executive Order 31, by prohibiting "unacceptable or inappropriate" speech, is a content-based restriction because it "applies to particular speech because of the topic discussed or

Just last week, the U.S. District Court for the Eastern District of Kentucky vacated new federal Title IX regulations for departing from *Davis*. *Tennessee v. Cardona*, No. 2:24-072, 2025 WL 63795, at *4 (E.D. Ky. Jan. 9, 2025).[12] The court explained that changing "severe and pervasive" to "severe *or* pervasive," inserting elements of subjective offense, and requiring only "limits" on, rather than deprivations of, access to educational opportunities resulted in an overbroad and vague rule that "goes far beyond" the *Davis* standard. *Id.* EO-31, meanwhile, blows past such departures from *Davis*'s language to instituting a capacious ban on "unacceptable or inappropriate" speech "regardless of whether" it constitutes illegal harassment or discrimination.

---

the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Content-based speech regulations are subject to strict scrutiny, which the University has the burden of satisfying, *id.*, which it makes no effort to do.

[12] That court, and several others, had previously issued preliminary injunctions against enforcement of the regulations in about half the states across the country. *See, e.g.*, *Alabama v. U.S. Sec'y of Educ.*, 24-12444, 2024 WL 3981994, at *1 n.2, *5 (8th Cir. Aug. 22, 2024) (granting states' motion for injunction of rule pending appeal as it "flies in the face of *Davis*," and listing other courts to enjoin its enforcement). The recent decision vacates the rules nationwide. *See Cardona*, 2025 WL 63795, at *6–7.

30

Under *Davis*, Professor Reges's parody land acknowledgment cannot credibly be interpreted as even resembling speech that is "so severe, pervasive, and objectively offensive" that it "effectively denie[s] equal access" educational opportunities. *Davis*, 526 U.S. at 651. Either the policy does not proscribe speech like Professor Reges's parody land acknowledgment—meaning the University never should have censored and punished him in the first place—or it does, and thus extends far beyond *Davis*'s express limitations in violation of the Constitution.

Finally, the University's reliance on *Hernandez* is misplaced. Ans. Br. 54 (citing *Hernandez*, 43 F.4th at 980–83). In *Hernandez*, this Court upheld a police department's policy prohibiting its officers from posting social media messages detrimental to its functions or that undermined public confidence in the department. *Id.* Its holding rests on the government interest in maintaining not only discipline and cohesion among ranks of police, but also public trust that they will enforce the law in an even-handed way—both of which could be harmed by statements from on- or off-duty officers. *Id.* That kind of discipline and rank-and-file cohesion is not applicable to the university setting, where "vigorous exchange of ideas and resulting tension between an administration and

31

its faculty is as much a part of college life as homecoming and final exams." *Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001). *Hernandez* does nothing to bolster the constitutionality of EO-31, nor do any of the University's other arguments on behalf of it.

## CONCLUSION

Professor Reges respectfully requests that the Court reverse the grant of Defendants-Appellees' motion for summary judgment on his retaliation and viewpoint discrimination claims and their motion to dismiss his vagueness and overbreadth claims, and that it direct entry of summary judgment for Professor Reges on all of his claims.

Dated: January 13, 2025

*/s/ Joshua T. Bleisch*
JOSHUA T. BLEISCH
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. Suite 340
Washington, DC 20003
Tel: (215) 717-3473
josh.bleisch@thefire.org

SARA BERINHOUT
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 717-3473
sara.berinhout@thefire.org

*Attorneys for Plaintiff-Appellant*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  24-3518

I am the attorney or self-represented party.

**This brief contains**  6,075  **words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/Joshua T. Bleisch     **Date**  1/13/2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

33